UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

-----------------------------------------------------------------------x
STATE OF NEW JERSEY, DEPARTMENT OF
TREASURY, DIVISION OF INVESTMENTS  BY
TREASURER JOHN E. McCORMAC, on behalf of the
COMMON PENSION FUND A, DCP EQUITY FUND,
DCP SMALL CAP EQUITY FUND, SUPPLEMENTAL
ANNUITY COLLECTIVE TRUST FUND,
NJ BEST POOLED EQUITY FUND, and TRUSTEES
FOR THE SUPPORT OF PUBLIC SCHOOLS FUND,

                   Plaintiffs,

       v.

TYCO INTERNATIONAL LTD., L. DENNIS
KOZLOWSKI, MARK H. SWARTZ,  MARK A.
BELNICK, PRICEWATERHOUSECOOPERS, LLP,
PRICEWATERHOUSECOOPERS, FRANK E. WALSH,
JR.,  RICHARD S. BODMAN, JOHN F. FORT, III,
JAMES S. PASMAN, JR., and WENDY E. LANE,

                  Defendants.

-----------------------------------------------------------------------x

Civ. No. 03-1337-B

MDL No. 1335

**<u>AMENDED COMPLAINT</u>**

The State of New Jersey, Department of Treasury, Division of Investments, by Treasurer John E. McCormac, on behalf of the Common Pension Fund A, DCP Equity Fund, DCP Small Cap Equity Fund, Supplemental Annuity Collective Trust Fund, the NJ Best Pooled Equity Fund and the Trustees for the Support of the Public Schools Fund (collectively, "Plaintiffs") allege the following based upon the investigation conducted by and through their undersigned attorneys, except as to those paragraphs relating to Plaintiffs or their purchases of the securities of defendant Tyco International, Ltd. ("Tyco" or the "Company"). Those allegations are alleged upon Plaintiffs' personal knowledge. The investigation of Plaintiffs' counsel has included, but has not been limited to, the following: (a) the review and analysis of the filings made by Tyco with the United States Securities and Exchange Commission ("SEC"); (b) the review and analysis of Tyco press releases; (c) the review and analysis of the newspaper, magazine and other periodical articles identified in the Complaint; (d) the review and analysis of the pleadings in certain civil litigations, regulatory proceedings and criminal actions brought against the individual defendants named herein by Tyco, the SEC and the District Attorney's Office for New York County (the "Manhattan D.A."); and (e) interviews of potential witnesses in this action.

## I.

## SUMMARY OF CLAIMS

1.       Shareholders entrust their investments to corporate officers and directors with the knowledge that those individuals have the highest fiduciary obligations of good faith, fair dealing, loyalty, due care and disclosure. As a further check upon the fidelity of those fiduciaries, the shareholders of publicly-traded companies rely upon certified public accountants, whose job it is to audit companies' financial statements and declare that their financial disclosures comply with generally accepted accounting principles ("GAAP").

2.     This case involves the total collapse of that system of checks and balances upon the conduct of corporate fiduciaries.  As all the world now knows, the senior executive officers and directors of defendant Tyco pillaged the Company at a breathtaking rate while simultaneously concealing from investors the grossly excessive compensation they were paying themselves and their own criminal conduct.

3.     All of the defendants named herein (collectively, "Defendants") exploited the trust reposed in them by Tyco shareholders.  These Defendants include: L. Dennis Kozlowski, Tyco's former Chairman of the Board and Chief Executive Officer, whose repeated misrepresentations concerning Tyco's financial performance and his theft of Tyco funds to finance his lavish lifestyle have made him the poster boy for corporate greed; Mark H. Swartz, Tyco's former Executive Vice President and Chief Financial Officer, who likewise authorized the issuance of materially misleading representations concerning Tyco's financial results and who personally enriched himself at the expense of Plaintiffs and other Tyco shareholders; Mark A. Belnick, Tyco's former Executive Vice President and Chief Corporate Counsel, who authorized the release of financial information concerning Tyco's operations that he knew was  materially false as a result the theft of Tyco funds by him and other Tyco executives; and former Tyco director Frank E. Walsh, Jr., who also actively participated in and benefitted from the theft of Tyco funds and the dissemination of materially misleading statements concerning that theft.

4.     While the scale of the Defendants' misconduct was massive, the manner in which they perpetrated their unlawful scheme was simple in nature.

5.     For example, the "Officer Defendants" (Kozlowski, Swartz and Belnick) used Tyco loan programs as a corporate piggybank for their personal enrichment.  Those loan programs were designed exclusively for limited uses such as financing home purchases by Tyco

employees forced to sell their primary homes and to relocate to other Tyco locations or financing the purchase of Tyco stock.

6. Nevertheless, the Officer Defendants, with the knowing assistance of the other Defendants, utilized those loan programs (which provided for interest-free loans in many circumstances) to finance a flurry of personal expenditures on everything from real estate purchases that did not fit within the terms of Tyco's loan programs to lavish expenditures on art work and furnishings.

7. On many occasions, the Officer Defendants thereafter arranged by fiat to have their loan balances reduced by millions of dollars. As a result, it is apparent that each of the Defendants either knew or was recklessly unaware that the Officer Defendants were paying themselves grossly excessive compensation and that Defendants' statements regarding such matters were materially misleading.

8. The larceny committed by the Officer Defendants could not have been accomplished had defendants PricewaterhouseCoopers and PricewaterhouseCoopers, LLP (collectively, the "PWC Defendants"), the international accounting firms that were responsible for auditing Tyco's financial statements, performed even the most rudimentary audit procedures prior to certifying the financial statements issued by Tyco each year as compliant with GAAP.

9. At best, the PWC Defendants were supine lapdogs rather than the corporate watchdogs investors reasonably expected them to be. More probably, the PWC Defendants were knowing participants in an early contender for the fraud of the century. As Lynn Turner, the former Chief Accountant of the SEC, has stated in discussing the misconduct alleged herein, "[T]his is called fraud. . . How the hell do you do that and not have PricewaterhouseCoopers find it?"

10.     Similarly, Defendants Richard S. Bodman, John F. Fort, III, James S. Pasman, Jr. and Wendy E. Lane, the members of the Tyco Audit Committee during some or all of the time period in which Plaintiffs invested in Tyco stock (the "Audit Committee Defendants"), failed miserably in their duty to ensure that Tyco made accurate disclosures to Plaintiffs and other investors regarding such critical matters as the compensation paid to the Company's officers and the related-party transactions in which Tyco engaged. Although the transactions through which the Officer Defendants and Walsh enriched themselves were, for the most part, reflected in large, obvious entries in Tyco's financial records, the Audit Committee Defendants failed to so much as question the reasons why Tyco's officers were receiving hundreds of millions of dollars in unauthorized and grossly excessive compensation.

11.     Moreover, Defendants' unlawful conduct was by no means limited to making materially false and misleading representations concerning the compensation received by the Officer Defendants and Walsh. To the contrary, Tyco has now conceded that Defendants made repeated misrepresentations concerning, among other critical matters: Tyco's quarterly and annual financial results; the quality of the Company's accounting controls and policies; the manner in which Tyco accounted for the hundreds of acquisitions that it conducted during the time frame in which Plaintiffs purchased Tyco stock; the restructuring and merger reserves that Tyco created in connection with those acquisitions and later employed to inflate the Company's reported financial results; Tyco's liquidity; and the Company's future prospects.

12.     In many cases, the impropriety of Defendants' disclosures regarding those matters was nearly as obvious as their materially misleading statements concerning the compensation paid to the Officer Defendants and Walsh and Tyco's related-party transactions. Tyco has conceded that Defendants made huge accounting entries in obviously improper accounts. The

Company has also acknowledged that Defendants engaged in a longtime pattern of unduly aggressive accounting that had the purpose and effect of inflating Tyco's reported financial results. Moreover, Tyco has stated that the Company's reported financial results were the product of grossly deficient accounting controls and procedures although Swartz, the Audit Committee Defendants and the PWC Defendants were all specifically charged with assessing the adequacy of those controls.

13. While somewhat less sensational than Defendants' pillaging of Tyco, Defendants' false representations concerning Tyco's financial results and prospects also inflicted severe injury upon Plaintiffs. That injury could easily have been avoided if any Tyco officer or director or either of the PWC Defendants had even approached satisfying their obligations to undertake reasonable efforts to assure that the disclosures made to Tyco investors were accurate.

14. Tragically, thousands of investors have fallen prey to Defendants' wrongdoing and unmitigated greed. Plaintiffs, who include certain pension funds operated for the benefit of current and former employees of the State of New Jersey and a fund that invested certain assets to be utilized to help finance New Jersey's public schools, are among the most sympathetic of those investors for two reasons. First, Plaintiffs have lost well over a hundred million dollars as a result of Defendants' misconduct. Second, the beneficiaries of the Plaintiff funds are, quite literally, the widows, pensioners and children who are victimized in literature's finest tales of greed run amuck.

15. Like other investors, Plaintiffs, by necessity, placed heavy reliance upon the willingness and ability of Tyco's corporate officers, directors and auditors to safeguard the interests of Tyco and its shareholders. That reliance proved devastating to Plaintiffs. When the egregious misconduct committed by Defendants was belatedly disclosed, Tyco stock plummeted

in value because of the scope of Defendants' wrongdoing and the fact that breaches of trust by corporate fiduciaries inevitably exert a dramatic negative impact upon the market prices of publicly-traded securities.

16.     Many of the purchases of Tyco stock made by Plaintiffs between July 1997 and May 2002 in reliance upon the Defendants' fidelity and the accuracy of their disclosures were at prices that exceeded $55.00 per share. Once investors learned that the Company's management had utilized Tyco as a personal piggybank and made repeated misrepresentations concerning their conduct and Tyco's financial performance and prospects, that stock dropped to as low as $6.98 per share.

17.     As a result, the funds controlled by Plaintiffs and the thousands of current and former New Jersey employees and New Jersey school children who are the beneficiaries of those funds, have suffered over $100 million in damages. Because those damages are the direct and proximate result of the misconduct in which Defendants engaged, Plaintiffs have commenced this action to recover damages and other appropriate relief.

## II.

## JURISDICTION AND VENUE

18.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78aa, because Plaintiffs assert claims arising under Sections 10(b), 14(a) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78n(a) and 78t(a)), and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5). In addition, the Court has jurisdiction over this action pursuant to § 22 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77v, because Plaintiffs assert

claims for violation of §§ 11, 12 and 15 of the Securities Act. The Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

19.    Venue is proper in this District because Plaintiffs have been ordered to pursue their claims here by the Judicial Panel on Multi-District Litigation. Furthermore, venue would initially have been proper in this District under Section 27 of the Exchange Act because Tyco maintain offices in this district. Furthermore, many of the alleged acts and transactions, and much of the conduct constituting violations of law, including the issuance and dissemination to the investing public of materially false and misleading information, occurred, at least in part, in this District and the District of New Jersey, where this case was originally filed.

20.    In connection with the acts alleged in this Complaint, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the mails, telephone communications, and the facilities of the national securities exchanges. Defendants' actions had a significant impact upon interstate commerce, including causing Plaintiffs and other investors to purchase Tyco securities over national securities exchanges and causing Plaintiffs to suffer damages when Defendants' unlawful actions were belatedly disclosed.

## III.

## THE PARTIES

### A.    Plaintiffs

21.    Plaintiff the State of New Jersey, Department of Treasurer, Division of Investments (the "Division of Investment") is a division of the New Jersey Department of the Treasury. The Division of Investment, under the direction of the State Investment Council, has investment responsibility for all funds administered by the State of New Jersey Division of Pensions and Benefits. The Division of Investment administers each of the following Funds that

purchased Tyco common stock and were damaged by Defendants' unlawful conduct: Common Pension Fund A, DCP Equity Fund, DCP Small Cap Equity Fund, Supplemental Annuity Collective Trust Fund, N. J. Best Pooled Equity Fund and the Trustees for the Support of Public Schools Fund.

22.     Plaintiff Common Pension Fund A ("Fund A") is an equity investment pension fund managed by the Division of Investment.  Fund A invests contributions from various state pension trust funds including the Public Employee Retirement System ("PERS"), the Police and Fireman's Retirement System ("PERS"), the State Police Retirement System, and the Teachers' Pension and Annuity Fund ("TPAF").

23.     Plaintiff DCP Equity Fund is a deferred compensation equity investment pension fund managed by the Division of Investment.

24.     Plaintiff DCP Small Cap Equity Fund is a deferred compensation small capital equity investment pension fund managed by the Division of Investment.

25.     Plaintiff Supplemental Annuity Collective Trust Fund is an investment pension fund managed by the Division of Investment.

26.     Plaintiff N. J. Best Pooled Equity Fund is an investment pension fund managed by the Division of Investment.

27.     Plaintiff Trustees For the Support of Public Schools Fund is an equity investment fund containing assets to be utilized by the New Jersey public schools that is managed by the Division of Investment.

28.     Plaintiffs made various purchases and sales of Tyco common stock on the dates and in the amounts specified in the attached Exhibit A.

29.     As a direct and proximate result of their purchases of Tyco securities, Plaintiffs have suffered many millions of dollars in damages.  Plaintiffs purchased Tyco securities at prices that were materially inflated as a result of the misrepresentations, omissions and other unlawful conduct alleged herein.  Moreover, Plaintiffs suffered enormous economic losses when the market prices of those securities collapsed following the belated revelation that Defendants had engaged in the unlawful conduct specified herein.

**B.     Defendants**

30.     Defendant Tyco is incorporated in Bermuda to avoid the payment of certain taxes that would be payable if it were incorporated in the United States.  According to the *Boston Globe*, just 19 of Tyco's 242,500 employees work in Bermuda. Tyco's principal United States subsidiary has its office at 273 Corporate Drive, Suite 100, Portsmouth, New Hampshire.  Tyco also maintains offices in the District of New Jersey at 60 Colombia Road, Morristown, New Jersey.

31.     Tyco is a diversified manufacturing and services company.  During the relevant time period of , Tyco designed, manufactured and distributed electronic and electrical components, undersea cable communications systems, disposable medical supplies, fire detection and suppression systems, electronic security systems and other products.

32.     Defendant Kozlowski was the Company's CEO from July 1993 until June 3, 2002, and Chairman of the Board beginning in July 1997.  Kozlowski "resigned" from his positions at Tyco on June 3, 2002, because he was soon to be indicted for tax evasion by the Manhattan D.A.

33.     Defendant Swartz was Tyco's Executive Vice President and Chief Financial Officer from 1995 through September of 2002.  Swartz, too, left Tyco in shame as a result of his

participation in the unlawful schemes developed by Defendants to enrich themselves at the expense of Tyco shareholders.

34.     Defendant Belnick was Tyco's Executive Vice President and Chief Corporate Counsel from 1998 through June of 2002, when he was fired as a result of his refusal to cooperate with an internal Tyco probe of the excessive compensation paid to the Officer Defendants.  Since his termination, Tyco has revealed that Belnick also received tens of millions of dollars in unauthorized compensation in connection with the unlawful conduct alleged herein during his tenure as Tyco's highest-ranking legal officer.

35.     Defendant Walsh is a resident of New Jersey.  Walsh was a Tyco director from 1997 through February 2002, during which time he also became the "Lead Director" of Tyco's board.  He was also a director of a predecessor of Tyco from 1992 to 1997.  Walsh was forced to resign from the Tyco Board as a result of his participation in an unlawful scheme pursuant to which the Officer Defendants agreed to pay Walsh a massive $20 million fee for performing the limited "service" of introducing Kozlowski to an executive of an acquisition candidate although he was already obligated to perform such "services" because of his status as a Tyco director and fiduciary.

36.     During the time period relevant to Plaintiffs' claims, the Audit Committee Defendants – Richard S. Bodman, John F. Fort, III, James S. Pasman, Jr. and Wendy E. Lane – were members of the Audit Committee of Tyco's Board of Directors.  Fort was a member of the Audit Committee from 1997 through 2002.  Pasman was a member of the Audit Committee from 1997 through 2000.  Bodman was a member of the Audit Committee from at least 1998 until 2002.  Lane was a member of the Audit Committee from at least 2000 through 2002.

37.     By virtue of their roles as members of the Board and/or as the Company's highest-ranking executives, defendants Kozlowski, Swartz, Belnick, Walsh, Bodman, Fort, Pasman and Lane were "control persons" of Tyco as that term is utilized in § 20(a) of the Exchange Act. These defendants are collectively referred to as the "Individual Defendants."

38.     Defendant Kozlowski was able to exercise control over Tyco's operations because he was the Company's highest-ranking executive.  As a result, Kozlowski served as the Company's primary voice in all press releases and interviews and actively participated in the day-to-day management of Tyco's affairs.

39.     Defendant Belnick was able to exercise control over Tyco's operations because he was the Company's General Counsel at the time of Defendants' material misrepresentations and omissions and other unlawful conduct.  In that role, Belnick was directly involved in all aspects of the day-to-day management of Tyco's affairs and the misconduct alleged herein.

40.     Defendant Swartz was able to exercise control over Tyco's operations because he was the Company's highest-ranking financial officer during the time Plaintiffs' purchases of Tyco securities were made.  As a result, he was intimately involved in all aspects of the day-to-day management of Tyco's operations and the misrepresentations and omissions concerning the Company's operations, financial results and compensation plans that are the subject of Plaintiffs' claims.  Swartz also prepared the Company's false and misleading financial statements, participated in the drafting of the Company's financial disclosures, supervised and drafted material portions of the Company's SEC filings and signed certain of the SEC filings described herein.

41.     As Tyco's "Lead Director," Walsh served as the primary liaison between Tyco's management and the Company's independent directors.  Walsh also served as a member of the

Board's Corporate Governance, Nominating and Compensation Committees. Through these various positions, Walsh was actively involved in the management of Tyco and had the ability to exercise control over Tyco's operations.

42.     The Audit Committee Defendants were able to exercise control over Tyco's operations because they signed the SEC Form 10-Ks in which the Company's financial statements were disclosed to investors and were actively involved in and oversaw the Company's accounting policies and procedures, including the manner in which the Company publicly reported its executive compensation. Indeed, the Charter of Tyco's Audit Committee reserved to the members of that committee important roles in formulating Tyco's system of financial controls and in developing the financial disclosures made by the Company.

43.     Tyco, the Officer Defendants and the Audit Committee Defendants are collectively referred to herein as the "Tyco Defendants."

44.     The issuance of the false, misleading and incomplete information concerning Tyco that was conveyed to Plaintiffs and other investors in Tyco securities resulted from the collective actions of the Tyco Defendants. The Tyco Defendants served as the Company's public spokespersons, participated in drafting, reviewing and disseminating the false and misleading statements and information alleged herein, oversaw the Company's accounting policies and procedures and were aware of the material adverse facts that rendered those statements false and misleading.

45.     PricewaterhouseCoopers ("PWC-Bermuda") is an accounting firm based in Hamilton, Bermuda. PWC-Bermuda is a member of PricewaterhouseCoopers International, a "membership company" based in the United Kingdom. In conjunction with PWC LLP, PWC-Bermuda conducted the audits of Tyco's year-end financial statements for the 1997-2001 fiscal

years.  PWC-Bermuda signed the clean audit opinions affixed to each set of those financial statements.

46.     Defendant PricewaterhouseCoopers LLP ("PWC LLP") is an accounting firm based in the United States, with its principal place of business located at 1177 Avenue of the Americas, New York, New York 10036, and regional offices located throughout the country.

47.     While PWC-Bermuda signed all of the audit opinions attached to Tyco's financial statements for the 1997-2001 fiscal years, and was therefore responsible for the content of those reports, PWC LLP actually performed the overwhelming majority of Tyco's auditing work.

48.     Tyco has also acknowledged in the following SEC filings, among others, that PWC LLP is the Company's auditor and was responsible for the issuance of the audit reports issued by the PWC Defendants, as alleged below: the Proxy Statement filed by Tyco with the SEC on February 7, 2003; the 10-Q/A for the quarter ended June 30, 2002 filed by Tyco with the SEC on December 31, 2002; the 10-K filed by Tyco with the SEC on December 30, 2002; and the 10-Q filed by Tyco with the SEC on August 14, 2002.

49.     PWC LLP also acknowledged that it was Tyco's auditor in a February 18, 2002 letter from PWC LLP to Audit Committee Chairman John Fort that was attached as an exhibit to a Form 8-K filed by Tyco with the SEC on February 26, 2002.  The letter to Fort was signed by Rick Scalzo, a partner in the Boston office of PWC LLP.  The Scalzo letter stated:

> As you know, we meet with you and the other members of the Audit Committee periodically to discuss our worldwide audit approach and areas of audit focus for the purpose of our overall annual audit of Tyco International Ltd. ("Tyco" or the "Company").  Our audits of the consolidated financial statements of Tyco as of September 30, 2001 and 2000, and for the three years ended September 30, 2001 comprised audit test and procedures deemed necessary for the purpose of expressing an opinion on such financial statements taken as a whole.  We conducted our audits of these statements in accordance with auditing standards generally accepted in the United States of America, which require that we plan and perform the audit to obtain reasonable assurance about whether the financial

-13-

statements are free of material misstatements. For none of the periods referred to above, or for any other period, did we perform audit tests for the purpose of expressing an opinion on individual balances of accounts or summaries of selected transactions, and accordingly, we express no opinion thereon. As a reminder, the financial statements of the Company are the responsibility of the Company's management; our responsibility is to express an opinion on these financial statements based on our audits.

One of the areas of our audit focus on Tyco relates to business combinations. The nature of the procedures that we perform related to any specific business combination is dependent on the nature and materiality of the transaction. Each significant business combination may have unique characteristics, and accordingly we exercise independent judgment as to what audit procedures related to any specific business combination are necessary to support our audit opinion on the financial statements of Tyco taken as a whole.

50.     In addition, PWC LLP stated in the Form 10-K/A filed by Tyco with the SEC on December 31, 2002 that the audit report concerning Tyco's financial statements that was "dated October 18, 2001, except as to Note 31 which is as of December 18, 2001" was issued by PWC LLP.

51.     Similarly, PWC LLP acknowledged that PWC-Bermuda's audit reports were, in effect, the opinions of PWC LLP in a Form S-4 Registration Statement filed by Tyco with the SEC on May 22, 2002. In that SEC filing, PWC LLP explicitly adopted the audit report of PWC-Bermuda dated October 18, 2001 by stating:

We hereby consent to the incorporation by reference in this Amendment No. 1 to the Registration Statement on Form S-4 of Tyco International Ltd. of our report dated October 18, 2001, except as to Note 31 which is as of December 18, 2001, relating to the financial statements and financial statement schedule, which appears in Tyco International Ltd.'s Annual Report on Form 10-K for the year ended September 30, 2001. We also consent to the reference to us under the heading "Experts" in such Registration Statement.

52.     During Tyco's fiscal 2001, Tyco paid the PWC Defendants more than $51.1 million, including at least $37.9 million for consulting, advisory, tax and accounting services and $13.2 million in auditing fees.

## IV.

## DEFENDANTS' UNLAWFUL PILLAGING OF
## TYCO AND MATERIALLY FALSE AND MISLEADING
## DISCLOSURES CONCERNING THAT CONDUCT

53.     Throughout the time period in which Plaintiffs invested the savings of New Jersey

pension fund participants and money intended to be utilized in the New Jersey public schools in

Tyco securities, Defendants made a series of misrepresentations and omissions concerning Tyco

that had the effect of inflating the prices at which the Company's securities traded or of

maintaining the prices of those securities at artificially high levels.

54.     During the same time period, Defendants engaged in an unlawful conspiracy to

enrich themselves at the expense of Plaintiffs and other investors by engaging in a wide variety

of misconduct that violated the federal securities laws, the statutes of New Jersey and New

Hampshire and the common law.

55.     As a result of Defendants' misconduct: (a) defendant Walsh pled guilty to

violating § 352-c(6) of the New York General Business Law, a felony statute that makes it

unlawful to "intentionally engage[] in fraud" or to "make[] any material false representation or

statement with intent to deceive or defraud" while "inducing or promoting" the sale of securities;

(b) the Officer Defendants have been universally derided by investors and the general public as

the poster boys of corporate greed; (c) there are currently a number of criminal and regulatory

investigations under way concerning the Officer Defendants' conduct, including criminal

prosecutions of each of them being pursued by the Manhattan D.A., and ongoing investigations

being conducted by the Committee on Energy and Commerce of the United States House of

Representatives, the United States Attorney for the District of New Hampshire and the Bureau of

Securities Regulation of the State of New Hampshire.

56.     Tyco has acknowledged the egregious and obvious nature of the Officer Defendants' misconduct.  For example, in an 8-K filed by the Tyco Defendants with the SEC on September 10, 2002 (the "September 8-K"), Tyco stated that: the Officer Defendants engaged in "improper and unlawful conduct"; the amount of money stolen by those Defendants "is very large"; and their unlawful conduct continued for over five years.

### A.     The Significant Role Played By The PWC Defendants In The Tyco Defendants' Unlawful Conduct

57.     The PWC Defendants played prominent roles in the Officer Defendants' efforts to enrich themselves at the expense of Tyco shareholders and to mislead investors concerning that conduct and Tyco's financial results and prospects.

58.     The PWC Defendants (or their predecessor firm of Coopers & Lybrand) jointly served as Tyco's outside auditors throughout the time period in which Plaintiffs invested in Tyco stock.

59.     Most of Tyco's accounting services were performed by PWC LLP's Boston office, where the Tyco account was headed by partners Rick Scalzo and John O'Connor.  Nevertheless, PWC-Bermuda played a significant role in performing those accounting services.  Indeed, PWC-Bermuda signed all of the audit reports issued by the PWC Defendants between 1997 and 2002.

60.     Even with respect to those audit reports, however, PWC LLP maintained control over the content of the PWC Defendants' public statements concerning Tyco's operations.  PWC-Bermuda issued audit reports only after lengthy consultation with PWC LLP and only after PWC LLP directed PWC-Bermuda to do so.  In the absence of either the auditing work performed by PWC LLP or PWC LLP's express instructions to issue those audit reports, PWC Bermuda would not have done so.

61.     The PWC Defendants' involvement in Tyco's operations and public disclosures extended well beyond performing annual audits and issuing reports concerning those audits.

62.     Prior to Tyco issuing any public statement concerning its quarterly financial results, Tyco's proposed results were disclosed to the PWC Defendants, the PWC Defendants performed significant due diligence concerning the those results and the PWC Defendants approved the content of the financial disclosures made by the Tyco Defendants to investors.  In light of the location of Tyco's operations (only a minuscule portion of the Company's operations are in Bermuda) and the disclosures made by Tyco concerning the role played by the PWC Defendants in Tyco's financial disclosures, the market justifiably assumed that any statement made by either of the PWC Defendants concerning Tyco was, in effect, the joint statement of both PWC Defendants.

63.     Likewise, before Tyco issued any public statement concerning the compensation paid to the Officer Defendants, those proposed disclosures were reviewed by the PWC Defendants, the PWC Defendants performed substantial due diligence concerning the proposed disclosures and the PWC Defendants approved the content of those disclosures.  In particular, the disclosures specified herein that appeared in Tyco's Form 10-Ks and Proxy Statements concerning the Officer Defendants' compensation and the related-party transactions in which the Tyco Defendants engaged were reviewed and approved by the PWC Defendants prior to their disclosure.

64.     Indeed, the Officer Defendants and defendant Walsh have asserted in various criminal proceedings brought by the Manhattan D.A. that it was the PWC Defendants' responsibility to gather all of the available information concerning the compensation paid to

Tyco's officers and directors and that they fully cooperated with the PWC Defendants in formulating those disclosures.

**B. The Unlawful And Undisclosed Walsh Compensation Scheme And Defendants' Materially False And Misleading Representations Concerning The Compensation Paid To Walsh**

65.     The first of Defendants' numerous unlawful schemes that was belatedly disclosed to Tyco shareholders was the grossly excessive payment of $20 million that the Officer Defendants conspired to pay to defendant Walsh and a charity of his choice for the minimal service of introducing Kozlowski to the Chairman of The CIT Group ("CIT"), a large financial services company.

66.     In early 2001, Walsh, who was at the time Tyco's "Lead Director" (a position in which he served as the principal liaison between Tyco's management and Board), proposed that he introduce Kozlowski to the Chairman and CEO of CIT after a discussion at a Tyco Board meeting in which management expressed its interest in purchasing a financial services company.

67.     At the time Walsh proposed to make that introduction, he was obligated to do so as a result of the fiduciary obligations that he owed to Tyco and its shareholders.  As a result, the Tyco Board did not contemplate that Walsh would be paid for making his introduction.

68.     Following the introduction of Kozlowski and the CIT Chairman facilitated by Walsh, negotiations led to an agreement for Tyco to acquire CIT.  That transaction closed in June of 2001.

69.     After the terms of the CIT transaction had been agreed upon, Kozlowski, Walsh and Swartz agreed that Tyco would pay Walsh a secret $20 million fee for his role in the transaction.  Walsh and the Officer Defendants decided not to disclose that massive fee to investors.

70.     Tyco made a number of filings with the SEC in which Defendants were obligated to, but did not, disclose the $20 million Walsh fee.  For example, Defendants affirmatively stated that no fee of the kind received by Walsh would be paid in the following three SEC filings: the Form S-4 that Tyco filed with the SEC on March 29, 2001, relating to a proposed merger between CIT and a Tyco subsidiary (the "March 2001 CIT S-4"); an amendment to that document on Form S-4/A that Tyco filed with the SEC on April 13, 2001 (the "April 2001 CIT S-4/A"); and a Prospectus related to that transaction that Tyco filed with the SEC on April 24, 2001 (the "April 2001 CIT Prospectus").

71.     Specifically, Defendants falsely stated in those documents as follows:

Except for Lehman Brothers and Goldman, Sachs & Co., the fees and expenses of which will be paid by Acquiror, there is no investment banker, broker, finder or other intermediary that has been retained by or is authorized to act on behalf of Acquiror or Guarantor who might be entitled to any fee or commission from Acquiror, Guarantor or any of their respective affiliates in connection with the transactions contemplated by this Agreement.

72.     Similarly, the agreement between Tyco and Dai-Ichi Kangyo Bank, Ltd. (the holder of 71 million shares of CIT's common stock) that was an exhibit to the April 2001 CIT S-4/A falsely stated:

No broker, finder or investment banker other than Lehman Brothers Inc. is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Purchaser.  Purchaser is solely responsible for the fees and expenses of Lehman Brothers Inc.

73.     Defendants also made materially false and misleading disclosures regarding the unlawful $20 million payment to Walsh in the Company's 2001 10-K, which was filed with the SEC on or about December 28, 2001.  In that SEC filing, Defendants stated that, in connection with the CIT acquisition: (a) Tyco Industrial incurred "$29.2 million in acquisition related costs" that "were reflected on Tyco Capital's Consolidated Balance Sheet as a contribution by Tyco in

accordance with 'push-down' accounting for business combinations"; and (b) "$22.3 million was paid by Tyco Industrial for acquisition related costs and have been reflected on Tyco Capital's Consolidated Balance Sheet as an additional capital contribution." Those representations were materially false and misleading because Defendants failed to disclose that the costs associated with the CIT acquisition included the $20 million payment made to Walsh.

74. According to the September 8-K, Kozlowski and Walsh agreed that they should conceal this payment from the Board and, as a result, none of Tyco's directors (other than Kozlowski, Swartz and Walsh) was aware of the Walsh payment until early January 2002. Tyco has claimed in its SEC filings that, at that time, the remaining Tyco directors confronted Kozlowski and Walsh and demanded that the money be returned immediately.

75. When Walsh refused, he was not re-nominated for election to the Board, and his term expired as of the 2002 annual meeting. The Board never ratified the Walsh payment. Rather, it set in motion an investigation into the conduct of Walsh, Kozlowski and Swartz that culminated in the disclosure of the Officer Defendants' systematic looting of the Company.

76. Tyco belatedly disclosed the improper payments made to Walsh in a Proxy Statement filed with the SEC on January 28, 2002 (the "2002 Proxy").

77. The disclosure of that payment received significant attention in the financial press and was the subject of public outcry regarding Defendants' misconduct and failure to make required disclosures to shareholders. As a result, Tyco's stock price fell approximately 20% from $42 to $33.65, reducing the Company's market capitalization by $16.7 billion in one day.

78. Even at that late juncture, however, the Tyco Defendants continued to mislead investors concerning the reasons for the enormous payment made to Walsh, rather than

disclosing that the Board had never approved the payment of that fee. For example, the January 29, 2002 edition of *The Wall Street Journal* stated:

> Tyco spokeswoman Maryanne Kane said Tyco's board decided, without any outside help, that the $20 million payment was "appropriate based on the amount of work" Mr. Walsh did, which she said included providing guidance, advice and facilitating meetings.

A Tyco press release of that same date quoted defendant Kozlowski as saying, "The Board felt that fee was appropriate in light of Mr. Walsh's efforts."

79. On June 17, 2002, Tyco sued Walsh in the Southern District of New York for his misconduct in connection with the CIT transaction and the disclosures made to investors in connection with that deal. Tyco has alleged claims for restitution, breach of fiduciary duty and inducing breach of fiduciary duty, conversion, and unjust enrichment.

80. That civil suit was the least of Walsh's legal problems. On December 17, 2002, the SEC filed a settled civil action in the Southern District of New York, alleging that Walsh violated the federal securities laws by signing a Tyco registration statement that failed to disclose his $20 million finder's fee.

81. Walsh was also indicted by the Manhattan D.A.'s office for, among other offenses, violating § 352-c(6) of the New York General Business Law. That statute makes it unlawful to "intentionally engage[] in fraud" or to "make[] any material false representation or statement with intent to deceive or defraud" while "inducing or promoting" the sale of securities.

82. On December 17, 2002, Walsh pled guilty to violating that felony statute. Thus, Walsh has already admitted that he intentionally engaged in securities fraud.

83. In connection with that guilty plea, Walsh was required to repay the $20 million that he unlawfully pilfered from Tyco, to pay a $2.5 million fine, to resign from all of the boards

of directors of public companies on which he sat and to enter a consent decree with the SEC that barred him from serving on for-profit boards of directors.

84.     During his allocution, Walsh admitted that the fee that he received from Tyco was for providing "investment banking or finder's" services.  He stated that he "intentionally did not disclose to any of the members of the Board, other than Kozlowski and Swartz, that [he] stood to receive a substantial fee if the transaction was approved."

85.     Walsh also admitted that, "[f]ollowing the Board's approval, a securities filing was done by Tyco in which the Company omitted to disclose that I was to get a fee.  That made the filing false."

## C.     The Unlawful And Undisclosed Compensation Paid To The Officer Defendants

86.     Pursuant to applicable disclosure principles and SEC regulations, including FASB Statement No. 57 and SEC Regulation S-X, Defendants were required to make detailed periodic disclosures to investors concerning all compensation paid to Tyco's directors and officers, any loans made to those persons and other related-party transactions between Tyco and those executives and directors.

87.     Among other information concerning such transactions, Defendants were obligated under FASB Statement No. 57 to set forth:

> A description of the transactions, including transactions in which no amounts or nominal amounts were ascribed, for each of the periods for which income statements are presented, and such other information deemed necessary to an understanding of the effects of the transactions on the financial statements.

88.     As is alleged in detail below, during the time period in which Plaintiffs invested in Tyco securities, Defendants' disclosures regarding such matters were grossly deficient and materially misleading.  Among other matters, Defendants made materially false and misleading disclosures or omitted material facts concerning: (a) unauthorized Tyco relocation loan

programs; (b) unauthorized Tyco loan forgiveness programs; (c) unauthorized use of Tyco's Key

Employee Loan ("KEL") program; (d) unauthorized bonus programs relating to Tyco's

acquisition and sale of other companies; and (e) other unlawful compensation and personal

benefits paid to the Officer Defendants – all of which cost Tyco hundreds of millions of dollars.

89.     While the Walsh compensation scheme resulted in a dramatic decline in the

market prices of Tyco securities at the time it was belatedly disclosed to investors, that adverse

effect paled in comparison to the devastation wreaked upon Tyco by the belated disclosure of the

manner in which the Officer Defendants had pillaged Tyco for their own gain.

      **1.**      **Defendants' Unlawful Conduct And False And Misleading
Disclosures Concerning The Compensation Paid To The
Officer Defendants Pursuant To The New York "Relocation"
Scheme And The Florida "Relocation" Scheme**

90.     One principal undisclosed method that the Officer Defendants utilized to enrich

themselves at the expense of Tyco shareholders was taking large, no-interest "relocation" loans

from Tyco.  As Tyco concedes in the September 8-K, "certain executive officers used the

relocation program to receive non-qualifying loans and unauthorized benefits that were not

generally available to all salaried employees affected by relocations, or were not related to any

Tyco relocation, enriching themselves with no colorable benefit to Tyco."

91.     Unequivocal SEC regulations require companies to disclose loans to senior

executives that amount, in aggregate, to over $60,000.  Those regulations mandated that

Defendants disclose those loans in Tyco's SEC filings.  Throughout the time period in which

Plaintiffs invested in Tyco securities, Defendants failed to fulfill those straightforward

obligations.

92. The thievery of Kozlowski and Swartz through the use of "relocation loans" was set in motion in March of 1995, when they initiated a "relocation program" to serve Kozlowski's desire to move his offices from Exeter, New Hampshire to Manhattan.

93. After Kozlowski proposed a relocation program that would only have benefitted five or six Tyco executives, Tyco's counsel rejected that proposal because it would have had to be disclosed to Tyco shareholders as compensation paid to those executives.

94. As a result, the Company adopted a broader relocation program that was designed not to discriminate in favor of the Company's officers and directors. After that program was approved by the Tyco Board, however, Kozlowski implemented a different, more generous relocation plan, tailored to the individual circumstances of five or six executives and one assistant (the "New York Plan"). The unauthorized New York Plan was nearly twice as generous to Kozlowski, Swartz and Belnick as the relocation plan that was approved by the Tyco Board.

95. The unauthorized New York Plan permitted reimbursement of school tuition, and provided for "gross-up" payments of additional compensation to offset the taxes due on imputed income from the program.

96. After Tyco's 1997 reverse merger with ADT Ltd., a company that conducted its U.S. operations from Boca Raton, Florida, Kozlowski and Swartz adopted a second relocation program through which they stole additional money from Tyco (the "Florida Plan"). That generous plan for executives was maintained in the files of Tyco's then-Treasurer, while a Board-authorized Florida relocation plan was maintained in the files of the Company's Human Resources Department.

97. Kozlowski was, by far, the biggest abuser of the Tyco "relocation" programs. The September 8-K summarizes Kozlowski's unauthorized borrowing from the Company as follows:

a.    $7,011,669 in interest free loans for purported New York relocations that did not qualify under the New York Plan;

b.    $29,756,110 in interest free loans for the acquisition of property under the unauthorized Florida Plan; and

c.    $24,922,849 in interest free loans for the acquisitions of other properties that were not authorized by any relocation program.

98.    Of that total amount of $61,690,628 in unauthorized interest free "relocation" loans, Kozlowski: repaid $21,697,303 without interest; bestowed $19,439,392 in authorized loan forgiveness upon himself; and reclassified $20,553,933 to other loan accounts maintained by him with the Company.

99.    Exhibit B hereto is a chart that was set forth in the September 8-K that details the undisclosed, interest-free "relocation loans" improperly taken by Kozlowski.

100.    While not quite as large as the loans taken by Kozlowski, the unauthorized loans received by Swartz from Tyco were also extravagant and improper.

101.    According to the September 8-K, Swartz took the following illegal loans:

a.    $7,668,750 in interest free loans for property acquisitions in New York and New Hampshire in March of 1996 under the unauthorized New York Plan;

b.    $20,992,000 in interest free loans under the unauthorized Florida Plan between 1997 and 2000; and

c.    $4,437,175 in interest-free loans for the acquisition of other properties that were not authorized by any relocation program.

102.    Of the $33,097,925 in unauthorized, interest free relocation loans obtained by Swartz, $10,786,977 was repaid by him without interest, $9,792,000 was repaid through loan

"forgiveness" that Kozlowski was not authorized to bestow, and $12,518,948 was reclassified to other loan accounts that Swartz maintained with the Company.

103.    Exhibit C hereto is a chart that was set forth in the September 8-K that details the undisclosed, interest-free "relocation loans" improperly taken by Swartz.

104.    According to the September 8-K, Belnick also used the unauthorized version of the New York Plan to borrow approximately $4,217,000 from September 1998 through May 2001 for the purchase and improvement of a cooperative apartment in New York City.  Belnick claimed those benefits under the New York Plan although he lived less than 50 miles from the address of his new apartment and had worked in New York City prior to purchasing the apartment (factors that disqualified him from participating in any Tyco relocation program). Belnick also improperly used the unauthorized relocation program to pay his rent for several months while his new apartment was being renovated.

105.    In 2001 and 2002, Belnick incurred an additional $10,418,599 in "relocation" debt to purchase land and build a chalet in the ski resort community of Park City, Utah.  Belnick then charged Tyco $1,600 per month for his home office located in that house although Tyco maintains no corporate offices in Utah, and Belnick was not requested to relocate to Utah.  The September 8-K states that Belnick's indebtedness "was not incurred through an authorized employee relocation plan available generally to all salaried employees, and as such was not exempt from disclosure in the Company's proxies" and that "[t]here was no colorable benefit to Tyco for any of Belnick's loans."

106.    Furthermore, in a complaint filed by Tyco against Belnick in federal court (the "Belnick Complaint"), the Company states:

> Tyco never adopted a relocation program to Utah. Second, Tyco has no offices in
> Utah to which Belnick could be said to be relocating . . ., Belnick did not even

execute the various documents called for by the Company's legitimate relocation plans, and there is no corporate document that even arguably purports to authorize Belnick's Utah loan. In fact, the only documentation of the loan is a series of promissory notes, signed only by Belnick, which total over $10 million.

107.     Nevertheless, like the unauthorized loans taken by Kozlowski and Swartz, Belnick's massive borrowing was never disclosed to the Company's investors.

108.     Rather, Defendants made a series of affirmative statements concerning the compensation paid to Kozlowski, Swartz and Belnick that were grossly misleading as a result of Defendants' failure to disclose those Defendants' abuse of Tyco's relocation programs.

109.     Furthermore, Defendants' abuse of Tyco's relocation loan programs extended into the ranks of the Company's mid-level managers. According to the September 8-K, as of June 30, 2002, there was $3.8 million in loans to Tyco "segment-level" managers outstanding under Tyco's relocation program. Of that amount, $3.2 million, or 84% of the total outstanding, did not conform to the requirements of the loan programs.

### 2.     Defendants' Failure To Disclose The Unauthorized TyCom Bonus Scheme

110.     After the Officer Defendants incurred massive debts to the Company by means of the unauthorized real estate loans discussed above, they engaged in a number of additional unlawful schemes designed to eliminate much of the interest-free debt that they had incurred to the Company.

111.     The first such unlawful scheme introduced by the Officer Defendants involved the initial public offering ("IPO") of Tyco's TyCom subsidiary in September 2000 (the "TyCom Scheme").

112.     In order to facilitate the TyCom Scheme, in early September 2000, Kozlowski falsely informed Tyco's Senior VP of Human Resources that, in addition to cash and share bonuses for the successful completion of the TyCom IPO, the Board had decided to forgive all of

the relocation loans made to the Tyco employees who had relocated to Florida in 1998. He exacerbated his misconduct by falsely representing that the Board agreed to "gross-up" the benefits, making each employee whole on an after-tax basis for the forgiveness of the loans. In effect, he falsely represented that the Company would both forgive the loans and pay all income taxes associated therewith.

113. When the Human Resources executive requested a memorandum for her files documenting those purported Board decisions, Kozlowski provided her and Swartz (her direct supervisor) with a memorandum from Kozlowski that indicated that "a decision has been made to forgive the relocation loans for those individuals . . . whose efforts were instrumental to successfully completing the TyCom IPO."

114. Pursuant to the TyCom Scheme, which the September 8-K states was not authorized by the Tyco Compensation Committee, $56,415,037 in loan forgiveness was provided to 51 Tyco employees. Including the "gross up" benefits that Kozlowski stated had been authorized, the TyCom Scheme cost Tyco $95,962,000, of which amount Kozlowski received $32,976,000 and Swartz received $16,611,000.

115. In an effort to conceal his unlawful conduct from investors, Kozlowski also directed the Human Resources executive to obtain confidentiality agreements from each of the employees who benefitted from the TyCom Scheme providing that the breach thereof would result in forfeiture of the award. The purported justification for those agreements was that morale would be diminished if information about this generous benefit were made available to the public.

116. Normally, executive compensation would have appeared in Tyco's financial statements as part of the Company's selling, general and administrative expenses. Tyco,

however, accounted for the TyCom bonus in three different accounts totaling $97.4 million. Approximately $44.6 million of the total was incorrectly booked as part of the TyCom offering expense.

117.    The other $52.8 million was not counted as an expense at all. Rather, Tyco hid that sum in two reserve accounts that had been previously established on the Company's balance sheet for unrelated purposes. The majority of the money, $41 million, was booked against "Accrued Federal Income Tax," in effect reducing sums that Tyco had put aside to pay its federal corporate taxes. The remainder of the bonus payments, approximately $11.8 million, was offset against a balance sheet account called "Accrued G&A Expenses," an account intended to offset previous over-accruals of General and Administrative Expenses. Defendants' distribution of these payments to various places in the balance sheet demonstrates their intention to conceal those payments.

118.    By hiding the TyCom Scheme payments in this manner, Defendants also made it impossible for Plaintiffs and other investors to determine that the enormous bonuses had been paid. In addition, by disguising the bonuses as "non-recurring charges," Defendants were able to inflate Tyco's earnings before non-recurring charges, a primary measure by which Tyco's financial performance was gauged by investors.

119.    In a September 30, 2002 *Wall Street Journal* article discussing the TyCom bonus payments, a number of leading accounting experts commented upon the obvious impropriety of the accounting for those bonuses.

120.    For example, Charles Mulford, an accounting professor at Georgia Institute of Technology stated, "This looks like blatant misstatement of both the income statement and the balance sheet." Mulford noted that Defendants' maneuvers improperly inflated Tyco's pretax

income by $52.8 million in the fourth quarter of fiscal 2000. He also called Defendants' recording of the expense in the income tax reserve account particularly "egregious," and said "it would be very surprising if it wasn't picked up by the auditors."

121. Those sentiments were echoed by Lynn Turner, the former Chief Accountant at SEC. According to Turner, the TyCom Scheme was particularly obvious because auditors typically look closely at such items as tax accounts and big one-time gains, and thus should have spotted the bonus payments easily because of their highly suspicious nature. In the October 14, 2002 issue of *Business Week*, Turner was quoted as stating, "I can't understand how they missed that one." Likewise, the September 30, 2002 *Wall Street Journal* article quoted Turner as stating, "[T]his is called fraud. . . How the hell do you do that and not have PricewaterhouseCoopers find it?"

122. The September 8-K also notes that "[a]ll of the forgiveness benefits were individually reported on separate W-2s, yet none of the income associated with the forgiveness benefits was reported in the Company's proxies."

123. Thus, Defendants made a series of affirmative statements concerning the compensation paid to Kozlowski, Swartz and Belnick that were grossly misleading as a result of Defendants' failure to disclose those Defendants' participation in the unlawful TyCom Scheme.

**3.      Defendants' Failure To Disclose The Unauthorized ADT Automotive Scheme**

124. Those benefits were not sufficient, however, to satisfy the Officer Defendants.

125. During the first quarter of Tyco's fiscal 2001 – just a few weeks after implementing the unauthorized TyCom Scheme – Kozlowski provided 16 of the Company's executives with additional bonuses and "relocation" payments as a purported result of their

contributions to the successful divestiture of Tyco's ADT Automotive business (the "ADT Scheme").

126. Each of the recipients of those purported relocation benefits had already recovered all of the grossed-up costs associated with their supposed relocations as part of the nearly $100 million unauthorized TyCom Scheme.

127. The total of the additional ADT Automotive cash bonuses and "relocation" benefits were $3,979,000 and $32,009,641, respectively. In forwarding those payments to the Company's executives, Kozlowski claimed that the amounts listed were reviewed and approved by the Chairman of Tyco's Compensation Committee. According to the September 8-K, that representation was false.

128. Kozlowski and Swartz each received millions of dollars at the time of the distribution of the unauthorized ADT Automotive distribution.

129. Kozlowski and Swartz also directed that those costs be offset against the unrelated gain accrued by Tyco on the disposition of the ADT Automotive business. Again, that accounting treatment was obviously incorrect. Thus, the erroneous nature of the entries on Tyco's financial statements were, or should have been, obvious to all of the Defendants, particularly the PWC Defendants.

130. As was the case with the TyCom Scheme, the unauthorized benefits paid in connection with the ADT Scheme were individually reported on separate 2000 W-2s. None of these benefits were disclosed to Tyco's investors, however. Thus, Defendants' representations concerning the compensation paid to Kozlowski and Swartz were also materially misleading as a result of Defendants' failure to disclose the unlawful ADT Scheme.

**4. Defendants' Failure To Disclose The Unlawful Flag Telecom Scheme**

131.     On June 22, 2001, Tyco acquired 15 million shares of Flag Telecom Holdings Ltd. ("Flag"), a telecom company, for $11,421,810 in cash and 5,580,647 TyCom shares.

132.     The Company reported a $79,364,700 gain associated with the swap of TyCom shares for Flag equity.  As a result of that purported "gain," certain Tyco officers and directors, including Kozlowski and Swartz, received accelerated vesting of restricted shares.

133.     Contrary to the claim that the Flag transaction produced a "gain" for Tyco, the deal actually resulted in the Company suffering substantial losses.  As *The New York Times* reported in its September 2, 2002 issue, Verizon sold to Tyco 15 million Flag shares with a market value $74.4 million when the deal closed on June 22.

134.     In exchange, Tyco paid $11.4 million in cash and 5.6 million shares of TyCom. At the June 22 price, those TyCom shares were worth $89.3 million, and the total consideration paid by Tyco for the Flag shares was therefore $100.7 million.  Thus, simple mathematics demonstrates that Tyco suffered a $26.3 million loss in connection with the transaction.

135.     Nevertheless, as *The New York Times* reported in the September 2, 2002 article, Tyco reported a $79.5 million profit on the Flag Telecom transaction by employing some accounting machinations in order to justify the bonuses paid to the Officer Defendants.

136.     In particular, Defendants rationalized reporting a gain in connection with the Flag transaction by claiming that the Flag stock that Tyco acquired was worth the amount paid by Tyco.  In fact, however, at the time the transaction closed, the Flag stock that Tyco obtained was worth far less than the consideration paid by Tyco for the stock.  That was the case because the consideration paid by Tyco was set based upon the trading price of Flag stock during a five-day period chosen by Verizon pursuant to the terms of a deal struck between Verizon and Tyco in April of 2000.

137.     In addition, when Tyco bought the Flag shares, it calculated its profit by treating Flag stock as being worth $7.60 per share, even though Flag stock closed that day at $4.96.

138.     Furthermore, at the time Verizon exercised its option to force the sale of Flag stock to Tyco, the cost basis of the TyCom shares used by Tyco to pay part of the transaction price was less than the market value of those shares. Thus, Tyco computed that the transaction had produced a profit by claiming that it received more for its TyCom shares than the amount of the Company's cost basis in those shares.

139.     Ultimately, however, Tyco was left holding equity in an entity that went bankrupt soon after the Company's acquisition of the Flag equity was completed.

140.     Furthermore, the September 25, 2002 *New York Times* article noted that Tyco reported a $64.1 million gain on the Flag transaction, rather than the $79.4 million gain that was appropriate using Tyco's chosen accounting methodology, in order to hide $15.4 million of the unlawful bonuses paid in connection with the deal as transaction costs, rather than executive compensation, as would have been appropriate.

141.     Each of the executives who received restricted shares based upon the false assertion that Tyco had produced a massive "gain" in connection with the Flag transaction sold the shares back to the Company's Newington subsidiary on June 20, 2001. Immediately thereafter, those executives received wire transfers to their personal accounts based upon the purported justification that the transaction resulted in the $79 million gain for Tyco.

142.     After the Officer Defendants had authorized the payment of the Flag transaction-related bonuses, the Compensation Committee approved and certified the vesting of 290,000 shares for Kozlowski and Swartz only on October 1, 2001 "in conjunction with the gain . . ." on the transaction. The total cost to the Company related to the award of these shares was

$15,378,700. By the end of the last quarter in Tyco's 2001 fiscal year (September 30, 2001), and, therefore, prior to the Compensation Committee's October 1, 2001 approval, the value of the Flag stock decreased substantially, to the point that it was impaired.

143. According to the September 8-K, neither Kozlowski nor Swartz, who were both members of the Board during this time period, disclosed this impairment or the full circumstances of the Flag transaction to the Compensation Committee. More importantly, they never disclosed to investors and potential investors that they had succeeded in advancing their personal interests at the expense of Tyco in this manner.

144. In the Complaint that Tyco filed against Kozlowski in federal court (the "Kozlowski Complaint"), the Company provided the following damning summary of the TyCom, ADT Automotive and Flag bonus schemes employed by Kozlowski and Swartz to loot Tyco:

> The combined cost of these unauthorized "special bonus" programs - TyCom Forgiveness Program ($95,962,653), the ADT Automotive Bonus ($55,954,455), and Flag Vesting ($15,378,700) - cost the Company over $167,295,808. None of these programs was properly approved by the Board or its Compensation Committee. The net benefit from these combined programs accrued overwhelmingly to Kozlowski and permitted him to realize more than $66,760,551 in undisclosed income in less than twelve months.

145. None of the benefits paid to Swartz and Kozlowski pursuant to the unlawful Flag Telecom Scheme were disclosed to Plaintiffs. Thus, Defendants' representations concerning the compensation paid to Kozlowski and Swartz were also materially misleading as a result of Defendants' failure to disclose the Flag Telecom Scheme.

**5. The Unlawful And Undisclosed "KEL" Loan Scheme**

146. Kozlowski and the other Officer Defendants also abused a Tyco "Key Employee Loan Program" that was intended to encourage ownership of Tyco common shares by executive

officers and other key employees. The program was intended to provide loans ("KEL" loans) on favorable terms so that officers would pay taxes due upon the vesting of shares granted under Tyco's restricted share ownership plan without having to sell the shares at the time of vesting to pay the resultant tax liability.

147.    Although the Officer Defendants were well aware of the authorized uses for KEL loans, the September 8-K concedes that, starting no later than 1997, the Officer Defendants "used KEL loans for purposes other than the payment of taxes due upon the vesting of restricted shares, borrowed more than the limits allowed under the program's terms, or both." The September 8-K also claims that "[n]either the Compensation Committee nor the Board of Directors was aware of any non-program loans or loans in excess of program limits."

148.    The September 8-K also acknowledges that Kozlowski "borrowed funds for purposes other than those stated in the KEL program and used the KEL program like an unlimited line of credit. In addition to taking non-program loans, Kozlowski borrowed in excess of the KEL program's limits."

149.    A chart setting forth the KEL loans taken by Kozlowski and his total loan balances between April 1, 1996 and June 30, 2002 (including both authorized program uses and non-authorized, non-program loans) is attached hereto as Exhibit D. Balances after August 31, 1999 reflect the effect of a $25 million unauthorized credit that has been reversed by Tyco and all balances thereafter should be adjusted accordingly.

150.    As was revealed in the September 8-K, by August of 1999, Kozlowski had taken $55.9 million in KEL loans, 90% of which did not satisfy the program's criteria. By June 30, 2002, Kozlowski's balance in unauthorized KEL loans was approximately $43,841,000, plus accrued interest.

151.    The September 8-K summarizes Kozlowski's unlawful abuse of the KEL program as follows:

> Because Mr. Kozlowski generally abandoned his investment in the Company by selling substantially all of his restricted shares when they vested (or shortly thereafter - thus violating both the spirit and the letter of the KEL program), all of his loans are now due and payable. As described above, Mr. Kozlowski was indicted on September 12, 2002 for using the KEL loan program as a vehicle for misappropriating millions of dollars from Tyco. Mr. Kozlowski's total principal outstanding balance under the KEL program (including adjustments for improperly classified loans), as of June 30, 2002, was approximately $43,841,000, plus accrued interest.

152.    Swartz also took tens of millions of dollars in unauthorized KEL loans.  In a complaint filed by the SEC against Swartz in federal court (the "SEC Complaint"), the SEC states (based upon documentation provided by Tyco) that Swartz took $85 million in KEL loans between 1997 and 2002, although he utilized just $13 million of that amount for the sole authorized purpose of KEL loans – paying taxes on his sales of Tyco stock.

153.    A chart setting forth the KEL loans taken by Swartz and his total loan balances between January 1, 1996 and June 30, 2002 (including both authorized program uses and non-authorized, non-program loans) is attached hereto as Exhibit E.  Balances after August 31, 1999 reflect the effect of a $12.5 million unauthorized credit that has been reversed by Tyco and all balances thereafter should be adjusted accordingly.

154.    Furthermore, Tyco acknowledged in the September 8-K that, as Tyco's CFO, Swartz "was responsible for approving and monitoring the KEL loans of senior management, including Mr. Kozlowski's KEL loans.  As such, he was aware of the nature and extent of Mr. Kozlowski's loans."

155.    The September 8-K summarizes Swartz's abuse of the KEL program as follows:

> Mr. Swartz also generally abandoned his investment in the Company by selling substantially all of his restricted shares when they vested or shortly thereafter –

thus violating both the spirit and the letter of the KEL program. As described above, Mr. Swartz was indicted on September 12, 2002 for conspiring with Mr. Kozlowski to use the KEL loan program as a vehicle for misappropriating millions of dollars from Tyco. Mr. Swartz's total principal outstanding balance under the KEL program (including adjustments for improperly classified loans), as of July 18, 2002 was approximately $2,853,025, plus accrued interest.

156. In August 1999, at the direction of Kozlowski and Swartz, entries were made in Tyco's KEL records that purported to reduce $25,000,000 of Kozlowski's outstanding KEL indebtedness, $12,500,000 of Swartz's KEL indebtedness, and $1,000,000 of the KEL indebtedness of another Tyco employee. Tyco is currently seeking to recover those amounts in its civil lawsuit against Kozlowski and an arbitration proceeding Tyco has brought against Swartz.

157. Tyco has conceded in the September 8-K that Belnick was aware of Kozlowski's abuse of the KEL loan program. According to that document, Belnick personally approved language in Tyco's SEC filings that gave varying descriptions of how the KEL loan program was being used by Kozlowski without disclosing Kozlowski's abuse of that program. In addition, the September 8-K reveals that, during the week of June 3-7, 2002, Belnick agreed that it was wrong for Kozlowski to use the KEL program for purposes other than to facilitate his retention of Tyco stock.

158. Despite these abuses of Tyco's KEL program, Defendants never disclosed the Officer Defendants' conduct to investors. Rather, they continually made false representations concerning the compensation paid to the Officer Defendants, the KEL program and the Officer Defendants' balances under that program. Thus, Defendants' disclosures concerning the compensation paid to the Officer Defendants and Tyco's related-party transactions were materially misleading for this additional reason.

**6.     The Unlawful And Undisclosed Belnick Compensation Scheme**

159.    Defendant Belnick also received a number of forms of compensation that were not disclosed to the Company's shareholders.

160.    SEC rules require companies to disclose in their Proxy Statements the compensation of their CEOs and their four highest-paid executive officers. The determination of who are the four highest-paid executive officers is made by reference to total annual salary and bonus, not other forms of remuneration. For this purpose, SEC rules allow a company in limited circumstances not to count the distribution or accrual of a large amount of cash compensation (such as a bonus) that is not part of a recurring arrangement and which is unlikely to continue.

161.    On August 19, 1998 (a month before Belnick began working at Tyco), Kozlowski sent Belnick a letter describing Belnick's proposed compensation. The version of that letter given to the Company's personnel department, and represented to be the agreement with Belnick, described Belnick's cash compensation as:

> - a base salary of $700,000 per year;
> - a sign-on bonus of $300,000;
> - a guarantee cash bonus of $1,500,000 the first year; $1,000,000 the second year; and $1,000,000 the third year, with your first bonus payable with our fiscal year end September 30, 1999.

162.    The letter agreement also entitled Belnick to 100,000 restricted Tyco shares (with a then-market value of over $5 million), vesting over three years, and 500,000 options (with a then fair market value in the millions), also vesting over three years.

163.    On the date that agreement was reached, however, Belnick and Kozlowski executed another agreement that was far more generous to Belnick. That version of Belnick's agreement was kept by him in a file entitled "Tyco Compensation." In that agreement, Kozlowski assured Belnick that, "in any event, your annual cash bonus will not be less than 1/3 of mine."

164.    Belnick's version of the Kozlowski letter also included two additional paragraphs not in the version of the letter represented to the Tyco personnel department to be the agreement with Belnick.  Those paragraphs provided:

> You will also be entitled to participate in and benefit from (proportionate to your position) all existing and future benefit plans and programs that are available for senior executive officers of the Company.  Accordingly, among other benefits, you will be entitled to participation in Tyco's relocation program to New York City, participation in the Company's 401(k) Plan, the use of a car and either a Company loan or a re-load of restricted shares in connection with your tax liability on the same of previously restricted shares.

> If for any reason the relationship does not work out to your or the Company's satisfaction and you leave the Company prior to September 30, 2001, the Company will pay you until then your base salary and guaranteed cash bonuses, less the sign-on bonus, (regardless of your income or earnings from other employment).  You would also retain in full the sign-on bonus, restricted shares (whether or not still restricted) and your stock options.

165.    The undisclosed version of the August 19, 1998 letter purported to increase Belnick's compensation substantially by tying Belnick's compensation to Kozlowski's, giving him access to millions in zero-interest loans, and guaranteeing Belnick's compensation (including cash bonuses and stock) regardless of how long Belnick worked for Tyco or the circumstances under which he departed from the Company.

166.    Due to the rich terms of Belnick's undisclosed compensation agreements with Kozlowski, Belnick's actual compensation in 1999, 2000 and 2001 was as follows:

a.    1999 – $700,000 base salary, $1,500,000 guaranteed bonus, $179,990 in loan interest forgiveness, $3,388,258 in restricted stock vesting and $1,906,799 in proceeds from the exercise of stock options (of a total of 1,000,000 options granted) for total compensation (after adjustments for deferred compensation and other matters, but excluding unexercised stock options) of $6,916,004;

b.     2000 – $750,000 base salary, $2,000,000 guaranteed bonus (though $1,000,000 was reclassified as a "special bonus"), $2,000,000 in another "special bonus," $231,445 in loan interest forgiveness, $197,485 in gross-up payments to compensate for taxes on the imputed income from his loan interest forgiveness, $6,035,803 in restricted stock vesting, and new options to purchase 200,000 shares of stock for total compensation (after adjustments for deferred compensation and other matters, but excluding unexercised stock options) of $10,442,331;

c.     2001 – $762,500 base salary, $50,000 in an undefined "special bonus," $300,010 in loan interest forgiveness, $255,420 in gross-up payments to compensate for taxes on the imputed income from his loan interest forgiveness, $15,592,042 in restricted stock vesting, and more options to purchase 200,000 shares of stock for total compensation (after adjustments for deferred compensation and other matters, but excluding unexercised options) of $16,973,344.

167.     Because Belnick's 2000 compensation made him one of the Company's four-highest paid executives other than Kozlowski, he was obligated to disclose that compensation in the Company's 2001 Proxy Statement and other SEC filings.  In conjunction with the other Defendants, however, Belnick conspired to, and did, avoid making those required disclosures.

168.     Belnick's efforts to conceal his compensation required the manipulation of the bonus income that he received from the Company in 2000.  In July of that year, Belnick demanded and received a $2 million "special bonus" for his role in bringing about the conclusion of an SEC investigation of Tyco's accounting policies and a purported guaranteed minimum annual bonus of $2 million (for a total of $4 million).

169.     Even standing alone, the $2 million guaranteed minimum annual bonus would have made Belnick one of Tyco's four highest paid executives other than Kozlowski.

Nevertheless, Belnick repeatedly caused Tyco to make filings with the SEC that did not disclose significant portions of the compensation that he received from Tyco. In addition, Belnick made enormous sales of Tyco stock without disclosing that he was receiving large amounts of unauthorized compensation from Tyco as a result of unlawful side deals that he cut with Kozlowski.

170.    Belnick sought to conceal his actual compensation by causing Tyco's HR department to record his 2000 bonuses as being comprised of $3 million in special bonuses, and only a $1 million guaranteed bonus. In particular, Belnick caused $1 million of the purported $2 million guaranteed bonus to be characterized as a special bonus related to a transaction with TyCom. As a result of that reclassification, $3 million of the bonus income received by Belnick was considered non-recurring and was thus excluded from the computation of Tyco's four highest-paid executives, dropping Belnick out of that category.

171.    None of the foregoing facts concerning Belnick's compensation was disclosed to Plaintiffs or other investors in Tyco securities. To the contrary, Defendants made affirmative representations concerning the compensation that was purportedly paid to the Company's top executives without disclosing the excessive payments made to Belnick. Defendants' representations concerning the compensation paid to the Officer Defendants were therefore materially misleading for this additional reason.

**7.    The Tyco Defendants' Failure To Disclose
        The Unlawful Belnick Retention Agreement**

172.    The Tyco Defendants also failed to disclose to Tyco shareholders the material circumstances surrounding the "Retention Agreement" that Belnick drafted for himself in late 2001. That agreement provided for Belnick to receive a further payment by October 1, 2003 of

approximately $20 million ($10.6 million plus a "gross-up" for taxes) even if he were discharged for intentional misconduct.

173.   In February 2002, weeks after the Retention Agreement had been agreed to and executed, a proposal for such an agreement was purportedly reported for the first time to the Compensation Committee, at a meeting attended by the head of Tyco's Human Resources department.  During the course of the meeting, a "Term Sheet" was presented to the Compensation Committee purporting to summarize the principal terms of Belnick's new agreement.

174.   The Term Sheet was important for what it did not state.  According to Tyco, neither in the Term Sheet nor at any other time was the Compensation Committee informed that the Retention Agreement had already been executed and that it purported to provide for multi-million dollar payments to Belnick, even if he were fired for an intentional breach of his duties to the Company.

175.   What was included in the Term Sheet was also misleading.  For example, the Term Sheet represented that the retention "payment is in lieu of bonuses," without revealing the huge undisclosed bonuses Belnick had just received in 2000.

176.   As Tyco's Chief Corporate Counsel, Belnick was aware that the Compensation Committee was responsible for conducting a review of compensation, "including salary, bonus, equity plan awards, and prerequisites" for all executives and those senior officers reporting directly to Kozlowski.  Especially for these reasons, Belnick had a duty to inform the Compensation Committee of the magnitude of his undisclosed prior compensation.

177.   After review by Tyco's outside counsel on benefits and employment matters, Belnick's executed Retention Agreement was revised to add some basic terms for that type of

agreement, but the essential economic terms were never changed and neither the Board nor

Compensation Committee ever sought or received any independent advice as to the

reasonableness of such terms.

178.    The Tyco Defendants failed to disclose to investors that Belnick had obtained the

rich Retention Agreement, that he had allegedly concealed material terms of that agreement from

the Tyco Compensation Committee, that he failed to disclose the actual bonuses that he had been

paid at the time the Compensation Committee approved the agreement or that he secured Tyco's

agreement to pay him millions of dollars, even if he were terminated from his position as the

Company's General Counsel for cause by failing to disclose those highly material facts.

179.    Because the Retention Agreement was a material agreement for Tyco, it was set

forth as an Exhibit to the Company's Form 10-Q for the quarter ended March 31, 2002 (the "May

2002 10-Q").  The Retention Agreement falsely stated:

> If Executive remains employed by the Company or any Affiliate through October
> 1, 2003 then he shall receive a lump sum cash payment within ten (10) business
> days after October 1, 2003 in the amount of ten million six hundred thousand
> dollars ($10,600,000.00).  This payment shall be in lieu of cash bonuses for the
> fiscal years ending September 30, 2001, September 30, 2002 and September 30,
> 2003, and any and all severance obligations.

180.    Furthermore, the Retention Agreement falsely stated:

> The sum of the payments received by Executive, if any, pursuant to Section 2,
> 4(b) or 4(c) is referred to herein as the "Retention Payment."  The Retention
> Payment shall be in lieu of cash bonuses for the fiscal years ending September 30,
> 2001, September 30, 2002 and September 30, 2003, and any and all severance and
> benefit obligations.

181.    Thus, the Retention Agreement falsely stated that Belnick had received no bonus

during fiscal 2001 and failed to disclose the $9.4 million "gross-up" he received for taxes.

Accordingly, the Tyco Defendants were obligated to disclose Belnick's true compensation to

investors.

182.     At no time, however, did the Tyco Defendants disclose that Belnick had secured the Retention Agreement by failing to disclose his lucrative bonus payments or that those payments had been made to him.  The Tyco Defendants' disclosures concerning the Officer Defendants' compensation were therefore materially misleading for this additional reason.

### 8.     Defendants' Failure To Disclose The Additional Unlawful Compensation Paid To Kozlowski And Swartz By Tyco

183.     Apparently unsatisfied with the enormous misappropriations outlined above, Kozlowski engaged in a number of other undisclosed real estate-related scams through which he enriched himself at the expense of Tyco shareholders.  All of the Defendants either knew or should have known that Kozlowski had engineered these scams, but failed to reveal the compensation that Kozlowski derived from them in Tyco's disclosures to shareholders.

184.     In particular, the September 8-K and the Kozlowski Complaint acknowledge that Defendants improperly failed to disclose that Kozlowski:

a.     arranged for Tyco to rent for him, at Tyco's expense, a Manhattan apartment with annual rent of $264,000 from 1997 to 2001;

b.     purchased, using interest-free relocation loans, a $7 million Tyco-owned apartment on Park Avenue in Manhattan without any appraisal at depreciated book value (which was well below market value) and then deeded the apartment to his ex-wife a few months later;

c.     sold his New Hampshire house to the Company in 2000 without appraisals for $4.5 million, an amount approximately three times its market value (less than 24 months later, the Company wrote down this asset by approximately $3 million);

d.     sold a home in North Hampton, New Hampshire to the Company in 2000 and then continued to make personal use of the property by permitting his ex-wife to reside there for two years, without a lease or without even reimbursement to the Company of expenses;

e. caused Tyco to purchase a second Manhattan apartment for his use for $16.8 million, and then caused Tyco to spend $3 million in improvements and $11 million in furnishings for that apartment (including a $6,000 shower curtain, a $15,000 dog umbrella stand, a $6,300 sewing basket, a $17,100 traveling toilette box, a $2,200 gilt metal wastebasket, coat hangers for $2,900, two sets of sheets for $5,960, a $1,650 notebook, and a $445 pincushion);

f. furnished a home that he owned in New Castle, New Hampshire, at a cost of $269,000, which he expensed to the Company although he thereafter made exclusive use of the property, while charging the maintenance costs to the Company;

g. purchased a home in Rye, New Hampshire with Company funds that he later reimbursed and then made personal use of the property, while expensing its maintenance to the Company;

h. purchased a home in Boca Raton with the Company's money and then made personal use of the property for himself and visiting family members;

i. caused Tyco's Fire & Security unit to spend $110,000 on hotel accommodations for him during one 13-day stay in London;

j. caused Tyco's Fire and Security unit to employ his personal assistant in London and provide her with an apartment, maintenance expenses and other benefits from May 2001 to July 2002; and

k. caused TyCom to employ a person whose primary duties related to Kozlowski's yacht from December 1999 to July 2000.

185. Furthermore, none of the Defendants disclosed that, as is conceded in the September 8-K and the Kozlowski Complaint, Kozlowski received "gross-up" benefits to avoid having to pay any state income tax liability incurred after relocating to New York.

186.     In sum, according to the September 8-K and the Kozlowski Complaint, Kozlowski:

a.      misappropriated for himself over $100 million that he was not authorized to receive;

b.      "wrongfully divert[ed] to others millions of dollars in cash and stock, used to induce their cooperation or buy their silence";

c.      caused Tyco executives to receive $95,962,653 in connection with the unapproved TyCom Scheme, of which $79,177,081 represented senior executive benefits Kozlowski awarded allegedly without obtaining requisite Board approvals;

d.      provided himself with $17,188,034 and 148,000 shares of Tyco stock in connection with the unauthorized ADT Scheme;

e.      caused the Company to pay a total of $36,584,338 and to issue a total of 261,500 shares of Tyco stock in connection with that program, of which $34,822,412 and 259,500 shares represent senior executive benefits Kozlowski awarded allegedly without obtaining the requisite Board approvals;

f.      provided himself with $8,219,650 in connection with the unauthorized Flag Telecom Scheme;

g.      caused the Company to pay $15,378,700 in connection with that unauthorized bonus program; and

h.      misappropriated tens of millions of dollars in Company funds that were charged as purported business expenses, including at least $20,000,000 for artwork, antiques and furnishings; $700,000 to finance the movie "Endurance"; one-half of the $2.1 million expense of a week-long birthday party for his wife in Sardinia; $110,000 for use of his yacht; $1,144,000 for

jewelry, clothing, flowers, club memberships, wines and private ventures; and $150,000 for

personal expenses at 59 Harbor Rd., Rye, New Hampshire from 1996 to 2002.

187.    Kozlowski also caused Tyco to make donations or pledges to charitable

organizations totaling over $106 million.  Of that total, at least $43 million in donations were

represented in transmittal letters or otherwise as Kozlowski's personal donations, or were made

using the Company's funds for Kozlowski's personal benefit.

188.    Most egregiously, Kozlowski donated to the Nantucket Conservation Foundation,

Inc. a total of $1,300,000 in Tyco funds.  That sum was used partially to purchase 60 acres of

property called "Squam Swamp" adjacent to Kozlowski's own Nantucket estate.  The effect of

this gift was to preclude future development of the land and thereby increase the value of

Kozlowski's home.

189.    Ironically, Kozlowski also donated $4 million to Cambridge University to study

corporate governance, falsely claiming that half the contribution was being made from his

personal funds.  In fact, all of this money had been misappropriated from Tyco.  According to the

November 6, 2002 edition of *The Daily Telegraph* of London:

> Even the producers of The Office [a British television sitcom] would be hard-
> pressed to invent a script quite as whacky as a chair of Corporate Governance
> donated to Cambridge University by Tyco International.
>
> Mr. Kozlowski claimed the glory for endowing the chair with $4m, but it seems
> that half of it came from the Tyco shareholders.  In practice, it all came from their
> pockets, since he seemed to have some difficulty in distinguishing between what
> was his, and what belonged to the company . . . .

190.    Similarly, during the course of his personal spending spree with funds he

unlawfully misappropriated from Tyco, Kozlowski repeatedly extolled the benefits of a simple

office headquarters.  For example, in a May 21, 2001 *Business Week* article, he stated, "If you

build an elaborate headquarters, people are tempted to spend a lot of time there, and it becomes

really unproductive." Nevertheless, Kozlowski built lavish offices for himself and other senior Tyco staffers in New York and Boca Raton.

191.    On March 1, 2002, purportedly without approval by the Compensation Committee or the Board, Swartz caused Tyco to pay him a reimbursement of $1.2 million to cover lost deposits on personal real estate transactions involving apartments in the Trump Tower on 5th Avenue in Manhattan.

192.    Swartz also engaged in undisclosed, related-party transactions with the Company. For example, in 1995, he sold certain real estate in New Hampshire to a Tyco subsidiary for $305,000, a price well in excess of the property's actual value and the price obtained by Tyco for the property when it was sold to an unrelated third party in 1997.

193.    Moreover, in 2000, Swartz caused Tyco to purchase an apartment in his name on the Upper East Side of Manhattan.  Swartz then moved into the apartment and lived there rent-free, a perquisite worth in excess of $18,000 per month.

194.    In addition, on May 6, 2002, Swartz caused Tyco to enter a notation in its books and records purporting to transfer to him a Tyco-owned apartment on Manhattan's Upper East Side in which he lived, including fixtures and furniture, at its depreciated book value of $9,646,975.  No appraisal was performed in connection with that supposed transfer.  Nor was the transaction authorized by the Board.

195.    On July 18, 2002 (*i.e.*, after Kozlowski had resigned in shame), Swartz agreed to reverse that transaction, and his KEL account was credited $9,646,975 to reflect the reversal.

196.    Again, none of the foregoing additional compensation paid to Kozlowski and Swartz was disclosed to Plaintiffs or other investors in the Company's securities.  Defendants'

disclosures concerning the Officer Defendants' compensation were therefore materially misleading for this additional reason.

**D.     Defendants' Affirmative Misrepresentations**
**Concerning The Officer Defendants' Compensation**

     **1.     Defendants' Affirmative Misrepresentations Concerning The Officer**
     **Defendants' Compensation For The Period Ended September 30, 1997**

197.     On January 28, 1998, Tyco filed with the SEC Amendment No. 1 on Form 10-K/A amending the Form 10-K for the "transition period" from January 1, 1997, through September 30, 1997 (the "1997 10-K Amendment"). The 1997 10-K Amendment was signed by defendant Swartz.

198.     The 1997 10-K Amendment contained a table that purportedly disclosed the "annual and long-term compensation for services in all capacities to the Company and its subsidiaries for those persons who served as the Chief Executive Officer during Fiscal 1997 and the other four most highly compensated executive officers of the Company." That table falsely described Defendants Kozlowski's and Swartz's annual and long-term compensation as follows:

|  | Year | Salary | Cash Bonus | Options | Plan Payouts | Other Compensation |
|---|---|---|---|---|---|---|
| Kozlowski | 1997 | $1,250,000 | $2,544,260 | 3,300,000 | $6,508,125 | $108,125 |
| Swartz | 1997 | $559,500 | $1,272,130 | 1,100,000 | $2,169,375 | $31,994 |

199.     That information was materially false and misleading because, as is specifically alleged above, the actual compensation paid to Kozlowski and Swartz during Tyco's fiscal 1997 vastly exceeded the disclosed payments.

200.     On February 20, 1998, Tyco filed with the SEC a Proxy Statement in connection with the Company's Annual General Meeting of Shareholders scheduled for March 27, 1998 (the

"1998 Proxy"). Portions of the 1998 Proxy were signed by Defendant Kozlowski. Because the

1998 Proxy contained the same or similar information concerning the Officer Defendants'

reported compensation as was contained in the 1997 10-K Amendment, it was materially false

and misleading for the same reasons as the 1997 10-K Amendment.

201.    The 1998 Proxy also contained a "Board Compensation Committee Report on

Executive Compensation." That report, which was submitted by the members of the Tyco Board

of Directors Compensation Committee (defendant Walsh and fellow directors Stephen W. Foss,

Philip M. Hampton and W. Peter Slusser) represented, among other things, that:

> During Fiscal 1997, compensation was earned by the [officers including
> Kozlowski and Swartz] based on arrangements approved at the beginning of the
> year by the Remuneration Committee of ADT and/or by the Compensation
> Committee of Former Tyco. . . .
>
> The Compensation Committee meets shortly after the end of each fiscal year to
> consider and make its determination regarding the total compensation of the Chief
> Executive Officer for the ensuing year. The Compensation Committee determines
> such compensation based on its assessment of the individual performance of the
> Chief Executive Officer, a review of the Company's operating performance
> (including such factors as revenues, operating income, earnings per share and cash
> flow generation), an analysis of total returns to shareholders relative to total
> returns generated by comparable quoted companies and a review of compensation
> of the chief executive officers of companies with similar businesses of
> comparable size.

202.    As is specifically alleged above, Tyco has subsequently stated in various SEC

filings that the Compensation Committee did not approve the compensation paid to Kozlowski

and Swartz. The foregoing description of the Compensation Committee's role in determining the

compensation paid to Kozlowski and Swartz and the factors considered in setting that

compensation were therefore materially false and misleading.

203.    The 1998 Proxy failed to disclose the true terms of the KEL program and noted

only the following with respect to Kozlowski's use of that program:

At September 30, 1997, Mr. Kozlowski had $11,866,675 outstanding under the Key Employee Loan Program of Former Tyco, the proceeds of which were used for payment of taxes due on the vesting of restricted shares of common stock of Former Tyco. The loans to Mr. Kozlowski are unsecured and bear interest at the Company's incremental short term borrowing rate.

204.    The foregoing statements from that 1998 Proxy concerning the KEL program were materially false and misleading because the 1998 Proxy did not disclose, as detailed above, that Kozlowski and Swartz abused the KEL program by borrowing huge sums of money from Tyco for purposes other than those authorized under the KEL program.

205.    On or about December 24, 1997, Tyco filed with the SEC a Report on Form 10-K disclosing the Company's financial results for the fiscal year ended September 30, 1997 (the "1997 10-K"). The 1997 10-K was signed by defendants Kozlowski, Swartz, Bodman, Fort, Pasman and Walsh.

206.    Under the heading "Management Remuneration," the 1997 10-K incorporated by reference the information concerning management compensation contained in the 1997 10-K Amendment. The 1997 10-K was therefore materially false and misleading for the same reasons as the 1997 10-K Amendment.

**2.      Defendants' Affirmative Misrepresentations Concerning The  Officer Defendants' Compensation For The Period Ended September 30, 1998**

207.    On January 29, 1999, Tyco filed with the SEC Amendment No. 1 on Form 10-K/A to Form 10-K for the fiscal year ended September 30, 1998 (the "1998 10-K Amendment"). The 1998 10-K Amendment was signed by defendant Swartz.

208.    The 1998 10-K Amendment contained a table that purportedly disclosed the "annual and long-term compensation for services in all capacities to the Company and its subsidiaries for those persons who served as the Chief Executive Officer during fiscal 1998 and

the other four most highly compensated executive officers of the Company." That table described Kozlowski's and Swartz's annual and long-term compensation as follows:

|  | Year | Salary | Cash Bonus | Options | Restricted Stock Awards[1] | Other Compensation |
|---|---|---|---|---|---|---|
| Kozlowski | 1998 | $1,250,000 | $2,500,000 | 1,916,400 | $20,140,000 | $901,002 |
| Swartz | 1998 | $559,500 | $1,250,000 | 1,100,000 | $10,070,000 | $256,878 |

209.    That information was materially false and misleading because, as is specifically alleged above, the actual compensation paid to Kozlowski and Swartz during Tyco's fiscal 1998 vastly exceeded the disclosed amounts.

210.    On September 27, 1999, Tyco filed with the SEC a Proxy Statement in connection with the Company's Annual General Meeting of Shareholders scheduled for November 3, 1999 (the "1999 Proxy"). Portions of the 1999 Proxy were signed by Kozlowski. The 1999 Proxy contained the same or similar information concerning the Officer Defendants' reported compensation as was contained in the 1998 10-K Amendment. The 1999 Proxy was therefore materially false and misleading for the same reasons as the 1998 10-K Amendment.

211.    The 1999 Proxy stated the following concerning the KEL program:

Former Tyco established the Former Tyco 1983 Key Employee Corporate Loan Program, as amended, to encourage ownership of Tyco common shares on favorable terms. Loans made by subsidiaries of Tyco are used primarily for the payment of taxes due as a result of the vesting of ownership of shares granted under Former Tyco's restricted stock ownership plans.

---

[1]    Restricted shares are issued under a restricted share program whereby specific performance criteria determine the number of shares that vest for the fiscal year. If the performance criteria are not met resulting in some or all of the shares not being earned (i.e., not vesting) within the three-year period, those shares are forfeited and must be returned to the Company. The values shown are the fair market value on the date of the grant.

The Compensation Committee administers the loan program and authorizes loans, which may not exceed the amount allowable as provided by any regulation of the United States Treasury or other state or federal statute. Loans may be required to be secured by Tyco common shares owned by the employee or may be unsecured. Loans under the loan program generally bear interest at Tyco's incremental short-term borrowing rate (5.75% for 1998).

212.    The foregoing statements concerning the KEL program were materially false and misleading because the 1999 Proxy did not disclose, as detailed above, that Kozlowski and Swartz abused the KEL program by borrowing huge sums of money from Tyco for purposes other than those authorized under the KEL program.

213.    The 1999 Proxy stated the following concerning Kozlowski's and Swartz's participation in Tyco's loan programs:

At September 30, 1998, the amount of loans outstanding under the Loan Programs totaled $22,162,828 of which $4,821,982 was loaned to Mr. Kozlowski . . . and $2,750,000 to Mr. Swartz. The largest amount of indebtedness since October 1, 1997 for each of these individuals is: Mr. Kozlowski, $22,474,345 . . . and Mr. Swartz, $12,538,406. In addition, a subsidiary of the Company made short-term loans to Mr. Kozlowski and Mr. Swartz in the amounts of $59,750,014 and $23,428,695, respectively, to assist in the exercise of stock options. Interest of 5.75% was charged and the loans were repaid within 3 days.

214.    Those representations were materially false and misleading because the 1999 Proxy did not accurately disclose the total loans outstanding to Kozlowski and Swartz and did not disclose that they used the proceeds of Company loans for unauthorized purposes.

215.    The 1998 10-K Amendment also purported to describe the Tyco KEL program. According to the 1998 10-K Amendment, "[KEL] Loans are primarily used for the payment of taxes due as a result of the vesting of restricted stock."

216.    The 1998 10-K Amendment further described the general terms and conditions of the KEL program as follows:

The Compensation Committee authorizes loans, which may not exceed the amount allowable under any regulation of the United States Treasury or other

applicable statute or regulation.  Loans may be required to be secured by Tyco common shares owned by the employee or may be unsecured. Loans generally bear interest at Tyco's incremental short-term borrowing rate (5.5% for 1999). Loans are generally repayable in ten years or when the participant reaches age 69, whichever occurs first, except that earlier payments must be made in the event that the participant's employment with the Company or its subsidiaries terminates. The participant is also required to make loan payments upon the sale or other disposition of Tyco common shares (other than gifts to certain family members) with respect to which loans have been granted.

217.    According to the 1998 10-K Amendment, as of September 30, 1998, the amount of loans outstanding under the loan programs to Defendants Kozlowski and Swartz totaled $4,821,982 and $461,680, respectively.  In addition, Defendants reported that the largest amount of indebtedness since October 1, 1997 for Kozlowski and Swartz under these programs was $22,474,345 and $12,538,406, respectively.  The 1998 10-K Amendment further represented that "the Company made short-term loans to Mr. Kozlowski and Mr. Swartz in the amounts $59,750,014 and $23,428,695, respectively, to assist in the exercise of stock options." According to the 1998 10-K Amendment, "[i]nterest of 5.75% was charged and the loans were repaid within 3 days."

218.    As is specifically alleged above, the foregoing disclosures concerning the KEL program were materially false and misleading because Defendants failed to disclose that Kozlowski and Swartz abused the KEL program by borrowing huge sums of money from Tyco for purposes other than those authorized under the KEL program.

219.    The 1999 Proxy also contained a "Board Compensation Committee Report on Executive Compensation."  That report, which was submitted by the members of the Tyco Board of Directors' Compensation Committee (defendant Walsh and fellow directors Stephen W. Foss, Philip M. Hampton and W. Peter Slusser) represented, among other things, that:

> A.    The Compensation Committee of the Board of Directors approves all of the policies under which compensation is paid or awarded to the

Company's executive officers and key managers and oversees the administration of executive compensation programs. The Compensation Committee is composed solely of independent directors, none of whom has any interlocking relationships with the Company that are subject to disclosure under rules of the United States Securities and Exchange Commission (the "SEC") relating to proxy statements.

B.    The Compensation Committee meets shortly after the end of each fiscal year to consider and make its determination regarding the total compensation of the Chief Executive Officer for the ensuing year. The Compensation Committee determines such compensation based on its assessment of the individual performance of the Chief Executive Officer, a review of the Company's operating performance (including such factors as revenues, operating income, earnings per share and cash flow generation), an analysis of total returns to shareholders relative to total returns generated by comparable quoted companies and a review of compensation of the chief executive officers of companies with similar businesses of comparable size.

C.    The Committee considers Mr. Kozlowski's level of compensation appropriate in view of his leadership of the Company during fiscal 1998, which both created significant current shareholder value and laid the groundwork for continued growth. For example, during fiscal 1998, the Company and Former Tyco were successfully integrated, the Company made over 20 acquisitions totaling over $3.8 billion and earnings per share before non-recurring items increased by 51% over the prior fiscal year.

220.    As is specifically alleged above, Tyco has stated in various subsequent SEC filings that the Compensation Committee did not approve the compensation paid to Kozlowski and Swartz. The foregoing description of the Compensation Committee's role in determining the compensation paid to Kozlowski and Swartz and the factors considered in setting that compensation were therefore materially false and misleading.

221.    On or about December 10, 1998, Tyco filed with the SEC a Form 10-K annual report for the fiscal year ended September 30, 1998 (the "1998 10-K"). The 1998 10-K was signed by defendants Kozlowski, Swartz, Bodman, Fort, Pasman and Walsh. Under the heading "Management Remuneration," the 1998 10-K incorporated by reference the information concerning management compensation contained in the 1998 10-K Amendment and the 1999

Proxy. The 1998 10-K was therefore materially false and misleading for the same reasons as the other two SEC filings.

### 3. Defendants' Affirmative Misrepresentations Concerning The Officer Defendants' Compensation For The Period Ended September 30, 1999

222. On February 1, 2000, Tyco filed with the SEC Amendment No. 1 on Form 10-K/A to Tyco's Form 10-K for the fiscal year ended September 30, 1999 (the "1999 10-K Amendment"). The 1999 10-K Amendment was signed by defendant Swartz.

223. The 1999 10-K Amendment contained a table that purportedly disclosed the "annual and long-term compensation for services in all capacities to the Company and its subsidiaries for the Chief Executive Officer of the Company and the other four most highly compensated executive officers of the Company during fiscal 1999." That table described defendants Kozlowski's and Swartz's annual and long-term compensation as follows:

|  | Year | Salary | Cash Bonus | Options | Restricted Stock Awards | Other Compensation |
|---|---|---|---|---|---|---|
| Kozlowski | 1999 | $1,350,000 | $3,200,000 | 6,621,834 | $25,707,178 | $387,001 |
| Swartz | 1999 | $750,000 | $1,600,000 | 2,976,480 | $12,029,641 | $150,014 |

224. That information was materially false and misleading because, as is specifically alleged above, the actual compensation paid to Kozlowski and Swartz during Tyco's fiscal 1999 vastly exceeded the disclosed amounts.

225. On March 1, 2000, Tyco filed with the SEC a Proxy Statement on Form 14A in connection with the Company's Annual General Meeting of Shareholders scheduled for April 19, 2000 (the "2000 Proxy"). Portions of the 2000 Proxy were signed by defendant Kozlowski. The

2000 Proxy contained the same or similar information concerning the Officer Defendants'

reported compensation as the 1999 10-K Amendment.

226.    The 2000 Proxy Statement also set forth the following false description of

Kozlowski's compensation:

> For fiscal 1999, Mr. Kozlowski received a base salary of $1.35 million and a cash
> bonus in the amount of $3.2 million, as shown in the SUMMARY
> COMPENSATION TABLE on page 12.  Mr. Kozlowski was also granted
> 624,000 shares of restricted stock on October 18, 1999.  Mr. Kozlowski's
> eligibility for the cash bonus was conditioned on the Company's experiencing
> minimum growth in pre-tax income and operating cash flow of 15% over fiscal
> 1998 and his eligibility for the stock award was conditioned upon an increase in
> earnings per share of at least 17.5% over fiscal 1998.  The Company's
> performance substantially exceeded these benchmarks.  These shares were granted
> based on achievement of fiscal 1999 performance criteria and vested on January 5,
> 2000.  While Mr. Kozlowski did not receive any new stock option awards during
> fiscal 1999, he did receive restoration options.  The restoration provision enables
> executive officers to use their earned equity award to repay indebtedness owed to
> the Company or to use option proceeds for tax planning purposes while
> maintaining their equity position in the Company.

227.    Defendants also made materially false and misleading statements concerning the

KEL program and the Officer Defendants' participation in that program.

228.    In particular, the 1999 10-K Amendment represented that, as of September 30,

1999, there were no loans outstanding under the KEL program for defendants Kozlowski and

Swartz.  According to the 1999 10-K Amendment, the largest amount of indebtedness under the

loan program since October 1, 1998, was $52,688,249 for defendant Kozlowski, and

$17,435,319 for defendant Swartz.

229.    In addition, the 2000 Proxy Statement provided the following materially false and

misleading description of Tyco's KEL Program:

> The Compensation Committee administers the loan program.  The Compensation
> Committee authorizes loans, which may not exceed the amount allowable under
> any regulation of the United States Treasury or other applicable statute or
> regulation.  Loans may be required to be secured by Tyco common shares owned

by the employee or may be unsecured. Loans generally bear interest at Tyco's incremental short-term borrowing rate (5.5% for 1999). Loans are generally repayable in ten years or when the participant reaches age 69, whichever occurs first, except that earlier payments must be made in the event that the participant's employment with the Company or its subsidiaries terminates. The participant is also required to make loan payments upon the sale or other disposition of Tyco common shares (other than gifts to certain family members) with respect to which loans have been granted.

230. The 2000 Proxy Statement also falsely and misleadingly stated:

At September 30, 1999, the amount of loans outstanding under the [KEL program] totaled $18,569,137, of which $0 was loaned to Mr. Kozlowski . . . and $0 to Mr. Swartz. The largest amount of indebtedness since October 1, 1998 incurred by each of the Named Officers was: $52,688,249 for Mr. Kozlowski . . . .

231. In addition, Defendants made materially false and misleading statements concerning the KEL program in the 1999 Annual Report to Shareholders on Form 10K/A that Tyco filed with the SEC on or about March 14, 2000. In particular, Defendants stated:

Loans are made to employees of the Company under the Former Tyco 1983 Key Employee Loan Program for the payment of taxes upon the vesting of shares granted under Former Tyco's Restricted Stock Ownership Plans. The loans are unsecured and bear interest, payable annually, at a rate which approximates the Company's incremental short-term borrowing rate. Loans are generally repayable in ten years, except that earlier payments are required under certain circumstances. During Fiscal 1999, the maximum amount outstanding under this program was $91.6 million. Loans receivable under this program were $18.6 million and $22.2 million at September 30, 1999 and 1998, respectively.

232. In addition, Kozlowski authorized the dissemination of materially false and misleading information concerning his abuse of Tyco's KEL program that was reported in a February 1, 2000 *Wall Street Journal* article. In that article, a Tyco spokesperson stated that the $139.7 million in gains that Kozlowski realized from exercising 6.3 million Tyco stock options during Tyco's fiscal 1999 was utilized to repay loans to Tyco that were taken to pay taxes on restricted stock Kozlowski had received and to pay taxes on exercised options.

233.     As is specifically alleged above, the foregoing disclosures in the 1999 10-K

Amendment, the 2000 Proxy Statement, the 1999 Annual Report and the *Wall Street Journal*

article concerning the KEL program were materially false and misleading because Defendants

failed to disclose that Kozlowski and Swartz ignored the stated purposes of the KEL program by

borrowing from the Company to fund their personal expenditures, rather than to fund their

purchases of Tyco shares.

234.     The 2000 Proxy also contained a "Board Compensation Committee Report on

Executive Compensation."  That report, which was submitted by the members of the Tyco Board

of Directors Compensation Committee (defendant Walsh and fellow directors Stephen W. Foss,

 Philip M. Hampton and W. Peter Slusser) falsely stated that "[t]he Compensation Committee of

the Board of Directors approves all of the policies under which compensation is paid or awarded

to the Company's executive officers and key managers and oversees the administration of

executive compensation programs."

235.     As is specifically alleged above, Tyco has stated in various subsequent SEC

filings that the Compensation Committee did not approve the compensation paid to Kozlowski

and Swartz.  The foregoing description of the Compensation Committee's role in determining the

compensation paid to Kozlowski and Swartz and the factors considered in setting that

compensation were therefore materially false and misleading.

236.     On or about December 13, 1999, Tyco filed with the SEC a Form 10-K annual

report for the fiscal year ended September 30, 1999 (the "1999 10-K").  The 1999 10-K was

signed by defendants Kozlowski, Swartz, Bodman, Fort, Pasman and Walsh.  Under the heading

"Management Remuneration," the 1999 10-K incorporated by reference the information

concerning management compensation contained in the 2000 Proxy. The 1999 10-K was therefore materially false and misleading for the same reasons as the 2000 Proxy.

237. The 1999 10-K also contained notes to the consolidated financial statements of Tyco that the PWC Defendants certified. In those notes, Defendants which falsely described the KEL program as follows:

KEY EMPLOYEE LOAN PROGRAM

Loans are made to employees of the Company under the Former Tyco 1983 Key Employee Loan Program for the payment of taxes upon the vesting of shares granted under Former Tyco's Restricted Stock Ownership Plans. The loans are unsecured and bear interest, payable annually, at a rate which approximates the Company's incremental short-term borrowing rate. Loans are generally repayable in ten years, except that earlier payments are required under certain circumstances. During Fiscal 1999, the maximum amount outstanding under this program was $91.6 million. Loans receivable under this program were $18.6 million and $22.2 million at September 30, 1999 and 1998, respectively.

The total compensation cost expensed for all stock-based compensation awards discussed below was $96.9 million, $37.1 million and $59.9 million for Fiscal 1999, Fiscal 1998 and Fiscal 1997, respectively.

238. In addition, with respect to the Company's KEL Program, the 1999 10-K stated, "During Fiscal 1999, the maximum amount outstanding under the program was $91.6 million."

239. All of these representations regarding the KEL Program and Tyco's compensation expenses were materially false and misleading as a result of Defendants' failure to disclose the Individual Defendants' abuse of the KEL program and the fact that the vast majority of the loans extended pursuant to that program did not comply with its stated purpose.

**4. Defendants' Affirmative Misrepresentations Concerning The Officer Defendants' Compensation for the Period Ended September 30, 2000**

240.    On January 28, 2001, Tyco filed with the SEC a Proxy Statement on Form 14A in connection with the Company's Annual General Meeting of Shareholders scheduled for March 27, 2001 (the "2001 Proxy").  Portions of the 2001 Proxy were signed by defendant Kozlowski.

241.    The 2001 Proxy contained a table that purportedly disclosed the "annual and long-term compensation for services in all capacities to Tyco and its subsidiaries for the periods shown for Tyco's Chief Executive Officer and the other four most highly compensated executive officers of Tyco during fiscal 2000."   That table described Kozlowski's and Swartz's annual and long-term compensation as follows:

|  | Year | Salary | Cash Bonus | Tyco Options | TyCom Options | Restricted Stock Awards | Other Compensation |
|---|---|---|---|---|---|---|---|
| Kozlowski | 2000 | $1,350,000 | $2,800,000 | 1,439,135 | 800,000 | $21,207,540 | $527,152 |
| Swartz | 2000 | $768,750 | $1,400,000 | 788,425 | 500,000 | $10,603,770 | $292,487 |

242.    The 2001 Proxy Statement also made the following materially false and misleading representations concerning the compensation paid to Kozlowski:

> For fiscal 2000, Mr. Kozlowski received a base salary of $1.35 million and a cash bonus in the amount of $2.8 million, as shown in the SUMMARY COMPENSATION TABLE on page 14.  Mr. Kozlowski was granted 600,000 shares of restricted stock on January 5, 2000.  These shares will vest over a period of up to three years if the specified performance criteria referred to above are met.
>
> Mr. Kozlowski also received an aggressive performance-based option award, which includes significant growth in earnings per share and stock price appreciation measures (described in footnote 3 on page 16).  Mr. Kozlowski also received restoration options in accordance with the restoration option provision. The restoration provision enables executive officers to use certain earned equity awards and certain proceeds from the sale of shares acquired upon the exercise of options to pay option exercise costs, repay indebtedness owed to Tyco International (US) Inc., or for tax planning purposes while maintaining their

equity position in Tyco. At the time of the TyCom initial public offering, Mr. Kozlowski received an award of options to purchase 800,000 TyCom common shares at the initial public offering price of $32.00 with pro-rata vesting over four years. The Committee believes Tyco is best served by the continued leadership of Mr. Kozlowski. The Committee conferred with a nationally recognized consulting firm that analyzed Tyco's performance, as well as the marketplace for executive talent. The firm reviewed the performance option award, designed to focus on Mr. Kozlowski's retention as well as growth in shareholder value, and made its recommendations. Another consulting firm reviewed and concurred with the recommendations.

The Committee considers Mr. Kozlowski's level of compensation appropriate in view of his performance and continued leadership of Tyco during fiscal 2000. As noted above, Tyco experienced outstanding growth in earnings per share of 42.5%, operating cash flow of 48.6%, and net sales of 29%.

243.     Those representations concerning the compensation paid to Tyco's principal executives were materially false and misleading because: (a) the actual compensation paid to Kozlowski and Swartz during Tyco's fiscal 2000 vastly exceeded the disclosed amounts; and (b) the Tyco Defendants improperly failed to disclose the compensation paid to defendant Belnick during Tyco's fiscal 2000.

244.     Defendants also set forth the following false description of the KEL program in the 2001 Proxy Statement:

The Compensation Committee administers the loan program. The Compensation Committee authorizes loans, which may not exceed the amount allowable as provided by any regulation of the United States Treasury or other state or federal statute. Loans may be required to be secured by Tyco common shares owned by the employee or may be unsecured. Loans under the loan program generally bear interest at Tyco's incremental short-term borrowing rate (6.67% for 2000) and are generally repayable in ten years or when the participant reaches age 69, whichever occurs first, except that earlier payments must be made in the event that the participant's employment with Tyco or its subsidiaries terminates. The participant is also required to make loan payments upon the sale or other disposition of Tyco common shares (other than gifts to certain family members) with respect to which loans have been granted.

245. In addition, Defendants made the following materially false and misleading representations concerning the money borrowed by Kozlowski and Swartz pursuant to the KEL Program:

> At September 30, 2000, the amount of loans outstanding under the [Key Employee Loan] program totaled $11,421,655, of which nothing was outstanding for any of the Named Officers. The largest amount of indebtedness since October 1, 1999 for each of these individuals was $12,711,768 for Mr. Kozlowski, $304,363 for Mr. Garvey, and $1,000,000 for Mr. Swartz. Neither Dr. Gromer nor Mr. Meelia had loans under the program during fiscal 2000.

246. Those statements concerning the KEL program were materially false and misleading because Defendants failed to disclose the Officer Defendants' abuse of that program for their personal gain and their repeated use of KEL loans for unauthorized purposes.

247. On or about January 30, 2001, Tyco released its 2000 Annual Report to Shareholders (the "2000 Annual Report"). With respect to the KEL program, the 2000 Annual Report misleadingly stated, "During Fiscal 2000, the maximum amount outstanding under the program was $26.0 million. Loans receivable under this program were $11.4 million and $18.6 million at September 30, 2000 and 1999, respectively."

248. As is specifically alleged above, the foregoing disclosures concerning the KEL program were materially false and misleading because the Tyco Defendants failed to disclose that Kozlowski and Swartz ignored the stated purposes of the KEL program by borrowing from the Company to fund their personal expenditures, rather than to fund their purchases of Tyco shares.

249. The 2001 Proxy also contained a "Board Compensation Committee Report on Executive Compensation." The Report, which was submitted by Tyco directors Philip M. Hampton, Stephen W. Foss, James S. Pasman and W. Peter Slusser, stated, among other things, that:

A.    . . . The Compensation Committee approves all of the policies under which compensation is paid or awarded to Tyco's Chief Executive Officer, reviews and, as required, approves such policies for executive officers and key managers, and oversees the administration of executive compensation programs.

B.    In formulating the policies under which Tyco's executives were compensated, the Committee considers the following factors, among others:

\*    \*    \*    \*

        – Company growth and ultimately shareholder value are best served by having incentive compensation based on the financial performance of the Company and its various operating companies with a large component based on increase in the value of Tyco shares.

        – The compensation paid by Tyco to its management team should be competitive with executive compensation of other similarly situated public companies. The Committee retains an independent outside consulting firm to evaluate the appropriateness of Tyco's executive pay practices.

C.    At the end of each fiscal year, the Compensation Committee reviews with the Chief Executive Officer the individual performance of each of the other executive officers and reviews his recommendations for the appropriate compensation awards and the financial and other objectives for each of the executive officers for the following year.

D.    The Committee considers Mr. Kozlowski's level of compensation appropriate in view of his performance and continued leadership of Tyco during fiscal 2000.

250.    As is specifically alleged above, Tyco has stated in various subsequent SEC filings that the Compensation Committee did not approve the compensation paid to Kozlowski and Swartz. The foregoing description of the Compensation Committee's role in determining the compensation paid to Kozlowski, Swartz and Belnick and the factors considered in setting that compensation were therefore materially false and misleading.

251. On or about December 21, 2000, Tyco filed with the SEC on Form 10-K the Company's financial results for the fiscal year ended September 30, 2000 (the "2000 10-K"). The 2000 10-K was signed by Defendants Kozlowski, Swartz, Bodman, Fort, Lane, Pasman and Walsh. Under the heading "Management Remuneration," the 2000 10-K incorporated by reference the information concerning management compensation contained in the 2001 Proxy. The 2000 10-K was therefore materially false and misleading for the same reasons as the 2001 Proxy.

### 5. Defendants' Materially False And Misleading Representations Concerning The Officer Defendants' Compensation for the Period Ended September 30, 2001

252. On January 28, 2002, Tyco filed with the SEC a Proxy Statement on Form 14A in connection with the Company's Annual General Meeting of Shareholders scheduled for February 21, 2002 (the "2002 Proxy"). Portions of the 2002 Proxy were signed by defendant Kozlowski.

253. The 2002 Proxy contained a table that purportedly represented the "annual and long-term compensation for services in all capacities to Tyco and its subsidiaries for the periods shown for Tyco's Chief Executive Officer and the other four most highly compensated executive officers of Tyco during fiscal 2001." That table described Kozlowski's and Swartz's annual and long-term compensation as follows:

| | Year | Salary | Cash Bonus | Options | Restricted Stock Awards | Other Compensation |
|---|---|---|---|---|---|---|
| Kozlowski | 2001 | $1,650,000 | $4,000,000 | 1,439,135 | $30,398,880 | $219,543 |
| Swartz | 2001 | $968,750 | $2,000,000 | 788,425 | $15,199,440 | $277,856 |

254. The 2002 Proxy Statement also contained the following materially false and misleading description of Kozlowski's fiscal 2001 compensation:

For fiscal 2001, Mr. Kozlowski received a base salary of $1.65 million and, based on a 38.9% increase in Net Income before non-recurring items and a 31.3% increase in Operating Cash Flow, a cash bonus in the amount of $4 million, as shown in the SUMMARY COMPENSATION TABLE on page 14. Mr. Kozlowski was granted 600,000 shares of performance-based restricted stock on October 1, 2001. If the pre-determined specified performance criteria are met, these shares will vest over a period of up to three years. After three years, any remaining unearned shares will be forfeited and returned to the Company.

Mr. Kozlowski also received restoration options in accordance with the restoration option provision of the Company's option program. The restoration provision enables executive officers to use certain earned equity awards and certain proceeds from the sale of shares acquired upon the exercise of options to pay option exercise costs, repay indebtedness owed to Tyco International (US) Inc., or for tax planning purposes while maintaining their equity position in Tyco.

255.    Defendants' description of the compensation paid to the Officer Defendants was materially false and misleading because, as is specifically alleged above: (a) the actual compensation paid to Kozlowski and Swartz vastly exceeded the disclosed amounts; and (b) the Tyco Defendants improperly failed to disclose the compensation paid to defendant Belnick during Tyco's fiscal 2000.

256.    The 2002 Proxy Statement also contained materially false and misleading statements concerning Tyco's KEL Program. Investors were falsely informed, for example, that "[l]oans under the loan program generally bear interest at Tyco's incremental short-term borrowing rate (which was 3.7% for 2001)."

257.    The 2002 Proxy Statement also falsely and misleadingly states:

At September 30, 2001, the amount of loans outstanding under the [KEL] program totaled $11,230,192, of which $0 was outstanding for Mr. Kozlowski, $231,718 was outstanding for Mr. Boggess, $20,702 was outstanding for Mr. Meelia and $0 was outstanding for Mr. Swartz. The largest amount of indebtedness under the program during fiscal 2001 for each of the named officers was $23,009,703 for Mr. Kozlowski, $6,500,000 for Mr. Swartz, $20,702 for Mr. Meelia and $231,718 for Mr. Boggess. . . .

258.     As is specifically alleged above, the foregoing disclosures concerning the KEL program were materially false and misleading because Defendants failed to disclose that Kozlowski and Swartz ignored the stated purposes of the KEL program by borrowing from the Company to fund their personal expenditures, rather than to fund their purchases of Tyco shares.

259.     The 2002 Proxy also contained a materially false and misleading "Board Compensation Committee Report on Executive Compensation."  That report, which was submitted by Tyco directors Stephen W. Foss, James S. Pasman and W. Peter Slusser, stated, among other things, that:

> A.     . . . The Compensation Committee approves all of the policies under which compensation is paid or awarded to Tyco's Chief Executive Officer, reviews and, as required, approves such policies for executive officers and key managers, and has oversight of the administration of executive compensation programs.  The Compensation Committee reviews the compensation policies in light, among other things, of the competitive environment in which Tyco must compete for superior executive talent and the benefit to the Company and its shareholders of having a large portion of incentive compensation tied to the equity value of the Company.
>
> B.     The elements of Tyco's compensation program for its executives are base salary, annual incentive bonus opportunity, and long-term, equity-based incentive compensation.
>
> C.     During fiscal 2001, the Committee took steps to ensure the continued leadership of the executive management of the Company.  In this connection, at the Committee's request and approval, Tyco entered into retention agreements with L. Dennis Kozlowski, described in the CEO compensation section below, and with Mark H. Swartz.
>
> D.     The Committee retains a nationally recognized consulting firm to review and analyze Tyco's executive compensation practices relative to the Company's performance, as well as the marketplace for executive talent. The Committee also observed that Tyco and Mr. Kozlowski's leadership of Tyco have received many favorable comments from the business and financial community.  The Committee noted that Tyco was named the best performing company by BUSINESS WEEK in its Spring 2001 special edition featuring its choice of the 50 best performing companies and that more recently Mr. Kozlowski was named one of the top 25 managers of the year by BUSINESS WEEK in its January 14, 2002 edition.  Mr.

Kozlowski has led Tyco from a $3 billion manufacturing corporation in 1993 to a $36 billion diversified service and manufacturing corporation in 2001 that has provided 910% in total cumulative shareholder return from 1993 - 2001. In addition, Mr. Kozlowski grew revenue an average of 38% per year from 1993-2001. During Mr. Kozlowski's tenure as Chief Executive Officer, Tyco has consistently enjoyed a strong balance sheet, with debt levels appropriate for a company of its size and scope of operations, and with investment grade ratings that allow the Company efficiently to address and service its capital requirements.

260. As is specifically alleged above, Tyco has stated in various subsequent SEC filings that the Compensation Committee did not approve the compensation paid to Kozlowski and Swartz. The foregoing description of the Compensation Committee's role in determining the compensation paid to Kozlowski and Swartz and the factors considered in setting that compensation were therefore materially false and misleading.

261. On or about December 28, 2001, Tyco filed with the SEC on Form 10-K the Company's financial results for the fiscal year ended September 30, 2001 (the "2001 10-K"). The 2001 10-K was signed by Defendants Kozlowski, Swartz, Bodman, Fort, Lane, Pasman and Walsh. Under the heading "Executive Compensation," the 2000 10-K incorporated by reference the information concerning management remuneration contained in the 2002 Proxy. The 2001 10-K was therefore materially false and misleading for the same reasons as the 2002 Proxy.

262. The 2001 10-K also provided the following materially false and misleading description of the KEL program:

During Fiscal 2001, the maximum amount outstanding under [the KEL] program was $29.5 million. Loans receivable under this program were $11.2 million and $11.4 million at September 30, 2001 and 2000, respectively.

263. Those representations were materially false and misleading because Defendants failed to disclose that the Officer Defendants ignored the stated purposes of the KEL program by

borrowing from the Company to fund their personal expenditures, rather than to fund their purchases of Tyco shares.

V.

**THE OFFICER DEFENDANTS' UNLAWFUL<br>FAILURE TO DISCLOSE THEIR CRIMINAL CONDUCT**

264.    According to the September 8-K, on May 3, 2002, Kozlowski and Belnick learned that Kozlowski's efforts to unlawfully evade substantial New York State sales taxes on purchases of works of art had resulted in him becoming the target of a criminal investigation by the Manhattan D.A.  The Manhattan D.A. was investigating conduct that commenced no later than August of 2001.

265.    In addition to Kozlowski's tax evasion, that investigation concerned the compensation paid to Kozlowski by Tyco.   Soon after Kozlowski learned that he was a target of the investigation, Swartz and Belnick learned the same information.

266.    Kozlowski perpetrated his tax evasion over several years by engaging in deceptive conduct designed to create the impression that art works that he purchased – including paintings by Monet and Renoir – were being shipped to Tyco's offices in New Hampshire (where they were not subject to New York sales tax).

267.    As Kozlowski knew, however, those works of art were being sent to his New York City apartment.  Oftentimes, Kozlowski attempted to perpetrate that ruse by having empty containers shipped to Tyco while the paintings were secretly delivered to his apartment.

268.    The Officer Defendants were immediately aware of the seriousness of this investigation and the danger it posed to the Company.  As a result, on May 3, 2002, Belnick retained criminal counsel for both Kozlowski and Tyco.  Because Belnick recognized that the

interests of Kozlowski and Tyco were in conflict, different law firms were retained to represent each.

269.    Although Belnick retained counsel to represent Tyco in connection with that investigation, caused those counsel to meet with the Manhattan D.A. and arranged to provide prosecutors with documents and data, the September 8-K states that Belnick, Kozlowski and Swartz withheld the existence of that investigation from the Tyco Board until May 31, 2002, and from Tyco investors until three days thereafter.

270.    Belnick and Kozlowski concealed those facts although, on May 23, 2002, they met and conferred with the members of the Board in New York.  According to the Belnick Complaint and the Kozlowski Complaint, neither Kozlowski nor Belnick mentioned (on or off the record) the pending criminal investigation or the subpoena to the Board during the course of that meeting.

271.    According to the Belnick and Kozlowski Complaints, the Officer Defendants disclosed the existence of the criminal investigation into Kozlowski's conduct only after they were told that Kozlowski would soon be indicted.  The Officer Defendants concealed those highly material facts in a vain attempt to protect themselves, rather than act in good faith towards investors in Tyco securities.

272.    May 31, the day Tyco claims the criminal investigation was disclosed to the Tyco Board, was a Friday.  On the evening of Sunday, June 2, the Tyco Board met by phone and requested Kozlowski's resignation as Chairman, CEO and director, and Kozlowski tendered his resignation.  On Monday, June 3, the Manhattan D.A. held a press conference to announce its investigation.

273.     On Tuesday June 4, Kozlowski was indicted on twelve counts of conspiring to evade New York sales taxes on $13.1 million in paintings he purchased (the "Kozlowski Indictment").

274.     According to the Kozlowski Indictment, Kozlowski conspired with executives and employees of art galleries and art consultants in New York and London to avoid paying more than $1 million in New York State and City sales taxes on art purchases made by him and his wife.  By engaging in that conspiratorial conduct between August 11, 2001 and June 3, 2002, Kozlowski and his co-conspirators avoided paying the sales taxes due on at least six sales of paintings valued at a total of $13,175,000.

275.     According to a July 12, 2002 article in the *New York Post*, the paintings were paid for with Tyco funds and then repaid without interest.  Kozlowski and his co-conspirators generated false documents, such as invoices and shipping documents, to make it appear that the art was to be shipped out of New York and therefore not covered by New York State sales tax provisions.

276.     The belated disclosure of Kozlowski's criminal conduct had a devastating impact on the value of Tyco securities.  Tyco's stock declined from a closing price of $21.95 on May 31, 2002, to $16.45 on Tuesday, June 4, 2002 (a drop of approximately 25%).

277.     That initial indictment was only the beginning of the Officer Defendants' criminal problems.  On June 26, 2002, Kozlowski was charged in a superseding indictment with two additional counts of obstruction of justice relating to his falsification of documents subpoenaed by the Manhattan D.A.

278. The same day Kozlowski was indicted for the second time, Tyco filed a lawsuit against him in federal court in New York seeking the return of his income and benefits since 1997 and the forfeiture of all his severance pay.

279. Furthermore, on September 12, 2002, an additional indictment (the "RICO Indictment") was filed in New York Supreme Court against Kozlowski and Swartz alleging enterprise corruption, fraud, conspiracy, grand larceny, falsifying certain business records and other crimes, and against Belnick alleging falsification of business records.

280. The RICO Indictment specifically states that, from January 1, 1995 through September 9, 2002, Kozlowski and Swartz created and operated a criminal enterprise for the purpose of stealing money from Tyco and defrauding investors. Kozlowski and Swartz accomplished those goals by, among other things, falsifying records, concealing material information and providing false information to Tyco shareholders.

281. Through that misconduct, Kozlowski and Swartz were able to steal more than $170 million from Tyco. According to the RICO Indictment, Kozlowski and Swartz capitalized upon their unlawful conduct and materially false and misleading disclosures to sell hundreds of millions of dollars in Tyco stock at artificially inflated prices. In particular, between January of 2000 and August of 2001 alone, Kozlowski and Swartz received proceeds of more than $457 million and $231 million, respectively, in connection with unlawful insider sales of Tyco stock.

282. As the RICO Indictment noted, Kozlowski's vast insider sales shares were made at the same time that he was assuring investors that he had the greatest confidence in the Company.

283. The RICO Indictment describes the roles played by Kozlowski and Swartz in the criminal enterprise that they created as follows:

Defendant Kozlowski was the boss of the criminal enterprise, and set its policies. He decided what bonuses would be paid, to whom, and when, without regard for

the restrictions that the Board had put on executive officers' compensation. He entered into private deals with executive officers and directors of Tyco, which he sought to keep secret even when they were required to be disclosed. He caused Internal Audit to report to the Board through himself, and ensured that they would not audit TME [Management, Inc., a Tyco subsidiary]. Working with personnel from Investor Relations, defendant Kozlowski met with and defrauded investors, analysts and journalists to manipulate Tyco's stock price. He used the personnel in Executive Treasury to pay his bills from the Tyco "concentration account." He established a system of internal controls in which his assistant's authorization was sufficient to warrant expenditures of many millions of dollars.

Defendant Swartz was chief of operations of [the criminal enterprise]; he was the second-in-command to defendant Kozlowski. Defendant Swartz exercised control over the transfer of funds, the booking of accounting entries, and the operations of those portions of Tyco's Human Resources department dealing with certain compensation, bonuses, and loans. Defendant Swartz established a system by which the Finance Department, and not the Tyco Legal Department, controlled the data going into Tyco's filings with the [SEC] and caused Tyco's filings to be false and deceptive. Defendant Swartz deceived investors and the Board by misallocating substantial personnel costs resulting in falsely enhanced operating performance.

284.     Furthermore, the RICO Indictment includes the following description of the

disclosure violations committed by Kozlowski and Swartz:

As part of a scheme constituting a systematic on-going course of conduct the defendants and others . . . falsely represented and materially omitted to represent accurately and in a timely fashion:

(1) The compensation paid to executive officers.

(2) The loans extended to executive officers.

(3) The extent of stock sales by corporate insiders.

(4) The earnings per share of Tyco stock before non-recurring charges.

(5) The level of spending by the executive officers in managing the money and property of Tyco's owners and investors.

(6) Related party transactions.

285.    One day after the filing of the RICO Indictment, the Manhattan D.A. obtained an

Order to Show Cause with Temporary Restraining Order that froze the assets and property of

Kozlowski and Swartz and their families and dependents.

286.    On September 10, 2002, Belnick was indicted by a New York County Supreme

Court Grand Jury for failing to disclose two relocation loans that he obtained from Tyco in six

Director and Officer Questionnaires he completed between November 1998 and January 2002.

According to an Omnibus Pretrial Motion (the "Pretrial Motion") filed by Belnick in the case,

Belnick "regularly completed disclosure forms for PricewaterhouseCoopers confirming the

balance of his outstanding New York (and subsequently Utah) relocation loans (and on two

occasions advised the auditors that he actually owed more on the relocation loans than they

calculated)."

287.    Furthermore, Belnick specifically alleged that, on October 17, 2001, he

"confirmed the Utah (and reconfirmed the New York) relocation loans" to the PWC Defendants.

Still, those loans were not publicly disclosed and Belnick knew they were not publicly disclosed.

288.    In sum, therefore, each of the Officer Defendants engaged in significant criminal

conduct during the time frame in which Plaintiffs invested in Tyco securities.  Pursuant to

applicable disclosure principles and SEC regulations, the Officer Defendants were obligated to

disclose any criminal conduct in which they engaged because of the significant adverse effect

that any criminal prosecution of them would have upon Tyco's business and the price of Tyco

securities.  Moreover, the Officer Defendants could not engage in the massive sales of Tyco stock

they undertook during the time period in which Plaintiffs were investing in Tyco securities

without disclosing the adverse facts concerning their criminal conduct.  In violation of those

disclosure obligations, Tyco and the Officer Defendants failed to make the required disclosures

until the last possible moment prior to the public revelation of their criminal conduct by prosecutors, if at all.

**VI.**

**DEFENDANTS' GAAP AND GAAS VIOLATIONS AND
MATERIALLY FALSE AND MISLEADING REPRESENTATIONS
AND OMISSIONS CONCERNING TYCO'S FINANCIAL RESULTS**

289.    During the period in which Plaintiffs were investing in Tyco stock, Defendants made repeated false and misleading statements concerning the financial results produced by Tyco in the Company's press releases, financial statements and SEC filings.  As is alleged in detail below, these misrepresentations concerned a number of measures of Tyco's financial health and results and impacted all of the financial results reported by the Company from October of 1997 through August of 2002.

**A.    Improper Accounting Practices That Inflated Tyco's
Reported Financial Results At All Material Times**

**1.    The Unlawfully Aggressive Accounting Practices Employed By Defendants**

290.    Defendants' statements concerning Tyco's financial results were materially false and misleading because, as Tyco has now conceded, Defendants failed to disclose that Tyco produced the results reported by Defendants only by aggressively and improperly accounting for Tyco's business operations and the numerous acquisitions conducted by the Company.

291.    In that regard, Tyco concedes as follows in an 8-K that Tyco filed with the SEC on December 30, 2002 (the "December 8-K"):

> [C]urrent management has concluded that, in the past, the Company in general suffered from poor documentation; inadequate policies and procedures to prevent the misconduct of senior executives that occurred; inadequate procedures for proper corporate authorizations; inadequate approval procedures and documentation; a lack of oversight by senior management at the corporate level; a pattern of using aggressive accounting that, even when not erroneous, was undertaken with the purpose and effect of increasing reported results above what

they would have been if more conservative accounting were used; pressure on, and inducements to, segment and unit managers to increase current earnings, including by decisions as to what accounting treatment to employ; and a lack of a stated and demonstrable commitment by former senior corporate management to set appropriate standards of ethics, integrity, accounting, and corporate governance.

292.     The December 8-K further acknowledges that the Company "took aggressive approaches in its accounting, including its acquisition accounting, the classification of charges and expenses as non-recurring, amortization and depreciation decisions, recognition of revenue, and capitalization of expenses." As a result, the December 8-K acknowledges that the Company needed to "adopt accounting controls and procedures which improve the clarity and consistency of its financial statements and which are intended to be neutral as to the timing of the recognition of expenses and revenues . . ."

293.     Among other examples, the December 8-K states that those changes caused Tyco: to modify its recognition of dealer fees in Tyco's ADT business; to adopt specific account identification for disconnects in its ADT business; to reduce the amount of expense that the Company capitalizes in connection with the installation of 1-800 upgrades; and to undertake certain adjustments related to its Earth Tech subsidiary.

294.     Tyco has also acknowledged in various SEC filings that Defendants employed a wide variety of improper accounting practices and entries to produce the financial results reported to the public.

295.     For example, Defendants frequently utilized inflated reserves taken in conjunction with acquisitions, which Tyco executives oftentimes referred to as "financial engineering," to overstate the Company's reported financial results. Those reserves enabled Tyco to inflate its future reported financial results by charging future expenses against the reserves without negatively impacting the Company's reported earnings.

296. In describing the manner in which Defendants manipulated Tyco's financial results by exaggerating the Company's acquisition-related reserves, the December 8-K concedes that Defendants:

a. consistently reduced the book value of acquired assets by taking substantial reserves for accounts receivable and inventories, and writing down fixed assets, but made virtually no allocations to increase tangible depreciable assets by, for example, stepping up the value of inventory or fixed assets;

b. consistently increased existing reserves previously recorded by acquired entities;

c. frequently created reserves such as warranty and environmental accruals for which acquired entities had not previously maintained reserves;

d. created reserves for exit costs that did not qualify as exit costs; and

e. made "[e]xpansive and liberal use of FAS 38 for litigation and other accruals recorded in purchase accounting, some of which were subsequently reversed back to goodwill upon further review and analysis."

297. Tyco also acknowledges in the December 8-K that its review of Defendants' accounting practices revealed "[a] significant number of acquisition and merger related reserves being reversed as a result of further analysis by segment management, . . . suggesting that initial entries may not have been fully supported by contemporaneous documentation."

298. In addition, the December 8-K states:

There were some instances of reversals to income, and such reversals were timed on a number of occasions for the purpose of making EBIT targets. Among the 15 transactions scrutinized, three companies (Raychem, Mallinckrodt, and Wells Fargo) had reversals of reserves to income; these reversals totaled approximately $41.4 million over the period 1997-2001.

299.     Tyco also concedes in the December 8-K that Defendants' practices of taking

excessive reserves and engaging in other "financial engineering" were not motivated by their

desire to provide investors with accurate reporting concerning Tyco's actual financial results.  To

the contrary, the December 8-K states:

> Tyco's aggressive accounting in the past was not neutral as to the timing of the
> recognition of revenues and expenses.  The Company, for example, devoted
> considerably less attention to identifying appropriate accounting adjustments that
> would reduce reported earnings in the period immediately after an acquisition than
> it devoted to identifying appropriate accounting adjustments that would increase
> reported earnings after an acquisition.

300.     The December 8-K provides numerous specific examples of the improper

methods through which Defendants inflated Tyco's financial results.  For example, that SEC

filing states:

> In 1999, a controller for one of the Fire & Security business units prepared and
> gave a presentation to the subsidiary's operating managers relating to what was
> entitled "Acquisition Balance Sheet Opportunities."  It urged its audience to "be
> aggressive in determining exposures; determine reserves with worst case scenario;
> have a strong story to tell regarding each reserve; book the reserves on the
> acquired company's financial system; use the owner for ideas; improve on your
> estimates."   The presentation also told its audience to "be aggressive in
> determining the reductions of the asset," and "create stories to back the
> reductions."  With respect to "transitioning the acquired company" by creating
> reserves to cover one-time costs, the document provided "being aggressive in our
> estimates will allow us to be aggressive in the cost we apply."  It also provided,
> "keep the reserve descriptions within the accounting rules but stretch the
> expenditures that go in."

301.     Moreover, Tyco employees recognized the impropriety of the unduly aggressive

accounting practices mandated by their superiors.  The December 8-K reports that one version of

the document containing the foregoing instructions contains marginal notations stating, "Be

Careful!! — I wouldn't want this to get out."  Likewise, following a comment in the presentation

that reads, "Severance — if immaterial, our existing business — include fringe at high rate," a

handwritten notation states, "I would strongly recommend Never to put this in writing!!"

302.     The December 8-K also acknowledges that Defendants manipulated Tyco's financial results by repeatedly taking supposedly "one-time" charges that were of questionable validity.  In fact, Tyco reported restructuring and non-recurring charges for each of the twelve consecutive quarters in the fiscal years 1999-2001.

303.     With regard to those repeated "one-time" charges, the December 8-K stated:

> Such a practice, when repeatedly employed, implicates the validity of the characterization of the charges as one time charges.  Even where charges and expenses can reasonably be classified as non-recurring charges, the extent to which the Company used non-recurring charges, particularly when combined with the widespread creation of reserves, can have the effect of reducing the clarity and effectiveness of the financial statements in conveying to investors the most accurate picture of the Company's operations.

**2.     The Unlawful Manner In Which Defendants Accounted For The Results Produced By Tyco's ADT Subsidiary**

304.     The December 8-K also acknowledges the existence of serious accounting errors made at the Company's ADT security business that resulted in the Company consistently reporting inflated financial results.

305.     The ADT unit is the world's largest provider of burglar alarm services, and accounted for approximately 15% of Tyco's $36 billion in revenue during fiscal 2002.

306.     ADT routinely purchases residential security monitoring contracts from external independent dealers who operate under the umbrella of ADT's authorized dealer network.  ADT incurs costs for performing due diligence associated with the purchase of such contracts and for maintaining and operating the authorized dealer network.

307.     According to a November 15, 2002 *Wall Street Journal* article, "The dealers sell the monitoring contracts to ADT for about $1,000 each, and the company primarily makes its revenue from collecting monthly monitoring fees of about $30 to $33 per customer."

308.    The independent dealers operating within the network reimburse ADT for certain of the costs noted above.  Tyco has now disclosed that the amounts reimbursed to ADT by the independent dealers materially exceed the actual costs incurred by ADT.  Prior to fiscal 2002, Tyco improperly recorded the amount by which the payments exceeded ADT's actual costs as an immediate reduction in ADT's selling, general and administrative expenses, thereby improperly reducing those expenses and increasing the Company's reported earnings.  Tyco now concedes, however, that GAAP required Tyco to defer and amortize the fees received that were in excess of the Company's actual costs of acquiring the contracts over the estimated useful life of the acquired customer relationship.  Thus, Tyco and ADT improperly recognized as earnings the amount by which the independent dealer reimbursements exceeded the costs actually incurred by ADT.

309.    The proper accounting treatment for the excess reimbursements was addressed by the SEC in SAB No. 101, which was issued in 1999.  That GAAP pronouncement by the SEC mandates that payments received for initiating a service such as security monitoring must "be recognized on a straight-line basis, unless evidence suggests that the revenue is earned or obligations are fulfilled in a different pattern, over the contractual term of the arrangement or the expected period during which those specified services will be performed, whichever is longer."

310.    As a result of Defendants' failure to recognize the ADT revenue in compliance with GAAP, Tyco had to restate the Company's financial results for the first three quarters of 2002, a restatement that resulted in a $135 million reduction in reported pre-tax earnings.

311.    Rather than restating results for the periods prior to 2002, Tyco took a charge of $185.9 million during 2002 to account for the amount of revenue recognized in the fiscal years 1999 to 2001 that should have been deferred and amortized over the estimated useful life of the

acquired customer accounts. Thus, Tyco has effectively admitted that its revenue and earnings for the 1999 through 2001 fiscal years were overstated by $185.9 million as a result of Defendants' failure to properly account for ADT's financial results.

312.     Tyco has also conceded facts that demonstrate that, even as restated, the financial results reported for the ADT unit were improperly inflated.

313.     The December 8-K states that ADT had "historically estimated the useful life of residential customer installations (whether internally- or dealer-generated) at ten years." In part, that estimate of the useful life of ADT accounts was based upon Company analyses and a third-party analysis prepared in May of 2001 that, according to Tyco, supported an average attrition rate for ADT customers of 8.5% per year. Relying upon that assumption, the Company amortized the cost of acquiring accounts in the United States from dealers over that ten year period and depreciated the capitalized cost of ADT-initiated U.S. accounts over the same time frame.

314.     The data that Defendants relied upon in calculating the ten-year average useful life was inherently unreliable, and was contradicted by more reliable data in their possession.

315.     In that regard, the December 8-K suggests that the third-party analysis that Tyco had prepared in May of 2001 to analyze the useful life of ADT customer accounts produced unreliable results. Tyco euphemistically states, "The useful lives as estimated by the methodology used in the independent appraiser's May 2001 appraisal of dealer accounts is a function of the data used; elimination of certain accounts and periods about which reasonable questions can be raised would result in significantly shorter estimated lives."

316.     Tyco also suggests that the May 2001 estimate was unreliable because "it is particularly difficult to accurately estimate useful lives of ADT accounts purchased from dealers

because the dealer program is relatively young, has grown significantly in recent years (more than half of the total accounts purchased since the program's inception were purchased in the last two years), and the credit status of the program's accounts has changed over time."

317. Moreover, according to a November 21, 2002 article in *The Wall Street Journal*, however, "ADT executives acknowledge that internal measurements have long pegged the [attrition] rate at more than 14%." Likewise, a November 15, 2002 *Wall Street Journal* article stated:

> Eight months ago, Mr. Swartz, then Tyco's chief financial officer, justified the way Tyco wrote off cancelled alarms by telling investors the attrition rate for such customers was a low 8.5%. But now, ADT officials say the actual attrition rate has been about 14% for several years. Mr. Swartz's figure was at odds with internal calculations, they say.

318. Furthermore, Defendants continued to utilize the 8.5% attrition rate in calculating ADT's expenses although they were aware that, throughout the late 1990s, ADT was adding a large volume of high risk customers who were significantly more likely to discontinue their service with ADT than the company's clients had been in the past.

319. As *The Wall Street Journal* reported in a November 15, 2002 article, following Tyco's acquisition of ADT in 1997, ADT began to pressure its dealers to sell alarm systems in impoverished neighborhoods, thereby increasing the risk that customers would default on their obligations to ADT or cancel their service. The Tyco Defendants also incentivized ADT dealers to sign up customers who were poor credit risks because, until 2000, ADT executives who oversaw dealers were paid bonuses based solely on the number of new accounts they generated.

320. That strategy produced a customer base with extremely poor credit. The December 8-K states that poor credit risk accounts (accounts with a Beacon score below 625) constituted 40% of ADT's accounts prior to 2000 and approximately 25% of ADT's accounts in

2000 and 2001. As a result of the extremely high default rate associated with those accounts, ADT completely eliminated them subsequent to September 2002, *i.e.*, after Defendants' unlawful conduct came to light.

321. The Tyco Defendants' efforts to expand ADT's sales in impoverished neighborhoods had the unsurprising effect of dramatically increasing ADT's attrition rate. As the December 8-K acknowledges, "during fiscal years 2001 and 2002, the attrition rate of dealer accounts has increased significantly" because of the foregoing factors. Nevertheless, Tyco never changed the manner in which it amortized or depreciated its customer accounts.

322. As a result, the financial results for the ADT unit were inflated because Tyco continually amortized the cost of acquiring accounts in the United States from dealers and depreciated the capitalized cost of ADT-initiated U.S. accounts over a time period that was far longer than the period the Company's data showed was appropriate. Thus, Tyco continually under-estimated the costs associated with conducting ADT's operations.

### 3. The Unlawful Manner In Which Tyco Employed Acquisition-Related Accounting Entries To "Spring-Load" Tyco's Reported Financial Results

323. The December 8-K also concedes that, after a limited review of a small percentage of the acquisitions conducted by Tyco during the time period relevant to this action, Tyco had concluded that the Company consistently manipulated the financial results of acquired entities immediately prior to the consummation of transactions in order to improperly inflate Tyco's post-acquisition results.

324. The Tyco Defendants accomplished that objective by inducing Tyco's acquisition candidates: (a) to forestall revenue generating activity prior to the consummation of acquisitions so that sales could be recorded by Tyco following the closing of the acquisition; and (b) to

accelerate the payment of expenses that were not due so that they would be incurred by the acquired entities, not Tyco.

325.     The December 8-K concedes that, as a result of such manipulations:

> there were instances in which the pre-acquisition earnings of an acquired entity for the period immediately preceding the consummation of its acquisition by Tyco were significantly lower than the entity's earnings in prior periods.  The decrease in reported earnings in the period immediately preceding the consummation of an acquisition, which decreases were for the most part due to non-recurring charges, raise the issue as to whether the acquired entity's pre-merger financials had been improperly manipulated in order to increase reported earnings subsequent to the consummation of the acquisition.

**B.     Additional Improper Accounting Practices That Inflated Tyco's Reported Financial Results In Fiscal 1997 And Thereafter**

326.     In addition to the unlawful accounting practices and entries described above, Defendants employed a number of specific improper accounting entries during Tyco's fiscal 1997 that had the effect of inflating the Company's reported financial results.

327.     For example, the December 8-K reveals that Defendants employed improper financial engineering that inflated the Company's financial results in connection with Tyco's acquisition of Carlisle Plastics in a transaction that closed in or about September 1996.

328.     The December 8-K acknowledges that Tyco created a September 10, 1996 memorandum that discussed "Carlisle Plastics — Financial Engineering and Purchase Accounting."  The memo and attachments define "financial engineering" as "pre-merger entries" and "purchase accounting" items as "post-merger entries."  A "Discussion Items" attachment to the memo states, "[W]e'll book additional 'Financial Engineering' reserves in July with the objective of having a break even month.  This way we won't raise any flags with the Lender reporting.  The balance of the reserves will be booked in August."

329.     In addition, the December 8-K reports:

The equity balance sheet attachment for the Carlisle acquisition contemplates $26,440,000 in financial engineering, thereby reducing pre-merger earnings by that amount. The detailed schedule demonstrates that the overwhelming portion of the financial engineering will be in the month just prior to the consummation of the merger.

330.     Thus, it is evident that Tyco intentionally manipulated Carlisle Plastics' financial results in a manner designed to inflate Tyco's reported financial results for the 1997 fiscal year.

**C.     Additional Improper Accounting Entries That Inflated Tyco's Reported Financial Results In Fiscal 1998 And Thereafter**

331.     The December 8-K further acknowledges that Tyco made improper accounting entries in connection with the Company's acquisition of Sigma Circuits, Inc. in a $71 million transaction (inclusive of debt assumption) that closed on July 8, 1998.

332.     In particular, the December 8-K states that Defendants sought to increase Tyco's reported earnings by delaying the shipment of Sigma products until after the acquisition was completed so that Tyco, rather than Sigma, would be credited with the revenue.

333.     That improper conduct was revealed in a June 19, 1998 letter from the Sigma CFO in which he indicated that he was "prepared to delay shipment of certain product until early July," as had been requested by Tyco. The letter also noted that, as a result of that accounting manipulation, Sigma would not achieve the revenue minimum established for it in the June 1, 1998 Merger Agreement with Tyco.

334.     The Sigma CFO therefore asked Tyco to confirm that the resulting failure of Sigma to meet the quarterly revenue minimum established in the Merger Agreement was "acceptable to Tyco and within the spirit of the Definitive Agreement." The Sigma CFO's June 19 letter was faxed to Tyco the same day and, later that day, faxed from the recipient to others within Tyco.

335. On June 22, a handwritten notation was made on one of the faxed copies stating, "I.G. [which was shorthand for Tyco officer Irving Gutin] says do side letter — no reference to underlying reason — told Brian [the original recipient of the letter] to proceed."

336. The Sigma acquisition therefore provides a particularly clear example of Tyco's longtime practice of manipulating the financial results of its acquisition candidates to spring-load Tyco's post-acquisition financial results.

337. Tyco has also conceded in the December 8-K that, in connection with the Company's acquisition of Sherwood, Defendants inappropriately charged IT implementation and temporary employee costs related to a failed implementation project against a reserve accrued in purchase accounting, instead of expensing those costs as they were incurred.

338. That accounting manipulation had the effect of overstating Tyco's goodwill by $700,000 and overstating the Company's fiscal 1998 pre-tax earnings by $438,000.

339. Tyco also acknowledges in the December 8-K that, in connection with the Company's acquisition of a Wells Fargo security business, Tyco inappropriately accrued costs to maintain idle capacity during the transition of customers to the ADT network.

340. That improper accounting treatment had the effect of overstating Tyco's goodwill and fiscal year 1998 pre-tax earnings by $3 million.

**D.  Additional Improper Accounting Entries That Inflated Tyco's Reported Financial Results In Fiscal 1999 And Thereafter**

341. The December 8-K also acknowledges that Defendants employed improper "financial engineering" designed to inflate Tyco's reported financial results in connection with the Company's acquisition of U.S. Surgical Corp. ("US Surgical") in a transaction that closed on October 1, 1998.

342.     The December 8-K reports that Tyco managers distributed a "Synergies Summary" for the US Surgical transaction that was created on or about September 18, 1998. That document stated that, in connection with the US Surgical transaction, Tyco could recognize $72 million from "Financial Engineering" in 1999 and $52 million in the each of the following two years.

343.     The improper "Financial Engineering" conducted by Defendants in connection with the US Surgical merger is also reflected in an August 17, 1998 memorandum that discussed the manner in which Defendants intended to achieve certain financial goals for US Surgical in the first year after the merger.  According to the 2002 8-K:

> The memo lists numerous cost-savings measures, and reaches a "total savings before financial engineering" of $145.4 million.  The memo also suggests $64.6 million in "financial engineering" categories, including plans to "over-accrue expenses in Q3 before closing" and "accrue in advance rebates."

344.     The December 8-K also acknowledges that Defendants caused US Surgical to accrue $18.7 million for potential legal fees related to ongoing patent litigation defense and other items in the month immediately preceding the merger between Tyco and US Surgical.

345.     Ultimately, however, Defendants were forced to reduce that accrual by $18.2 million because the "initial accrual did not represent a reasonable estimate of legal fees."

346.     The December 8-K also acknowledges that Defendants exploited the US Surgical merger to inflate the Company's financial results by manipulating US Surgical's revenues and expenses immediately prior to the consummation of the merger.

347.     Specifically, in the quarter immediately prior to the merger (the quarter ending September 30, 1998), US Surgical's revenues decreased to $242.2 million, a 33% decline from the previous quarter. The following quarter, the first quarter following the merger, revenues increased 47%, to $355.2 million.

348.    In addition, Defendants inflated Tyco's financial results by prematurely recognizing certain expenses immediately prior to the consummation of the merger with US Surgical.

349.    In September 1998, US Surgical accrued $132.1 million in expenses related to changes in the contractual terms of long-term contributions that US Surgical had agreed to make to hospitals and academic institutions under a program called the Centers of Excellence.

350.    Prior to September 1998, US Surgical's grants and contributions to those institutions extended over a period of years but were cancelable at any time by either party. Effective September 30, 1998, the Company amended certain agreements by committing itself to contributions over a long-term period, generally five years.  That change in the terms of the grants – which Tyco adopted independently – resulted in the Company accruing future grant awards, and therefore immediately recognizing the expenses associated with them.

351.    Those maneuvers, which produced no cognizable benefit for the Company, had the effect of accelerating expenses just prior to the merger and, accordingly, reducing expenses (and thereby increasing earnings) subsequent to the merger.

352.    It is therefore evident that the "Financial Engineering" conducted by the Tyco Defendants in connection with the US Surgical transaction had the purpose and effect of improperly inflating Tyco's post-acquisition financial results.

353.    Tyco also concedes in the December 8-K that Tyco engaged in improper financial engineering in connection with the Company's acquisition of AMP in a transaction that closed on April 2, 1999.

354.     In particular, the December 8-K acknowledges that Defendants induced the management of AMP to manipulate that company's financial results in a manner designed to inflate Tyco's post-acquisition reported results.

355.     The December 8-K states that the quarterly results for AMP show a decline in profits prior to the acquisition by Tyco and a significant increase in profits following the acquisition.  AMP's reported EBIT for the last quarter of 1998 was $85 million and its EBIT for the first quarter of 1999, the quarter prior to the transaction, was a loss of $12 million.  AMP's reported EBIT for the second quarter of 1999, the quarter after the transaction, was $245 million.

356.     The increase in EBIT between the March 1999 quarter and the June 1999 quarter related primarily to a decrease in AMP's cost of sales.  The cost of sales percentage for AMP during the 18-month period to March 31, 1999 was roughly comparable with the cost of sales for other participants in its markets.  The cost of sales percentage then decreased against both historic levels and market levels during the June 1999 and the September 1999 quarters.

357.     The December 8-K also specifically acknowledges that Defendants inflated Tyco's financial results by creating an unnecessary $15 million reserve to pay anticipated legal costs related to severed employees in connection with the AMP transaction.  Of that total, $5 million was reversed by the Company and $10 million was used inappropriately to pay future severance costs.

358.     Once again, therefore, it is evident that the "Financial Engineering" conducted by Defendants in connection with the AMP transaction had the purpose and effect of improperly inflating Tyco's post-acquisition financial results.

359.     Defendants repeated a similar pattern of misconduct in connection with Tyco's acquisition of Raychem in a transaction that was announced May 19, 1999 and consummated on August 12, 1999.

360.     In the quarter immediately prior to the consummation of the acquisition, Raychem management, at Tyco's direction, caused employees to hold back shipments.  In addition, the Raychem executives instructed employees to pay all bills received, whether due or not, prior to the consummation of the acquisition.

361.     Raychem's reported EBIT for the quarters ending June 1998, September 1998, December 1998 and March 1999 were $25 million, $64 million, $55 million and $55 million, respectively.  The quarter ending September 1999 was divided into two approximately six week periods: the pre-acquisition period from July 1, 1999 through August 12, 1999 with EBIT of a loss of ($48 million), and the post-acquisition period from August 13, 1999 to September 30, 1999 with an EBIT of $38 million.  Those exceedingly unlikely results were produced as a result of Defendants' accounting manipulations.

362.     Defendants' manipulation of Raychem's financial results to inflate Tyco's results was also reported in an article that appeared in the February 28, 2002 edition of *The New York Times*.  The article stated that, when faced with statements by former employees that Tyco had caused Raychem to pre-pay expenses to inflate Tyco's reported cash flow, Tyco conceded that it had caused Raychem to engage in such manipulations shortly before the closing of the Raychem acquisition.

363.     The December 8-K also acknowledges that, due to Defendants' failure to record the value of the inventory acquired by Tyco from Raychem in compliance with purchase

accounting rules, Tyco understated its inventory following the close of the Raychem transaction by $34.3 million.

364.    Not recording these inventory costs had the effect of overstating Tyco's pre-tax earnings by $13.3 million in fiscal 1999.

365.    In addition, the December 8-K concedes that Defendants inappropriately accrued salary costs related to unproductive time for employees in connection with the Raychem transaction. That inappropriate accounting treatment resulted in an overstatement of goodwill of $2.3 million and an overstatement of pre-tax earnings in fiscal year 1999.

366.    Tyco also concedes in the December 8-K that Defendants made a number of inappropriate accounting entries in connection with the Sherwood acquisition that had the effect of inflating Tyco's fiscal 1999 financial results.

367.    First, Defendants inappropriately accrued employee retention costs in purchase accounting, instead of expensing them as incurred. That improper accounting treatment had the effect of overstating Tyco's goodwill and fiscal year 1999 pre-tax earnings by $1.5 million.

368.    Second, Defendants inappropriately charged IT implementation and temporary employee costs related to a failed implementation project against a reserve accrued in purchase accounting, instead of expensing those costs as they were incurred. That accounting manipulation had the effect of overstating Tyco's goodwill by $700,000 and overstating the Company's fiscal 1999 pre-tax earnings by $262,000.

E.    **Additional Improper Accounting Entries That Inflated Tyco's Reported Financial Results In Fiscal 2000 And Thereafter**

369.    The December 8-K also acknowledges that Defendants engaged in numerous accounting manipulations that had the effect of improperly inflating the Company's fiscal 2000 financial results.

370. As noted above, due to Defendants' failure to record the value of the inventory acquired by Tyco from Raychem in compliance with purchase accounting rules, Tyco understated its inventory following the close of the Raychem transaction by $34.3 million.

371. As a result of Defendants' failure to accurately record those inventory costs, Defendants overstated Tyco's fiscal 2000 pre-tax earnings by $21.0 million.

372. After the acquisition of Raychem, the Company reversed into income a $945,000 reserve that was established prior to the acquisition for an inventory dispute between AMP and Raychem. That inappropriate accounting treatment had the effect of overstating Tyco's fiscal year 2000 pre-tax earnings by $945,000.

373. Defendants also created excess reserves for severance and relocation payments in connection with the Raychem transaction that exceeded those that were permissible under the Company's stated policies. As a result, Defendants overstated the Company's goodwill and fiscal year 2000 pre-tax earnings by $2 million. Because $600,000 of this amount was later reversed to goodwill, the resulting overstatement was $1.4 million.

374. In addition, Defendants failed to recognize previously existing accounts receivable belonging to Raychem at the time that acquisition closed. Thereafter, Defendants improperly recorded payments for those accounts receivable as income when collected. Those actions had the effect of overstating Tyco's goodwill and fiscal year 2000 pre-tax earnings by $500,000.

375. As noted above, Tyco has also conceded that Defendants made inappropriate accounting entries in connection with the Company's acquisition of the Wells Fargo security business. At the time of the acquisition, sales and use taxes were accrued in purchase accounting even though the Company was indemnified by the seller and would not be liable for such taxes.

The accrual was reversed subsequently into income, overstating goodwill and fiscal year 2000 pre-tax earnings by $4.4 million.

**F.  Additional Improper Accounting Entries That Inflated Tyco's Reported Financial Results In Fiscal 2001 And Thereafter**

376.  The December 8-K also acknowledges that Defendants engaged in numerous accounting manipulations that had the effect of improperly inflating the Company's fiscal 2001 financial results.

377.  For example, the December 8-K acknowledges that Tyco significantly overstated the revenue generated by the Company's Engineered Products and Services business segment during 2001 and 2002.  According to the December 8-K, EarthTech, a Tyco subsidiary, did not maintain adequate procedures to ensure that intra-company and inter-company revenues were eliminated during the consolidation process.  As a result, certain EarthTech revenue was double counted and not eliminated in consolidation.

378.  That glaring deficiency in Tyco's accounting controls resulted in Tyco overstating the revenue generated by EarthTech during 2001 by $41 million and overstating EarthTech's revenue for the first three quarters of 2002 by $101 million.

379.  The December 8-K also noted that Defendants engaged in inappropriate accounting that artificially inflated the Company's fiscal 2001 financial results in connection with the Company's acquisition of Mallinckrodt.

380.  The purchase price used to record the acquisition was understated by $120 million as a result of incorrectly computing the value of equity securities issued by Tyco to acquire Mallinckrodt and by $115 million as a result of incorrectly computing the value of employee stock options issued by Tyco to replace similar employee stock options at Mallinckrodt.

381.     Defendants therefore overstated Tyco's goodwill and equity by $235 million and overstated the Company's pre-tax earnings as a result of the related goodwill amortization of $5.6 million that Tyco should have recognized in fiscal 2001.

382.     Defendants also overstated Tyco's 2001 results by creating inappropriate reserves of $5.4 million in connection with the Company's acquisition of Chemelex.  Those reserves were subsequently reversed into income, overstating the Company's fiscal 2001 goodwill and pre-tax earnings by $5.4 million.

383.     Tyco has also acknowledged in the December 8-K that, in connection with the acquisition of Simplex, Defendants inappropriately accrued fringe benefit costs of $0.6 million.  That entry was later reversed into income, thereby overstating Tyco's goodwill and fiscal year 2001 pre-tax earnings by $0.6 million.

384.     A June 12, 2002 article in the *New York Daily News* also reported on improper financial engineering that Tyco conducted in connection with the Simplex acquisition.  The article quoted a person with close ties to Simplex as stating, "I think it's fair and accurate to say they made writedowns on the value of their receivables to a level that, if it didn't break the law, certainly bordered on breaking the law."

385.     Defendants also engaged in inappropriate accounting in connection with the Company's acquisition of CIT in a transaction that closed on or about June 4, 2001.

386.     As *The Wall Street Journal* reported in its January 7, 2003 edition, sources revealed that CIT had made "a series of charges" immediately before the closing of that transaction that "depressed CIT's earnings but didn't show up on Tyco's books."

387.     Specifically, *The Wall Street Journal* reported that, during April and May of 2001, CIT posted a $148 million provision for credit loss, resulting in a net loss of $78.8 million.

388.     In June 2001, after being absorbed by Tyco, CIT posted net profits of $71.2 million, which added 1.5 cents per share to Tyco's third quarter results, and substantially contributed to Tyco beating analysts' expectations by $0.03 per share.

389.     According to the February 25, 2002 edition of *Business Week*, Tyco produced that startling "turnaround" by employing similar financial engineering to that utilized by the Company in numerous other transactions.  According to that article, the CIT acquisition provided a rare glimpse into the manner in which Tyco spring-loaded its acquisitions because CIT debt continued to trade publicly after the acquisition and, therefore, financial analysts could compare CIT's reported results immediately prior to and after the acquisition.

390.     The massive $148.1 million "provision for credit losses" that Tyco took in the April-May period was well over twice the $68.3 million provision CIT took in the entire first quarter.  The *Business Week* article also noted that CIT made total downward "adjustments" to income totaling $221.6 million in May of 2001, just before the deal closed.

391.     At the same time, CIT booked a $54 million charge for acquisition-related costs. As Jack Ciesielski, publisher of the *Accounting Observer*, explained in the *Business Week* article, those charges were booked by CIT because Tyco caused CIT to adopt "a new basis of accounting" on June 2, allowing Tyco to "push down" deal costs to CIT.   According to Ciesielski, "That [shifts] some of Tyco's closing transactions into the CIT financials, making them appear as if they were CIT's own."

392.     In addition, CIT's revenues were unusually low during the two months before the deal closed.  In that period, CIT recorded just $25.9 million in a category called "other revenue," down from $211.6 million in the first quarter, and $95.9 million in June alone.

393.    Furthermore, the *Business Week* article reported that, in its first four months under the Tyco umbrella – from June 2, 2001 to September 30, 2001 – CIT generated $252.5 million in net income.  That net income was more than three times the $81.3 million that CIT earned in its last five months as an independent public company (*i.e.*, from January 1, 2001 until June 1, 2001).

394.    As the *Business Week* article noted:

> Even if you accept Tyco's explanations for each of those items, the bottom-line impact is indisputable: The huge surge in charges taken by CIT just before the deal closed – combined with the drop in "other revenue" – helped produce a noticeable jump in CIT earnings just after the deal closed.  Indeed, CIT was the major reason Tyco reported a 34% increase in per-share earnings for the quarter ending Sept. 30, just as profits were tanking throughout Corporate America.

395.    A financial analyst quoted in the *Business Week* article, Albert J. Meyer of David W. Tice & Associates, stated that those results provided "one of the most startling examples of financial engineering you can hope to find."

396.    Thus, as was true of many other companies acquired by Tyco, CIT's results surged in the first month after the Company took control, creating the false impression that Tyco was producing rapid growth in CIT's business.

## G.    Additional Improper Accounting Entries That Inflated Tyco's Reported Financial Results In Fiscal 2002 And Thereafter

397.    The December 8-K also acknowledges that Defendants engaged in numerous accounting manipulations that had the effect of improperly inflating the Company's fiscal 2002 financial results.

398.    The December 8-K concedes that, in connection with the Company's acquisition of Sensormatic, Defendants improperly capitalized interest expenses related to the debt assumed

by Tyco. As a result of that error, Defendants overstated Tyco's goodwill and fiscal year 2002 pre-tax earnings by $1.6 million.

399.    Tyco has also conceded that it materially overstated the Company's goodwill, and therefore its earnings, during 2002 because Tyco failed to timely record a loss due to an impairment in the value of its CIT subsidiary.

400.    As noted in Tyco's financial statements for the year ended September 30, 2002:

During the quarter ended March 31, 2002, Tyco experienced disruptions to its business surrounding its announced break-up plan, a downgrade in its credit ratings, and a significant decline in its market capitalization. During this same time period, CIT also experienced credit downgrades and a disruption to its historical funding base. Further, market-based information used in connection with the Company's preliminary consideration of the proposed IPO of CIT indicated that CIT's book value exceeded its estimated fair value as of March 31, 2002. As a result, the Company performed a SFAS 142 first step impairment analysis as of March 31, 2002 and concluded that an impairment charge was warranted at that time.

401.    Nevertheless, in furtherance of their ongoing scheme to inflate Tyco's operating results, Defendants improperly failed to record the impairment in CIT's value in the May 2002 10-Q, as was required by GAAP.

402.    Rather, in that SEC filing, Tyco reported accumulated earnings of $11.8 billion. This amount, which generally represents the total net income, less dividends, over the life of a corporation, was inflated by $4.5 billion (or approximately 38%).

403.    Ultimately, Tyco conceded in a Form 10-Q/A filed with the SEC on or about June 12, 2002 (the "June 2002 10-Q/A") that CIT's goodwill had suffered a $4.5 billion impairment, and reduced the Company's accumulated earnings by that amount. That charge eliminated almost 40% of the retained earnings Tyco had accumulated *since its inception*.

404.    Tyco has also admitted that it improperly failed to record a timely impairment in the value of goodwill at Tyco Telecommunications and Tyco Infrastructure Services during the

quarter ended June 30, 2002. As a result, Tyco's reported pre-tax earnings of approximately $151 million during the quarter ended June 30, 2002 were overstated by approximately $387 million.

### H. Defendants' False And Misleading Statements Concerning Tyco's Accounting Practices And The Integrity Of Tyco Management

405. Ignoring the foregoing facts, during the period in which Plaintiffs invested in Tyco securities, Defendants issued repeated assurances that Tyco's accounting practices not only complied with GAAP, but were conservative. Those representations were made to quell any investor concern regarding the legitimacy of Tyco's accounting practices.

406. For example, during a January 18, 2000 conference call held by Tyco to discuss the Company's results for the first quarter of fiscal 2000, Swartz stated:

> Since we disclosed last month, when the SEC informed us about the informal inquiry being performed, we ended up making the submissions as expected, beginning in January and will continue to provide the information that's being requested by the SEC. What's extremely important to realize though is that we have gone through this information, reviewed the materials going back three years; we at the company remain very comfortable and confident that our accounting was appropriate for reserves as our auditors also remain confident with the accounting that we performed for those acquisitions. We will continue to make the submissions as requested by the SEC and move as quickly as possible in providing it to them so that we can get this behind us; however, we continue, as I said, to remain very comfortable with our accounting.

407. During the same call, Kozlowski stated, "[W]e believe we have no issues with the SEC from everything we've seen."

408. On April 18, 2000, Tyco held a conference call to discuss, among other things, its earnings during the second quarter of fiscal 2000. During that call, Kozlowski and Swartz also addressed the SEC's informal investigation of Defendants' acquisition accounting. In that regard, Swartz falsely stated, "[W]e continue to remain very confident with the financial results we've reported."

409.     On July 13, 2000, Tyco issued a press release announcing that the SEC had terminated its informal inquiry into Tyco's accounting practices without recommending an enforcement action.  According to the press release:  "As Tyco has previously stated, the Company has at all times been confident with respect to the propriety of its accounting and its previously issued financial statements."

410.     On July 19, 2000, Tyco held a conference call to discuss, among other things, the termination of the SEC's inquiry into Tyco's accounting practices.  Reiterating the message of Tyco's July 13, 2000 press release, Kozlowski stated, "[T]he company has at all times been confident with respect to the propriety of its accounting and its previously issued financial statements.  I hope with that we will not deal with accounting questions or accounting inquiries here at Tyco."  When asked whether he was "aware of any new negative news articles or anything that happens to be coming out," Kozlowski responded, "Not at all."

411.     Defendants did not disclose at that time, however, that they withheld a substantial number of documents from the SEC, causing the SEC to reach a false conclusion in its investigation.  In the December 8-K, Tyco admitted that "[a] large quantity of documents collected by Tyco and its counsel in connection with the SEC's document request had not been produced to the SEC at the time the SEC closed its inquiry."

412.     After rumors of accounting improprieties at Tyco began to circulate anew in 2002, Defendants again took steps designed to negate those rumors and to reassure investors concerning the integrity of the Company's accounting controls and its management.  For example, on January 15, 2002, Tyco held a conference call to discuss, among other things, the Company's accounting practices.

413.     During that call, Kozlowski falsely reassured investors and analysts about

"rumors" that were resurfacing about Tyco's accounting, and about the supposed completeness of

its disclosures:

> We're a very open company, we're very willing to talk about anything that our
> investors, shareholders, interested parties have to talk to us about, we have Jack
> Blackstock, Maryanne Kane, Mark Swartz, myself, available, we present our
> accounting in the best disclosures that we can possibly put together here. Are we
> complex? Yes, but because we are complex we have absolutely no qualms
> whatsoever in presenting a good disclosure, there's nothing hidden behind the
> scenes, our cash flows are going to be strong, we will back up our earnings with
> our cash flows and from time to time there are, of course, some motivated parties
> who can thrive or make money on rumors and that's an unfortunate part of this
> business, but here at Tyco we're very willing to discuss anything at all that
> anybody might have  . . . .

414.     Similarly, in a January 16, 2002 article in *The Wall Street Journal*, Kozlowski was

quoted as stating that he was "frustrated by continuing negative rumors" regarding Tyco's

accounting.  Kozlowski also falsely assured investors that "[t]here is nothing negative going on at

any place at Tyco."

415.     Kozlowski made similar false statements in an article that appeared in *The New

York Times* on January 16, 2002.  That article stated:

> Dennis Kozlowski, Tyco's chairman, expressed frustration in a conference call
> with analysts yesterday morning that Tyco's accounting continues to be
> questioned.  "Our accounting has been reviewed and found to be sound," Mr.
> Kozlowski said.  "Our disclosure is exceptionally detailed."

416.     The same article also noted that, "Mr. Swartz, Tyco's chief financial officer, said

Tyco follows standard accounting in its acquisitions and does not manipulate balance sheets."

417.     The Officer Defendants made additional materially false and misleading

statements concerning Tyco's accounting practices during a January 22, 2002 conference call

held to discuss Tyco's plan to separate Tyco's operations into four publicly-traded companies.

418.    During that call, Kozlowski falsely stated that "there's absolutely no new accounting questions" at Tyco.

419.    In addition, Swartz made the following materially misleading representation concerning Tyco's accounting disclosures regarding its acquisitions:

I do take issue with better disclosure and we have many times asked people to show us better disclosure on acquisitions and we'll do it and have yet to see any that would be improved from what we currently have.  Secondly, as far as cash pay for acquisitions, they are included in those footnotes 100 percent and back to footnote 2 you can look and see exactly what the cash was this year and last year and go back every year you want to so every acquisitions we have made is disclosed and it is included.

420.    In addition, Swartz stated:

So the amount of disclosure that will end up being seen will be the same good state of art disclosure that we have had better than anyone else we can find out there but it will be done on a more reduced level and even with all these accounting insinuations, allegations, rumors, etc. we have had over the past few weeks, this has not changed our plan any nor any level of comfort as far as being able to go forward, have these individual financial statements and send each of these businesses off with extremely strong earnings and cash flows.

421.    Kozlowski also falsely defended the integrity of Tyco's management in an interview that was reported in *The New York Times* on January 24, 2002.  Kozlowski stated, "Crooks are going to be crooks at any company. . . . But we have executives of very high integrity."

422.    During a February 6, 2002 conference call, Kozlowski and Swartz again made materially false and misleading representations concerning Tyco's accounting practices.  For example, Swartz stated:

On one other issue, the accounting questions that have been asked.  Unfortunately, buried in a *New York Times* article today, they do come out and say that no evidence of accounting irregularities have been found at Tyco.  That is true, that is exactly what happened two years ago when these same allegations were given, same exact arguments, and we were able to demonstrate two years ago that our accounting was sound, the results we were showing were appropriate, and that

was confirmed by independent reviews both from the government and also from independent auditors. We are in the same position today as far as our approach to accounting. It's on a conservative basis, it is full disclosure, second to none, and we do know that as a result of the questions being thrown out into the marketplace, in a current jittery market, that there are questions that end up coming from just the allegations themselves. We understand that, we recognize that, and we are currently working on the best way to once again demonstrate that the accounting is sound and appropriate and we will put that on a public filing in an 8-K with SEC to be able to once again demonstrate to you that the accounting continues to be as sound as it was two years ago, a year ago and as included in our 10-K and our 10-Q that will be coming, one of full disclosure.

423. On February 13, 2002, the Tyco Defendants again held a conference call to assure investors that Tyco's accounting practices were "conservative" and reliable. During that call, Kozlowski stated:

I do want to remind you that we will be filing our fiscal first quarter Q . . . tomorrow. You'll see even more disclosure than you are used to at Tyco. We already provide substantially more disclosure than our peers. We believe this is a good thing. The more you know about our accounting, I believe the more comfortable you will be.

424. Swartz also assured investors during the call that Tyco's accounting practices were conservative. He stated, "We believed that as with all of our accounting that the best approach for us is to follow the most conservative that we can as far as showing the financial strength of the company."

425. Kozlowski again assured investors that there were no accounting improprieties at Tyco in a February 22, 2002 article in the *Boston Globe* concerning a Tyco shareholder meeting. That article quoted Kozlowski as stating, "We have nothing to hide. . . . Our accounting is conservative and it is proper."

426. Swartz also falsely re-assured investors concerning the propriety of Tyco's accounting practices in a conference call held on February 26, 2002. During that call, Swartz stated:

So now roll forward 2 years where we do have the same accounting allegations once again and as a management group we tell you once again that the accounting is appropriate and conservative, PwC, our outside auditors continue with their opinions unchanged and the new round of shareholder suits that copy the ones 2 years ago are also baseless. And our integrity is extremely important to us, that is why we believe in being completely open, disclosing to a level far beyond others and we will continue to do that until we are able to in the future provide you the same closure that we have been able to provide to the accusations that we had 2 years ago.

427.     Swartz also added, ". . . to conclude, our accounting continues to be done appropriately and conservatively."

428.     On March 5, 2002, Swartz made a similar effort to defend Tyco's accounting practices during a conference call. At that time, Swartz stated:

Well again, thank you for listening to us today and learning more about the accounting here at Tyco which, as you hear, continues to be in conformance with GAAP, prepared on a conservative basis with proper disclosure for our investors to see the performance of our business.

429.     The March 10, 2002 edition of the *Ft. Lauderdale Sun-Sentinel* reported an additional attempt by Kozlowski to defend Tyco's accounting practices. The article quoted Kozlowski as stating, "Tyco has always been an open company and we have nothing to hide. . . . Our accounting is conservative and proper, living up to the letter and the spirit of the law."

430.     Swartz again made false statements concerning Tyco's accounting practices during a conference call held on March 12, 2002. Swartz stated, "[A]s we have said, our accounting, as far as acquisition accounting, in addition to the other areas that we have talked about, is in accordance with GAAP in an appropriate and consistent basis."

431.     Tyco also defended the Company's accounting practices in an article that appeared in the March 19, 2002 edition of *The Wall Street Journal*. In discussing the Company's accounting for the Raychem acquisition, the article stated, "A Tyco executive vice president, J.

Brad McGee, denied there was any attempt to boost Tyco's results, and defended its accounting as proper."

432.     The article also quoted McGee as stating that Tyco had never "manipulated the cash flow or earnings of companies we acquire for the purpose of spring-loading, or getting better results after the acquisition."

433.     Swartz again defended the purportedly conservative accounting practices followed by Tyco in an April 2, 2002 conference call with investors.  At that time, he stated, "We also are real pleased and proud of our accounting policies and the standard we have set for open and forthright disclosure."  Swartz also stated:

> We are unaware of any other management team of any company, of any size or complexity that has been willing to subject itself to as open a discussion of its accounting and disclosure practices as Tyco has.  We think that says something about our confidence in Tyco and more importantly the integrity of our numbers.

434.     Kozlowski also defended Tyco's accounting practices and the integrity of its management team in a letter to all Tyco shareholders that was attached to the Company's April 25, 2002 press release.  In that letter, Kozlowski stated:

> We have always tried to be as transparent in our accounting as possible.  Indeed, I consider our disclosure to be second to none among our peer companies.  That some in the media would compare us to companies that may have intentionally misled investors through the use of financial chicanery is insulting and inaccurate.  To be thrown into stories about "accounting scandals" damages our reputation and casts aspersions on our employees.

435.     Kozlowski again made positive remarks concerning his personal integrity in an interview reported by the Dow Jones news service on April 25, 2002.  During that interview, Kozlowski stated, "I'm very well qualified to lead the Company out of its present state," and that he had "'absolutely no intention at all' of resigning."

436.    Even after Kozlowski was forced to resign from Tyco in shame, the Tyco

Defendants continued to make materially false and misleading representations concerning the

Company's accounting practices.  For example, during a June 7, 2002 conference call with

analysts and investors, John Fort, who was chosen by the Board to assume the position of CEO,

stated:

> [W]e expect nothing related to Dennis to be material to our financials, and I think
> that's worth repeating.  They're just not material.  They're not going to affect
> either our historic or expected financials.

437.    In addition, he repeated Defendants' frequent assurances that Tyco's accounting

practices were legitimate.  In particular, he stated:

> I mean our accounting is sound, even though we have tough economic times, our
> earnings and cash flows are strong and real.  We're built on real hard assets
> factories and products and customers.  We're committed to solid organic growth
> going forward.  We have competent excellent employees and we have our
> liquidity issues under control and with all that, I think it's very difficult to forecast
> that we're not going to be successful going forward.

438.    All of the foregoing representations concerning the supposed conservatism of

Tyco's accounting practices were materially false and misleading because, as Tyco has conceded,

the Company consistently applied unduly aggressive accounting practices during the time in

which Plaintiffs invested in Tyco securities.  In addition, those representations were misleading

because Defendants engaged in the numerous accounting manipulations specifically alleged

above.

439.    Furthermore, all of the foregoing representations concerning the supposed

integrity of Tyco management were materially false and misleading because, as Tyco has now

conceded, the Officer Defendants and Walsh pillaged Tyco by paying themselves millions of

dollars in unearned compensation.

**I.    Defendants' Materially False And Misleading**

**Representations Concerning Tyco's Liquidity**

440.    On January 22, 2002, Tyco announced that the Company intended to reverse its longtime business plan of growing through acquisitions "by separating Tyco into four independent, publicly traded companies: Security and Electronics; Healthcare; Fire Protection and Flow Control; and Financial Services."

441.    The Tyco Defendants' planned breakup called for the Company to raise approximately $11 billion in cash to pay down debt by selling its plastics business for $3 billion to $4 billion and by conducting initial public offerings of Tyco's remaining three Tyco business units.  After those public offerings were completed, Tyco planned to spin off the remaining shares to its existing shareholders.

442.    Immediately after Tyco announced that stunning about face, some investors began to voice concerns that the Company had adopted the new business plan because of liquidity concerns, *i.e.*, that the Tyco Defendants believed that they needed additional sources of capital to fund the Company's operations."

443.    Although the Tyco Defendants' plan to split the Company into four separate companies was, in fact, intended to address growing liquidity problems that Tyco was facing, the Tyco Defendants consistently denied the existence of any such concerns in their public statements in 2002.

444.    Indeed, on the day that Tyco announced the proposed restructuring, Kozlowski emphatically stated during the Company's conference call with analysts and investors that "we have no liquidity crisis."

445.    That representation concerning Tyco's liquidity, and all of Defendants' subsequent assurances that Tyco was not facing any liquidity problems, were materially false and misleading.

Contrary to Defendants' representations, Tyco was, in fact, facing a liquidity crisis by January of 2002.

446.     In particular, unless Tyco was able to complete the dramatic restructuring that the Tyco Defendants nervously announced on January 22, 2002, Tyco would be unable to fund its ongoing operations through the sale of commercial paper – a low-cost mainstay of Tyco's corporate financing.

447.     Furthermore, the Tyco Defendants either knew or should have known that the revelation of their pillaging of Tyco or the manner in which they manipulated the Company's financial results would further aggravate the Company's liquidity problems.  As a result, Defendants' positive statements concerning the Company's liquidity lacked a reasonable basis at the time Defendants made those representations.

448.     When the market reacted negatively to the Tyco Defendants' planned restructuring, the falsity of the Tyco Defendants' representations concerning the Company's liquidity gradually began to emerge.

449.     On February 4, 2002, the Tyco Defendants reversed course once again and announced that the Company would not complete the restructuring they had trumpeted only two weeks earlier.

450.     In a press release issued on that date, the Tyco Defendants admitted that the Company had been forced to exit the commercial paper market, and had to draw down the full $5.9 billion from its emergency backup credit lines to pay off $4.5 billion in outstanding commercial paper debt.

451.     Tyco also stated that: (a) $3.9 billion of the bank debt would mature in February 2003 and that the remaining $2 billion would mature in February 2006; and (b) reliance upon

higher cost bank debt rather than commercial paper to fund the Company's operations would negatively impact the Company's financial results.

452.     Thus, by drawing down on the bank lines of credit, Tyco was relying upon a short-term, high-cost solution to the Company's liquidity problems.

453.     The depth of the liquidity problems faced by the Company at the time the Tyco Defendants announced the withdrawal of the restructuring plan was made evident by the reaction of the credit rating agencies to Tyco's announcement.

454.     In particular, Standard & Poor's ("S&P") reduced Tyco's rating three notches from A to BBB, and placed the Company on "CreditWatch," citing concern over the "uncertainty" regarding Tyco's access to the capital markets and the smaller cushion available to the Company after the exhaustion of its emergency backup credit facilities.

455.     Similarly, Fitch Ratings placed Tyco's commercial paper ratings on "Rating Watch Negative," downgraded Tyco's Senior Unsecured Debt (along with the Unconditionally Guaranteed Debt of Tyco's subsidiary, Tyco International Group S.A.) from A to A-, and downgraded Tyco's commercial paper from F1 to F2.

456.     Despite this mounting evidence that Tyco was suffering liquidity problems, the Tyco Defendants continued to misleadingly state that the Company was not experiencing such difficulties.

457.     For example, during a February 6, 2002 conference call, Kozlowski falsely stated that "there's no liquidity problem[]" at Tyco.  Likewise, Kozlowski falsely stated, "Another benefit of the bank debt is that it makes us less susceptible to various market rumors, including those that we could have a liquidity issue, which we don't, but if it is left to grow, it could become some kind of a self-fulfilling prophecy."

458.     On February 13, 2002, the Tyco Defendants again held a conference call to assure investors that Tyco had no liquidity problems.  During that call, Kozlowski falsely stated that "once we sit with these people and walk with them through what's going on they see there is a stable company that's a going concern, that'll continue to be a going concern and does not have a liquidity crisis."

459.     Swartz also falsely re-assured investors concerning Tyco's liquidity in a conference call held on February 26, 2002.  Swartz stated:

> [W]e are in a very liquid position right now for the next 12 months and that divestitures that we're looking at and have talked about publicly to this point, which is both plastics and CIT, will be incremental to that liquidity and should give people even more comfort relative to our outlook and our ability to continue to go ahead and increase shareholder value and get the credit side of the house comfortable that all these other assertions that are being made are not true.

460.     Swartz again made false statements concerning Tyco's liquidity during a conference call held March 12, 2002.  In particular, Swartz stated, "We have ample amounts of cash and liquidity available and given the ongoing uncertainty in that [commercial paper] market, we don't think it makes sense for us to jump in until that all balances itself out on issues unrelated to Tyco."

461.     Even when the Tyco Defendants undertook steps designed to address Tyco's growing liquidity problems, those steps failed.  On April 25, 2002, Tyco publicly announced its plans for a public offering of CIT.  According to the Tyco Defendants, that transaction would improve Tyco's liquidity and reduce its debt by at least $10 billion.  Eventually, however, the CIT public offering proved to produce far less cash than the Tyco Defendants expected.

462.     Following that announcement, the Tyco Defendants continued to claim that Tyco was not experiencing liquidity problems.  During an April 30, 2002 conference call, Swartz stated:

We are continuing to run these businesses without a liquidity issue in that we do not believe there is one right now and its not that our heads are in the sand but on the contrary it's an issue next February, we've got a plan in place to go ahead and raise the cash proceeds that are necessary to overcome that . . .

463.    In addition, Swartz emphasized that, from Tyco's perspective, "there is no liquidity issue, for those of you looking at next February."

464.    Similarly, during a conference call on May 16, 2002, Swartz assured investors that "there is no real liquidity issue going on here at Tyco."

465.    On the same date, the Associated Press, Dow Jones, and Reuters reported that Swartz had reiterated that the Company planned to pay off about $10 billion of its $27 billion in debt after spinning-off CIT, and that the Company was on course to do so by the end of June.

466.    *The Wall Street Journal* also reported upon Swartz's positive comments in a May 17, 2002 article.  The article stated that: (a) Swartz "said the company is confident it can complete a sale or initial public offering of its CIT Group finance unit by the end of June"; and (b) "Swartz also told an investor conference call that the company plans to pay off at least $10 billion of the $27 billion in debt being shouldered by its industrial arm, using the proceeds from the CIT deal, along with cash on hand from operations."

467.    A number of events that occurred in June of 2002 served only to aggravate Tyco's growing liquidity problems.  Kozlowski's criminal tax evasion came to light, and market participants grew increasingly leery of holding Tyco debt because of the fidelity issues that were implicated by Kozlowski's misconduct.

468.    In response, the major credit rating agencies swiftly downgraded Tyco's credit ratings, thereby aggravating the Company's growing liquidity problems.

469.    On June 7, 2002, Moody's cut Tyco's long-term credit rating to Baa3 from Baa2 and lowered its short-term rating to Prime 3 from Prime 2.  Moody's warned that, "[a]bsent

significant near-term debt reduction with proceeds from a successful sale of CIT, Tyco's ratings would likely fall into speculative grade." Moody's further warned that it might cut the Company's debt to junk status if a sale was not completed "in the very near future, as early as the end of June." Moody's also stated that it "believes that potential proceeds from the (IPO) will fall short of expectations and Tyco will face a significant debt burden with sizable maturities over the next 18 months."

470. On the same day, S&P cut Tyco's long-term rating to BBB- and left its short term rating unchanged at A2. S&P said that Tyco faced an erosion in management credibility and investor confidence, and that it was "concerned about the Company's ability to access capital markets or bank financing." As a result, S&P also changed its CreditWatch implication to "negative."

471. Furthermore, S&P stated that its ratings could be lowered further in the coming days or weeks if there were further developments in the criminal investigation of Kozlowski or if the CIT initial public offering: (a) was not launched within the next two weeks; (b) did not close within a month of the launch; or (c) did not produce sufficient proceeds to improve Tyco's liquidity.

472. On June 10, 2002, Fitch Investors Services followed the lead of Moody's and S&P. Fitch cut Tyco's corporate credit rating to junk status, BB, from BBB, cut Tyco's commercial paper rating to B from F2, and downgraded its ratings on CIT's senior debt to BBB from A, citing concerns about the chaos surrounding the Company and "shortcomings in corporate governance." Fitch further warned that it might cut the long-term rating again.

473. In response to those ratings downgrades, and the market's increasing concern with Tyco's liquidity, the Company's shares plunged $4.50 per share on June 7, to close at $10.10 (a

six-year low). According to a June 7, 2002 story in Reuters Business Report, "The downgrades . . ., which are likely to make borrowing more expensive, could reduce [Tyco's] cash flow by $635 million in its third and fourth quarter, [Tyco] Chief Financial Officer Mark Swartz said."

474. That onslaught of negative news also forced Tyco to announce on June 7, 2002 that it might delay the public offering of CIT, which only worsened the rapidly-deteriorating liquidity situation at Tyco.

475. Nevertheless, even at that late juncture, the Tyco Defendants continued to make materially false and misleading representations concerning the Company's liquidity. For example, during a June 7, 2002 conference call with analysts and investors, John Fort, who was chosen by the Board to assume the position of interim CEO, stated that "we do not have a liquidity issue at this point even in spite of recent developments."

476. On July 1, 2002, Tyco priced the CIT shares at $23, well below the $25-$29 share estimated range the Company had claimed it would achieve on June 12, 2002. Thus, the CIT IPO grossed proceeds of $4.6 billion, well below the June 12, 2002 estimated range of $5.0-$5.8 billion and dramatically less than the expected proceeds of $7.2 billion that Tyco had estimated when it first announced the CIT IPO. Given the announcement of the diminished proceeds Tyco would receive from the CIT IPO, Tyco's shares declined by 6.2% on July 1, 2002.

477. On July 3, 2002, *The Wall Street Journal* reported that Tyco planned to take a $2.4 billion charge for the third quarter to "reflect the diminished value of its former CIT Group finance unit."

**J.     Defendants' False And Misleading Representations Concerning Tyco's Financial Results And The Manner In Which Defendants' Statements And Conduct Violated GAAP And GAAS**

478.     Ignoring the facts alleged above, Defendants consistently made materially false and misleading representations concerning Tyco's financial results during the time period in which Plaintiffs invested in the Company's securities.

479.     In particular, Defendants announced the financial results for the Company set forth in the chart attached hereto as Exhibit H on the dates and in the documents specified in that chart.

480.     Defendants' representations concerning those financial results were materially false and misleading because Tyco's announced financial results were consistently inflated for the reasons specified above.

481.     In addition, Defendants' representations concerning Tyco's financial results, the compensation paid to Walsh and the Tyco Defendants and the Company's related-party transactions were materially false and misleading because Defendants consistently assured investors that the Company's disclosures regarding such matters complied with applicable SEC regulations and the requirements of GAAP and GAAS.

482.     In particular, in each of the Forms 10-Q filed by the Tyco Defendants with the SEC during the time period in which Plaintiffs invested in Tyco securities, the Tyco Defendants (with the consent and approval of the PWC Defendants), falsely represented:

> The consolidated financial statements have not been examined by independent accountants in accordance with generally accepted auditing standards, but, in the opinion of management, such financial statements include all adjustments, consisting only of normal recurring adjustments, necessary to summarize fairly the Company's financial position and results of operations.

483.    Likewise, the PWC Defendants consistently issued "clean" audit opinions concerning the annual financial statements that were attached to the Forms 10-K filed by the Tyco Defendants with the SEC and which were provided to investors in Tyco's Annual Reports and in other SEC filings.

484.    Tyco's fiscal 1997 financial statements, which were included in the Form 10-K filed with the SEC by the Tyco Defendants on December 24, 1997 (the "1997 10-K"), were audited by Coopers & Lybrand, the predecessor firm to the PWC Defendants.

485.    Coopers & Lybrand delivered a "clean" audit opinion with respect to those financial statements.  Specifically, Coopers & Lybrand falsely stated:

> We have audited the consolidated balance sheets of Tyco International Ltd. (the "Company", formerly known as ADT Limited) as of September 30, 1997 and December 31, 1996, and the related consolidated statements of operations, stockholders' equity and cash flows and the related consolidated financial statement schedule for the nine months ended September 30, 1997 and for each of the two years in the period ended December 31, 1996.  These financial statements are the responsibility of the Company's management.  Our responsibility is to express an opinion on these financial statements and financial statement schedule based upon our audits.  We did not audit the financial statements of Tyco International (US) Inc. (formerly known as Tyco International Ltd. prior to the merger with ADT Limited), a wholly-owned subsidiary, as of December 31, 1996 and for the year ended December 31, 1996 and the year ended June 30, 1995, which statements reflect total assets constituting 61.4 % of consolidated total assets as of December 31, 1996 and net sales constituting 70.6% and 65.6% of consolidated net sales for the years ended December 31, 1996 and 1995, respectively, and of Keystone International, Inc., a wholly owned-subsidiary, as of December 31, 1996 and for each of the two years in the period ended December 31, 1996, which statements reflect total assets constituting 6.4% of consolidated total assets as of December 31, 1996 and net sales constituting 8.4%, and 8.6% of consolidated net sales for the years ended December 31, 1996 and 1995, respectively.  Those statements were audited by other auditors whose reports have been furnished to us, and our opinion, insofar as it relates to data included in the consolidated financial statements for such entities, is based solely on the reports of other auditors.

> We conducted our audits in accordance with generally accepted auditing standards. Those standards require that we plan and perform our audits to obtain reasonable assurance about whether the financial statements are free of material

misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits and the reports of other auditors provide a reasonable basis for our opinion.

In our opinion, based upon our audits and the reports of other auditors, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of Tyco International Ltd., as of September 30, 1997 and December 31, 1996, and the consolidated results of its operations and its cash flows for the nine months ended September 30, 1997, and for each of the two years in the period ended December 31, 1996 in conformity with generally accepted accounting principles. In addition, in our opinion, the consolidated financial statement schedule referred to above, when considered in relation to the basic consolidated financial statements taken as a whole, presents fairly, in all material respects, the information required to be included therein.

486. Tyco's fiscal 1998 financial statements, which were included in the Form 10-K filed by the Tyco Defendants with the SEC on December 10, 1998 (the "1998 10-K"), were audited by the PWC Defendants.

487. The PWC Defendants delivered a "clean" audit opinion with respect to those fiscal 1998 financial statements. Specifically, the PWC Defendants falsely stated:

In our opinion, the consolidated financial statements listed in the accompanying index present fairly, in all material respects, the financial position of Tyco International Ltd. and its subsidiaries at September 30, 1998 and 1997, and the results of their operations and their cash flows for the year ended September 30, 1998, the nine months ended September 30, 1997 and the year ended December 31, 1996, in conformity with generally accepted accounting principles in the United States. In addition, in our opinion, the financial statement schedule listed in the accompanying index presents fairly, in all material respects, the information set forth therein when read in conjunction with the related consolidated financial statements. These financial statements and financial statement schedule are the responsibility of the Company's management; our responsibility is to express an opinion on these financial statements and financial statement schedule based on our audits. We did not audit the financial statements of Keystone International, Inc., a wholly owned subsidiary, for the year ended December 31, 1996, which statements reflect net sales constituting 8.4% of consolidated net sales for the year ended December 31, 1996. Those statements were audited by other auditors whose report thereon has been furnished to us, and our opinion expressed herein, insofar as it relates to the amounts included for Keystone International, Inc. is

based solely on the report of the other auditors. We conducted our audits of these statements in accordance with generally accepted auditing standards in the United States, which require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for the opinion expressed above.

488. Tyco's fiscal 1999 financial statements, which were included in the Form 10-K filed by the Tyco Defendants with the SEC on December 13, 1999 (the "1999 10-K"), were audited by the PWC Defendants.

489. The PWC Defendants issued a "clean" audit opinion concerning the 1999 financial statements that was dated October 21, 1999.

490. The PWC Defendants' audit opinion falsely stated as follows:

In our opinion, based upon our audits and the reports of other auditors, the accompanying consolidated balance sheets and the related consolidated statements of operations, shareholders' equity and cash flows present fairly, in all material respects, the financial position of Tyco International Ltd. and its subsidiaries at September 30, 1999 and 1998, and the results of their operations and their cash flows for the years ended September 30, 1999 and 1998, and the nine months ended September 30, 1997, in conformity with accounting principles generally accepted in the United States. In addition, in our opinion, the accompanying financial statement schedule presents fairly, in all material respects, the information set forth therein when read in conjunction with the related consolidated financial statements. These consolidated financial statements and financial statement schedule are the responsibility of the Company's management; our responsibility is to express an opinion on these consolidated financial statements and financial statement schedule based on our audits. We did not audit the financial statements of AMP Incorporated, a wholly owned subsidiary, at September 30, 1998, and for the year ended September 30, 1998 and the nine months ended September 30, 1997, which statements reflect total assets constituting 20.1% of consolidated total assets as of September 30, 1998, and net sales constituting 29.0% and 33.6% of consolidated net sales for the year ended September 30, 1998 and the nine months ended September 30 1997, respectively. We did not audit the financial statements of United States Surgical Corporation, a wholly owned subsidiary, for the nine months ended September 30, 1997, which statements reflect net sales constituting 6.8% of consolidated net sales for the nine months ended September 30, 1997. Those statements were audited by other

auditors whose reports thereon have been furnished to us, and our opinion expressed herein, insofar as it relates to the amounts included for AMP Incorporated and United States Surgical Corporation, as of and for the periods described above, is based solely on the reports of the other auditors. We conducted our audits of these statements in accordance with auditing standards generally accepted in the United States, which require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits and the reports of other auditors provide a reasonable basis for the opinion expressed above.

491. Following the completion of an SEC limited review of the Company's financial reporting, Tyco filed a Form 10-K/A with the SEC on June 26, 2000 (the "June 2000 10-K/A"). The financial statements included in that SEC filing were audited by the PWC Defendants, who issued a clean audit opinions with respect to the financial statements.

492. The PWC Defendants' audit opinion was identical to the opinion that appeared in the 1999 10-K, except the opinion was dated as of June 12, 2000 insofar as it related to "a 'Revision' in Note 1 [to the financial statements], which was dated as of June 12, 2000." In addition, the opinion contained the following additional paragraph:

As discussed under the heading "Revision" in Note 1, the accompanying consolidated financial statements for the fiscal year ended September 30, 1999 have been revised to adjust merger, restructuring and other non-recurring charges and charges for the impairment of long-lived assets for the timing and classification of certain charges.

493. Tyco's fiscal 2000 financial statements, which were included in the Form 10-K filed by the Tyco Defendants with the SEC on December 21, 2000 (the "2000 10-K"), were audited by the PWC Defendants.

494.    The PWC Defendants issued a clean audit opinion concerning the 2000 financial statements that was dated October 24, 2000 (except as to Note 25, which was dated as of December 4, 2000).

495.    In their audit opinion, the PWC Defendants falsely stated as follows:

In our opinion, based upon our audits and the report of other auditors, the accompanying consolidated balance sheets and the related consolidated statements of operations, shareholders' equity and cash flows present fairly, in all material respects, the financial position of Tyco International Ltd. and its subsidiaries at September 30, 2000 and 1999, and the results of their operations and their cash flows for each of the three years in the period ended September 30, 2000, in conformity with accounting principles generally accepted in the United States of America. In addition, in our opinion, the accompanying financial statement schedule presents fairly, in all material respects, the information set forth therein when read in conjunction with the related consolidated financial statements. These financial statements and financial statement schedule are the responsibility of the Company's management; our responsibility is to express an opinion on these financial statements and financial statement schedule based on our audits. We did not audit the financial statements of AMP Incorporated, a wholly owned subsidiary, as of September 30, 1998, and for the year ended September 30, 1998, which statements reflect total assets of 20.1% of the related consolidated total assets as of September 30, 1998, and net sales of 29.0% of the related consolidated total sales for the year ended September 30, 1998. Those statements were audited by other auditors whose report thereon has been furnished to us, and our opinion expressed herein, insofar as it relates to the amounts included for AMP Incorporated, as of and for the period described above, is based solely on the report of the other auditors.  We conducted our audits of these statements in accordance with auditing standards generally accepted in the United States of America, which require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits and the report of other auditors provide a reasonable basis for our opinion.

496.    The PWC Defendants audited Tyco's fiscal 2001 financial statements, which were included in the Form 10-K filed by the Tyco Defendants with the SEC on December 28, 2001 (the "2001 10-K").

497.    The PWC Defendants issued a clean audit opinion concerning the 2001 financial statements that was dated October 18, 2001 (except as to Note 31, which was dated as of December 18, 2001).

498.    In their audit opinion, the PWC Defendants falsely stated as follows:

In our opinion, based upon our audits, the accompanying consolidated balance sheets and the related consolidated statements of operations, of shareholders' equity and of cash flows present fairly, in all material respects, the financial position of Tyco International Ltd. and its subsidiaries at September 30, 2001 and 2000, and the results of their operations and their cash flows for each of the three years in the period ended September 30, 2001, in conformity with accounting principles generally accepted in the United States of America. In addition, in our opinion, the accompanying financial statement schedule presents fairly, in all material respects, the information set forth therein when read in conjunction with the related consolidated financial statements. These financial statements and financial statement schedule are the responsibility of the Company's management; our responsibility is to express an opinion on these financial statements and financial statement schedule based on our audits. We conducted our audits of these statements in accordance with auditing standards generally accepted in the United States of America, which require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion. As described in Note 18, the Company changed its method of revenue recognition and changed its method of accounting for derivative instruments and hedging activities.

499.    Contrary to Defendants' representations, however, the financial results disclosed, approved and audited by Defendants did not comply with GAAP and did not contain all adjustments necessary to summarize fairly the Company's financial position and results of operations.  Furthermore, the audits conducted by the PWC Defendants did not comply with the requirements of GAAS.

500.    By consistently understating and failing to disclose the amounts paid to the Officer Defendants and Walsh, and by failing to accurately disclose the related-party transactions

in which Tyco engaged, Defendants violated SEC regulations requiring the accurate disclosure of such information, including:

a.      Item 402 of SEC Regulation S-K, which "requires clear, concise and understandable disclosure of all plan and non-plan compensation awarded to, earned by, or paid to" a company's CEO and four next highest-paid executives;

b.      Item 404 of Regulation S-K, which requires detailed disclosures concerning any transaction having a value of more than $60,000 involving the issuer or one of its subsidiaries in which any of the issuer's officers or directors or any member of their immediate families has a material interest;

c.      Item 404 of Regulation S-K, which requires companies to accurately disclose the purpose of any loan in excess of $60,000 made to an officer or director of an issuer, the largest amount of any such loan outstanding during the course of a year and the rate of interest paid on any such loan.

501.    Defendants' failure to adhere to those GAAP requirements was particularly important because, as the SEC has recognized in SAB Topic 4E (a GAAP provision), disclosures regarding such matters are material to investors "independent of the amount involved" because of the fidelity concerns implicated by compensation and related-party transaction issues.

502.    Defendants' representations concerning Tyco's financial results were also materially false and misleading because the SEC's SAB Topic 4G requires that notes and receivables from a company's affiliates should be reported as a reduction of stockholders' equity. In violation of that requirement, Defendants failed to report the vast amounts owed to Tyco by the Officer Defendants, Walsh and others affiliates as a reduction of the Company's stockholder's

equity. Defendants therefore consistently overstated Tyco's stockholders' equity on the Company's financial statements.

503. By engaging in the accounting manipulations specified above, Defendants also violated Accounting Principles Board ("APB") Opinion No. 22. That GAAP provision recognizes that financial statements must accurately disclose the accounting policies followed by a company to be useful to investors. In light of the fact that Tyco's financial statements violated numerous GAAP provisions, Defendants did not comply with APB Opinion No. 22's requirement that they accurately disclose Tyco's accounting policies.

504. Furthermore, even had Tyco's accounting practices not violated GAAP, APB Opinion No. 22, ¶ 8 would have required Defendants to make additional disclosures concerning the Company's admitted policy of continually applying aggressive interpretations of the requirements of GAAP.

505. Disclosure of those aggressive policies was required because ¶ 22 of APB Opinion No. 22 mandates that "disclosure should encompass important judgments as to appropriateness of principles relating to recognition of revenue and allocation of asset costs to current and future periods." In particular, that GAAP provision mandated that Defendants disclose the reasons for their "selection from existing acceptable alternatives" and "[u]nusual or innovative applications of generally accepted accounting principles."

506. Defendants violated those requirements by failing to disclose, among other things: (a) their continued reliance upon aggressive accounting policies to produce the results reported by Tyco; and (b) their decision to rely upon the assumption that the attrition rate among ADT customers was only 8.5% per year in calculating that unit's financial results despite their knowledge of contrary information.

507.     By consistently applying unduly aggressive interpretations of certain GAAP

principles and completely ignoring others, Defendants violated a host of additional GAAP

requirements.  In particular, Defendants failed to comply with the following provisions of

GAAP:

a.     FASB's Concepts Statement No. 1, which states that the role of "financial

reporting requires it to provide evenhanded, neutral, or unbiased information";

b.     FASB Concepts Statement No. 1, ¶ 34, which mandates that financial

reporting should provide information that is useful to present and potential investors and

creditors and other users in making rational investment, credit and similar decisions;

c.     FASB Concepts Statement No. 1, ¶ 40, which mandates that financial

reporting should provide information about the economic resources of an enterprise, the claims to

those resources, and the effects of transactions, events and circumstances that change resources

and claims to those resources;

d.     FASB Concepts Statement No. 1, ¶ 42, which states that financial

reporting should provide information about an enterprise's financial performance during a

particular reporting period because investors and creditors often use information about the past to

help in assessing the prospects of an enterprise;

e.     FASB Concepts Statement No. 1, ¶ 50, which mandates that financial

reporting should provide information about how management of an enterprise has discharged its

stewardship responsibility to stockholders for the use of enterprise resources entrusted to it and

that, to the extent that management offers securities of the enterprise to the public, it voluntarily

accepts wider responsibilities for accountability to prospective investors and to the public in

general;

f.      FASB Concepts Statement No. 2, which provides that accounting information is not useful if it is unreliable, that reliable accounting information must be verifiable and neutral and that the convention of conservatism – meaning prudence – must be applied in financial accounting and reporting;

g.      FASB Concepts Statement No. 2, ¶¶ 58-59, which dictates that financial reporting should be reliable, *i.e.*, that it should represent what it purports to represent;

h.      FASB Concepts Statement No. 2, ¶ 79, which provides that financial reporting should be complete, so that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions; and

i.      FASB Concepts Statement No. 2, ¶¶ 95, 97, which mandates that financial reporting should be conservative and should ensure that uncertainties and risks inherent in business situations are adequately considered.

508.    By violating those GAAP provisions, Defendants violated the disclosure requirements of SEC Regulation S-X, 17 C.F.R. § 210.4-01(a)(1), which provides that financial statements that do not conform to GAAP are presumptively misleading and inaccurate.

509.    In certifying that Tyco's fiscal 1997 through 2001 financial statements complied with GAAP, the PWC Defendants also falsely represented that their examination of those financial statements was made in accordance with GAAS.

510.    Those statements were materially false and misleading because the audits conducted by the PWC Defendants were not performed in accordance with GAAS in a number of critical respects.

511.    For example, the PWC Defendants violated GAAS Standard of Reporting No. 1, which requires the audit report to state whether the financial statements are presented in

accordance with GAAP. The PWC Defendants' audit opinions falsely represented that Tyco's financial statements for the 1997 through 2001 fiscal years were presented in conformity with GAAP although they were not for the reasons specifically alleged herein.

512.     The PWC Defendants violated GAAS General Standard No. 2, which requires that independence in mental attitude is to be maintained by the auditor in all matters related to the assignment. Rather than maintaining independence in connection with the Tyco audits, the PWC Defendants ignored obvious red flags that those financial statements did not comply with GAAP because Tyco was the largest client of the Boston office of PWC LLP.

513.     The PWC Defendants also violated GAAS Standard of Reporting No. 4, which requires that, when a clean opinion on the financial statements as a whole cannot be expressed, the reasons therefore must be stated. To comply with that GAAS, the PWC Defendants should have stated that no opinion could be issued by them on Tyco's 1997 through 2001 financial statements, or issued adverse opinions stating that those financial statements were not presented in accordance with GAAP.

514.     The PWC Defendants violated SAS No. 1 and SAS No. 53 by failing to adequately plan their audit to detect accounting improprieties at Tyco. The PWC Defendants violated the same GAAS requirements by failing to properly supervise the work of assistants and by failing to establish and carry out procedures reasonably designed to search for and detect the existence of errors and irregularities that would have a material effect upon the financial statements.

515.     The PWC Defendants violated GAAS General Standard No. 3, which requires that due professional care must be exercised by the auditor in the performance of the audit and the preparation of the report. In light of the number and extent of the accounting improprieties in

which the Tyco Defendants engaged, the PWC Defendants' audits of the Company's financial statements amounted to no audits at all.

516.  The PWC Defendants violated GAAS Standard of Field Work No. 2, which requires the auditor to make a proper study of existing internal controls, including accounting, financial and managerial controls, to determine whether reliance thereon is justified.  That GAAS provision further mandates that, if such controls are not reliable, the auditor must expand the nature and scope of the auditing procedures to be applied.  As is specifically alleged below, Tyco has conceded that the accounting controls maintained by Tyco during the relevant time period were grossly deficient.  Yet, the PWC Defendants repeatedly chose to rely upon those controls in performing their audits of Tyco's financial statements.

517.  In addition, the PWC Defendants violated Standard of Field Work No. 3, which requires auditors to collect sufficient competent evidential matter through inspection, observation, inquiries and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit.  In light of the obvious nature of the accounting and disclosure improprieties committed by Defendants during the relevant time period, the PWC Defendants could not have obtained sufficient evidential matter to support their clean audit opinions.

518.  Critically, the PWC Defendants violated AU § 334, which requires auditors to identify and examine related-party transactions and guarantee that such transactions are adequately disclosed in financial statements.  As is alleged in detail above, Tyco consistently failed to disclose highly material related-party transactions in its financial statements.

519.  The PWC Defendants also violated the crucial requirement, as set forth in AU § 230, that auditors maintain professional skepticism regarding a company's financial statements and disclosures in performing an audit.  That GAAS provision specifically requires that auditors

not accept "less than persuasive evidence" of the propriety of a company's accounting "because of a belief that management is honest."

520.     In addition, the PWC Defendants violated SAS No. 82 by failing to adequately consider the risk that Tyco's financial statements contained material misstatements, whether caused by errors or fraud.

521.     In particular, the PWC Defendants did not adequately assess the likelihood that the following factors specifically identified in SAS No. 82 would cause Tyco's financial statements for the fiscal years 1997 through 2001 to contain material misrepresentations or omissions:

a.     the excessive interest that the Officer Defendants demonstrated in maintaining and increasing Tyco's stock price and earnings to increase their own options and stock-related compensation and to facilitate Tyco's strategy of increasing the Company's revenues and earnings by conducting acquisitions;

b.     the fact that the Officer Defendants uniformly chose to employ aggressive accounting policies in connection with acquisitions made by Tyco in order to facilitate their objective of increasing the Company's reported earnings and, therefore, their own compensation;

c.     Tyco management's practice (as conceded in the December 8-K) of putting "pressure on" and giving "inducements to, segment and unit managers to increase current earnings, including by decisions as to what accounting treatment to employ";

d.     the culture created by the Officer Defendants at Tyco, which the Company has now conceded was characterized by an inappropriate willingness to disregard accounting rules in order to inflate Tyco's reported financial results;

e.      the failure of the Officer Defendants to display and communicate an appropriate attitude regarding Tyco's internal controls and the financial reporting process;

f.      the disregard that Tyco management displayed for the SEC and other regulatory authorities by, for example, failing to produce relevant documents to the SEC in connection with its informal investigation of Tyco's acquisition accounting practices;

g.      the failure of Tyco management to employ appropriate internal auditing staff to assess the manner in which the Company accounted for the compensation paid to the Officer Defendants and defendant Walsh; and

h.      the fact that Tyco management and members of the Tyco Board engaged in numerous related-party transactions with Tyco for their personal enrichment.

522.   The PWC Defendants also violated SAS No. 54 by failing to perform the audit procedures required to assess the reliability of Tyco's financial statements after the PWC Defendants discovered that Tyco management had engaged in various accounting and compensation-related improprieties.

523.   In that regard, Tyco has admitted in the 10-K that Tyco filed with the SEC on December 31, 2002 (the "2002 10-K") that the PWC Defendants proposed that Tyco make adjustments to the Company's acquisition reserves in connection with the 2000 audit that would have reduced Tyco's reported income by $22.7 million. Likewise, Tyco conceded in the 2002 10-K that the PWC Defendants proposed that Tyco make adjustments to its acquisition reserves that would have reduced the Company's reported net income by $26.4 million in 2001. In both cases, the Officer Defendants failed to make those adjustments, but the PWC Defendants nevertheless issued a clean audit opinion and failed to take the steps necessary to require the disclosure of the accounting improprieties alleged herein.

524. In addition, the PWC Defendants violated the requirements of Section 10A of the Securities Exchange Act, which requires auditors of public companies: (a) to design procedures to provide reasonable assurance of detecting illegal acts and to identify material related-party transactions; and (b) to notify the SEC if they become aware of information indicating that an illegal act has, or may have occurred, if management or the Board of the company fails to take appropriate remedial actions with respect to the illegal acts.

525. The misrepresentations set forth in the PWC Defendants' audit reports were repeated in numerous additional SEC filings made by Tyco because the PWC Defendants consented to the incorporation of the audit report in those SEC filings. Certain of the SEC filings in which the PWC Defendants consented to the Tyco Defendants incorporating the 1999, 2000 and 2001 audit reports and the dates of the PWC Defendants' consents are set forth in Exhibit F hereto.

**K. Additional Materially False And Misleading Representations Made By Defendants Concerning Tyco's Financial Results**

526. In addition to reporting the inaccurate revenue, pre-tax earnings, and earnings per share numbers for Tyco specified in Exhibit H, Defendants made a number of representations concerning Tyco's financial results and the nature of the Company's operations that were materially false and misleading as a result of the accounting manipulations alleged above.

527. Because Tyco's disclosures concerning its operations during time period relevant to this action were set forth in hundreds of documents filed with the SEC, dozens of press releases issued by the Company, numerous private and public meetings with securities analysts and institutional investors and in other settings, it is impossible to catalog all of Defendants'

material misrepresentations.  The following, however, is a summary of some of Defendants' most critical misrepresentations concerning Tyco's financial operations.

1. **Defendants' Materially False And Misleading Statements Concerning Tyco's Financial Results For The Fiscal Year And Quarter Ended September 30, 1997**

528.    On October 27, 1997, the Tyco Defendants issued a press release concerning Tyco's financial results for the fiscal year and quarter ended September 30, 1997.  In that press release, Defendants falsely stated:

> Tyco International Ltd. . . . reported today that income before extraordinary items for its quarter ended September 30, 1997 increased 68 percent to a record $205.1 million, or 78 cents per share (before restatement for pooling of interests for periods prior to acquisition and before acquisition charges) compared to last year's $122.2 million, or 52 cents per share on the same basis.  Sales for the quarter increased 29 percent to $2.57 billion compared with last year's $1.99 billion.

529.    Tyco filed the 1997 10-K with the SEC on December 24, 1997.  In that document, which was signed by defendants Kozlowski, Bodman, Fort, Pasman, Swartz and Walsh, Defendants falsely described the Company's financial results as follows:

> Loss before extraordinary item was ($776.8) million, or ($1.50) per share, for Fiscal 1997 compared with ($364.8) million, or ($0.76) per share, for the nine months ended September 30, 1996.  Excluding the $1.32 billion ($2.54 per share) after-tax charge for merger and transaction costs, write offs and integration costs associated with the acquisitions (see Notes 2 and 3 to the Consolidated Financial Statements), income before extraordinary item rose 42.8% to $543.0 million, or $0.98 per share.  The increase was attributable to margin improvements, strong earnings and results of acquired companies in each of the Company's business segments.
>
> Sales
>
> Sales increased 29% during Fiscal 1997 to $7.59 billion from $5.87 billion in the nine months ended September 30, 1996.

530.    Those representations concerning the financial results generated by Tyco for the fiscal year and quarter ended September 30, 1997 were materially false and misleading because

Defendants failed to disclose that Tyco produced those results only by engaging in the accounting

manipulations specifically alleged above.

> **2.      Defendants' Materially False And Misleading Statements Concerning Tyco's Financial Results For The Quarter Ended December 31, 1997**

531.     On January 21, 1998, the Tyco Defendants issued a press release concerning the

Company's financial results for the quarter ended December 31, 1997.  In that press release,

Defendants falsely stated:

> Tyco International Ltd. . . . reported today that diluted earnings per share, before extraordinary items, for its first quarter ended December 31, 1997 were 43 cents per share, a 43 percent increase, compared to last year's 30 cents per share.  Net income, before extraordinary items, rose to $240.8 million compared to last year's $150.5 million.  Sales for the quarter increased 17 percent to $2.69 billion compared with last year's $2.29 billion.

532.     On February 17, 1998, Tyco filed with the SEC the Company's 10-Q for the

quarter ended December 31, 1997 (the "February 1998 10-Q").  That document was signed by

defendant Swartz.  In describing the Company's results for the quarter in that 10-Q, Defendants

falsely stated:

> Net income before extraordinary item was $240.8 million, or $0.43 per share on a diluted basis for the quarter ended December 31, 1997 as compared to $68.1 million, or $0.14 per share, for the quarter ended December 31, 1996.  Excluding the $80.3 million ($0.16 per share) after-tax net charge for restructuring and other non-recurring items recorded in the quarter ended December 31, 1996, income before extraordinary item rose 62.3% from $148.4 million, or $0.30 per share.  The increase was attributable to increased income from operations primarily in the Electrical and Electronic Components and Fire and Security Services segments and, to a lesser extent, the Disposable and Specialty Products and Flow Control Products segments.

533.     Those representations concerning the financial results generated by Tyco for the

quarter ended December 31, 1997 were materially false and misleading because Defendants

failed to disclose that Tyco produced those results only by engaging in the accounting

manipulations specifically alleged above.

534.     In the February 1998 10-Q, Defendants also made the following materially false

and misleading representations concerning Tyco's merger and restructuring reserves:

> Approximately $329.7 million of accrued merger and restructuring costs remain in
> other current liabilities and $106.9 million in other non-current liabilities as of
> December 31, 1997.  The Company currently anticipates that the restructurings
> will be substantially completed by September 30, 1998, except for certain long-
> term obligations.

535.     Those statements were materially false and misleading because Defendants failed

to disclose their practice of aggressively inflating Tyco's restructuring and merger reserves in

order to spring-load the Company's future reported results.

### 3.     Defendants' Materially False And Misleading Statements Concerning Tyco's Financial Results For The Quarter Ended March 31, 1998

536.     On April 21, 1998, the Tyco Defendants issued a press release concerning the

Company's financial results for the quarter ended March 31, 1998.  In that press release,

Defendants falsely stated:

> Tyco International Ltd. . . . reported today that diluted earnings per share, before
> extraordinary items, for its second quarter ended March 31, 1998 were 48 cents
> per share, a 55 percent increase, compared to last year's 31 cents per share.  Net
> income, before extraordinary items, rose to $276.2 million compared to last year's
> $163.0 million.  Sales for the quarter increased 22 percent to $2.85 billion
> compared with last year's $2.33 billion. . . .
>
> Income before extraordinary items for the first half of fiscal 1998 rose to $517.0
> million, or 91 cents per share, a 49% increase over last year's per share earnings of
> 61 cents. Revenues for the first half increased to $5.54 billion, 20% higher than
> last year's $4.62 billion.

537.     On May 15, 1998, Tyco filed with the SEC the Company's 10-Q for the quarter

ended March 31, 1998 (the "May 1998 10-Q"). That document was signed by defendant Swartz.

In that 10-Q, Defendants falsely stated:

> Income before extraordinary item was $517.0 million, or $.91 per share on a
> diluted basis for the six months ended March 31, 1998 as compared to $215.4
> million, or $.43 per share, for the six months ended March 31, 1997. Excluding
> the $89.9 million ($.17 per share) after-tax net charge for restructuring and other
> non-recurring items recorded in the six months ended March 31, 1997, income
> before extraordinary item rose 69.3% from $305.3 million, or $.60 per share. The
> increase was attributable to strong earnings in the Electrical and Electronic
> Components group principally resulting from the earnings from the acquisition of
> AT&T's Submarine Systems unit, as well as, significant increases in income from
> operations in the Fire and Security Services and Disposable and Specialty
> Products segments and, to a lesser extent, in the Flow Control Products group.

538.     Those representations concerning the financial results generated by Tyco for the

quarter ended March 31, 1998 were materially false and misleading because Defendants failed to

disclose that Tyco produced those results only by engaging in the accounting manipulations

specifically alleged above.

539.     Defendants also made the following materially false and misleading

representation concerning Tyco's restructuring and merger reserves in the May 1998 10-Q:

> During the six months ended March 31, 1997, ADT recorded a charge of $246.9
> million related to restructuring and other non-recurring charges in its electronic
> security services and corporate operations. During the last quarter of fiscal 1997
> the Company recorded merger, restructuring and other non-recurring charges
> related to the mergers between ADT, Former Tyco, Keystone and INBRAND.
>
> Approximately $293.1 million of accrued merger and restructuring costs remain in
> other current liabilities and $112.9 million in other non-current liabilities as of
> March 31, 1998. The Company currently anticipates that the restructurings will be
> substantially completed by September 30, 1998, except for certain long-term
> obligations.

540.     Those statements were materially false and misleading because Defendants failed

to disclose their practice of aggressively inflating Tyco's restructuring and merger reserves in

order to spring-load the Company's future reported results.

### 4.     Defendants' Materially False And Misleading Statements Concerning Tyco's Financial Results For The Quarter Ended June 30, 1998

541.     On July 17, 1998, the Tyco Defendants issued a press release concerning the

Company's financial results for the quarter ended June 30, 1998.  In that press release,

Defendants falsely stated:

> Tyco International Ltd. . . ., a diversified manufacturing and service company,
> reported today that diluted earnings per share, before extraordinary item, for its
> third quarter ended June 30, 1998 were 54 cents per share, a 50 percent increase,
> compared to last year's 36 cents per share.  Income before extraordinary item rose
> to $320.2 million compared to last year's $197.9 million.  Sales for the quarter
> increased 27 percent to $3.24 billion compared with last year's $2.55 billion. . . .
>
> Income before extraordinary item for the first nine months of fiscal 1998 rose to
> $837.2 million, or $1.45 per share, a 48% increase over last year's per share
> earnings of 98 cents.  Sales for the first nine months increased to $8.77 billion,
> 22% higher than last year's $7.17 billion.

542.     On August 13, 1998, Tyco filed with the SEC the Company's 10-Q for the quarter

ended June 30, 1998 (the "August 1998 10-Q").  That document was signed by defendant

Swartz.  In that 10-Q, Defendants falsely stated:

> Income before extraordinary item was $837.2 million, or $1.45 per share on a
> diluted basis for the nine months ended June 30, 1998 as compared to $353.9
> million, or $.68 per share, for the nine months ended June 30, 1997.  Excluding
> the $130.2 million ($.25 per share) after-tax net charge for restructuring and other
> non-recurring items recorded in the nine months ended June 30, 1997, income
> before extraordinary item rose 72.9% from $484.1 million, or $.93 per share.  The
> increase was attributable to strong earnings in the Electrical and Electronic
> Components group principally resulting from earnings at TSSL, which includes
> the business acquired from AT&T's Submarine Systems unit, as well as
> significant increases in income from operations in the Fire and Security Services
> and Disposable and Specialty Products segments and, to a lesser extent, in the
> Flow Control Products group.

543.     Those representations concerning the financial results generated by Tyco for the

quarter ended June 30, 1998 were materially false and misleading because Defendants failed to

disclose that Tyco produced those results only by engaging in the accounting manipulations

specifically alleged above.

544.     Defendants also made the following materially false and misleading

representations concerning Tyco's accounting reserves in the August 1998 10-Q:

> During the nine months ended June 30, 1997, ADT recorded a charge of $268.7
> million related to restructuring and other non-recurring charges in its electronic
> security services and corporate operations. During the quarter ended June 30,
> 1997, INBRAND recorded a charge of $25.2 million related to restructuring and
> other non-recurring charges in its disposable medical products business.

> Approximately $221.2 million and $112.5 million of accrued merger and
> restructuring costs remain in other current liabilities and other non-current
> liabilities, respectively, as of June 30, 1998.

545.     Those statements were materially false and misleading because Defendants failed

to disclose their practice of aggressively inflating Tyco's restructuring and merger reserves in

order to spring-load the Company's future reported results.

**5.     Defendants' Materially False And Misleading Statements
Concerning Tyco's Financial Results For The Fiscal Year
And Quarter Ended September 30, 1998**

546.     On October 22, 1998, the Tyco Defendants issued a press release concerning the

Company's financial results for the fiscal year and quarter ended September 30, 1998.  In that

press release, Defendants falsely stated:

> Tyco International Ltd. . . ., a diversified manufacturing and service company,
> reported today that diluted earnings per share, before extraordinary items, for its
> fourth quarter ended September 30, 1998 were 57 cents per share, a 54 percent
> increase over last year's 37 cents per share.  Income before extraordinary items
> rose to $339.9 million, an increase of 64 percent over last year's $207.4 million.
> Sales for the quarter rose 31 percent to $3.54 billion compared with last year's
> $2.71 billion.  Last year's results reflect the mergers with ADT, Keystone and

INBRAND, which were accounted for under pooling of interests accounting, and are before non-recurring charges and extraordinary items.

For the fiscal year, diluted earnings before extraordinary items rose to an all time high of $1.18 billion, or $2.02 per share, a 51% increase over the comparable twelve months diluted per share earnings of $1.34. Sales for the fiscal year were $12.31 billion, 25% higher than last year's $9.88 billion. The results exclude the acquisition of U.S. Surgical, which was acquired on October 1, 1998.

547. Tyco filed the 1998 10-K with the SEC on December 10, 1998. In that document, which was signed by defendants Kozlowski, Bodman, Fort, Pasman, Swartz and Walsh, Defendants stated:

Income (loss) before extraordinary items was $1.18 billion, or $2.02 per share on a diluted basis for Fiscal 1998, as compared to ($708.7) million, or ($1.39) per share, for the twelve months ended September 30, 1997. Excluding the $1.40 billion ($2.59 per share) after-tax charge in the twelve months ended September 30, 1997 for merger and transaction costs, writeoffs and integration costs associated with acquisitions (see Notes 2 and 3 to the Consolidated Financial Statements), income (loss) before extraordinary items rose 70.2% from $691.4 million, or $1.30 per diluted share. The increase was attributable to margin improvements, increased sales and results of acquired companies in each of the Company's business segments.

After each acquisition, acquired companies are immediately integrated and Tyco does not separately track post-acquisition financial results. Accordingly, amounts in the following analysis related to the impact of acquired companies are estimates based on pre-acquisition results.

Sales

Sales increased 25% during Fiscal 1998 to $12.31 billion from $9.82 billion in the twelve months ended September 30, 1997.

548. Those representations concerning the financial results generated by Tyco for the fiscal year and quarter ended September 30, 1997 were materially false and misleading because Defendants failed to disclose that Tyco produced those results only by engaging in the accounting manipulations specifically alleged above.

6.     **Defendants' Materially False And Misleading Statements Concerning Tyco's Financial Results For The Quarter Ended December 31, 1998**

549.    On January 19, 1999, the Tyco Defendants issued a press release concerning the

Company's financial results for the quarter ended December 31, 1998.  In that press release,

Defendants falsely stated:

> Tyco International Ltd. . . ., a diversified manufacturing and service company, reported today that diluted earnings per share, before extraordinary item, for its first quarter ended December 31, 1998 were 61 cents per share (before acquisition related charges), a 42 percent increase over last year's 43 cents per share.  Income before acquisition related charges and extraordinary item rose to $401.6 million, an increase of 52 percent over last year's $265.0 million.  Sales for the quarter rose 28 percent to $3.82 billion compared with last year's $2.99 billion.  Last year's results have been restated to reflect the merger with U.S. Surgical, which was accounted for as a pooling of interests, and are before non-recurring charges and extraordinary item.  After giving effect to acquisition related and other non-recurring charges, loss per share was 4 cents in 1998 compared to diluted earnings per share of 41 cents in 1997.

550.    On February 16, 1999, Tyco filed with the SEC the Company's 10-Q for the

quarter ended December 31, 1998 (the "February 1999 10-Q").  That document was signed by

defendant Swartz.  In that 10-Q, Defendants falsely stated:

> (Loss) income before extraordinary item was $(26.0) million, or $(.04) per share on a diluted basis, for the quarter ended December 31, 1998, as compared to $255.8 million, or $.41 per diluted share, for the quarter ended December 31, 1997.  During the quarter ended December 31, 1998, the Company incurred an after-tax charge of $427.6 million ($.65 per share) for merger and transaction costs, write-offs and integration costs primarily associated with the USSC merger.  During the quarter ended December 31, 1997, the Company incurred an after-tax charge of $9.2 million ($.01 per share) for restructuring charges in USSC's operations.  Excluding these non-recurring charges, income before extraordinary item rose 51.5% to $401.6 million, or $.61 per diluted share, for the quarter ended December 31, 1998, as compared to $265.0 million, or $.43 per diluted share, for the quarter ended December 31, 1997.  The increase was attributable to increased sales, margin improvements and results of acquired companies in each of the Company's business segments.

> After each acquisition, acquired companies are immediately integrated, and Tyco does not separately track post-acquisition financial results.  Accordingly, the

impact of certain acquired companies in the following analysis is based on estimates and assumes that acquisitions were completed as of the beginning of the periods discussed. . . .

Sales increased 27.7% during the quarter ended December 31, 1998 to $3.82 billion from $2.99 billion in the quarter ended December 31, 1997.

551.    Those representations concerning the financial results generated by Tyco for the quarter ended December 31, 1998 were materially false and misleading because Defendants failed to disclose that Tyco produced those results only by engaging in the accounting manipulations specifically alleged above.

552.    Defendants also made the following materially false and misleading representations concerning Tyco's merger and restructuring reserves in the February 1999 10-Q:

During the first quarter of fiscal 1999, the Company recorded merger, restructuring and other non-recurring charges of $434.9 million primarily related to the merger with USSC (Notes 1 and 2). Transaction costs of $53.3 million to effect the merger consists of legal, accounting, financial advisory services, and other costs payable at the effective time of the merger, as well as other direct expenses. These were expensed as required under the pooling of interests method of accounting. Costs incurred to combine USSC's disposable medical products business with the related business of Tyco include the cost of announced workforce reductions of $124.8 million involving the elimination of approximately 800 positions in the United States, 200 positions in Puerto Rico and 600 positions in Europe; the combination of certain facilities of $51.8 million involving the closure of 20 manufacturing and distribution facilities in Europe and the shut down and consolidation of 30 sales and administrative offices located primarily throughout the United States and/or Europe; lease termination costs of $156.8 million; and other costs of $35.1 million relating to the consolidation of certain product lines and other non-recurring charges. Approximately $183.4 million of accrued merger and restructuring costs are included in other current liabilities at December 31, 1998. The Company currently anticipates that the restructuring will be substantially completed by December 31, 1999.

553.    Those statements were materially false and misleading because Defendants failed to disclose their practice of aggressively inflating Tyco's restructuring and merger reserves in order to spring-load the Company's future reported results.

**7.  Defendants' Materially False And Misleading Statements Concerning
Tyco's Financial Results For The Quarter Ended March 31, 1999**

554.  On April 20, 1999, the Tyco Defendants issued a press release concerning the

Company's financial results for the quarter ended March 31, 1999.  In that press release,

Defendants falsely stated:

> Tyco International Ltd. . . ., a diversified manufacturing and service company,
> reported today that diluted earnings per share, before extraordinary item, for its
> second quarter ended March 31, 1999 were 69 cents per share, a 47 percent
> increase over last year's 47 cents per share.  Income before an extraordinary item
> rose to $459.3 million, an increase of 52 percent over last year's $301.2 million.
> Sales for the quarter rose 25 percent to $3.96 billion compared with last year's
> $3.17 billion.  Income before acquisition related charges and extraordinary items
> for the first half of fiscal 1999 rose to $860.9 million, or $1.30 per diluted share, a
> 44 percent increase over last year's diluted per share earnings of 90 cents.
> Revenues for the first half increased to $7.78 billion, 26 percent higher than last
> year's $6.16 billion.

555.  On May 17, 1999, Tyco filed with the SEC the Company's 10-Q for the quarter

ended March 31, 1999 (the "May 1999 10-Q").  That document was signed by defendant Swartz.

In that SEC filing, Defendants falsely described the Company's results for the quarter as follows:

> Income before extraordinary item was $433.3 million, or $.65 per share on a
> diluted basis, for the six months ended March 31, 1999 as compared to $557.0
> million, or $.89 per diluted share, for the six months ended March 31, 1998.
> During the six months ended March 31, 1999, the Company incurred an after-tax
> charge of $427.6 million ($.65 per share) for merger and transaction costs, write-
> offs and integration costs primarily associated with the USSC merger.  During the
> six months ended March 31, 1998, the Company incurred an after-tax charge of
> $9.2 million ($.01 per share) for restructuring charges in USSC's operations.
> Excluding these non-recurring charges, income before extraordinary item rose
> 52.0% to $860.9 million, or $1.30 per diluted share, for the six months ended
> March 31, 1999, as compared to $566.2 million, or $.90 per diluted share, for the
> six months ended March 31, 1998.  The increase was attributable to increased
> sales and margin improvements, as well as results of acquired companies in each
> of the Company's business segments.

> After each acquisition, acquired companies are immediately integrated, and Tyco
> does not separately track post-acquisition financial results.  Accordingly, the
> impact of certain acquired companies in the following analysis is based on

estimates and assumes that acquisitions were completed as of the beginning of the periods discussed. . . .

Sales increased 24.9% during the quarter ended March 31, 1999 to $3.96 billion from $3.17 billion in the quarter ended March 31, 1998.

556.    Defendants' representations concerning the financial results generated by Tyco for the quarter ended March 31, 1999 were materially false and misleading because Defendants failed to disclose that Tyco produced those results only by engaging in the accounting manipulations specifically alleged above.

557.    Defendants also made the following materially false and misleading representations concerning Tyco's restructuring and merger reserves in the May 1999 10-Q:

During the six months ended March 31, 1999, the Company recorded merger, restructuring and other non-recurring charges of $434.9 million primarily related to the merger with USSC (Notes 1 and 2). This includes transaction costs of approximately $53.3 million consisting of legal, printing, accounting, financial advisory services and other direct expenses. It also includes charges of approximately $368.5 million incurred to combine USSC's disposable medical products business with the related business of Tyco including the cost of workforce reductions of $124.8 million involving the elimination of approximately 552 positions in the United States, 251 positions in Europe, 31 positions in the Asia Pacific region, and 27 positions in Canada and Latin America, consisting primarily of manufacturing, technical, sales and administrative personnel; the costs of combining certain facilities of $51.8 million involving the shut down and consolidation of 21 sales, manufacturing and distribution facilities in Europe, 9 sales and administrative offices in the United States, 7 sales and administrative offices in the Asia Pacific region and 3 sales and administrative offices in Canada and Latin America; lease termination costs of $156.8 million; and other costs of $35.1 million relating to the consolidation of certain product lines and other non-recurring charges. At March 31, 1999, approximately 603 employees had been terminated.

Approximately $131.7 million of accrued merger, restructuring and other non-recurring charges related to charges recorded during and prior to the six months ended March 31, 1999 are included in other current liabilities and $41.6 million are included in other non-current liabilities at March 31, 1999. The Company currently anticipates that the restructuring activities to which all of these charges relate will be substantially completed by December 31, 1999, except for certain long-term contractual obligations.

558.    Those statements were materially false and misleading because Defendants failed to disclose their practice of aggressively inflating Tyco's restructuring and merger reserves in order to spring-load the Company's future reported results.

### 8.    Defendants' Materially False And Misleading Statements In The June 1999 S-4 And Related SEC Filing

559.    One June 11, 1999, Tyco filed with the SEC a Registration Statement on Form S-4 (the "June 1999 S-4") in connection with its acquisition of Raychem Corp.  The June 1999 S-4 was signed by Defendants Kozlowski, Swartz, Bodman, Fort, Pasman and Walsh.  On July 1, 1999, Tyco filed with the SEC an Amended Registration Statement on Form S-4/A (the "July 1999 S-4/A") in connection with the same acquisition.  That document was also signed by Defendants Kozlowski, Swartz, Bodman, Fort, Pasman and Walsh.

560.    Both the June 1999 S-4 and the July 1999 S-4/A incorporated by reference the 1998 10-K and the 1998 10-K Amendment, including the information in those documents concerning management compensation, related-party transactions, Tyco's accounting for mergers and acquisitions and Tyco's financial results.  The June 1999 S-4 and the July 1999 S-4A were therefore materially false and misleading for the same reasons as the 1998 10-K and the 1998 10-K Amendment.

561.    The June 1999 S-4 and July 1999 S-4/A also both incorporated by reference the February 1999 10-Q, including the information in that document concerning management compensation, Tyco's related-party transactions, Tyco's accounting for mergers and acquisitions and the Company's financial results.  The June 1999 S-4 and the July 1999 S-4/A were therefore materially false and misleading for the same reasons as the February 1999 10-Q.

562.    On July 14, 1999, Tyco filed with the SEC a Prospectus concerning its proposed acquisition of Raychem Corp. (the :July 1999 Prospectus").

563.    The July 1999 Prospectus included the following materially false and misleading chart setting forth Tyco's financial results:

| | Six months ended March 31, | | Year Ended September 30, | Nine Months Ended September 30, |
| | 1999 | 1998 | 1998 | 1997 |
|---|---|---|---|---|
| Net Sales........................................ | $10,452.3 | $9,000.6 | $19,061.7 | $12,742.5 |
| Operating Income........................... | 472.3 | 1,253.0 | 1,948.1 | 125.8 |
| Income (loss) from continuing operations...................................... | 54.3 | 778.0 | 1,168.6 | (348.5) |
| Income (loss) from continuing operations per common share | | | | |
|     Basic................................... | 0.07 | 1.00 | 1.48 | (0.48) |
|     Diluted................................ | 0.07 | 0.98 | 1.45 | (0.48) |

*    *    *    *

| | | | | |
|---|---|---|---|---|
| Consolidated Balance Sheet Data: | | | | |
| Total Assets.................................... | $26,681 | | $23,440.7 | $16,960.8 |
| Long-term debt............................... | 8,037.2 | | 5,424.7 | 2,785.9 |
| Shareholders' equity....................... | 9,829.0 | | 9,901.8 | 7,478.7 |

564.    Those representations were materially false and misleading because Defendants failed to disclose that Tyco produced those results only by engaging in the accounting manipulations specifically alleged above.

565.    The July 1999 Prospectus also incorporated by reference the 1998 10-K, the 1998 10-K Amendment and the February 1999 10-Q, including the information in those documents concerning management compensation, the Company's related-party transactions, Tyco's accounting for mergers and acquisitions and Tyco's financial results.  The July 1999 Prospectus was therefore materially false and misleading for the same reasons as the 1998 10-K, the 1998 10-K Amendment and the February 1999 10-Q.

**9. Defendants' Materially False And Misleading Statements Concerning Tyco's Financial Results For The Quarter Ended June 30, 1999**

566. On July 20, 1999, the Tyco Defendants issued a press release concerning the

Company's financial results for the quarter ended June 30, 1999. In that press release,

Defendants falsely stated:

> Tyco International Ltd. . . ., a diversified manufacturing and service company, reported today that diluted earnings per share, before acquisition and other non-recurring charges and before an extraordinary item, for its third quarter ended June 30, 1999 were 84 cents per share, a 71 percent increase over last year's 49 cents per share. Income before acquisition and other non-recurring charges and an extraordinary item rose to a record $699.4 million, an increase of 75 percent over last year's $400.1 million. Sales for the quarter were up 18 percent at $5.82 billion compared with last year's $4.95 billion. Income before acquisition and other non-recurring charges and an extraordinary item for the first nine months of fiscal 1999 reached $1.78 billion, or $2.14 per diluted share, a 44 percent increase over last year's diluted per share earnings of $1.49. Revenues for the first nine months increased to $16.27 billion, 17 percent higher than last year's $13.95 billion.

567. On August 9, 1999, Tyco filed with the SEC the Company's 10-Q for the quarter

ended June 30, 1999 (the "August 1999 10-Q"). That document was signed by defendant

Swartz. In that SEC filing, Defendants falsely described the results produced by Tyco for the

quarter as follows:

> Income before extraordinary item was $248.3 million, or $.30 per share on a diluted basis, for the nine months ended June 30, 1999 as compared to $1.19 billion, or $1.48 per diluted share, for the nine months ended June 30, 1998. During the nine months ended June 30, 1999, the Company incurred an after-tax charge of $1.34 billion ($1.61 per share) related to the mergers with USSC and AMP and costs associated with AMP's Profit Improvement Plan. During the nine months ended June 30, 1998, the Company incurred a net after-tax credit of $5.2 million ($.01 per share) resulting from a reduction in restructuring reserves related to AMP's 1996 restructuring plans, partially offset by restructuring charges incurred in USSC's operations. Excluding these non-recurring charges, income before extraordinary item rose 34.3% to $1.59 billion, or $1.91 per diluted share, for the nine months ended June 30, 1999, as compared to $1.18 billion, or $1.47 per diluted share, for the nine months ended June 30, 1998. The increase was

attributable to increased sales, margin improvements and results of acquired companies in each of the Company's business segments.

After each acquisition, acquired companies are immediately integrated, and Tyco does not separately track post-acquisition financial results. Accordingly, the impact of certain acquired companies in the following analysis is based on estimates and assumes that acquisitions were completed as of the beginning of the periods discussed. . . .

Sales increased 17.6% to $5.82 billion during the quarter ended June 30, 1999 from $4.95 billion in the quarter ended June 30, 1998.

568.    Defendants' representations concerning the financial results generated by Tyco for the quarter ended June 30, 1999 were materially false and misleading because Defendants failed to disclose that Tyco produced those results only by engaging in the accounting manipulations specifically alleged above.

569.    Defendants also made the following materially false and misleading representations concerning Tyco's restructuring and merger reserves in the August 1999 10-Q:

During the nine months ended June 30, 1999, the Company recorded merger, restructuring and other non-recurring charges of $1.26 billion, consisting of $826.8 million primarily related to the merger with AMP and costs associated with AMP's Profit Improvement Plan and $434.9 million primarily related to the merger with USSC (Notes 1 and 2). Included in the total charges of $1.26 billion are transaction costs of $121.2 million for legal, printing, accounting, financial advisory services, and other direct expenses related to the USSC and AMP mergers; integration costs of $368.5 million related to the combination of USSC's disposable medical products business with the related business of Tyco; integration and restructuring costs of $823.9 million associated with the combination of AMP's electronics business with the related business of Tyco and restructuring activities under AMP's Profit Improvement Plan, which was initiated in July 1998; a credit of $50.0 million related to a litigation settlement with Allied Signal Inc.; and a credit of $15.0 million representing a revision of estimates related to Tyco's 1997 restructuring accruals. Most of the actions under Tyco's 1997 restructuring plans are completed or near completion and have resulted in total estimated costs being less than originally anticipated. The aggregate $1.19 billion of integration and restructuring costs consist of the following: the cost of announced workforce reductions of $549.8 million involving the elimination of approximately 7,200 positions in the United States, 3,100 positions in Europe, 1,400 positions in the Asia-Pacific region and 1,200 positions in Canada and Latin

America, which consist primarily of manufacturing and distribution, research and development, technical, marketing, and sales and administrative personnel; the costs of combining certain facilities of $296.4 million involving the shutdown and consolidation of 69 facilities in the United States, 37 facilities in Europe, 13 facilities in the Asia-Pacific region and 8 facilities in Canada and Latin America, which include manufacturing plants, sales offices, administration buildings and distribution centers; lease termination costs of $166.4 million; $78.9 million related to the write-down of inventory used in AMP's operations which is included in cost of sales; and other costs of $100.9 million relating to the consolidation of certain product lines and other non-recurring charges. At June 30, 1999, approximately 8,400 employees had been terminated and 47 facilities had been shut down.

Approximately $514.2 million of accrued merger and restructuring costs related to charges recorded during and prior to the nine months ended June 30, 1999 are included in other current liabilities and $98.3 million are included in other non-current liabilities at June 30, 1999. The Company currently anticipates that the restructuring activities to which all of these charges relate will be substantially completed within fiscal 2000, except for certain long-term contractual obligations.

During the nine months ended June 30, 1998, the Company recorded a net merger, restructuring and other non-recurring credit of $9.4 million comprised of a $21.4 million credit representing a revision of estimates by AMP related to its 1996 restructuring activities, which were completed in fiscal 1998, and a $12.0 million charge related to employee severance costs, facility disposals and asset write-downs as part of USSC's cost cutting objectives, which were substantially completed during fiscal 1999.

570. Those statements were materially false and misleading because Defendants failed to disclose their practice of aggressively inflating Tyco's restructuring and merger reserves in order to spring-load the Company's future reported results.

### 10. Defendants' Materially False And Misleading Statements Concerning The Company's Financial Results For The Fiscal Year And Quarter Ended September 30, 1999

571. On October 21, 1999, the Tyco Defendants issued a press release concerning the Company's financial results for the quarter ended September 30, 1999. In that press release, Defendants falsely stated:

Tyco International Ltd. . . ., a diversified manufacturing and service company, reported today that diluted earnings per share before extraordinary item, for its fourth quarter ended September 30, 1999 were 92 cents per share, compared to last year's 25 cents per share. Income before extraordinary item rose to $782.7 million, compared to last year's $207.0 million. Sales for the quarter rose 22 percent to $6.22 billion compared with last year's $5.11 billion. Income before acquisition and other non-recurring charges and an extraordinary item for fiscal 1999 rose to $2.56 billion, or $3.06 per diluted share, compared to last year's diluted per share earnings of $1.74. Revenues for fiscal 1999 increased to $22.5 billion, 18 percent higher than last year's $19.1 billion. Inclusive of acquisition and other non-recurring charges, income before extraordinary item was $1.03 billion, or $1.24 per diluted share, for fiscal 1999 as compared to $1.17 billion, or $1.45 per diluted share, for fiscal 1998. All per share amounts are prior to the effect of the two-for-one stock split announced on July 20 and payable today.

572. Tyco filed the 1999 10-K with the SEC on December 13, 1999. In that document, which was signed by defendants Kozlowski, Bodman, Fort, Pasman, Swartz and Walsh, Defendants stated:

Sales increased 18.0% during Fiscal 1999 to $22,496.5 million from $19,061.7 million in Fiscal 1998. Sales in Fiscal 1998 increased 14.4% compared to the twelve months ended September 30, 1997. Income (loss) before extraordinary items and cumulative effect of accounting changes was $1,031.0 million in Fiscal 1999, as compared to $1,168.6 million in Fiscal 1998 and $(300.5) million in the twelve months ended September 30, 1997. Income before extraordinary items for Fiscal 1999 included an after-tax charge of $1,341.5 million ($1,596.7 million pre-tax) related to the mergers with USSC and AMP and costs associated with AMP's profit improvement plan. Income before extraordinary items for Fiscal 1998 included an after-tax charge of $192.0 million ($256.9 million pre-tax) primarily related to AMP's profit improvement plan and costs incurred by USSC to exit certain businesses. Loss before extraordinary items and cumulative effect of accounting changes for the twelve months ended September 30, 1997 included an after-tax charge of $1,485.5 million ($1,670.4 million pre-tax) for merger and transaction costs, write-offs and integration costs primarily associated with the mergers of ADT, Former Tyco, Keystone and Inbrand.

573. On or about March 14, 2000, Tyco released its 1999 Annual Report to Shareholders (the "1999 Annual Report"). Defendants set forth the following materially false and misleading summary of Tyco's fiscal 1999 financial results in the 1999 Annual Report:

Sales increased 18.0% during Fiscal 1999 to $22,496.5 million from $19,061.7 million in Fiscal 1998. Sales in Fiscal 1998 increased 14.4% compared to the twelve months ended September 30, 1997. Income (loss) before extraordinary items and cumulative effect of accounting changes was $1,031.0 million in Fiscal 1999, as compared to $1,168.6 million in Fiscal 1998 and ($300.5) million in the twelve months ended September 30, 1997. Income before extraordinary items for Fiscal 1999 included an after-tax charge of $1,341.5 million ($1,596.7 million pre-tax) related to the mergers with USSC and AMP and costs associated with AMP's profit improvement plan. Income before extraordinary items for Fiscal 1998 included an after-tax charge of $192.0 million ($256.9 million pre-tax) primarily related to AMP's profit improvement plan and costs incurred by USSC to exit certain businesses. Loss before extraordinary items and cumulative effect of accounting changes for the twelve months ended September 30, 1997 included an after-tax charge of $1,485.5 million ($1,670.4 million pretax) for merger and transaction costs, write-offs and integration costs primarily associated with the mergers of ADT, Former Tyco, Keystone and Inbrand.

574.    Defendants' representations concerning the financial results generated by Tyco for the fiscal quarter and year ended September 30, 1999 were materially false and misleading because Defendants failed to disclose that Tyco produced those results only by engaging in the accounting manipulations specifically alleged above.

575.    Defendants also made the following materially false and misleading statement concerning Tyco's merger and restructuring reserves in the 1999 10-K:

In Fiscal 1999, the Company made acquisitions that were accounted for under the purchase accounting method at an aggregate cost of $6,923.3 million. Of this amount, $4,546.8 million was paid in cash (net of cash acquired), $1,449.6 million was paid in the form of Tyco common shares, and the Company assumed $926.9 million in debt. In connection with these acquisitions, the Company established purchase accounting reserves of $525.4 million for transaction and integration costs. At the beginning of Fiscal 1999, purchase accounting reserves were $505.6 million as a result of purchase accounting transactions made in prior years. During Fiscal 1999, the Company paid out $354.4 million in cash and incurred $16.3 million in non-cash charges against the reserves established during and prior to Fiscal 1999. Also in Fiscal 1999, the Company determined that $90.0 million of purchase accounting reserves related to acquisitions prior to Fiscal 1999 were not needed and reversed that amount against goodwill. At September 30, 1999, there remained $570.3 million in purchase accounting reserves on the Company's Consolidated Balance sheet, of which $408.0 is included in current liabilities and $162.3 million is included in long-term liabilities. The Company

expects to pay out approximately $350.0 million in cash in Fiscal 2000 that will be charged against these purchase accounting reserves.

576.     Those representations were materially false and misleading because Defendants engaged in the improper manipulations of Tyco's accounting reserves specified above and, as Tyco now admits, employed improperly aggressive assumptions in setting those reserves.

577.     The 1999 10-K also makes specific misleading statements concerning the Company's mergers with AMP and U.S. Surgical without disclosing the accounting manipulations conducted by Defendants in connection with those transactions.  According to the 1999 10-K:

> In Fiscal 1999, the Company consummated two mergers that were accounted for under the pooling of interests method of accounting.  The merger with United States Surgical Corporation closed on October 1, 1998, and the merger with AMP Incorporated closed on April 2, 1999.  As required by generally accepted accounting principles, the Company restated its financial statements as if USSC and AMP had always been a part of the Company.  The Company recorded as expenses during Fiscal 1999 costs directly associated with the USSC and AMP mergers and the costs of terminating employees and closing or consolidating facilities as a result of the mergers.  The Company also expensed in Fiscal 1999 the costs of staff reductions and facility closings that AMP undertook as part of a plan to improve its profitability unrelated to the Company's merger with AMP.  In Fiscal 1998, the Company expensed charges for staff reductions and facility closings under the AMP profit improvement plan and charges that USSC incurred to exit certain of its businesses.  These are discussed in more detail under "Liquidity and Capital Resources" below.

578.     Those statements were materially false and misleading because Defendants failed to disclose the manner in which they had manipulated Tyco's reserves and the financial results of AMP and US Surgical in order to spring-load Tyco's post-acquisition financial results.

579.     The 1999 10-K also makes the following misleading statements concerning the Company's acquisitions of AMP and Raychem without disclosing the improper financial

engineering tactics that Defendants employed to produce the improved results reported for those businesses.

> The 40.5% increase in operating profits in Fiscal 1999 compared with Fiscal 1998 [for Tyco's electrical business] was due to improved margins at AMP, the acquisition of Raychem, and higher sales volume at TSSL and the Tyco Printed Circuit Group. The improved operating margins in Fiscal 1999 compared with Fiscal 1998 were primarily due to the implementation of AMP's profit improvement plan, which was initiated in the fourth quarter of Fiscal 1998, cost reduction programs associated with the AMP merger, a pension curtailment/settlement gain and the acquisition of Raychem.

### 11. Defendants' False And Misleading Statements In The December 1999 S-8

580.    On December 21, 1999, Tyco filed with the SEC a Form S-8 for the registration of 10,000,000 shares of Tyco common stock (the "December 1999 S-8"). That document was signed by defendants Swartz, Kozlowski, Walsh, Bodman, Fort and Pasman. Because the December 1999 S-8 incorporates Tyco's 1999 10-K by reference, it contains the same materially false and misleading statements as the 1999 10-K.

### 12. Defendants' Materially False And Misleading Statements Concerning Tyco's Financial Results For The Quarter Ended December 31, 1999

581.    On January 18, 2000, the Tyco Defendants issued a press release concerning the Company's financial results for the quarter ended December 31, 1999. In that press release, Defendants falsely stated:

> Tyco International Ltd. . . ., a diversified manufacturing and service company, reported today that diluted earnings per share, before non-recurring charges and credits and extraordinary item, for its first quarter of fiscal 2000 ended December 31, 1999 were 46 cents per share, a 48 percent increase over last year''s 31 cents per share. Net income rose to $784.3 million, an increase of 54 percent over last year''s $509.3 million. Sales for the quarter rose 27 percent to $6.64 billion compared with last year''s $5.21 billion. Last year''s results have been restated to reflect the merger with AMP, which occurred on April 2, 1999 and was accounted for as a pooling of interests, and are before non-recurring charges and extraordinary item. After giving effect to acquisition related and other non-

recurring charges and credits, diluted earnings per share was were $0.46 cents in 2000 compared to a loss of 7 cents in 1999.

582.    On February 11, 2000, Tyco filed with the SEC the Company's 10-Q for the

quarter ended December 31, 1999 (the "February 2000 10-Q"). That document was signed by

defendant Swartz.

583.    Defendants falsely described the Company's quarterly results as follows in the

February 2000 10-Q:

> Sales increased 27.3% during the quarter ended December 31, 1999 to $6,638.8 million from $5,213.5 million in the quarter ended December 31, 1998. Income (loss) before extraordinary items was $791.4 million in the quarter ended December 31, 1999, as compared to $(107.7) million in the quarter ended December 31, 1998. Income before extraordinary items for the quarter ended December 31, 1999 included an after-tax net credit of $7.1 million ($24.2 million pre-tax) consisting of a credit of $99.1 million ($137.6 million pre-tax) representing a revision of estimates of merger, restructuring and other non-recurring accruals, offset by restructuring and impairment charges of $92.0 million ($113.4 million pre-tax) primarily related to the exiting of USSC's interventional cardiology business. Loss before extraordinary items for the quarter ended December 31, 1998 included an after-tax charge of $550.5 million ($693.0 million pre-tax) related to the merger with USSC and costs associated with AMP's profit improvement plan.

584.    In addition, Defendants offered the following materially misleading account of

Tyco's results in both the February 2000 10-Q and a Form 10-Q/A that Tyco filed with the SEC

on June 26, 2000 (the "June 2000 10-Q/A(1)"):

> Operating income improved in all segments in the quarter ended December 31, 1999 as compared to the quarter ended December 31, 1998. The operating improvements are the result of both increased revenues and enhanced margins. Increased revenues resulted from organic growth and from acquisitions.

585.    Defendants' representations concerning the financial results generated by Tyco for

the quarter ended December 31, 1999 were materially false and misleading because Defendants

failed to disclose that Tyco produced those results only by engaging in the accounting

manipulations specifically alleged above.

586.     With respect to Tyco's merger and restructuring reserves, Defendants also falsely

in the February 2000 10-Q that: (a) the Company had $119 million in reserves related to the

closing of facilities; and (b) the Company maintained $251.9 million in "other" reserves.  In

addition, Defendants falsely stated:

> During the quarter ended December 31, 1999, the Company recorded a net
> merger, restructuring and other non-recurring credit of $123.2 million.  The net
> credit of $123.2 million is comprised of a credit of $137.6 million representing a
> revision of estimates for accrued merger, restructuring and other non-recurring
> charges recorded in prior periods, offset by restructuring and other non-recurring
> charges of $14.4 million.  The $137.6 million credit is comprised of revisions of
> $83.8 million related primarily to the merger with AMP Incorporated ("AMP")
> and costs associated with AMP's profit improvement plan; $38.3 million related to
> the Company's 1997 restructuring plans; and $15.5 million related primarily to the
> merger with United States Surgical Corporation ("USSC").  The changes in
> estimates of the restructuring plan at AMP were attributable primarily to increased
> demand for certain of AMP's products which was not anticipated at the time of the
> merger and to recent acquisitions such as Siemens EC.  Therefore, the Company
> has determined not to close several facilities and not to terminate approximately
> 3,000 employees, whose costs were provided for in previous AMP restructuring
> plans.  In addition, certain restructuring activities at AMP were completed for
> amounts lower than originally anticipated.  The changes in estimates of the
> Company's 1997 restructuring plans and the USSC restructuring plans were due
> primarily to the completion of activities for amounts lower than originally
> recorded.  The charges of $14.4 million consist of $7.9 million related to the
> Company's exiting the USSC interventional cardiology business, of which $6.4
> million is included in cost of sales, and $6.5 million related to the restructuring of
> AMP's Brazilian operations. . . .

587.     Likewise, Defendants made the following similar false representation in the June

2000 10-Q/A:

> In the quarter ended December 31, 1999, the Company established restructuring
> and other non-recurring reserves of $22.1 million primarily related to the exiting
> of USSC's interventional cardiology business, charges associated with USSC's
> suture business and the restructuring of AMP's Brazilian operations.  At
> September 30, 1999, there existed merger, restructuring and other non-recurring

reserves of $399.3 million.  During the quarter ended December 31, 1999, the Company paid out $58.3 million in cash and incurred $19.9 million in non-cash charges that were charged against these reserves.  Also in the quarter ended December 31, 1999, the Company determined that $94.7 million of merger, restructuring and other non-recurring reserves established in prior years was not needed and recorded a credit to the merger, restructuring and other non-recurring charges line item in the Consolidated Statement of Operations.  The changes in estimates of the restructuring plan at AMP were attributable primarily to increased demand for certain of AMP's products which was not anticipated at the time of the merger and to recent acquisitions such as Siemens EC.  Therefore, the Company has determined not to close several facilities and not to terminate approximately 3,000 employees, whose costs were provided for in previous AMP restructuring plans.  In addition, certain restructuring activities at AMP were completed for amounts lower than originally anticipated.  The changes in estimates of the Company's 1997 restructuring plans and the USSC restructuring plans were due primarily to the completion of activities for amounts lower than originally recorded.  At December 31, 1999, there remained $248.5 million of merger, restructuring and other non-recurring reserves on the Company's Consolidated Balance Sheet, of which $204.3 million is included in current liabilities and $44.2 million is included in long-term liabilities.

588.    Those representations concerning Tyco's reserves were materially false and misleading because Defendants failed to disclose that they manipulated Tyco's accounting reserves – particularly those related to the US Surgical and AMP transactions – in the manner specified above.

### 13.    Defendants' Materially False And Misleading Statements In The December 1999 S-4 And Its Related SEC Filings

589.    On December 21, 1999, Tyco filed with the SEC a Form S-4 relating to the Company's proposed offer to exchange up to $1,000,000,000 aggregate principal amount of new 6 7/8% notes due 2002 for any and all of its outstanding 6 7/8% notes due 2002 (the "December 1999 S-4").  The December 1999 S-4 was signed by defendants Swartz, Kozlowski, Walsh, Bodman, Fort and Pasman.  Because the December 1999 S-4 incorporated Tyco's 1999 10-K by reference, the S-4 contained the same materially false and misleading statements as the 1999 10-K.

590.    On June 26, 2000, Tyco filed with the SEC a Form S-4/A (the "June 2000 S-4/A"), amending the December 1999 S-4.  The June 2000 S-4/A was signed by defendant Swartz for himself and for defendants Kozlowski, Walsh, Bodman, Fort and Pasman.

591.    Because the June 2000 S-4/A incorporates the following documents by reference, it contains the same materially false and misleading statements as those documents: the 1999 10-K; the 1999 10-K/A; the February 2000 10-Q; the June 2000 10-Q/A; the May 2000 10-Q; and the June 2000 10-Q/A(2).

592.    On June 30, 2000, Tyco filed with the SEC a Prospectus for the offering described in the December 1999 S-4.

593.    Because the June 2000 Prospectus incorporates by reference the same documents as the June 2000 S-4/A, both documents contain the materially false and misleading statements contained in the incorporated documents.

### 14.    Defendants' Material Misrepresentations And Omissions In The January 2000 S-8

594.    On January 28, 2000, Tyco filed with the SEC a Form S-8 for the registration of 10,000,000 shares of Tyco common stock (the "January 2000 S-8").  That document was signed by defendants Swartz, Kozlowski, Walsh, Bodman, Fort and Pasman.  Because the January 2000 S-8 incorporated Tyco's 1999 10-K by reference, the S-8 contained the same materially false and misleading statements as the 1999 10-K.

### 15.    Defendants' Materially False And Misleading Statements Concerning Tyco's Results For The Quarter Ended March 31, 2000

595.    On April 18, 2000, the Tyco Defendants issued a press release concerning the Company's financial results for the quarter ended March 31, 2000.  In that press release, Defendants falsely stated:

Tyco International Ltd. . . ., a diversified manufacturing and service company, reported today that diluted earnings per share before non-recurring charges and credits and extraordinary item, for its second quarter ended March 31, 2000 were 50 cents per share, a 47 percent increase over 34 cents per share for the same quarter last year. Net income rose to $853.6 million, an increase of 50 percent compared to $567.8 million last year. Sales for the quarter rose 35 percent to $7.07 billion compared with last year's $5.24 billion. The results for last year have been restated to reflect the merger with AMP, which occurred on April 2, 1999 and was accounted for as a pooling of interests, and are before acquisition-related and non-recurring charges and extraordinary item. After giving effect to acquisition related and other non-recurring charges and credits, and extraordinary item, diluted earnings per share were 50 cents, or $855.9 million, in fiscal 2000 compared to 7 cents, or $119.5 million, in fiscal 1999.

Income before non-recurring charges and credits and extraordinary items for the first half of fiscal 2000 rose to $1.64 billion, or 96 cents per diluted share, a 48 percent increase over last year's diluted per share earnings of 65 cents. After giving effect to acquisition related and other non-recurring charges and credits, and extraordinary item, diluted earnings per share were 96 cents, or $1.65 billion for the first half of fiscal 2000 compared to 1 cent, or $9.4 million, in fiscal 1999. Revenues for the first half increased to $13.7 billion, 31 percent higher than last year's $10.5 billion.

596.    On May 15, 2000, Tyco filed with the SEC Tyco's Form 10-Q for the quarter ended March 31, 1999 (the "May 2000 10-Q"). That document was signed by defendant Swartz.

597.    Defendants set forth the following materially false and misleading description of the financial results produced by Tyco for the March quarter in the May 2000 10-Q:

Sales increased 35.0% during the quarter ended March 31, 2000 to $7,070.0 million from $5,238.7 million in the quarter ended March 31, 1999. Income before extraordinary items was $855.9 million in the quarter ended March 31, 2000, as compared to $162.0 million in the quarter ended March 31, 1999. Income before extraordinary items for the quarter ended March 31, 2000 included an after-tax net credit of $2.3 million ($2.3 million pre-tax) consisting of a credit of $9.5 million ($12.7 million pre-tax) representing a revision of estimates of merger, restructuring and other non-recurring accruals, offset by restructuring charges of $7.2 million ($10.4 million pre-tax) primarily related to AMP's operations. Income before extraordinary items for the quarter ended March 31, 1999 included an after-tax charge of $285.6 million ($329.9 million pre-tax) related to AMP's profit improvement plan.

598.    In addition, Defendants stated:

Operating income improved in all segments in the six months ended March 31, 2000 as compared to the six months ended March 31, 1999. The operating improvements are the result of both increased revenues and enhanced margins. Increased revenues resulted from organic growth and from acquisitions.

599. That misrepresentation was repeated by the Defendants in an amendment to the May 2000 10-Q that was signed by Swartz and filed with the SEC on June 26, 2000 (the "June 2000 10-Q/A(2)").

600. Defendants' representations concerning the financial results generated by Tyco for the quarter ended March 31, 2000 were materially false and misleading because Defendants failed to disclose that Tyco produced those results only by engaging in the accounting manipulations specifically alleged above.

601. The May 2000 10-Q also contains the following materially misleading characterization of Tyco's restructuring and merger reserves:

In the six months ended March 31, 2000, the Company established restructuring and other non-recurring reserves of $24.8 million, of which $7.3 million is included in cost of sales, primarily related to the exiting of USSC's interventional cardiology business and the restructuring activities in AMP's Brazilian operations and wireless communications business. At September 30, 1999, there existed merger, restructuring and other non-recurring reserves of $453.3 million. During the six months ended March 31, 2000, the Company paid out $92.4 million in cash and incurred $45.5 million in non-cash charges that were charged against these reserves. Also in the six months ended March 31, 2000, the Company determined that $150.3 million of merger, restructuring and other non-recurring reserves established in prior years was not needed and recorded a credit of $144.0 million to the merger, restructuring and other non-recurring charges line item and a credit of $6.3 million to the cost of sales line item in the Consolidated Statement of Operations. The changes in estimates of the restructuring plan at AMP were attributable primarily to increased demand for certain of AMP's products which was not anticipated at the time of the merger and to recent acquisitions such as Siemens EC. Therefore, the Company has determined not to close several facilities and not to terminate approximately 3,000 employees, the costs of which were provided for in previous AMP restructuring plans. In addition, certain restructuring activities at AMP were completed for amounts lower than originally anticipated. The changes in estimates of the Company's 1997 restructuring plans and the USSC restructuring plans were due primarily to the completion of

activities for amounts lower than originally recorded.  At March 31, 2000, there remained $189.9 million of merger, restructuring and other non-recurring reserves on the Company's Consolidated Balance Sheet, of which $147.6 million is included in current liabilities and $42.3 million is included in long-term liabilities.

602.     The June 2000 10-Q/A(2) set forth the following similar material misrepresentation:

In the six months ended March 31, 2000, the Company established restructuring and other non-recurring reserves of $33.0 million, of which $7.3 million is included in cost of sales, primarily related to the exiting of USSC's interventional cardiology business, charges associated with USSC's suture business and the restructuring activities in AMP's Brazilian operations and wireless communications business.  At September 30, 1999, there existed merger, restructuring and other non-recurring reserves of $399.3 million.  During the six months ended March 31, 2000, the Company paid out $92.4 million in cash and incurred $45.5 million in non-cash charges that were charged against these reserves.  Also in the six months ended March 31, 2000, the Company determined that $107.4 million of merger, restructuring and other non-recurring reserves established in prior years was not needed and recorded a credit of $101.1 million to the merger, restructuring and other non-recurring charges line item and a credit of $6.3 million to the cost of sales line item in the Consolidated Statement of Operations.  The changes in estimates of the restructuring plan at AMP were attributable primarily to increased demand for certain of AMP's products which was not anticipated at the time of the merger and to recent acquisitions such as Siemens EC.  Therefore, the Company has determined not to close several facilities and not to terminate approximately 3,000 employees, the costs of which were provided for in previous AMP restructuring plans.  In addition, certain restructuring activities at AMP were completed for amounts lower than originally anticipated.  The changes in estimates of the Company's 1997 restructuring plans and the USSC restructuring plans were due primarily to the completion of activities for amounts lower than originally recorded.  At March 31, 2000, there remained $187.0 million of merger, restructuring and other non-recurring reserves on the Company's Consolidated Balance Sheet, of which $144.7 million is included in current liabilities and $42.3 million is included in long-term liabilities.

603.     Those representations concerning Tyco's reserves were materially false and misleading because Defendants failed to disclose that they manipulated Tyco's accounting reserves – particularly those related to the US Surgical and AMP transactions – in the manner specified above in order to spring-load Tyco's post-acquisition financial results.

### 16. Defendants' Materially Misleading Representations And Omissions In The Mallinckrodt Transaction SEC Filings

604. On July 12, 2000, Tyco filed with the SEC a Form S-4 relating to a proposed merger between Mallinckrodt Inc. and a subsidiary of Tyco (the "July 2000 Mallinckrodt S-4"). That document was signed by defendants Swartz, Kozlowski, Walsh, Bodman, Fort, Lane and Pasman. Because the July 2000 Mallinckrodt S-4 incorporates the following documents by reference, it contains the same materially false and misleading statements as those documents: the 1999 10-K; the 1999 10-K/A; the February 2000 10-Q; the June 2000 10-Q/A; the May 2000 10-Q; and the June 2000 10-Q/A(2).

605. On August 9, 2000, Tyco filed with the SEC a Form S-4/A (the "August 2000 Mallinckrodt S-4/A"), amending the July 2000 Mallinckrodt S-4. The August 2000 Mallinckrodt S-4/A was signed by defendant Swartz for himself and for defendants Kozlowski, Walsh, Bodman, Fort, Lane and Pasman.

606. The August 2000 Mallinckrodt S-4/A was materially false and misleading because it incorporated by reference the same documents as the July 2000 Mallinckrodt S-4.

607. On August 11, 2000, Tyco filed with the SEC a Prospectus relating to the Mallinckrodt transaction (the August 2000 Mallinckrodt Prospectus). That document was also materially false and misleading because it incorporated by reference the same documents as the July 2000 Mallinckrodt S-4.

### 17. Defendants' Material Misrepresentations And Omissions In The 2000 Euro Offering SEC Filings

608. On July 24, 2000, Tyco filed with the SEC a Form S-4 relating to Tyco's proposal to exchange up to Euro 600,000,000 aggregate principal amount of new 6 1/8% notes due 2007 for any and all of its outstanding 6-1/8% Notes due 2007 (the "July 2000 Euro S-4"). That

document was signed by defendants Swartz, Kozlowski, Walsh, Bodman, Fort, Lane and Pasman.

609.    Because the July 2000 Euro S-4 incorporates the following documents by reference, it contains the same materially false and misleading statements set forth in those documents: the 1999 10-K; the 1999 10-K/A; the February 2000 10-Q; the June 2000 10-Q/A; the May 2000 10-Q; and the June 2000 10-Q/A(2).

610.    On August 3, 2000, Tyco filed with the SEC a Form S-4/A (the "August 2000 Euro S-4/A"), amending the July 2000 Euro S-4. That document was signed by defendant Swartz for himself and for defendants Kozlowski, Walsh, Bodman, Fort, Lane and Pasman.

611.    Because the August 2000 S-4/A incorporates by reference the same documents as the July 2000 Euro S-4, both SEC filings are materially false and misleading for the same reasons as the incorporated documents.

612.    The August 2000 Euro S-4/A also sets forth the following materially misleading description of Tyco's financial results for the Company's third fiscal quarter of 2000:

> On July 19, 2000, Tyco announced its results for the third quarter of fiscal 2000, the three and nine months ended June 30, 2000. Tyco reported that diluted earnings per share before non-recurring charges and credits and extraordinary item, for its third quarter ended June 30, 2000 were 58 cents per share, a 38 percent increase over 42 cents per share for the same quarter last year. Net income rose to $992.1 million, an increase of 42 percent compared to $699.4 million last year. Sales for the quarter rose 27 percent to $7.42 billion compared with last year's $5.82 billion. The results for last year are before restructuring and non-recurring charges and extraordinary item. After giving effect to restructuring and other non-recurring charges and credits, diluted earnings per share before extraordinary item were 58 cents, or $997.3 million, in fiscal 2000 compared to 13 cents, or $212.2 million, in fiscal 1999.
>
> Income before non-recurring charges and credits and extraordinary items for the nine months of fiscal 2000 rose to $2.63 billion, or $1.54 per diluted share, a 44 percent increase over last year's diluted per share earnings of $1.07. After giving effect to acquisition related and other non-recurring charges and credits, diluted

earnings per share before extraordinary item were $1.52, or $2.61 billion for the first nine months of fiscal 2000 compared to 17 cents, or $286.9 million, in fiscal 1999. Revenues for the nine months increased to $21.13 billion, 30 percent higher than last year's $16.27 billion.

613. Those representations were materially false and misleading because Defendants failed to disclose that Tyco produced the reported results only by engaging in the accounting manipulations specifically alleged above.

614. On August 11, 2000, Tyco filed with the SEC a Prospectus for the offering described in the July 2000 Euro S-4. Because that Prospectus incorporates by reference the same documents that were incorporated by reference in the August 2000 Euro S-4/A, both SEC filings contain the materially false and misleading statements set forth in the incorporated documents.

615. The August 2000 Euro Prospectus also set forth the materially misleading description of Tyco's financial results for the third fiscal quarter of 2000 that appears in the August 2000 S-4/A.

616. On November 29, 2000, Tyco filed with the SEC a Post-Effective Amendment to the July 2000 Euro S-4 and the August 2000 Euro S-4/A (the "November 2000 Post-Effective Amendment"). That document was signed by defendant Swartz for himself and for defendants Kozlowski, Walsh, Bodman, Fort, Lane and Pasman.

617. The November 2000 Post-Effective Amendment incorporates by reference the same documents as the August 2000 Euro Prospectus. As a result, the November 2000 Post-Effective Amendment contains the same materially false and misleading representations as the incorporated documents.

618.     The November 2000 Post-Effective Amendment also sets forth the following

materially misleading description of Tyco's financial results for the Company's fiscal 2000 and

the fourth quarter of that fiscal year:

> On October 24, 2000, Tyco announced its results for the fourth quarter of fiscal
> 2000, the three months ended September 30, 2000. For the fiscal 2000 fourth
> quarter, income before restructuring and other non-recurring credits, charges, gain
> and extraordinary items was $1.10 billion, or $0.64 per diluted share, as compared
> to $782.7 million, or $0.46 per diluted share, for the quarter ended September 30,
> 1999. After giving effect to restructuring and other non-recurring credits, charges,
> gain and extraordinary items, net income for the fourth quarter of fiscal 2000 was
> $1.91 billion, or $1.12 per diluted share, compared to $780.5 million, or $0.46 per
> diluted share, in the fourth quarter of fiscal 1999. Results in the fourth quarter of
> fiscal 2000 included a $1.76 billion pretax gain from the initial public offering of
> TyCom Ltd. Fourth quarter sales rose 25% to $7.81 billion, up from $6.22 billion
> a year ago.
>
> For fiscal 2000, revenues increased to $28.93 billion, up 29% from revenues of
> $22.50 billion in fiscal 1999. Income before restructuring and other non- recurring
> credits, charges, gain and extraordinary items rose to $3.73 billion, or $2.18 per
> diluted share, a 42% increase over $1.53 per diluted share in fiscal 1999. After
> giving effect to restructuring and other non-recurring credits, charges, gain and
> extraordinary items, net income for fiscal 2000 was $4.52 billion, or $2.64 per
> diluted share, compared to $1.02 billion or $0.61 per diluted share, in fiscal 1999.

619.     Those representations were materially false and misleading because Defendants

failed to disclose that Tyco produced those results only by engaging in the accounting

manipulations specifically alleged above.

620.     In addition, the November Post-Effective Amendment included the following

materially misleading representations concerning the merger and restructuring charges taken by

Tyco during various accounting periods:

> Earnings for the nine months ended June 30, 2000, the years ended September 30,
> 1999 and 1998, the nine months ended September 30, 1997 and the years ended
> December 31, 1996 and 1995 include net merger, restructuring and other non-
> recurring (credits) charges of $(81.3) million (of which net charges of $1.0 million
> are included in cost of sales), $1,035.2 million (of which $106.4 million is
> included in cost of sales), $256.9 million, $947.9 million, $344.1 million and

$97.1 million, respectively. Earnings also include charges for the impairment of long-lived assets of $99.0 million, $507.5 million, $148.4 million, $744.7 million and $8.2 million in the nine months ended June 30, 2000, the year ended September 30, 1999, the nine months ended September 30, 1997 and the years ended December 31, 1996 and 1995, respectively.

621. Those representations were materially false and misleading because, as is specifically alleged above, Defendants manipulated the accounting reserves maintained by Tyco in order to spring-load the Company's post-acquisition financial results.

18. **Defendants' Materially False And Misleading Representations In The December 2000 TIGSA Prospectus**

622. On December 15, 2000, Tyco filed with the SEC a Prospectus relating to the proposed offer by Tyco International Group S.A. to exchange up to (Euro) 26,885,000 aggregate principal amount of new 6 1/8% notes due 2007 for any and all of its outstanding 6 1/8% notes due 2007 not heretofore exchanged (the "December 2000 TIGSA Prospectus").

623. Because the December 2000 TIGSA Prospectus incorporates by reference the same documents that were incorporated by reference in the November 2000 Post-Effective Amendment, both SEC filings contain the materially false and misleading statements set forth in the incorporated documents.

624. The December 2000 TIGSA Prospectus also contains the same description set forth in the November 2000 Post-Effective Amendment concerning Tyco's financial results for the Company's fiscal 2000 and the fourth quarter of that fiscal year. The statements in the December 2000 TIGSA Prospectus are therefore materially false and misleading for the same reasons as the statements that appear in the November 2000 Post-Effective Amendment.

625.     Moreover, the December 2000 TIGSA Prospectus contains the same materially false and misleading representations concerning Tyco's merger and restructuring charges as the November 2000 Post-Effective Amendment.

### 19.     Defendants' False And Misleading Statements Concerning The Company's Financial Results For The Quarter Ended June 30, 2000

626.     On July 19, 2000, the Tyco Defendants issued a press release concerning the Company's financial results for the quarter ended June 30, 2000.  In that press release, Defendants falsely stated:

> Tyco International Ltd. . . ., a diversified manufacturing and service company, reported today that diluted earnings per share before non-recurring charges and credits and extraordinary item, for its third quarter ended June 30, 2000 were 58 cents per share, a 38 percent increase over 42 cents per share for the same quarter last year.  Net income rose to $992.1 million, an increase of 42 percent compared to $699.4 million last year.  Sales for the quarter rose 27 percent to $7.42 billion compared with last year's $5.82 billion.  The results for last year are before restructuring and non-recurring charges and extraordinary item.  After giving effect to restructuring and other non-recurring charges and credits, diluted earnings per share before extraordinary item were 58 cents, or $997.3 million, in fiscal 2000 compared to 13 cents, or $212.2 million, in fiscal 1999.

> Income before non-recurring charges and credits and extraordinary items for the nine months of fiscal 2000 rose to $2.63 billion, or $1.54 per diluted share, a 44 percent increase over last year's diluted per share earnings of $1.07.  After giving effect to acquisition related and other non-recurring charges and credits, diluted earnings per share before extraordinary item were $1.52, or $2.61 billion for the first nine months of fiscal 2000 compared to 17 cents, or $286.9 million, in fiscal 1999.  Revenues for the nine months increased to $21.13 billion, 30 percent higher than last year's $16.27 billion.

627.     On August 14, 2000, Tyco filed with the SEC Tyco's Form 10-Q for the quarter ended June 30, 2000 (the "August 2000 10-Q").  That document was signed by defendant Swartz.

628.    The August 2000 10-Q sets forth the following materially misleading

representations concerning Tyco's financial results for the quarter and nine-month fiscal periods

ending June 30, 2000:

> Operating income, before certain credits (charges), improved in all segments in
> the quarter and nine months ended June 30, 2000 as compared to the quarter and
> nine months ended June 30, 1999.  The operating improvements are the result of
> increased revenues and enhanced margins in certain segments.  Increased revenues
> resulted from organic growth and from acquisitions.

629.    In addition, Defendants falsely stated:

> Sales increased 27.5% during the quarter ended June 30, 2000 to $7,417.8 million
> from $5,819.8 million in the quarter ended June 30, 1999.  Income before
> extraordinary items was $997.3 million in the quarter ended June 30, 2000, as
> compared to $212.2 million in the quarter ended June 30, 1999.  Income before
> extraordinary items for the quarter ended June 30, 2000 included an after-tax net
> credit of $5.2 million ($6.9 million pre-tax) consisting of a credit of $7.3 million
> ($9.8 million pre-tax) representing a revision of estimates of merger, restructuring
> and other non-recurring accruals, offset by restructuring charges of $2.1 million
> ($2.9 million pre-tax) related to USSC's suture business.  Income before
> extraordinary items for the quarter ended June 30, 1999 included an after-tax net
> charge of $487.2 million ($545.9 million pre-tax) consisting of merger,
> restructuring and non-recurring, and impairment charges of $532.5 million
> ($615.6 million pre-tax) primarily related to the merger with AMP and AMP's
> profit improvement plan, offset by a credit of $45.3 million ($69.7 million pre-
> tax).  The pre-tax credit consists of $50.0 million relating to a litigation settlement
> with Allied Signal Inc. and $19.7 million representing a revision of estimates
> related to the Company's 1997 restructuring and other non-recurring accruals.

630.    Those representations concerning Tyco's financial results were materially false

and misleading because Defendants failed to disclose that Tyco produced those results only by

engaging in the accounting manipulations specifically alleged above.

631.    In addition, the August 2000 10-Q makes the following materially false and

misleading statements concerning Tyco's restructuring and merger reserves:

> In the nine months ended June 30, 2000, the Company established restructuring
> and other non-recurring reserves of $35.9 million, of which $7.3 million is
> included in cost of sales, primarily related to the restructuring activities in AMP's

Brazilian operations and wireless communications business, charges associated with USSC's suture business and the exiting of USSC's interventional cardiology business. At September 30, 1999, there existed merger, restructuring and other non-recurring reserves of $399.3 million. During the nine months ended June 30, 2000, the Company paid out $116.4 million in cash and incurred $50.5 million in non-cash charges that were charged against these reserves. Also in the nine months ended June 30, 2000, the Company determined that $117.2 million of merger, restructuring and other non-recurring reserves established in prior years was not needed and recorded a credit of $110.9 million to the merger, restructuring and other non-recurring charges line item and a credit of $6.3 million to the cost of sales line item in the Consolidated Statement of Operations. The changes in estimates of the restructuring plan at AMP were attributable primarily to increased demand for certain of AMP's products which was not anticipated at the time of the merger and to recent acquisitions such as Siemens EC. Therefore, the Company has determined not to close several facilities and not to terminate approximately 3,000 employees, the costs of which were provided for in previous AMP restructuring plans. In addition, certain restructuring activities at AMP were completed for amounts lower than originally anticipated. The changes in estimates of the Company's 1997 restructuring plans and the USSC restructuring plans were due primarily to the completion of activities for amounts lower than originally recorded. At June 30, 2000, there remained $151.1 million of merger, restructuring and other non-recurring reserves on the Company's Consolidated Balance Sheet, of which $117.6 million is included in accrued expenses and other current liabilities and $33.5 million is included in other long-term liabilities.

632. Those representations were materially false and misleading because Defendants failed to disclose that they manipulated Tyco's accounting reserves – particularly those related to the US Surgical and AMP transactions – in order to spring-load the Company's post-acquisition financial results.

**20. Defendants' Materially False And Misleading Representations In Tyco's August 2000 Registration Statements And Related SEC Filings**

633. On August 18, 2000, Tyco filed a Form S-3 relating to the public offering and sale of 4,703,999 shares of Tyco common stock issuable upon exercise of stock options held by Kozlowski and the KMS Family Partnership L.P. (the "August 2000 S-3(1)"). That document was signed by defendants Swartz, Kozlowski, Walsh, Bodman, Fort, Lane and Pasman.

634.     Because the August 2000 S-3(1) incorporates the following documents by reference, it contains the materially false and misleading statements set forth in those documents: the 1999 10-K; the 1999 10-K/A; the February 2000 10-Q; the June 2000 10-Q/A; the May 2000 10-Q; the June 2000 10-Q/A(2); and the August 2000 10-Q.

635.     On September 12, 2000, Tyco filed with the SEC a Prospectus (the "September 2000 Prospectus") relating to the offering described in the August 2000 S-3(1).  Because the September 2000 Prospectus incorporated by reference the same documents that were incorporated by reference in the August 2000 S-3(1), both SEC filings contained the materially false and misleading representations set forth in the incorporated documents.

636.     On August 18, 2000, Tyco filed with the SEC a Form S-3 (the "August 2000 S-3(2)") for the registration of up to $2,500,000,000 of any of the following securities either separately or in units: debt securities, preference shares, depositary shares and common shares. The August 2000 S-3(2) was signed by defendants Swartz, Kozlowski, Walsh, Bodman, Fort, Lane and Pasman.

637.     On August 18, 2000, Tyco filed with the SEC a Form S-3 for the registration of $3,500,000,000 in debt securities of Tyco International Group S.A. (the "August 2000 S-3(3)"). That document was signed by defendants Swartz, Kozlowski, Walsh, Bodman, Fort, Lane and Pasman.

638.     On September 18, 2000, Tyco filed with the SEC a Prospectus relating to the offering described in the August 2000 S-3(3) (the "September 2000 Prospectus").

639.     On February 20, 2001, Tyco filed with the SEC a Prospectus Supplement (the "February 2001 Prospectus Supplement") to the September 2000 Prospectus.

640.     Because the August 2000 S-3(2), the August 2000 S-3(3), the September 2000 Prospectus and the February 2001 Prospectus Supplement incorporate by reference the same documents as the August 2000 S-3(1), those SEC filings contain the misrepresentations set forth in the incorporated documents.

641.     On June 5, 2001, Tyco filed with the SEC a Prospectus Supplement to the September 2000 Prospectus (the "June 2001 Prospectus Supplement").  Because the June 2001 Prospectus Supplement incorporated the following documents by reference, it contained the materially false and misleading statements set forth in those documents: the 2000 10-K; the 2000 10-K/A; the February 2000 10-Q; the June 2000 10-Q/A; the May 2000 10-Q; the June 2000 10-Q/A(2); and the August 2000 10-Q.

642.     On July 26, 2001, Tyco filed with the SEC a Prospectus Supplement (the "July 2001 Prospectus Supplement") to the September 2000 Prospectus.  Because the July 2001 Prospectus Supplement incorporated by reference the same documents that were incorporated by reference in the August 2000 S-3(3), both SEC filings contained the materially misleading statements set forth in the incorporated documents.

643.     The July 2001 Prospectus Supplement also contained the following materially misleading representations concerning Tyco's financial results for the first three quarters of the Company's fiscal 2001:

> On July 18, 2001, Tyco announced its results for the third quarter of fiscal 2001, the three months ended June 30, 2001.  Revenues for the quarter rose 25% to $9.29 billion compared with last year's $7.42 billion.  Diluted earnings per share before extraordinary items for the third quarter of fiscal 2001 were $0.67, or $1.22 billion, compared to $0.58 or $997.3 million, in the third quarter of fiscal 2000. Net income before non-recurring and extraordinary items rose to $1.31 billion, an increase of 32% compared to $992.1 million last year.  Diluted earnings per share before non-recurring and extraordinary items for the third fiscal quarter ended

June 30, 2001 were $0.72, a 24% increase over earnings of $0.58 per diluted share in the third quarter of fiscal 2000.

644.    Those representations were materially false and misleading because Defendants

failed to disclose that Tyco produced those results only by engaging in the accounting

manipulations specifically alleged above.

**21.    Defendants' False And Misleading Statements Concerning The Company's Financial Results For The Fiscal Quarter And Year Ended September 30, 2000**

645.    On October 24, 2000, the Tyco Defendants issued a press release concerning the

Company's financial results for the fiscal quarter and year ended September 30, 2000.  In that

press release, Defendants falsely stated:

> Tyco International Ltd. . . ., a diversified manufacturing and service company, reported today that diluted earnings per share for its fourth quarter ended September 30, 2000 were 64 cents, a 39 percent increase over earnings of 46 cents per share in its fourth quarter of 1999.  Net income before extraordinary item rose to $1.10 billion, an increase of 40 percent compared to $782.7 million last year.  Sales for the quarter rose 25 percent to $7.81 billion compared with last year's $6.22 billion.  These results are before restructuring and other non-recurring credits, charges, gain and extraordinary item.  After giving effect to restructuring and other non-recurring credits, charges and gain, diluted earnings per share before extraordinary item for the fourth quarter of fiscal 2000 were $1.12, or $1.91 billion, compared to 46 cents, or $780.8 million, in the fourth quarter of fiscal 1999.
>
> For fiscal 2000, income before restructuring and other non-recurring credits, charges, gain and extraordinary item rose to $3.73 billion, or $2.18 per diluted share, a 42 percent increase over last year's diluted per share earnings of $1.53. After giving effect to restructuring and other non-recurring credits, charges and gain, diluted earnings per share before extraordinary item were $2.64, or $4.52 billion for fiscal 2000 compared to 64 cents, or $1.07 billion, in fiscal 1999. Revenues for the twelve months increased to $28.93 billion, 29 percent higher than last year's $22.50 billion.

646. On December 21, 2000, Tyco filed with the SEC its 10-K for the fiscal year ended September 30, 2000 (the "2000 10-K"). That document was signed by defendants Swartz, Kozlowski, Walsh, Bodman, Fort, Lane and Pasman.

647. Defendants made the following materially false and misleading representation concerning the Company's financial results in the 2000 10-K:

> Operating income improved in all segments in each of Fiscal 2000 and Fiscal 1999. The operating improvements are the result of both increased revenues in all segments and enhanced margins in all but one segment in Fiscal 2000. Increased revenues result from organic growth and from acquisitions that are accounted for under the purchase method of accounting.

648. In addition, Defendants falsely stated:

> The 49.6% increase in operating income, before certain credits (charges), in Fiscal 1999 compared with Fiscal 1998 was due to improved margins at AMP, the acquisition of Raychem, and higher sales volume at the Tyco Printed Circuit Group. The improved operating margins, before certain credits (charges), in Fiscal 1999 compared with Fiscal 1998 were primarily due to the implementation of AMP's profit improvement plan, which was initiated in the fourth quarter of Fiscal 1998, cost reduction programs associated with the AMP merger, a pension curtailment/settlement gain and the acquisition of Raychem.

649. On or about January 30, 2001, Tyco released its 2000 Annual Report to Shareholders (the "2000 Annual Report").

650. The 2000 Annual Report included a letter to Tyco shareholders signed by Kozlowski that contained the following materially false and misleading description of the financial results produced by Tyco during fiscal 2000:

> For the seventh consecutive year, we increased revenues and earnings substantially. Revenues rose 29 percent to $28.9 billion and earnings grew $1.2 billion to $3.7 billion, a 46 percent increase over the prior year. Our diluted earnings per share increased 42 percent to $2.18. These are outstanding numbers, the result of our focus on lean, efficient management, continuous production improvement and aggressive expansion into new markets. . . .

651.     The 2000 Annual Report also provided investors with the following materially false and misleading description of the Company's fiscal 2000 financial results:

> Sales increased 28.6% during Fiscal 2000 to $28,931.9 million from $22,496.5 million in Fiscal 1999.  Sales in Fiscal 1999 increased 18.0% compared to Fiscal 1998.  Income before extraordinary items was $4,520.1 million in Fiscal 2000, as compared to $1,067.7 million in Fiscal 1999 and $1,168.6 million in Fiscal 1998.  Income before extraordinary items for Fiscal 2000 included an after-tax net credit of $793.7 million ($1,484.7 million pre-tax) consisting of restructuring, non-recurring and impairment charges of $327.3 million ($424.2 million pre-tax) primarily for non-recurring claims related to a merged company and the exiting of USSC's interventional cardiology business, offset by a credit of $113.6 million ($148.9 million pre-tax) representing a revision of estimates of merger, restructuring and other non-recurring accruals and a gain of $1,007.4 million ($1,760.0 million pre-tax) on the issuance of common shares in connection with TyCom's initial public offering.  Income before extraordinary items for Fiscal 1999 included an after tax net charge of $1,304.8 million ($1,542.7 million pre-tax) primarily related to the mergers with USSC and AMP and costs associated with AMP's profit improvement plan.  Income before extraordinary items for Fiscal 1998 included an after-tax charge of $192.0 million ($256.9 million pre-tax) primarily related to AMP's profit improvement plan and costs incurred by USSC to exit certain businesses.

652.     The 2000 Annual Report also quoted the PWC Defendants' audit report, dated October 24, 2000 (except as to Note 25, which is dated as of December 4, 2000), concerning Tyco's 2000 and 1999 financial statements.  As set forth above, the PWC Defendants' opinion falsely stated that Tyco's financial statements were presented in conformity with GAAP, and that the PWC Defendants' audit was performed in accordance with GAAS.

653.     The foregoing representations concerning Tyco's financial results for the fiscal quarter and year ended September 30, 2000 were materially false and misleading because Defendants failed to disclose that Tyco produced those results only by engaging in the accounting manipulations specifically alleged above.

654.     The 2000 10-K also set forth the following materially misleading representations concerning the merger and restructuring reserves established by Tyco:

In Fiscal 2000, we made acquisitions that were accounted for under the purchase accounting method at an aggregate cost of $5,162.0 million. Of this amount, $4,246.5 million was paid in cash (net of cash acquired), $671.4 million was paid in the form of Tyco common shares, and we assumed $244.1 million in debt. In connection with these acquisitions, we established purchase accounting reserves of $426.2 million for transaction and integration costs. At the beginning of Fiscal 2000, purchase accounting reserves were $570.3 million as a result of purchase accounting transactions made in prior years. During Fiscal 2000, we paid out $544.2 million in cash and incurred $52.1 million in non-cash charges against the reserves established during and prior to Fiscal 2000. Also in Fiscal 2000, we determined that $117.8 million of purchase accounting reserves related to acquisitions made prior to Fiscal 2000 were not needed and reversed that amount against goodwill. At September 30, 2000, there remained $372.6 million in purchase accounting reserves on our Consolidated Balance Sheet, of which $349.2 million is included in current liabilities and $23.4 million is included in long-term liabilities.

655. Those statements were materially false and misleading because Defendants failed to disclose their practice of aggressively inflating Tyco's restructuring and merger reserves in order to spring-load the Company's future reported results.

## 22. Defendants' Materially False And Misleading Representations In The October 2000 S-8

656. On October 23, 2000, Tyco filed with the SEC a Form S-8 for the registration of 1,000,000 shares of Tyco common stock relating to the Investment Plan for Employees of Mallinckrodt Inc. (the "October 2000 S-8"). That document was signed by defendants Swartz, Kozlowski, Walsh, Bodman, Fort, Lane and Pasman.

657. Because the October 2000 S-8 incorporated the following documents by reference, it contained the same materially false and misleading statements as those documents: the 1999 10-K; the 1999 10-K/A; the February 2000 10-Q; the June 2000 10-Q/A; the May 2000 10-Q; the June 2000 10-Q/A(2); and the August 2000 10-Q.

## 23. Defendants' Materially False And Misleading Representations In The November 2000 S-4/A

658.    On November 14, 2000, Tyco filed with the SEC a Form S-4/A (the "November 2000 S-4/A"), amending an S-4 filed on October 18, 2000 and an S-4/A filed on October 20, 2000 that related to the proposed merger between InnerDyne and a subsidiary of Tyco.  The November 2000 S-4/A was signed by defendant Swartz for himself and for defendants Kozlowski, Walsh, Bodman, Fort, Lane and Pasman.

659.    Because the November 2000 S-4/A incorporates the following documents by reference, it contains the same materially false and misleading statements set forth in those documents: the 1999 10-K; the 1999 10-K/A; the February 2000 10-Q; the June 2000 10-Q/A; the May 2000 10-Q; the June 2000 10-Q/A(2); and the August 2000 10-Q.

660.    In addition, the November 2000 S-4/A sets forth the following materially false and misleading description of the financial results produced by Tyco for the fiscal year and quarter ended September 30, 2000:

On October 24, 2000, Tyco announced its results for the fourth quarter of fiscal 2000, the three months ended September 30, 2000.  For the fiscal 2000 fourth quarter, income before restructuring and other non-recurring credits, charges, gain and extraordinary items was $1.10 billion, or $0.64 per diluted share, as compared to $782.7 million, or $0.46 per diluted share, for the quarter ended September 30, 1999.  After giving effect to restructuring and other non-recurring credits, charges, gain and extraordinary items, net income for the fourth quarter of fiscal 2000 was $1.91 billion, or $1.12 per diluted share, compared to $780.5 million, or $0.46 per diluted share, in the fourth quarter of fiscal 1999.  Results in the fourth quarter of fiscal 2000 included a $1.76 billion pretax gain from the initial public offering of TyCom Ltd.  Fourth quarter sales rose 25% to $7.81 billion, up from $6.22 billion a year ago.

For fiscal 2000, revenues increased to $28.93 billion, up 29% from revenues of $22.50 billion in fiscal 1999.  Income before restructuring and other non-recurring credits, charges, gain and extraordinary items rose to $3.73 billion, or $2.18 per diluted share, a 42% increase over $1.53 per diluted share in fiscal 1999.  After giving effect to restructuring and other non-recurring credits, charges, gain and extraordinary items, net income for fiscal 2000 was $4.52 billion, or $2.64 per diluted share, compared to $1.02 billion, or $0.61 per diluted share, in fiscal 1999.

661.     Those representations were materially false and misleading because Defendants

failed to disclose that Tyco produced those results only by engaging in the accounting

manipulations specifically alleged above.

**24.    Defendants' Materially False And Misleading**
**Statements In The November 2000 S-3 And Its Amendment**

662.     On November 9, 2000, Tyco filed a Form S-3 for the registration of 2,180,010

shares of Tyco common stock relating to Tyco's October 26, 2000 acquisition of CIGI

Investment Group, Inc. (the "November 2000 S-3"). The November 2000 S-3 was signed by

defendants Swartz, Kozlowski, Walsh, Bodman, Fort, Lane and Pasman. Because the November

2000 S-3 incorporates the following documents by reference, it contains the same materially false

and misleading statements as those documents: the 1999 10-K; the 1999 10-K/A; the February

2000 10-Q; the June 2000 10-Q/A; the May 2000 10-Q; the June 2000 10-Q/A(2); and the

August 2000 10-Q.

663.     The November 2000 S-3 also includes the following materially misleading

description of Tyco's financial results for the quarter and fiscal year ended September 30, 2000:

> On October 24, 2000, Tyco announced its preliminary unaudited results for the
> fourth quarter of fiscal 2000, the three months ended September 30, 2000. For the
> fiscal 2000 fourth quarter, income before restructuring and other non- recurring
> credits, charges, gain and extraordinary item was $1.10 billion, or $0.64 per share
> on a fully diluted basis, as compared to $782.7 million, or $0.46 per share on a
> fully diluted basis, for the quarter ended September 30, 1999. After giving effect
> to restructuring and other non-recurring credits, charges, gain and extraordinary
> item, net income for the fourth quarter of fiscal 2000 was $1.91 billion, or $1.12
> per diluted share, compared to $780.5 million, or $0.46 per diluted share, in the
> fourth quarter of fiscal 1999.  Results in the fourth quarter included a $1.76
> billion pretax gain from the initial public offering of TyCom Ltd. Fourth quarter
> sales rose 25% to $7.81 billion, up from $6.22 billion a year ago.
>
> For fiscal 2000, revenues increased to $28.93 billion, up 29% from revenues of
> $22.50 billion in fiscal 1999. Income before restructuring and other non-
> recurring credits, charges, gain and extraordinary items rose to $3.73 billion, or

$2.18 per diluted share, a 42% increase over $1.53 in fiscal 1999. After giving effect to restructuring and other non-recurring credits, charges, gain and extraordinary item, net income for fiscal 2000 was $4.52 billion, or $2.64 per diluted share, compared to $1.02 billion, or $0.61 per diluted share, in fiscal 1999.

664.    Those representations were materially false and misleading because Defendants

failed to disclose that Tyco produced those results only by engaging in the accounting

manipulations specifically alleged above.

665.    On November 30, 2000, Tyco filed with the SEC a Form S-3/A (the "November

2000 S-3/A"), amending the November 2000 S-3. The November 2000 S-3/A was signed by

defendant Swartz for himself and for defendants Kozlowski, Ashcroft, Bodman, Fort, Lane and

Pasman. Because the November 2000 S-3/A incorporates by reference the same documents as

the November 2000 S-3, both documents contain the materially false and misleading statements

set forth in the incorporated documents.

666.    The November 2000 S-3/A also included the following materially false and

misleading description of the financial results produced by Tyco for the fiscal quarter and year

ended September 30, 2000:

On October 24, 2000, Tyco announced its results for the fourth quarter of fiscal 2000, the three months ended September 30, 2000. For the fiscal 2000 fourth quarter, income before restructuring and other non-recurring credits, charges, gain and extraordinary items was $1.10 billion, or $0.64 per diluted share, as compared to $782.7 million, or $0.46 per diluted share, for the quarter ended September 30, 1999. After giving effect to restructuring and other non-recurring credits, charges, gain and extraordinary items, net income for the fourth quarter of fiscal 2000 was $1.91 billion, or $1.12 per diluted share, compared to $780.5 million, or $0.46 per diluted share, in the fourth quarter of fiscal 1999. Results in the fourth quarter of fiscal 2000 included a $1.76 billion pretax gain from the initial public offering of TyCom Ltd. Fourth quarter sales rose 25% to $7.81 billion, up from $6.22 billion a year ago.

For fiscal 2000, revenues increased to $28.93 billion, up 29% from revenues of $22.50 billion in fiscal 1999. Income before restructuring and other non-recurring credits, charges, gain and extraordinary items rose to $3.73 billion, or

$2.18 per diluted share, a 42% increase over $1.53 per diluted share in fiscal 1999. After giving effect to restructuring and other non-recurring credits, charges, gain and extraordinary items, net income for fiscal 2000 was $4.52 billion, or $2.64 per diluted share, compared to $1.02 billion or $0.61 per diluted share, in fiscal 1999.

667. Those representations were materially false and misleading because Defendants failed to disclose that Tyco produced those results only by engaging in the accounting manipulations specifically alleged above.

### 25. Defendants' Materially False And Misleading Representations In The December 2000 S-3 And Related SEC Filings

668. On December 8, 2000, Tyco filed with the SEC a Form S-3 for the registration of $4,657,500,000 in Liquid Yield Option Notes due 2020 (the "December 2000 S-3"). The December 2000 S-3 was signed by defendants Swartz, Kozlowski, Walsh, Bodman, Fort, Lane and Pasman. Because the December 2000 S-3 incorporates the following documents by reference, it contains the same materially false and misleading statements as those documents: the 1999 10-K; the 1999 10-K/A; the February 2000 10-Q; the June 2000 10-Q/A; the May 2000 10-Q; the June 2000 10-Q/A(2); and the August 2000 10-Q.

669. On December 15, 2000, Tyco filed a Form S-3/A (the "December 2000 S-3/A"), amending the December 2000 S-3. The December 2000 S-3/A was signed by defendant Swartz for himself and for defendants Kozlowski, Walsh, Bodman, Fort, Lane and Pasman. Because the December 2000 S-3/A incorporates by reference the same documents as the December 2000 S-3, both SEC filings contain the materially false and misleading statements set forth in the incorporated documents.

670. On December 19, 2000, Tyco filed with the SEC a Prospectus for the offering described in the December 2000 S-3 (the "December 2000 Prospectus"). Because the December

2000 Prospectus incorporates by reference the same documents that were incorporated by reference in the December 2000 S-3, both SEC filings contain the materially false and misleading statements set forth in the incorporated documents.

671.     The December 2000 S-3, its amendment and the December 2000 Prospectus all set forth the following materially false and misleading representations concerning Tyco's financial results for the fiscal quarter and year ended September 30, 2000:

> On October 24, 2000, Tyco announced its results for the fourth quarter of fiscal 2000, the three months ended September 30, 2000. For the fiscal 2000 fourth quarter, income before restructuring and other non-recurring credits, charges, gain and extraordinary items was $1.10 billion, or $0.64 per diluted share, as compared to $782.7 million, or $0.46 per diluted share, for the quarter ended September 30, 1999. After giving effect to restructuring and other non-recurring credits, charges, gain and extraordinary items, net income for the fourth quarter of fiscal 2000 was $1.91 billion, or $1.12 per diluted share, compared to $780.5 million, or $0.46 per diluted share, in the fourth quarter of fiscal 1999. Results in the fourth quarter of fiscal 2000 included a $1.76 billion pretax gain from the initial public offering of TyCom Ltd. Fourth quarter sales rose 25% to $7.81 billion, up from $6.22 billion a year ago.

> For fiscal 2000, revenues increased to $28.93 billion, up 29% from revenues of $22.50 billion in fiscal 1999. Income before restructuring and other non- recurring credits, charges, gain and extraordinary items rose to $3.73 billion, or $2.18 per diluted share, a 42% increase over $1.53 per diluted share in fiscal 1999. After giving effect to restructuring and other non-recurring credits, charges, gain and extraordinary items, net income for fiscal 2000 was $4.52 billion, or $2.64 per diluted share, compared to $1.02 billion or $0.61 per diluted share, in fiscal 1999.

672.     Those representations were materially false and misleading because Defendants failed to disclose that Tyco produced those results only by engaging in the accounting manipulations specifically alleged above.

673.     In addition, both the December 2000 S-3 and its amendment include the following materially false and misleading representations concerning Tyco's restructuring and merger charges:

Earnings for the nine months ended June 30, 2000, the years ended September 30, 1999 and 1998, the nine months ended September 30, 1997 and the years ended December 31, 1996 and 1995 include net merger, restructuring and other non-recurring (credits) charges of $(81.3) million (of which net charges of $1.0 million are included in cost of sales), $1,035.2 million (of which $106.4 million is included in cost of sales), $256.9 million, $947.9 million, $344.1 million and $97.1 million, respectively. Earnings also include charges for the impairment of long-lived assets of $99.0 million, $507.5 million, $148.4 million, $744.7 million and $8.2 million in the nine months ended June 30, 2000, the year ended September 30, 1999, the nine months ended September 30, 1997 and the years ended December 31, 1996 and 1995, respectively.

674. Those statements were materially false and misleading because Defendants failed to disclose their practice of aggressively inflating Tyco's restructuring and merger reserves in order to spring-load the Company's future reported results.

### 26. Defendants' Materially Misleading Representations And Omissions In The January 2001 S-8

675. On January 31, 2001, Tyco filed with the SEC a Form S-8 for the registration of 200,000 shares of Tyco common stock (the "January 2001 S-8"). That document was signed by defendants Swartz, Kozlowski, Walsh, Bodman, Fort, Lane and Pasman. Because the January 2001 S-8 incorporates by reference the 2000 10-K, the January 2001 S-8 contains the materially false and misleading statements set forth in the 2000 10-K.

### 27. Defendants' Materially False And Misleading Representations Concerning Tyco's Financial Results For The Quarter Ended December 31, 2000

676. On January 17, 2001, the Tyco Defendants issued a press release concerning the Company's financial results for the quarter ended December 31, 2000. In that press release, Defendants falsely stated:

Tyco International Ltd. . . ., a diversified manufacturing and service company, reported today that diluted earnings per share for its first quarter ended December 31, 2000 were 57 cents, a 24 percent increase over earnings of 46 cents per share in its first quarter of fiscal 2000. Net income before extraordinary items and cumulative effect of accounting change rose to $1.01 billion, an increase of 28

percent compared to $784.3 million last year. Sales for the quarter rose 21 percent to $8.02 billion compared with last year's $6.64 billion. These results are before non-recurring items. After giving effect to such items, diluted earnings per share before extraordinary items and cumulative effect of accounting change for the first quarter of fiscal 2001 were 57 cents, or $1.01 billion, compared to 44 cents, or $757.2 million, in the first quarter of fiscal 2000.

677.    On February 13, 2001, Tyco filed with the SEC Tyco's Form 10-Q for the quarter ended December 31, 2000 (the "February 2001 10-Q"). That document was signed by defendant Swartz.

678.    In the February 2001 10-Q, Defendants falsely described the Company's results for the quarter as follows:

Sales increased 20.8% during the quarter ended December 31, 2000 to $8,020.3 million from $6,638.8 million in the quarter ended December 31, 1999. Income before extraordinary item and cumulative effect of accounting change was $1,009.2 million in the quarter ended December 31, 2000, as compared to $757.2 million in the quarter ended December 31, 1999. Income before cumulative effect of accounting change for the quarter ended December 31, 2000 included an after-tax net credit of $3.9 million ($175.6 million pre-tax credit) consisting of the write-off of purchased in-process research and development, restructuring and other non-recurring charges, impairment charges and a non-recurring charge related to the write-up of inventory under purchase accounting which is included in cost of sales, totaling $218.3 million ($234.8 million pre-tax charge) primarily related to the acquisition of Mallinckrodt Inc. ("Mallinckrodt"); offset by a net gain on sale of businesses of $222.2 million ($410.4 million pre-tax gain) principally related to the sale of ADT Automotive. Income before extraordinary item for the quarter ended December 31, 1999 included an after-tax net charge of $27.1 million ($26.4 million pre-tax charge) consisting of restructuring and impairment charges of $97.5 million ($121.1 million pre-tax charge) primarily related to the exiting of USSC's international cardiology business, offset by a credit of $70.4 million ($94.7 million pre-tax credit) representing a revision of estimates of merger, restructuring and other non-recurring accruals.

679.    Defendants' representations concerning the financial results generated by Tyco for the quarter ended December 31, 2000 were materially false and misleading because Defendants failed to disclose that Tyco produced those results only by engaging in the accounting manipulations specifically alleged above.

-176-

680.     In addition, Defendants delivered the following materially false and misleading

description of the Company's merger and restructuring reserves in the February 2001 10-Q:

> During the quarter ended December 31, 2000, we recorded restructuring and other
> non-recurring charges of $18.1 million primarily related to an environmental
> remediation project and the closure of a manufacturing plant.  Additionally, we
> incurred a non-recurring charge of $25.0 million related to the write-up of
> inventory under purchase accounting.  The $25.0 million charge has been included
> in cost of sales.  At September 30, 2000, there existed merger, restructuring and
> other non-recurring reserves of $365.9 million.  During the quarter ended
> December 31, 2000, we paid out $11.3 million in cash and incurred $1.7 million
> in non-cash charges that were charged against these reserves.  At December 31,
> 2000, there remained $371.0 million of merger, restructuring and other non-
> recurring reserves in our Consolidated Balance Sheet, of which $341.3 million is
> included in current liabilities and $29.7 million is included in long-term liabilities.

681.     That description of the Company's merger and restructuring reserves was

materially false and misleading because, as is specifically alleged above, Defendants concealed

from investors the manner in which they manipulated the Company's reserves to inflate its

reported results.

### 28.     Defendants' Materially False And Misleading Statements In The February 2001 S-4 And Related SEC Filings

682.     On February 23, 2001, Tyco filed with the SEC a Form S-4 relating to Tyco's

proposed offer to issue 9,415,481 shares of Tyco stock upon consummation of a merger with

Scott Technologies, Inc. (the "February 2001 S-4").  The February 2001 S-4 was signed by

defendants Kozlowski, Swartz, Walsh, Bodman, Fort, Lane and Pasman.  Because the February

2001 S-4 incorporates the following documents by reference, it contains the same materially false

and misleading statements set forth in those documents: the 2000 10-K; and the February 2001

10-Q.

683.     On March 30, 2001, Tyco filed with the SEC a Form S-4/A (the "March 2001 S-

4/A") and a Prospectus (the "March 2001 Prospectus") relating to the proposed merger between

Scott Technologies, Inc. and Tyco. Because the March 2001 S-4/A and the March 2001 Prospectus each incorporate by reference the same documents as the February 2001 S-4, all of those SEC filings contain the materially false and misleading representations set forth in the incorporated documents.

**29.    Defendants' Materially False And Misleading
Representations In The March 2001 S-3**

684.    On March 16, 2001, Tyco filed with the SEC a Form S-3 related to the February 12, 2001 issuance of $3,035,000,000 of Zero Coupon Convertible Debentures due February 12, 2021 (the "March 2001 S-3"). The March 2001 S-3 was signed by defendants Kozlowski, Swartz, Walsh, Bodman, Fort, Lane and Pasman. Because the March 2001 S-3 incorporates the following documents by reference, it contains the materially false and misleading statements set forth in those documents: the 2000 10-K; and the February 2001 10-Q.

685.    On April 3, 2001, Tyco filed with the SEC a Prospectus related to the offering described in the March 2001 S-3 (the "April 2001 Prospectus"). The April 2001 Prospectus incorporates by reference the same documents that were incorporated by reference in the March 2001 S-3, and therefore contains the materially false and misleading statements set forth in the incorporated documents.

**30.    Defendants' Materially False And Misleading Representations
In The March 2001 CIT S-4 And Related SEC Filings**

686.    On March 29, 2001, Tyco filed with the SEC a Form S-4 relating to a proposed merger between CIT and a Tyco subsidiary (the "March 2001 CIT S-4"). The March 2001 CIT S-4 was signed by defendants Kozlowski, Swartz, Walsh, Bodman, Fort, Lane and Pasman. Because the March 2001 CIT S-4 incorporates the following documents by reference, it contains

the materially false and misleading statements set forth in those documents: the 2000 10-K; and the February 2001 10-Q.

687.    On April 13, 2001, Tyco filed with the SEC a Form S-4/A (the "April 2001 CIT S-4/A"), amending the March 2001 CIT S-4.  Because the April 2001 CIT S-4/A incorporates by reference the same documents as the March 2001 CIT S-4, both SEC filings contain the materially false and misleading statements set forth in the incorporated documents.

688.    On May 24, 2001, Tyco filed with the SEC a Post-Effective Amendment No. 1 to Form S-4 relating to the proposed merger between CIT and a Tyco subsidiary (the "May 2001 Post-Effective Amendment").  That document was signed by defendant Swartz for himself and for defendants Kozlowski, Walsh, Bodman, Fort, Lane and Pasman.  Because the May 2001 Post-Effective Amendment incorporates the following documents by reference, it contains the materially false and misleading statements set forth in those documents: the 2000 10-K; the February 2001 10-Q; and the May 2001 10-Q.

689.    On April 24, 2001, Tyco filed with the SEC a prospectus relating to the proposed merger between CIT and a Tyco subsidiary (the "April 2001 CIT Prospectus").  Because the April 2001 CIT Prospectus incorporates by reference the same documents as the March 2001 CIT S-4, both SEC filings contain the materially false and misleading statements set forth in the incorporated documents.

### 31.    Defendants' Materially False And Misleading Representations Concerning Tyco's Financial Results For The Quarter Ended March 31, 2001

690.    On April 18, 2001, the Tyco Defendants issued a press release concerning the Company's financial results for the quarter ended March 31, 2001.  In that press release, Defendants falsely stated:

Tyco International Ltd. . . ., a diversified manufacturing and service company, reported today that diluted earnings per share for its second quarter ended March 31, 2001 were 65 cents, a 30 percent increase over earnings of 50 cents per share in its second quarter of fiscal 2000. Net income before extraordinary items rose to $1.16 billion, an increase of 35 percent compared to $853.6 million last year. Sales for the quarter rose 26 percent to $8.9 billion compared with last year's $7.07 billion. These results are before non-recurring items. After giving effect to such items, diluted earnings per share before extraordinary items for the second quarter of fiscal 2001 were 65 cents, or $1.15 billion, compared to 50 cents, or $855.5 million, in the second quarter of fiscal 2000.

For the first half of fiscal 2001, income before non-recurring items, extraordinary items and cumulative effect of accounting change rose to $2.16 billion, or $1.22 per diluted share, a 27 percent increase over last year's diluted earnings per share of 96 cents. After giving effect to non-recurring items, diluted earnings per share before extraordinary items and cumulative effect of accounting change were $1.22, or $2.16 billion, for the first half of fiscal 2001 compared to 94 cents, or $1.61 billion, in fiscal 2000. Revenues for the first half of fiscal 2001 increased to $16.92 billion, 23 percent higher than last year's $13.71 billion.

691.    On May 11, 2001, Tyco filed with the SEC Tyco's Form 10-Q for the quarter ended March 31, 2001 (the "May 2001 10-Q"). That document was signed by defendant Swartz.

692.    Defendants made the following materially false and misleading representations concerning the Company's quarterly results in the May 2001 10-Q:

Sales increased 25.9% during the quarter ended March 31, 2001 to $8,898.4 million from $7,070.0 million in the quarter ended March 31, 2000. Income before extraordinary items was $1,147.3 million in the quarter ended March 31, 2001, as compared to $855.5 million in the quarter ended March 31, 2000. Income before extraordinary items for the quarter ended March 31, 2001 included an after-tax net charge of $8.0 million ($15.2 million pre-tax charge) consisting of the following: (i) restructuring and other non-recurring charges and impairment charges totaling $128.4 million ($178.1 million pre-tax charge) primarily related to certain electronics, flow control and healthcare businesses; (ii) a net loss on sale of businesses and investments of $2.5 million ($3.9 million pre-tax loss); and (iii) a non-recurring credit of $122.9 million ($166.8 million pre-tax credit) related to the settlement of litigation in which Tyco was provided with an ongoing OEM arrangement valued at $166.8 million. Income before extraordinary items for the quarter ended March 31, 2000 included an after-tax net credit of $1.9 million ($1.8 million pre-tax credit) consisting of a credit of $9.5 million ($12.7 million pre-tax credit) representing a revision of estimates of merger, restructuring and

other non-recurring accruals, offset by restructuring charges of $7.6 million ($10.9 million pre-tax charge) primarily related to AMP's operations.

693.    Defendants' representations concerning the financial results generated by Tyco for the quarter ended March 31, 2001 were materially false and misleading because Defendants failed to disclose that Tyco produced those results only by engaging in the accounting manipulations specifically alleged above.

694.    The May 2001 10-Q also delivered the following materially misleading description of the Company's merger and restructuring reserves:

> During the six months ended March 31, 2001, we recorded restructuring and other non-recurring charges of $164.5 million, of which $32.4 million was included in cost of sales, primarily related to the closure of several manufacturing plants, sales offices, warehouses and administrative offices and an environmental remediation project.  In addition, we incurred a non-recurring charge of $39.0 million related to the write-up of inventory under purchase accounting, which has been included in cost of sales.  We also determined that $166.8 million of non-recurring charges established in the prior year were not needed due to the settlement of litigation. At September 30, 2000, there existed merger, restructuring and other non-recurring reserves of $365.9 million.  During the six months ended March 31, 2001, we paid out $55.6 million in cash and incurred $35.7 million in non-cash charges that were charged against these reserves.  At March 31, 2001, there remained $272.3 million of merger, restructuring and other non-recurring reserves in our Consolidated Balance Sheet, of which $231.6 million is included in current liabilities and $40.7 million is included in long-term liabilities.

695.    Those representations were materially false and misleading because, as is specifically alleged above, Defendants failed to disclose that they improperly manipulated the Company's accounting reserves in order to inflate Tyco's reported financial results.

**32.    Defendants' Materially False And Misleading Representations In The June 2001 S-8**

696.    On June 7, 2001, Tyco filed with the SEC a Form S-8 related to the issuance of securities to CIT in connection with the proposed merger between CIT and Tyco (the "June 2001 S-8").  That document was signed by defendants Kozlowski, Swartz, Walsh, Bodman, Fort, Lane

and Pasman.  Because the June 2001 S-8 incorporates the following documents by reference, it contains the materially false and misleading statements set forth in those documents: the 2000 10-K; the February 2001 10-Q; and the May 2001 10-Q.

### 33.   Defendants' Materially False And Misleading Representations In The July 2001 S-3

697.    On July 24, 2001, Tyco filed with the SEC a Form S-3 relating to the registration of $300,000,000 of debt securities of a Tyco subsidiary (the "July 2001 S-3").  That document was signed by defendant Swartz for himself and for defendants Kozlowski, Walsh, Bodman, Fort, Lane and Pasman.  Because the July 2001 S-3 incorporates the August 2000 S-3(2) by reference, both SEC filings contain the materially false and misleading statements set forth in the August 2000 S-3(2) and the documents it incorporates by reference.

### 34.   Defendants' Materially False And Misleading Representations Concerning The Company's Results For The Quarter Ended June 30, 2001

698.    On July 18, 2001, the Tyco Defendants issued a press release concerning the Company's financial results for the quarter ended June 30, 2001.  In that press release, the Tyco Defendants made the following materially misleading representations concerning the Company's financial results for the quarter:

> Tyco International Ltd. . . ., a diversified manufacturing and service company, reported today that diluted earnings per share for its third quarter ended June 30, 2001 were 72 cents, a 24 percent increase over earnings of 58 cents per share for the same quarter last year.  Net income before extraordinary items rose to $1.3 billion, an increase of 32 percent compared to $992.1 million last year.  Revenues for the quarter rose 25 percent to $9.3 billion compared with last year's $7.4 billion.  These results are before non-recurring items.  After giving effect to such items, diluted earnings per share before extraordinary items for the third quarter of fiscal 2001 were 67 cents, or $1.2 billion, compared to 58 cents, or $997.3 million, in the third quarter of fiscal 2000.
>
> Income before non-recurring items, extraordinary items and cumulative effect of accounting change for the nine months ended June 30, 2001 rose to $3.5 billion,

or $1.94 per diluted share, a 32 percent increase over last year's first nine months' earnings of $2.6 billion, or $1.54 per diluted share. Revenues for the first nine months of fiscal 2001 increased to $26.2 billion, 24 percent higher than last year's first nine months' revenues of $21.1 billion. After giving effect to non-recurring items, diluted earnings per share before extraordinary items and cumulative effect of accounting change were $1.89, or $3.4 billion, for the first nine months of fiscal 2001 compared to $1.52, or $2.6 billion, in fiscal 2000.

699.    On August 13, 2001, Tyco filed with the SEC Tyco's Form 10-Q for the quarter ended June 30, 2001 (the "August 2001 10-Q"). That document was signed by defendant Swartz.

700.    The Tyco Defendants made the following materially false and misleading representations concerning the Company's financial results for the third fiscal quarter in the August 2001 10-Q:

Operating income, before certain (charges) credits, improved in all segments in both the quarter and nine months ended June 30, 2001 as compared to the quarter and nine months ended June 30, 2000, with the exception of the Telecommunications segment discussed below. The operating income improvements are the result of increased revenues resulting from organic growth and from acquisitions that are accounted for under the purchase method of accounting. We enhance our margins through improved productivity and cost reductions in the ordinary course of business, unrelated to acquisition or divestiture activities.

701.    Defendants' representations concerning the financial results generated by Tyco for the quarter ended June 30, 2000 were materially false and misleading because Defendants failed to disclose that Tyco produced those results only by engaging in the accounting manipulations specifically alleged above.

702.    The Tyco Defendants also made the following materially false and misleading statements concerning the Company's restructuring and merger reserves in the August 2001 10-Q:

During the nine months ended June 30, 2001, we recorded restructuring and other non-recurring charges of $214.7 million, of which $39.8 million was included in cost of sales, primarily related to the closure of several manufacturing plants, sales offices, warehouses and administrative offices and an environmental remediation project. In addition, we incurred a non-recurring charge of $39.0 million related to the write-up of inventory under purchase accounting, which has been included in cost of sales. We also determined that $166.8 million of non-recurring charges established in the prior year were not needed due to the settlement of litigation. At September 30, 2000, there existed merger, restructuring and other non-recurring reserves of $365.9 million. During the nine months ended June 30, 2001, we paid out $113.5 million in cash and incurred $86.2 million in non-cash charges that were charged against these reserves. At June 30, 2001, there remained $214.1 million of merger, restructuring and other non-recurring reserves in Tyco Industrial's Consolidated Balance Sheet, of which $183.8 million is included in current liabilities and $30.3 million is included in long-term liabilities.

703.    That description of the Company's reserves was materially false and misleading because, as is specifically alleged above, Defendants failed to disclose that they improperly manipulated the Company's reserves in order to inflate Tyco's reported financial results.

### 35.    Defendants' Materially False And Misleading Representations In The August 2001 S-4 And Related SEC Filings

704.    On August 24, 2001, Tyco filed with the SEC a Form S-4 relating to a proposed merger between Sensormatic Electronics Corporation ("Sensormatic") and a Tyco subsidiary (the "August 2001 S-4"). That document was signed by defendants Swartz, Kozlowski, Walsh, Bodman, Fort, Lane and Pasman. Because the August 2001 S-4 incorporates the following documents by reference, it contains the materially false and misleading statements set forth in those documents: the 2000 10-K; the February 2001 10-Q; the May 2001 10-Q; and the August 2001 10-Q.

705.    On September 13, 2001, Tyco filed with the SEC a Form S-4/A (the "September 2001 S-4/A"), amending the August 2001 S-4. The September 2001 S-4/A was signed by defendant Swartz for himself and for defendants Kozlowski, Walsh, Bodman, Fort, Lane and

Pasman.  Because the September 2001 S-4/A incorporates by reference the same documents that were incorporated by reference in the August 2001 S-4, both SEC filings contain the materially misleading statements set forth in those incorporated documents.

706.    On September 25, 2001, Tyco filed with the SEC a prospectus relating to the proposed merger between Sensormatic and a Tyco subsidiary (the "September 2001 Prospectus").  Because the September 2001 Prospectus incorporates by reference the same documents that were incorporated by reference in the August 2001 S-4, both SEC filings contain the materially misleading statements set forth in those incorporated documents.

**36.    Defendants' Materially False And Misleading Representations In The August 2001 S-3 And Related SEC Filings**

707.    On August 28, 2001, Tyco filed with the SEC a Form S-3 for the registration of $6,000,000,000 in yet to be determined senior and subordinated debt securities (the "August 2001 S-3").  The August 2001 S-3 was signed by defendants Swartz, Kozlowski, Walsh, Bodman, Fort, Lane and Pasman.  Because the August 2001 S-3 incorporated the following documents by reference, it contained the materially false and misleading statements set forth in those documents: the 2000 10-K; the February 2001 10-Q; the May 2001 10-Q; and the August 2001 10-Q.

708.    On August 31, 2001, Tyco filed with the SEC a Prospectus in connection with the offering described in the August 2001 S-3 (the August 2001 Prospectus").

709.    On October 25, 2001, Tyco filed a Prospectus Supplement to the August 2001 Prospectus (the "October 2001 Prospectus Supplement").   Because the October 2001 Prospectus Supplement incorporated by reference the same documents that were incorporated by reference in

the August 2001 S-3, both SEC filings contained the materially false and misleading statements set forth in those incorporated documents.

710.    Defendants made the following materially false and misleading representations concerning Tyco's financial results for the fiscal year and quarter ended September 31, 2001 in the October 2001 Prospectus Supplement:

> Revenues before non-recurring items . . . for the quarter rose 29% to $10.08 billion compared with last year's $7.80 billion. Diluted earnings per share before non-recurring items, extraordinary items and the adoption of SAB 101 for the fourth quarter fiscal 2001 were $0.86, a 34% increase over earnings of $0.64 per diluted share in the fourth quarter fiscal 2000. After giving effect to such items, revenues for the fourth quarter fiscal 2001 were $10.01 billion compared to $9.57 billion in the fourth quarter fiscal 2000 and diluted earnings per share for the fourth quarter of fiscal 2001 were $0.70 per share, compared to $1.12 diluted earnings per share in the fourth quarter of fiscal 2000.

> * * *

> Revenues before non-recurring items and the adoption of SAB 101 for the year ended September 30, 2001 increased to $36.29 billion, 25% higher than last year's $28.93 billion. Diluted earnings per share before non-recurring charges and credits and extraordinary items, and the adoption of SAB 101, for the year rose to $2.81 per diluted share, or $5.15 billion, a 29% increase over last year's diluted per share earnings of $2.18, or $3.73 billion.

711.    That description of the Company's financial results was materially false and misleading because Defendants failed to disclose that they produced the reported results only by engaging in the unlawful and improper accounting practices alleged herein.

**37.    Defendants' Materially False And Misleading Representations In The October 2001 S-4 And Related SEC Filings**

712.    On October 23, 2001, Tyco filed with the SEC a Form S-4 relating to a proposed business combination between TyCom and a subsidiary of Tyco wherein TyCom would become a wholly-owned subsidiary of Tyco (the "October 2001 S-4"). The October 2001 S-4 was signed by defendants Swartz, Kozlowski, Walsh, Bodman, Fort, Lane and Pasman. Because the

October 2001 S-4 incorporates the following documents by reference, it contains the materially

false and misleading statements set forth in those documents: the 2000 10-K; the 2000 10-K/A;

the February 2001 10-Q; the May 2001 10-Q; and the August 2001 10-Q.

713.    Defendants made the following materially false and misleading representations

concerning Tyco's financial results for the quarter and fiscal year ended September 31, 2001 in

the October 2001 S-4:

> Revenues before non-recurring items. . . for the quarter rose 29% to $10.08 billion
> compared with last year's $7.80 billion.  Diluted earnings per share before non-
> recurring items, extraordinary items and the adoption of SAB 101 for the fourth
> quarter fiscal 2001 were $0.86, a 34% increase over earnings of $0.64 per diluted
> share in the fourth quarter fiscal 2000.  After giving effect to such items, revenues
> for the fourth quarter fiscal 2001 were $10.01 billion compared to $9.57 billion in
> the fourth quarter fiscal 2000 and diluted earnings per share for the fourth quarter
> of fiscal 2001 were $0.70 per share, compared to $1.12 diluted earnings per share
> in the fourth quarter of fiscal 2000.

714.    That description of the Company's financial results was materially false and

misleading because Defendants failed to disclose that they produced the reported results only by

engaging in the unlawful and improper accounting practices alleged herein.

715.    On November 9, 2001, Tyco filed with the SEC a Form S-4/A (the "November

2001 S-4/A"), amending the October 2001 S-4.  The November 2001 S-4/A was signed by

defendant Swartz for himself and for defendants Kozlowski, Walsh, Bodman, Fort, Lane and

Pasman.  Because the November 2001 S-4/A incorporates by reference the same documents as

the October 2001 S-4, both SEC filings contain the materially false and misleading statements set

forth in the incorporated documents.

716.    On November 13, 2001, Tyco filed with the SEC a Prospectus relating to the

business combination between TyCom and Tyco (the "November 2001 Prospectus").  Because

the November 2001 Prospectus incorporates by reference the same documents as the October

2001 S-4, both SEC filings contain the materially false and misleading statements set forth in the incorporated documents.

717.    Defendants made the following materially false and misleading representations concerning Tyco's financial results in the November 2001 S-4/A and the November 2001 Prospectus:

> Revenues before non-recurring items . . . for the quarter rose 29% to $10.08 billion compared with last year's $7.80 billion.  Diluted earnings per share before non-recurring items, extraordinary items and the adoption of SAB 101 for the fourth quarter fiscal 2001 were $0.86, a 34% increase over earnings of $0.64 per diluted share in the fourth quarter fiscal 2000.  After giving effect to such items, revenues for the fourth quarter fiscal 2001 were $10.01 billion compared to $9.57 billion in the fourth quarter fiscal 2000 and diluted earnings per share for the fourth quarter of fiscal 2001 were $0.70 per share, compared to $1.12 diluted earnings per share in the fourth quarter of fiscal 2000.

*   *   *

> Revenues before non-recurring items and the adoption of SAB 101 for the year ended September 30, 2001 increased to $36.29 billion, 25% higher than last year's $28.93 billion.  Diluted earnings per share before non-recurring charges and credits and extraordinary items, and the adoption of SAB 101, for the year rose to $2.81 per diluted share, or $5.15 billion, a 29% increase over last year's diluted per share earnings of $2.18, or $3.73 billion.

718.    That description of the Company's financial results was materially false and misleading because Defendants failed to disclose that they produced the reported results only by engaging in the unlawful and improper accounting practices alleged herein.

### 38.    Defendants' Materially False And Misleading Representations Concerning Tyco's Financial Results For The Fiscal Quarter And Year Ended September 31, 2001

719.    On October 18, 2001, the Tyco Defendants issued a press release concerning the Company's financial results for the fiscal quarter and year ended September 30, 2001.  In that

press release, Defendants made the following materially misleading representations concerning the Company's financial results:

> Tyco International Ltd. . . ., a diversified manufacturing and service company, reported today that diluted earnings per share for its fourth quarter ended September 30, 2001 were 86 cents, a 34 percent increase over earnings of 64 cents per share for the same quarter last year. Revenues for the quarter rose 29 percent to $10.1 billion compared with last year's $7.8 billion. These results are before non-recurring charges and credits, extraordinary items, and the adoption of Staff Accounting Bulletin No.101 (SAB 101). After giving effect to such items, diluted earnings per share for the fourth quarter of fiscal 2001 were 70 cents, compared to $1.12 in the fourth quarter of fiscal 2000. Included in the prior year's $1.12 is 59 cents resulting from a gain on the issuance of shares by subsidiary.

> For fiscal 2001, income before non-recurring charges and credits, extraordinary items, and the adoption of SAB 101, rose to $2.81 per diluted share, a 29 percent increase over last year's diluted per share earnings of $2.18. After giving effect to such items, diluted earnings per share were $2.17 for fiscal 2001 compared to $2.64 in fiscal 2000. Included in the prior year's $2.64 is 59 cents resulting from a gain on the issuance of shares by subsidiary. Revenues for the twelve months increased to $36.3 billion, 25 percent higher than last year's $28.9 billion.

720.     On December 28, 2001, Tyco filed with the SEC its Form 10-K for the fiscal year ended September 30, 2001 (the "2001 10-K"). That document was signed by defendants Swartz, Kozlowski, Walsh, Bodman, Fort, Lane and Pasman.

721.     In the 2001 10-K, Defendants made the following materially false and misleading representations concerning the Company's financial results for the 2001 fiscal year:

> Operating income, before certain (charges) credits and accounting change, improved in all segments in each of Fiscal 2001 and Fiscal 2000, with the exception of the Telecommunications segment as discussed below. The operating improvements are the result of both increased revenues in all but our Telecommunications segment and enhanced margins in all but our Healthcare and Specialty Products segment. Increased revenues resulted from acquisitions that are accounted for under the purchase method of accounting and from organic growth. We enhanced our margins through improved productivity and cost reductions in the ordinary course of business, unrelated to acquisition or divestiture activities.

722.    On or about January 11, 2002, Tyco released its 2001 Annual Report to Shareholders (the "2001 Annual Report"). The annual report included a letter to Tyco shareholders from defendant Kozlowski. In that letter, Kozlowski delivered the following materially false and misleading description of the Company's fiscal 2001 financial results:

> For the ninth consecutive year, we increased revenues and earnings substantially. Revenues rose 25 percent to $36.3 billion and earnings grew $1.4 billion to $5.1 billion, a 38 percent increase over the prior year. Our diluted earnings per share increased 29 percent to $2.81. Free cash flow exceeded $4.7 billion in fiscal 2001 and should surpass $5 billion next year.

723.    In addition, the 2001 Annual Report sets forth the materially false and misleading financial statements that appeared in the 2001 10-K.

724.    Defendants' representations concerning Tyco's financial results for the fiscal year and quarter ended September 30, 2001 were materially false and misleading because Defendants did not disclose that they produced the reported results by engaging in the unlawful and manipulative accounting practices alleged herein.

725.    Because the 2001 10-K incorporates by reference Tyco's 2002 Proxy Statement (which was filed with the SEC on January 8, 2002), the 2001 10-K contains the materially false and misleading statements set forth in that Proxy Statement.

**39.    Defendants' Materially False And Misleading Representations In The January 2002 S-4 And Its Amendment**

726.    On January 8, 2002, Tyco filed with the SEC a Form S-4 relating to a proposed merger between McGrath RentCorp and Tyco (the "January 2002 S-4"). That document was signed by defendants Kozlowski, Swartz, Walsh, Bodman, Fort, Lane and Pasman. The January 2002 S-4 incorporates by reference Tyco's 2001 10-K and is therefore materially false and misleading for the same reasons as the 10-K.

727.    On May 22, 2002, Tyco filed with the SEC a Form S-4/A relating to the proposed

merger between McGrath RentCorp and Tyco (the "May 2002 S-4/A").  The May 2002 S-4/A

was signed by defendant Swartz for himself and for defendants Kozlowski, Walsh, Bodman,

Lane and Pasman.  The May 2002 S-4/A incorporates by reference the 2001 10-K and the May

2002 10-Q, and therefore contains the materially false and misleading representations set forth in

those SEC filings.

### 40.    Defendants' Materially False And Misleading Representations Concerning Tyco's Results For Quarter Ended December 31, 2001

728.    On January 15, 2002, the Tyco Defendants issued a press release concerning the

Company's financial results for the quarter ended December 31, 2001.  In that press release,

Defendants made the following materially misleading representations concerning the Company's

financial results:

> Tyco International Ltd. . . ., a diversified manufacturing and service company,
> reported today that diluted earnings per share for its first quarter ended December
> 31, 2001 were 74 cents, a 17 percent increase over pro forma earnings of 63 cents
> per share for the same quarter last year.  As required, results for the first quarter of
> fiscal 2001 have been restated to reflect the adoption of Staff Accounting Bulletin
> No. 101 (SAB 101) and are presented on a pro forma basis to exclude goodwill
> amortization as a result of the Company's adoption of Statement of Financial
> Accounting Standards No. (SFAS) 142, "Goodwill and Other Intangible Assets."
> Revenues for the quarter rose 25 percent to $10.1 billion compared with last year's
> $8.0 billion.  Results presented above are before non-recurring charges and
> credits, extraordinary items, and, for fiscal 2001, the cumulative effect of
> accounting changes.  As discussed further below and in the accompanying tables,
> non-recurring charges and credits for the first quarter totaled a charge of
> approximately $26 million, before tax, in fiscal 2002 and a credit of
> approximately $176 million, before tax, in fiscal 2001.  After giving effect to such
> non-recurring items, diluted earnings per share before cumulative effect of
> accounting changes and extraordinary items were 73 cents for the first quarter of
> fiscal 2002, compared to 57 cents in the first quarter of fiscal 2001.  The
> guidelines of SFAS 142 do not allow for restatement of prior year results.

729.     On February 14, 2002, Tyco filed with the SEC Tyco's Form 10-Q for the quarter ended December 31, 2001 (the "February 2002 10-Q"). That document was signed by defendant Swartz.

730.     In the February 2002 10-Q, Defendants represented that, for the quarter, Tyco had produced: revenue of $10,068,100,000; income before income taxes, minority interest, extraordinary items and cumulative effect of accounting changes of $1,854,100,000; net income of $1,451,000,000; and earnings of $0.73 per share.

731.     Those statements regarding Tyco's financial results were materially false and misleading because: (a) Defendants failed to disclose that those results were achieved only by engaging in the accounting manipulations alleged herein; and (b) Tyco has admitted that, during the quarter ended December 31, 2001, its pre-tax income was overstated by more than 21%. As both the December 8-K and Tyco's 10-Q/A for the quarter ended December 31, 2001 (filed on December 31, 2002) reflect, Tyco recorded charges of $290.6 million for the first quarter of fiscal 2002 that were not reflected in the results announced by the Company in the February 2002 10-Q. Of those total charges, $185.9 million was attributable to the ADT dealer reimbursements that Tyco improperly treated as reductions in the Company's selling, general and administrative expenses.

732.     The February 2002 10-Q also makes the following materially false and misleading disclosures concerning Tyco's merger and restructuring reserves:

> At the beginning of fiscal 2002, purchase accounting reserves were $732.1 million as a result of purchase accounting transactions in prior years. In connection with first quarter fiscal 2002 acquisitions, we established purchase accounting reserves of $80.7 million for transaction and integration costs. In addition, purchase accounting liabilities of $216.2 million and a corresponding increase to goodwill and deferred tax assets were recorded during the quarter ended December 31, 2001 relating to fiscal 2001 acquisitions. These reserves related primarily to

revisions associated with finalizing the exit plans of LPS, Tyco Capital and SecurityLink, all acquired during fiscal 2001. During the quarter ended December 31, 2001, we paid out $176.9 million in cash for purchase accounting liabilities, plus $41.8 million relating to earn-out liabilities, and incurred $2.6 million in non-cash charges (including $2.3 million relating to earn-out liabilities) against the reserves established during and prior to this quarter. Certain acquisitions have provisions which require Tyco to make additional "earn-out" payments to the sellers, if the acquired company achieves certain milestones subsequent to its acquisition by Tyco. Also, in the quarter ended December 31, 2001, we determined that $15.8 million of purchase accounting reserves related primarily to acquisitions prior to fiscal 2002 were not needed and reversed that amount against goodwill. At December 31, 2001, there remained $836.0 million in purchase accounting reserves on Tyco Industrial's Consolidated Balance Sheet, of which $650.8 million is included in accrued expenses and other current liabilities and $185.2 million is included in other long-term liabilities.

733.    Those representations were materially false and misleading because, as is specifically alleged above, Defendants failed to disclose that they improperly manipulated the Company's merger and restructuring reserves in order to inflate Tyco's reported financial results.

### 41.    Defendants' Materially False And Misleading Representations Concerning The Company's Financial Results For The Quarter Ended March 31, 2002

734.    On April 25, 2002, the Tyco Defendants issued a press release concerning the Company's financial results for the quarter ended March 31, 2002. In that press release, Defendants stated that Tyco had generated a net loss of $0.96 per share during the quarter on $8,661,500,000 in revenue.

735.    On May 15, 2002, Tyco filed with the SEC the Company's Form 10-Q for the quarter ended March 31, 2002 (the "May 2002 10-Q"). That document was signed by defendant Swartz.

736.    In the May 2002 10-Q, Defendants repeated the statements regarding Tyco's financial results for the quarter made by Defendants in the April 25, 2002 press release.

737.    The May 2002 10-Q also included the following materially misleading description of Tyco's analysis of whether its assets had been impaired:

> The Company periodically reviews and evaluates its goodwill and other intangible assets for potential impairment.  Effective October 1, 2001, the beginning of Tyco's fiscal year 2002, the Company adopted SFAS No. 142, "Goodwill and Other Intangible Assets," under which goodwill is no longer amortized but instead is assessed for impairment at least annually.  Under the transition provisions of SFAS No. 142, there was no goodwill impairment at October 1, 2001.  Updated valuations were completed as of March 31, 2002 for our Tyco Telecommunications (formerly TyCom) reporting unit and Tyco Capital, which resulted in no impairment of goodwill at that date.

> \* \* \*

> However, during the quarter ended March 31, 2002, circumstances developed that could potentially impair the value of goodwill with respect to our Tyco Telecommunications reporting unit and Tyco Capital.  Updated valuations were completed as of March 31, 2002, which resulted in no impairment of goodwill at that date.

738.    Those representations concerning Tyco's financial results and the Company's analysis of whether its assets had been impaired were materially false and misleading because: (a) Defendants failed to disclose that Tyco produced those results only by engaging in the accounting manipulations specifically alleged above; and (b) as Tyco has now admitted, the May 2002 10-Q understated the Company's net loss by more than 71% because Tyco failed to timely record a loss due to an impairment in the value of its CIT subsidiary.  Defendants failed to take that required write down although their contemporaneous analysis revealed that an impairment charge was necessary.  When Tyco ultimately restated its March 31, 2002 financial statements, it reported a $4.5 billion impairment in the value of CIT's goodwill.  The effect of this charge eliminated almost 40% of the earnings Tyco accumulated over its corporate life.

739.    The May 2002 10-Q also includes the following materially false and misleading description of Tyco's restructuring and merger reserves:

[A]t the beginning of fiscal 2002, purchase accounting reserves were $732.1 million as a result of purchase accounting transactions in prior years. In connection with fiscal 2002 acquisitions, we established purchase accounting reserves of $182.2 million for transaction and integration costs. In addition, purchase accounting liabilities of $355.7 million and a corresponding increase to goodwill and deferred tax assets were recorded during the six months ended March 31, 2002 relating to fiscal 2001 acquisitions. These reserves related primarily to revisions associated with finalizing the exit plans of LPS, Tyco Capital and SecurityLink, all acquired during fiscal 2001. During the six months ended March 31, 2002, we paid out $318.4 million in cash for purchase accounting liabilities, plus $58.0 million relating to earn-out liabilities, and incurred $26.3 million in non-cash charges and reclassifications (including $2.3 million relating to earn-out liabilities) against the reserves established during and prior to this six-month period. In addition, during the six months ended March 31, 2002, we assumed pre-existing put option rights of $105.9 million, of which $22.2 million has been paid in cash. Certain acquisitions have provisions which require Tyco to make additional "earn-out" payments to the sellers if the acquired company achieves certain milestones subsequent to its acquisition by Tyco. Also, in the six months ended March 31, 2002, we determined that $47.3 million of purchase accounting reserves related to acquisitions prior to fiscal 2002 were not needed and reversed that amount against goodwill. At March 31, 2002, there remained $880.3 million in purchase accounting reserves on Tyco Industrial's Consolidated Balance Sheet, of which $600.3 million is included in accrued expenses and other current liabilities and $280.0 million is included in other long-term liabilities.

740. Those representations were materially false and misleading because, as Plaintiffs allege in detail above, Defendants improperly manipulated Tyco's accounting reserves in a manner designed to inflate the Company's reported financial results.

## L. The Materially False And Misleading Guidance To Analysts Delivered By Kozlowski And Swartz

### 1. The Manner In Which Kozlowski's And Swartz's Guidance Was Materially False And Misleading

741. Throughout the time period in which Plaintiffs invested in Tyco securities, Tyco and the Officer Defendants repeatedly gave false guidance to securities analysts regarding Tyco's expected financial performance, including predictions of Tyco's earnings per share for various reporting periods.

742.     That guidance had the effect of artificially inflating the price of Tyco securities because investors reasonably interpreted the Officer Defendants' guidance as their informed estimate of the financial results that Tyco would produce.  Throughout the relevant time period, the price of Tyco stock was significantly impacted by the market's expectations regarding the results that Tyco would achieve and the ability of Tyco to meet or exceed the expectations that the Officer Defendants' guidance caused investors to expect.

743.     The Officer Defendants' representations concerning the results that they expected Tyco to achieve for the Company's fiscal 2002 were materially false and misleading for a number of reasons.  In making their representations concerning those expected results, the Officer Defendants failed to consider the likelihood that their unlawful compensation, their looting of Tyco and their undisclosed related-party transactions would be uncovered.  As events have show, it should have been obvious to the Officer Defendants that the belated disclosure of that misconduct would severely disrupt Tyco's operations and prevent the Company from producing the optimistic results predicted by the Officer Defendants.

744.     Similarly, in delivering their guidance to investors, the Officer Defendants failed to consider the likelihood that their criminal misconduct, as alleged in detail above, would be uncovered.  Again, any reasonable person would have recognized that the belated disclosure of such misconduct would severely disrupt Tyco's operations and make it impossible for the Company to produce the results predicted by the Officer Defendants.

745.     The Officer Defendants' representations concerning Tyco's expected financial results were also materially false and misleading because Defendants' predictions were based upon the assumption that the Company would continue to engage in the manipulative and unduly aggressive accounting practices alleged above.  That assumption was unreasonable because the

Officer Defendants recognized that the results that they predicted were unattainable in the event Tyco complied with GAAP.

       **2.**       **The Materially Misleading Guidance Delivered By Kozlowski And Swartz During The Company's Conference Calls With Investors**

746.     Kozlowski and Swartz caused investors to expect unattainable financial results from Tyco for fiscal 2002 by repeatedly making materially false and misleading statements concerning those expected results in a series of conference calls held during the second half of 2001 and 2002.

747.     For example, during a July 18, 2001 conference call, Kozlowski stated, "For fiscal year 2002, we continue to believe that $3.45 per share is a reasonable estimate, but as we said on the conference call, we will allow for a range between $3.20 and $3.60 . . ."

748.     Tyco hosted another conference call with investors on November 15, 2001. During the call, Kozlowski continued to provide investors with false assurances concerning the Company's projected earnings growth. He stated, "Let me start here this morning with our guidance for fiscal year 2002. We expect earnings per share to grow over 21% this year to $3.70 a share."

749.     Kozlowski again provided false guidance to investors during a January 15, 2002 conference call. During that call, Kozlowski stated:

> Putting all this together, we remain committed to our full year earnings guidance of $3.70 per share, up 21% from last year. We have not previously offered any guidance at all on the second quarter. Given the likelihood of another tough quarter in electronics, we think second quarter earnings will be in the range of 80-82¢ per share up roughly 17% for the quarter.

750.     Swartz reiterated those unreasonable estimates during a January 22, 2002 conference call with analysts, journalists and institutional investors.  During that call, Swartz stated as follows:

> During the balance of this year, and as we look forward to fiscal 2003, the earnings of Tyco will continue strong.  Guidance for the second quarter is a strong 14% to 17% growth over the prior year.  The full year earnings of $3.70 are in excess of 20% growth over the prior year, and every one of these businesses will enter fiscal 2003 with extremely strong organic fundamentals to continue to have these strong earnings.

751.     Swartz repeated Tyco's unreasonable 2002 earnings estimate during a conference call held on April 2, 2002.  During that call, Swartz stated, "As I have said over the past few weeks based on January's and February's numbers, we see no need to revise earnings or cash flow guidance for the quarter."

752.     All of the foregoing earnings guidance delivered by Kozlowski and Swartz was materially false and misleading because, at the time those Defendants made the quoted representations, they lacked a reasonable basis for their predictions because of the facts specifically alleged above.

## M.     Defendants' Material Omissions

753.     In addition to making material misrepresentations concerning Tyco's financial results, the Company's operations, the restructuring and merger reserves maintained by the Company, the compensation paid to the Officer Defendants and Walsh, the criminal conduct of the Officer Defendants and Walsh and the Company's related-party transactions, Defendants failed to disclose a host of material facts concerning those subjects during the time period in which Plaintiffs invested in Tyco common stock.

754.    For example, Tyco now concedes that Defendants failed to disclose the following

highly material facts in a timely manner:

        a.      the Company maintained grossly deficient internal financial controls at all

relevant times;

        b.      Defendants engaged in unduly aggressive accounting practices in order to

inflate Tyco's reported financial results;

        c.      Defendants manipulated Tyco's restructuring and merger reserves to

enable the Company to report inflated financial results;

        d.      Defendants caused the management of entities that Tyco planned to

acquire to alter the consummation of those companies' sales and the payment of their expenses so

that Tyco could spring-load its acquisitions;

        e.      the Officer Defendants paid themselves and defendant Walsh grossly

excessive and undisclosed compensation throughout the time period in which Plaintiffs invested

in Tyco securities;

        f.      the Officer Defendants and defendant Walsh enriched themselves at the

expense of Tyco and its shareholders by engaging in numerous undisclosed related-party

transactions; and

        g.      the Officer Defendants and defendant Walsh engaged in various criminal

activities, including securities law violations, tax evasion, violations of the New York RICO

statute and obstruction of justice while enriching themselves by, among other things, selling

hundreds of millions of dollars in Tyco common stock to unsuspecting investors.

755.    Defendants were obligated to disclose those material facts because, among other

reasons: (a) they made positive statements concerning topics closely related to the facts that they

concealed, and those statements were materially misleading in the absence of the disclosure of the adverse material facts; (b) they were obligated to disclose all material adverse facts in their possession at the times that they sold Tyco securities (including the public offerings conducted by Tyco during the time period relevant to this action); and (c) the disclosure of those adverse facts was mandated by controlling SEC regulations, including the instructions to the SEC disclosure forms filed by Tyco and Item 303 of SEC Regulation S-K [17 C.F.R. 229.303], which requires issuers to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."

## VII.

## THE DEVASTATING IMPACT OF DEFENDANTS' UNLAWFUL CONDUCT

756.     In the wake of Defendants' misconduct, Plaintiffs and other investors in Tyco securities have suffered devastating losses.  Among other tumultuous events:

a.      the Company's stock has fallen to as low as $6.98 per share, 88.96% less than its 2001 trading high of $63.21 per share and 88.32% less than its January 2002 trading high of $59.79 per share;

b.      some or all of the Defendants are currently the subject of investigations by the U.S. Attorneys for the Districts of New Hampshire and the Southern District of New York, the SEC, the Manhattan D.A., and the State of New Hampshire Bureau of Securities Regulation;

c.      the entire Tyco Board has been forced to resign;

d.      Kozlowski, Swartz and Belnick have been terminated and indicted by the Manhattan D.A.;

e.      Walsh has pled guilty in New York County of procuring an improper $20 million payment from the Company with the help of the Officer Defendants;

f.      the SEC has filed an action against Kozlowski, Swartz and Belnick for fraud, issuing false and misleading proxy statements, making fraudulent stock sales and committing reporting and record-keeping violations; and

g.      Tyco has filed an action pursuant to 15 U.S.C. § 78p(b) against Kozlowski and Swartz to recover over $40 million in "short-swing" trading profits they made on the sale of Tyco stock between August 1, 2000 and April 26, 2002.

757.    It is also evident that, without reliance upon the improper and unlawful accounting practices followed by the Company during the time period in which Plaintiffs invested in Tyco securities, Tyco cannot produce the ever-improving financial results previously reported by Defendants.

758.    On October 24, 2002, Tyco announced its financial results for the quarter ended September 30, 2002. For the quarter, Tyco suffered a net loss of 88 cents per share, compared with net income in the prior year's quarter of $1.38 billion, or 70 cents per share. Those results included pre-tax charges of about $2.8 billion, equal to $1.15 per share, mainly to write down assets associated with the Company's disastrous foray into the undersea optical fiber business.

759.    Furthermore, on March 12, 2003, Tyco announced that the Company had "reduced its operational fiscal 2003 EPS guidance, excluding the non-cash charges announced today, to a range of $1.40 to $1.50. Including these non-cash charges, EPS for the year is expected to range from $1.30 to $1.40."

## VIII.

## PLAINTIFFS REASONABLY RELIED UPON DEFENDANTS'

## REPRESENTATIONS, THE ABSENCE OF MATERIAL
## OMISSIONS AND THE INTEGRITY OF THE MARKET PRICES
## FOR TYCO SECURITIES IN PURCHASING THOSE SECURITIES

760.     Plaintiffs directly relied upon all of the foregoing misrepresentations in purchasing Tyco securities.  In addition, in making those purchases, Plaintiffs reasonably assumed that Defendants had not failed to disclose material adverse facts concerning Tyco's operations and that Defendants had not engaged in conduct with the purpose or effect of artificially inflating the market prices of Tyco securities.

761.     Plaintiffs are also entitled to the presumption of reliance upon the material misrepresentations and omissions alleged herein and upon the integrity of the market for Tyco stock that is provided by the fraud-on-the-market doctrine.

762.     The fraud-on-the-market doctrine's presumption of reliance arises here for the following reasons:

        a.       As a regulated issuer, Tyco filed periodic public reports with the SEC that disclosed information that was promptly disseminated to investors.

        b.       Tyco regularly communicated with public investors via established market communication mechanisms such as the regular dissemination of press releases on major newswire services, regular communications with the financial and trade press and through meetings with institutional investors and other major Tyco shareholders.

        c.       Tyco securities were traded in developed and efficient markets.  That is, the information disclosed by Defendants to the public concerning Tyco was incorporated by the market for Tyco securities into the market price for those securities in a manner that caused the market price of Tyco securities to reflect all publicly-available information concerning Tyco.  Of course, the market price of Tyco securities did not reflect the information that Defendants

concealed from the market. By concealing that information, Defendants therefore caused the Company's securities to trade at inflated prices at all material times.

      d.    At all relevant times, Tyco common stock met the requirements for listing on the New York Stock Exchange, a highly efficient market. During that time frame, Tyco common stock was among the most frequently-traded securities listed on the New York Stock Exchange.

      e.    Tyco was followed by several securities analysts employed by major brokerage firms and institutional investors who analyzed the Company's operations and prospects on a regular basis and who recommended the purchase or sale of Tyco stock and bonds on the basis of those analyses.

      f.    Defendants made material misrepresentations that impacted the prices at which Plaintiffs purchased Tyco securities and failed to disclose material facts that Defendants were obligated to disclose under the circumstances.

      g.    Plaintiffs purchased their Tyco securities between the time Defendants made the misrepresentations and omissions alleged herein and the time the market learned the adverse facts concerning the Company's operations that Defendants concealed from Plaintiffs.

763.    Plaintiffs are therefore entitled to a presumption of reliance upon the integrity of the market for Tyco securities and upon the material misrepresentations and omissions that form the basis for Plaintiffs' claims.

## IX.

## ADDITIONAL FACTS AND CIRCUMSTANCES THAT DEMONSTRATE THAT DEFENDANTS ACTED WITH SCIENTER

764. Defendants made the misrepresentations and omissions concerning then-existing facts complained of herein with scienter in that they knew or recklessly disregarded that their representations concerning the Company were materially false and misleading when made.

765. With respect to any forward-looking misrepresentations or omissions alleged herein, Defendants made such misrepresentations or omissions with actual knowledge that their statements were materially false. The facts alleged in the following paragraphs, among others alleged below, strongly support the conclusion that Defendants acted with scienter.

**A.      Tyco Has Admitted Numerous Facts That Demonstrate
         That The Tyco Defendants Acted With Scienter**

766. As is alleged in detail above, Tyco conceded in the September 8-K, the December 8-K, the December 2002 10-K, the Belnick Complaint, the Kozlowski Complaint and the Walsh Complaint virtually all of the fraudulent conduct alleged herein related to the Officer Defendants' compensation and criminal conduct and Tyco's related-party transactions.

767. For example, Tyco conceded in the September 8-K, the December 8-K, the December 10-K and elsewhere that the fraud perpetrated by Defendants was massive and obvious in character. For example, Tyco has conceded that: (1) Defendants made "a number of accounting entries that were incorrect and required"; (2) accounting corrections were required by the "aggressive accounting pursued by prior senior management"; (3) Tyco's financial results were misleading as a result of "breakdowns of internal control which occurred during fiscal 2002"; (4) the Officer Defendants engaged in "abuse of our employee relocation loan programs"; (5) the Individual Defendants paid themselves "unapproved bonuses"; (6) Tyco employed many "undisclosed compensation arrangements"; (7) the Officer Defendants paid themselves "unreported perquisites"; (8) the Individual Defendants engaged in unauthorized and improper

"self-dealing transactions"; (9) the conduct alleged herein demonstrated "a lack of a stated and demonstrable commitment by former senior management to set appropriate standards of ethics, integrity, accounting, and corporate governance"; (10) the Individual Defendants engaged in "other misuses of corporate trust"; (11) Tyco's senior management "exerted pressure" and "provided incentives" to report higher earnings; (12) Defendants repeatedly recorded and reported to investors results that were manipulated through the use of "Financial Engineering" reserves; (13) Tyco's management repeatedly goaded the management of acquired companies into adopting accounting treatments that violated GAAP; and (14) overall, Defendants' conduct amounted to a "pattern" of "aggressive" accounting that persisted over a number of years.

768.     Tyco has further conceded that Kozlowski, Swartz, Belnick and Walsh looted Tyco, that they did so with full knowledge that they were not entitled to the payments identified above and that they intentionally concealed their conduct from investors.

769.     The Company's admissions therefore provide particularly compelling support for the inference that Defendants acted with scienter in making the misrepresentations and omissions and in engaging in the other fraudulent conduct alleged herein.

**B.      The Tyco Defendants Possessed Substantial Motives
         To Commit The Fraudulent Acts Alleged Herein**

770.     The motives of the Officer Defendants and Walsh to engage in the fraudulent conduct alleged by Plaintiffs could not be more clear.

771.     As is alleged in substantial detail above, the Officer Defendants and Walsh made material misrepresentations and fraudulent omissions to conceal from investors the fact that they were looting Tyco of hundreds of millions of dollars.

772.     In addition, notwithstanding their obligation to refrain from trading Tyco stock or to disclose their insider information prior to selling such stock, the Officer Defendants and Walsh sold millions of shares of Tyco stock for hundreds of millions of dollars in proceeds at prices that were artificially inflated by Defendants' materially false representations and omissions and other fraudulent conduct.

773.     The insider trading committed by the Officer Defendants, Walsh and other Tyco insiders between January of 2000 and February of 2002 may be summarized as follows:

| INDIVIDUAL DEFENDANTS' INSIDER SALES | | | | |
|---|---|---|---|---|
| Insider | Date | Shares Sold | Price | Total Proceeds |
| | | | | |
| L. Dennis Kozlowski | 1/5/00 | 744,000.00 | 35.35 | 26,300,400.00 |
| L. Dennis Kozlowski | 9/7/00 | 934,417.00 | 58.28 | 54,457,822.76 |
| L. Dennis Kozlowski | 9/7/00 | 934,417.00 | 58.28 | 54,457,822.76 |
| L. Dennis Kozlowski | 9/7/00 | 451,191.00 | 58.28 | 26,295,411.48 |
| L. Dennis Kozlowski | 9/7/00 | 451,191.00 | 58.28 | 26,295,411.48 |
| L. Dennis Kozlowski | 9/7/00 | 30,626.00 | 58.28 | 1,784,883.28 |
| L. Dennis Kozlowski | 9/7/00 | 30,626.00 | 58.28 | 1,784,883.28 |
| L. Dennis Kozlowski | 9/11/00 | 1,007,401.00 | 56.83 | 57,250,598.83 |
| L. Dennis Kozlowski | 9/11/00 | 1,007,401.00 | 56.83 | 57,250,598.83 |
| L. Dennis Kozlowski | 9/11/00 | 240,501.00 | 56.83 | 13,667,671.83 |
| L. Dennis Kozlowski | 9/11/00 | 240,501.00 | 56.83 | 13,667,671.83 |
| L. Dennis Kozlowski | 9/11/00 | 7,700.00 | 56.83 | 437,591.00 |
| L. Dennis Kozlowski | 9/11/00 | 7,700.00 | 56.83 | 437,591.00 |
| L. Dennis Kozlowski | 9/12/00 | 219,107.00 | 55.25 | 12,105,661.75 |
| L. Dennis Kozlowski | 9/12/00 | 219,107.00 | 55.25 | 12,105,661.75 |
| L. Dennis Kozlowski | 9/12/00 | 52,308.00 | 55.25 | 2,890,017.00 |

| | | | | |
|---|---|---|---|---|
| L. Dennis Kozlowski | 9/12/00 | 52,308.00 | 55.25 | 2,890,017.00 |
| L. Dennis Kozlowski | 9/12/00 | 1,674.00 | 55.25 | 92,488.50 |
| L. Dennis Kozlowski | 9/12/00 | 1,674.00 | 55.25 | 92,488.50 |
| L. Dennis Kozlowski | 9/14/00 | 86,233.00 | 58.30 | 5,027,383.90 |
| L. Dennis Kozlowski | 9/14/00 | 86,233.00 | 58.30 | 5,027,383.90 |
| L. Dennis Kozlowski | 10/24/00 | 600,000.00 | 54.31 | 32,587,500.00 |
| L. Dennis Kozlowski | 10/31/00 | 148,000.00 | 56.69 | 8,389,750.00 |
| L. Dennis Kozlowski | 1/30/01 | 350,000.00 | 62.80 | 21,980,000.00 |
| L. Dennis Kozlowski | 6/20/01 | 107,935.00 | 52.96 | 5,716,237.60 |
| L. Dennis Kozlowski | 7/3/01 | 155,000.00 | 54.98 | 8,521,900.00 |
| L. Dennis Kozlowski | 8/1/01 | 117,696.00 | 53.15 | 6,255,542.40 |
| **TOTAL** | | **8,284,947.00** | | **457,770,390.66** |
| | | | | |
| Mark H. Swartz | 1/5/00 | 372,000.00 | 35.35 | 13,150,200.00 |
| Mark H. Swartz | 9/7/00 | 368,197.00 | 58.28 | 21,458,521.16 |
| Mark H. Swartz | 9/7/00 | 368,197.00 | 58.28 | 21,458,521.16 |
| Mark H. Swartz | 9/11/00 | 944,398.00 | 56.83 | 53,670,138.34 |
| Mark H. Swartz | 9/11/00 | 944,398.00 | 56.83 | 53,670,138.34 |
| Mark H. Swartz | 9/12/00 | 205,404.00 | 55.25 | 11,348,571.00 |
| Mark H. Swartz | 9/12/00 | 205,404.00 | 55.25 | 11,348,571.00 |
| Mark H. Swartz | 10/24/00 | 300,000.00 | 54.31 | 16,293,750.00 |
| Mark H. Swartz | 10/31/00 | 74,000.00 | 56.69 | 4,194,875.00 |
| Mark H. Swartz | 1/30/01 | 175,000.00 | 62.80 | 10,990,000.00 |
| Mark H. Swartz | 2/1/01 | 107,958.00 | 60.96 | 6,581,119.68 |
| Mark H. Swartz | 6/20/01 | 53,967.00 | 53.03 | 2,861,870.01 |
| Mark H. Swartz | 7/3/01 | 77,500.00 | 54.98 | 4,260,950.00 |
| **TOTAL** | | **4,196,423** | | **231,287,225.69** |

| | | | | |
|---|---|---|---|---|
| Mark A. Belnick | 10/25/00 | 116,717.00 | 54.35 | 6,343,568.95 |
| Mark A. Belnick | 7/19/01 | 200,000.00 | 53.85 | 10,770,000.00 |
| Mark A. Belnick | 12/4/01 | 116,666.00 | 58.00 | 6,766,628.00 |
| Mark A. Belnick | 12/4/01 | 116,666.00 | 58.13 | 6,781,794.58 |
| **TOTAL** | | **550,049.00** | | **30,661,991.53** |
| | | | | |
| Frank E. Walsh | 11/30/00 | 15,147.00 | 52.89 | 801,124.83 |
| Frank E. Walsh | 11/30/00 | 15,147.00 | 52.96 | 802,185.12 |
| Frank E. Walsh | 12/18/01 | 9,032.00 | 56.09 | 506,604.88 |
| Frank E. Walsh | 12/18/01 | 6,691.00 | 56.09 | 375,298.19 |
| Frank E. Walsh | 12/18/01 | 4,073.00 | 56.09 | 228,454.57 |
| **TOTAL** | | **50,090.00** | | **2,713,667.59** |
| | | | | |
| John F. Fort | 7/25/00 | 10,000.00 | 55.00 | 550,000.00 |
| John F. Fort | 7/26/00 | 7,500.00 | 55.25 | 414,375.00 |
| John F. Fort | 7/26/00 | 2,500.00 | 55.00 | 137,500.00 |
| John F. Fort | 7/27/00 | 10,000.00 | 54.56 | 545,600.00 |
| John F. Fort | 7/27/00 | 5,000.00 | 54.81 | 274,050.00 |
| John F. Fort | 7/28/00 | 5,000.00 | 52.56 | 262,800.00 |
| John F. Fort | 7/28/00 | 5,000.00 | 53.31 | 266,550.00 |
| John F. Fort | 7/28/00 | 5,000.00 | 53.43 | 267,150.00 |
| John F. Fort | 7/28/00 | 5,000.00 | 53.50 | 267,500.00 |
| John F. Fort | 7/28/00 | 500.00 | 52.68 | 26,340.00 |
| John F. Fort | 7/31/00 | 10,000.00 | 53.62 | 536,200.00 |
| John F. Fort | 8/1/00 | 10,000.00 | 54.50 | 545,000.00 |
| John F. Fort | 8/1/00 | 5,000.00 | 54.00 | 270,000.00 |

| | | | | |
|---|---|---|---|---|
| John F. Fort | 8/2/00 | 5,000.00 | 54.00 | 270,000.00 |
| John F. Fort | 8/2/00 | 5,000.00 | 54.06 | 270,300.00 |
| John F. Fort | 8/3/00 | 5,000.00 | 53.25 | 266,250.00 |
| John F. Fort | 10/25/00 | 10,000.00 | 54.06 | 540,600.00 |
| John F. Fort | 10/25/00 | 10,000.00 | 54.13 | 541,300.00 |
| **TOTAL** | | **115,500.00** | | **6,251,515.00** |
| | | | | |
| **Total Insider Selling by Individual Defendants** | | **13,197,009.00** | | **728,684,790.47** |

| INSIDER SELLING BY OTHER TYCO INSIDERS | | | | |
|---|---|---|---|---|
| Name | Date | Shares Sold | Price | Total Proceeds |
| Michael A. Ashcroft (Director) | 8/1/00 | 175,000.00 | 54.38 | 9,516,500.00 |
| Michael A. Ashcroft | 8/2/00 | 75,000.00 | 54.38 | 4,078,500.00 |
| Michael A. Ashcroft | 8/3/00 | 50,000.00 | 53.38 | 2,669,000.00 |
| Michael A. Ashcroft | 8/4/00 | 25,000.00 | 53.45 | 1,336,250.00 |
| Michael A. Ashcroft | 8/7/00 | 275,000.00 | 53.96 | 14,839,000.00 |
| Michael A. Ashcroft | 8/8/00 | 25,000.00 | 54.50 | 1,362,500.00 |
| Michael A. Ashcroft | 8/9/00 | 78,500.00 | 53.89 | 4,230,365.00 |
| Michael A. Ashcroft | 8/10/00 | 100,000.00 | 53.81 | 5,381,000.00 |
| Michael A. Ashcroft | 8/11/00 | 196,500.00 | 54.43 | 10,695,495.00 |
| Michael A. Ashcroft | 2/6/01 | 228,300.00 | 61.30 | 13,994,790.00 |
| Michael A. Ashcroft | 2/9/01 | 271,700.00 | 60.00 | 16,302,000.00 |
| Michael A. Ashcroft | 12/5/01 | 247,400.00 | 59.98 | 14,839,052.00 |
| Michael A. Ashcroft | 12/7/01 | 252,600.00 | 58.15 | 14,688,690.00 |
| **TOTAL** | | **2,000,000.00** | | **113,933,142.00** |
| | | | | |
| Jerry R. Boggess (President of Tyco's Fire and Security Services business) | 7/24/00 | 100,000.00 | 56.31 | 5,631,250.00 |
| Jerry R. Boggess | 10/24/00 | 6,218.50 | 54.31 | 337,742.28 |
| Jerry R. Boggess | 10/26/01 | 41,796.00 | 50.50 | 2,110,698.00 |
| **TOTAL** | | **148,014.5** | | **8,079,690.28** |
| | | | | |
| Stephen W. Foss (Director) | 12/22/00 | 5,000.00 | 51.00 | 255,000.00 |
| Stephen W. Foss | 9/21/01 | 4,088.00 | 40.78 | 166,708.64 |

| | | | | |
|---|---|---|---|---|
| Stephen W. Foss | 9/21/01 | 3,288.00 | 40.78 | 134,084.64 |
| Stephen W. Foss | 9/21/01 | 2,201.00 | 40.78 | 89,756.78 |
| Stephen W. Foss | 9/21/01 | 894.00 | 40.78 | 36,457.32 |
| **TOTAL** | | **15,471** | | **682,007.38** |
| | | | | |
| Albert R. Gamper (CEO of CIT) | 6/4/01 | 44,794.00 | 53.42 | 2,392,895.48 |
| Albert R. Gamper | 6/7/01 | 310,815.00 | 55.82 | 17,349,693.30 |
| Albert R. Gamper | 6/14/01 | 207,210.00 | 55.33 | 11,464,929.30 |
| Albert R. Gamper | 10/26/01 | 8,994.00 | 50.5 | 454,197.00 |
| **TOTAL** | | **571,813.00** | | **31,661,715.08** |
| | | | | |
| Neil R. Garvey (President and CEO of TyCom) | 10/24/00 | 26,528.00 | 54.31 | 1,440,802.00 |
| Neil R. Garvey | 6/18/01 | 75,000.00 | 55.80 | 4,185,000.00 |
| **TOTAL** | | **101,528.00** | | **5,625,802.00** |
| | | | | |
| Philip M. Hampton (Director) | 2/2/00 | 3,276.00 | 40.90 | 133,988.40 |
| Philip M. Hampton | 2/2/00 | 2,193.00 | 40.92 | 89,737.56 |
| Philip M. Hampton | 2/2/00 | 892.00 | 40.92 | 36,500.64 |
| **TOTAL** | | **6,361.00** | | **260,226.60** |
| | | | | |
| Stephen P. McDonough (President of Tyco Engineered Products and Services and President of Tyco's Plastics division) | 1/29/01 | 8,000.00 | 62.21 | 497,680.00 |
| Stephen P. McDonough | 1/30/01 | 10,000.00 | 62.21 | 622,100.00 |

| | | | | |
|---|---|---|---|---|
| **TOTAL** | | **18,000.00** | | **1,119,780.00** |
| | | | | |
| Richard J. Meelia (Vice President) | 8/7/00 | 125,000.00 | 54.38 | 6,797,500.00 |
| Richard J. Meelia | 10/24/00 | 14,607.00 | 54.31 | 793,342.69 |
| Richard J. Meelia | 10/26/01 | 96,970.00 | 50.59 | 4,905,712.30 |
| Richard J. Meelia | 10/26/01 | 96,970.00 | 50.59 | 4,905,712.30 |
| **TOTAL** | | **333,547.00** | | **17,402,267.29** |
| | | | | |
| William Peter Slusser (Director) | 12/13/01 | 2,467.00 | 54.35 | 134,081.45 |
| William Peter Slusser | 12/13/01 | 2,467.00 | 54.35 | 134,081.45 |
| William Peter Slusser | 12/14/01 | 4,533.00 | 55.00 | 249,315.00 |
| **TOTAL** | | **9,467.00** | | **517,477.90** |
| | | | | |
| Joseph F. Welch (Director) | 2/4/02 | 1,800.00 | 32.00 | 57,600.00 |
| **TOTAL** | | **1,800.00** | | **57,600.00** |
| | | | | |
| **Total Insider Selling by Other Tyco Insiders** | | **3,206,001.50** | | **179,339,708.53** |

774.    All of the foregoing trades were suspicious in nature because they were made at times when the Tyco Defendants either knew or should have known that the Officer Defendants had looted the Company, concealed their fraudulent conduct through the use of improper accounting and inflated the Company's reported financial results by engaging in the fraudulent accounting manipulations outlined above.

775.    Further, the sales occurred while Defendant Kozlowski was falsely touting his supposed practice of retaining nearly all of his Tyco stock.    For example, according to a January 30, 2002 article in the *New York Times*, in December 2002, Kozlowski stated, "I'm paid in Tyco stock . . . We, the board, everybody, feel the best way to keep management's interests aligned with shareholders is to keep 100 percent of our net worth in Tyco's stock."

776.    Notably, a significant portion of the insider sales undertaken by Kozlowski and Swartz were made to Tyco subsidiaries based in bank secrecy jurisdictions such as the Jersey Islands and the Bahamas, rather than in open market transactions.  Because of that unusual characteristic of the sales made by Kozlowski and Swartz, they were able to conceal those sales from investors until year-end, rather than disclosing them in SEC Form 4's within ten days of the beginning of the month following the date of sale.  Thus, by selling their stock to Tyco subsidiaries, Kozlowski and Swartz facilitated their ability to conceal their fraudulent conduct from investors.

777.    The Officer Defendants were also motivated to engage in their fraudulent conduct by the terms of the Tyco incentive plan (the "Incentive Plan").  Pursuant to the Incentive Plan, the compensation paid to Kozlowski and Swartz was directly tied to the Company's reported earnings growth and free cash flow.

778.    According to the 2001 Proxy Statement, the incentive compensation paid to Kozlowski and Swartz was based upon, *inter alia*, whether (a) Tyco reported increased earnings, and (b) the Company reported improved operating cash flow.  The 2001 Proxy Statement also acknowledged that Kozlowski's and Swartz's incentive compensation "is in direct correlation to Tyco's performance and . . . ultimately determined by the future performance of Tyco as reflected by its share price."

779.    Further, the Company's 2002 Proxy Statement stated:

[I]n order for Mr. Kozlowski and Mr. Swartz to have earned a cash bonus in fiscal 2001, the Company had to achieve a minimum of 15% growth in net income and at least a 10% growth in operating cash flow over fiscal 2000. The performance criterion required to vest the minimum number of restricted shares granted to these executives was a growth rate in earnings per share before non-recurring items of at least 15% over fiscal 2000.

780.    As a result, the compensation paid to Kozlowski and Swartz under Tyco's Incentive Plan was entirely dependent upon their ability to report that Tyco was producing improved financial results. This linkage is highly probative of the Officer Defendants' motive and opportunity to commit securities fraud.

781.    Furthermore, the compensation that the Officer Defendants could secure by artificially inflating the Company's results was quite substantial. In fiscal 2001 alone, Kozlowski and Swartz received shares of Tyco restricted stock worth $51,606,420 and $25,803,210, respectively, and were also paid cash bonuses of $6.8 million and $3.4 million, respectively, pursuant to the terms of the Incentive Plan.

782.    The Tyco Defendants were also motivated to engage in the fraudulent conduct alleged herein by the numerous public offerings made by the Company during the course of the fraudulent conduct alleged by Plaintiffs. During Tyco's fiscal years 1999 through 2002 alone, Tyco conducted more that $40 billion in acquisitions, and a large portion of the consideration paid by Tyco was comprised of Tyco stock.

783.    As a result, the Tyco Defendants had a strong incentive to inflate the value of Tyco stock in order to facilitate their business plan of growing Tyco's revenue and earnings through acquisitions. Moreover, the acquisitions conducted by the Tyco Defendants using the

Company's artificially inflated common stock as currency constituted insider trading on a massive scale.

784.    Walsh was also motivated not to "rock the boat" at Tyco by the substantial profits that he derived from self-dealing transactions with the Company other than the payment of $20 million that he secured in connection with the CIT transaction. From 1996 to 2002, Tyco leased an aircraft from Stockwood, Inc., a company in which Walsh has a controlling interest. During that time frame, Tyco paid Stockwood, Inc. $2,490,319 in lease payments.

785.    Furthermore, Stockwood VII, Inc., in which Walsh also has a controlling interest, provided pilot services to the Company. For the period 1996 through 2002, Stockwood VII, Inc. was paid $1,077,071 for providing such services to Tyco.

786.    Other members of the Tyco Board likewise had strong incentives not to alienate the Officer Defendants and insist that accurate disclosures be made concerning their compensation and the Company's financial results.

787.    For example, Defendant Bodman has acknowledged that Kozlowski invested $5 million in a $43 million investment fund that Bodman managed.

788.    Although Bodman was a member of Tyco's Audit, Corporate Governance and Nominating Committees, the very organizations that were supposed to protect investors from the malfeasance that occurred at Tyco, he nevertheless failed to disclose even his fund's transactions with Kozlowski.

789.    The conflicts of interest faced by the members of the Tyco Board were so severe that, even though the Company's directors knew that Swartz would soon be indicted for fraudulent conduct by the Manhattan D.A., the Board agreed to pay him a massive severance package days before that indictment. Specifically, the Board agreed to pay Swartz approximately

$44.8 million in severance, including $9.1 million in cash, $24.5 million from an executive life insurance plan and $10.4 million from a deferred compensation plan.

790.    The Board agreed to those payments although, according to the October 7, 2002 edition of *The Wall Street Journal*, Manhattan D.A. Robert Morganthau said his investigators had warned Tyco officials of Swartz's growing legal peril two days before the Company's board approved his severance agreement.  The article quoted Morganthau as stating, "They knew there was a substantial likelihood he was going to be indicted. . . They shouldn't have paid him."

791.    As a result of the public furor concerning the Board's payment of Swartz's massive severance deal immediately prior to his indictment, Tyco was forced to file an arbitration claim against Swartz seeking the repayment of his massive severance payments.

792.    A June 14, 2002 article in *The Wall Street Journal* disclosed the existence of additional conflicts of interest among Tyco directors that provided them with incentive not to insist that the Officer Defendants make accurate disclosures to Tyco investors.  The article stated that Defendant Fort, who assumed day-to-day management of the Company following Kozlowski's termination, was an investor in and paid advisor to a fund (DLJ Merchant Banking Partners II) that purchased Tyco's "flow-control" products division for $810 million in August 1999.  That conflict of interest was not disclosed to investors at the time of the transaction.

793.    Additionally, in 1996, Fort sold a home in Rye, N.H., to Kozlowski.  That purchase was made by GV Realty Trust.  Kozlowski was the sole beneficiary of that trust and Swartz was its trustee.  Although the purchase of that home was financed through a wholly-owned subsidiary of Tyco, was charged to Kozlowski's KEL Program account and was eventually paid for by Tyco, none of the Defendants caused it to be disclosed to investors.

794. Furthermore, following the Tyco/ADT merger in 1997, Lord Ashcroft KCMG, a Tyco director and the former CEO of ADT, offered for sale his residential property in Boca Raton, Florida. According to news reports, on October 27, 1997, Ashcroft sold his Royal Palm Yacht and Country Club home to his wife for $100. On the same day, she sold it to Byron Kalogerou, who was then Tyco's vice-president and general counsel, for $2.5 million. According to a June 10, 2002 article in *The Wall Street Journal*, the house was purchased with Tyco funds, without input from the Tyco Board, and placed in Kalogerou's name. According to the article, Kalogerou did not use the home – Kozlowski did.

**C.    The Tyco Defendants' Access To The Adverse
        Information Concerning The Company's Operations**

795. The inference that the Tyco Defendants acted with scienter is also strengthened by the fact that those Defendants were provided with complete access to all of the adverse information concerning Tyco's operations that is alleged herein.

796. The Tyco Defendants were aware of that information as a result of their status as the Company's highest ranking executives and directors.

797. Each of the Officer Defendants is a sophisticated businessman who held a senior executive position with the Company for a number of years. Those positions provided the Officer Defendants with access to the material adverse information that was concealed from Plaintiffs at all material times.

798. Furthermore, Tyco's SEC filings reveal that both the Audit Committee Defendants and the PWC Defendants were intimately involved in the Company's accounting practices and, therefore, should have been aware of the fraudulent conduct alleged herein. According to the

Company's 2001 Proxy Statement, which was filed with the SEC on March 27, 2001, the Audit

Committee's Charter stated:

The Committee believes its policies and procedures should remain flexible, in order to best react to changing conditions and to ensure the Board and shareholders that corporate accounting and reporting practices of the Company are in accordance with all requirements and are of the highest quality. In carrying out its responsibilities, the Committee will:

INTERNAL CONTROL

1. Review the adequacy of the Company's systems of internal control and evaluate whether management is communicating the importance of internal control and ensuring that all individuals possess an understanding of their roles and responsibilities; and

2. Ensure that the external and internal auditors keep the Committee informed of their internal control recommendations and review whether recommendations have been implemented by management.

DOCUMENT /REPORTS REVIEW

1. Review and update this Charter periodically, at least annually, as conditions dictate;

2. Review the Company's annual financial statements. Determine whether based on the review and discussion of the audited financial statements with management and independent accountants, if the Committee should recommend to the Board that the audited financial statements be included in the Company's Annual Report on Form 10-K for the last fiscal year for filing with the Securities and Exchange Commission;

3. Meet with management and the external auditors to discuss the results of the annual audit, including any significant changes in accounting principles and any serious difficulties or disputes with management encountered during the audit; and

4. Review with management and the external auditors the interim financial statements prior to filing (the Committee Chair may represent the entire committee for this review).

INDEPENDENT ACCOUNTANTS

1. Recommend to the Board the selection and evaluation of the independent accountants, considering independence and effectiveness, and approve the compensation to be paid to the independent accountants;

2. Review the performance of the independent accountants and approve any proposed discharge of the independent accountants when circumstances warrant;

3. Obtain a formal written statement from the independent accountants periodically delineating all relationships between the auditors and the Company; engage in a dialogue with the auditors regarding any disclosed relationships and services which may impact their independence; and recommend that the Board take appropriate action in response to the auditors' report to satisfy itself of the auditors' independence;

4. Periodically consult with independent accountants, without the presence of management, about internal controls and the fullness and accuracy of the Company's financial statements; and

5. Instruct the independent accountants that they are ultimately accountable to the Board and the Committee.

FINANCIAL REPORTING PROCESS

1. Review the Company's financial reporting process, both internal and external, in consultation with the independent accountants;

2. Consider the independent accountants' judgments about the quality and appropriateness of the Company's accounting principles applied, including management's handling of proposed audit adjustments identified by external auditors; and

3. Consider suggestions made by independent accountants, management, or internal audit, regarding the Company's accounting principles and practices.

PROCESS IMPROVEMENT

1. Establish regular and separate systems of reporting to the Committee by management, independent accountants and internal audit regarding any significant judgments made in management's preparation of the financial statements and the view of each as to the appropriateness of such judgments;

2. Review with management, independent accountants and internal audit difficulties encountered during the course of the annual audit, including any restrictions on the scope of work or access to required information and any other significant disagreements in connection with preparing the financial statements;

3. Discuss with management, independent accountants and internal audit the extent to which changes or improvements in financial or accounting practices, as approved by the Committee, have been implemented; and

4. Report periodically to the Board on significant results of activities or the lack thereof.

ETHICAL AND LEGAL COMPLIANCE

1. Establish, review and update periodically a Code of Ethical Conduct and ensure that management has established a system to enforce this Code;

2. Review activities, organizational structure, and qualifications of the internal audit department;

3. Review with the Company's attorneys legal compliance matters including corporate securities trading policies;

4. Review with the Company's attorneys any legal matter that could have a significant impact on the Company's financial statements; and

5. Perform any other activities consistent with this Charter, the Company's Bye-laws and governing law, as the Committee or Board deems necessary or appropriate.

799. In light of those significant responsibilities – and the absolute failure of the Audit Committee Defendants to fulfill them – their repeated practice of misrepresenting and failing to disclose material facts was knowing or, at best, grossly reckless.

800. To the extent that Defendants' fraudulent conduct relates to their misrepresentations and omissions concerning their compensation and Tyco's related-party transactions, the Officer Defendants and Walsh could not have been unaware of the information Defendants concealed.

801. Indeed, Defendant Walsh has admitted, by pleading guilty to a felony, that he engaged in fraudulent conduct by procuring a $20 million fee from the Company and failing to disclose that fee to the Company's investors.

802.     Furthermore, the Officer Defendants were obviously aware that they were abusing the KEL program, improperly forgiving their own loans and failing to comply with the terms of the Company's relocation loan programs.  In fact, as is specifically alleged above, the Officer Defendants concealed the relocation programs through which they secured tens of millions of dollars of improper, interest-free loans precisely because they were told that the plans they eventually adopted for themselves were unduly lucrative and would have to be disclosed to shareholders.

803.     An article in the December 27, 2002 edition of *The Wall Street Journal* also shows that Tyco's outside counsel and certain of the Tyco Defendants knew in early 2000 that the Company had serious accounting problems and that corporate funds were being misused by the Company's senior executives, including the Individual Defendants.  Because the Audit Committee is charged under its Charter with supervising Tyco's litigation, including the SEC's investigation of Tyco's financial statements, the Audit Committee Defendants either knew or should have known about those adverse facts as well.

804.     *The Wall Street Journal* article states:

Newly discovered e-mails written by attorneys at Tyco International Ltd.'s former outside law firm reveal that they knew about personal use of corporate funds by former Tyco Chairman L. Dennis Kozlowski and a host of accounting problems at the company in early 2000.

The e-mails – written by Wilmer, Cutler & Pickering partners Lewis Liman and William McLucas – have been obtained by the Manhattan district attorney's office and the Securities and Exchange Commission in their continuing investigation into Tyco and some of its former top executives, according to people familiar with the matter.  Part of the SEC's probe involves whether the conglomerate and Wilmer Cutler withheld relevant information that would have helped the SEC in an informal inquiry it launched in 1999 into Tyco's accounting practices . . . .

805.     One e-mail mentioned in that article, a March 23, 2000 communication from Wilmer Cutler partner Lewis Liman to Belnick, states, "There are payments to a woman whom the folks in finance describe to be Dennis's girlfriend [now wife, Karen Mayo]. I do not know Dennis's situation, but this is an embarrassing fact."

806.     In addition, a May 25, 2000 e-mail from Wilmer Cutler partner William McLucas to Belnick states, "We have found issues that will likely interest the SEC. . . creativeness is employed in hitting the forecasts. . ."

807.     The same document acknowledges that "[t]here is also a bad letter from the Sigma people just before the acquisition confirming that they were asked to hold product shipment just before the closing. . ." In addition, McLucas stated that the company's financial reports suggest "something funny which is likely apparent if any decent accountant looks at this."

808.     *The Wall Street Journal* reported in its December 23, 2002 edition that the "bad letter" referred to in the McLucas e-mail was from Sigma's CFO, Philip Bushnell. Bushnell confirmed for *The Wall Street Journal* that the e-mail's content was "'consistent with what I might have done at the time' in response to a Tyco request."

809.     Thus, it is evident that the Tyco Defendants were aware of facts that demonstrated the existence of fraudulent conduct long before Tyco disclosed Defendants' misconduct and that the Audit Committee Defendants were either aware of that information or were grossly reckless in ignoring it.

810.     Tyco has also conceded that members of the Tyco Board had reason to believe that Belnick and Kozlowski had struck an undisclosed side deal concerning Belnick's compensation. The complaint filed by Tyco against Belnick in federal court states that, in

early 2002, while discussing Belnick's new retention agreement with the Compensation Committee, Kozlowski referred to Belnick's entitlement to a bonus one-third the size of Kozlowski's bonus (*i.e.*, to the fraudulent side-deal cut by Kozlowski with Belnick). Despite that statement, the members of the Compensation Committee accepted without inquiry Kozlowski's bizarre explanation that he was confusing Belnick with someone else.

811. The Audit Committee Defendants also either knew or were reckless in not knowing should have known of the foregoing facts. Once Tyco's counsel began an inquiry concerning the compensation paid to the Officer Defendants, counsel determined in short order that the Officer Defendants had engaged in the fraudulent schemes to inflate their compensation that are alleged herein. It should have been equally easy for the Audit Committee Defendants, particularly with the assistance of the PWC Defendants, to learn the same information.

812. According to a September 24, 2002 *Associated Press* article, the Tyco Board's Compensation Committee (which was comprised by defendant Pasman and directors Foss and Slusser) was also apprized of several of the improper relocation loans taken by the Officer Defendants.

813. Indeed, the February 21, 2002 minutes of the Tyco Compensation Committee specifically mention Belnick's $14.9 million in "relocation" loans, an $18.8 million "relocation" loan to Kozlowski and a $7 million "relocation" loan to Swartz. Although Pasman, Foss and Slusser were present at that meeting, none of them took any action to investigate the propriety of those loans or the adequacy of Tyco's disclosures concerning the Company's self-dealing transactions.

814.    The PWC Defendants have also claimed in public statements that they raised questions with Tyco's management concerning the propriety of the compensation paid to the Officer Defendants.  For example, PWC LLP spokesman David Nestor was quoted in a January 3, 2003 *New York Times* article as stating, "We did not know that the disclosure was wrong.  We raised questions about it, went to the company and were told that the disclosure was appropriate."

815.    Again, despite those inquiries, neither the members of the Audit Committee nor any other Defendant investigated the propriety of the loans made to the Officer Defendants or the adequacy of Tyco's disclosures concerning the Individual Defendants' compensation or Defendants' self-dealing transactions.

816.    All of the Defendants also had access to facts that demonstrated that the Individual Defendants had fraudulently secured hefty bonuses for themselves in connection with the Flag Telecom transaction.

817.    As *The New York Times* reported in its September 25, 2002 edition, well before the Board approved the payment of the Flag Telecom bonus on October 1, 2001, Flag had announced that it was unable to raise the money necessary to pay for laying the cable it had hired TyCom to install under the Pacific Ocean.  In addition, by the time of the Board's action, Flag stock was trading well below the price at which the Officer Defendants valued it in calculating Tyco's supposed "gain."  By the time of the Board's approval of the massive Flag Telecom bonuses, Jack Grubman, the Salomon Smith Barney analyst who had been a strong supporter of Flag, had removed his buy recommendation.

818.    Furthermore, throughout much of the time relevant to this action, the Audit Committee Defendants were aware that the SEC was investigating or had investigated Tyco's

accounting practices, particularly those related to the Company's restructuring and merger reserves. Thus, those Defendants should have been particularly attentive to the possibility that the Company's books and records and financial statements contained materially misleading statements. Yet, despite the obvious nature of the fraudulent conduct alleged herein, none of the Audit Committee Defendants raised adequate questions regarding the compensation paid to the Officer Defendants, the related-party transactions in which Tyco engaged or the Company's materially misleading financial statement.

819.    In addition, the fraudulent accounting practices alleged herein – particularly those related to Tyco's acquisition accounting – had long been a topic of market rumors that the Defendants had attempted to squelch by, among other things, assuring investors that Tyco's accounting policies were "conservative." At best, therefore, Defendants remained ignorant concerning accounting fraud that outsiders had long sought to bring to their attention.

820.    The inference that the Tyco Defendants acted with scienter is also strengthened by the obvious nature of many aspects of the fraudulent conduct alleged herein. As is alleged in detail above, Defendants' fraudulent conduct involved hundreds of millions of dollars in fraudulent loans, hundreds of millions of dollars in unauthorized bonus payments, huge, multi-million dollar entries upon the Company's books and records and accounting entries that any objective observer would have recognized were grossly improper.

821.    In fact, many observers have noted the obvious nature of the fraudulent conduct in which the Officer Defendants engaged. For example, *Business Week* stated in a December 23, 2002 article that "the crimes of which [Kozlowski] now stands accused are not a whole lot more complicated than taking bags of cash from an unlocked vault." Similarly, in the March 3, 2003 edition of CFO.com, Thomas Newkirk, the Associate Director of the SEC's Division of

Enforcement, was quoted as stating, "Tyco is stupefying in the grossness of the fraud that took place . . ."

822.    The Officer Defendants were also provided with ready access to detailed financial reporting information that revealed the fraudulent nature of the financial results reported by Tyco.

823.    As the December 8-K acknowledges, Tyco uses a highly sophisticated "Hyperion" system for consolidating its financials.  Tyco's business segments report financial results through the Hyperion accounting system to the corporate level and the Hyperion system produces a consolidated balance sheet and profit and loss statement.  Separate entries are created for "top side" adjustments in Hyperion for each segment and are consolidated into a "Non-Operating Entity" balance sheet and Income Statement.  "Top Side" entries related to a particular segment are then communicated to the segment so that it can reconcile the balances resulting in the consolidation.  Thus, Defendants had available to them the most sophisticated financial tools to produce Tyco's financial statements, but failed miserably to accurately record the Company's results.

**D.    A Strong Inference Of Scienter Is Provided By Defendants' Efforts To Conceal Their Fraudulent Conduct**

824.    The extensive efforts undertaken by the Tyco Defendants to conceal their fraudulent conduct also significantly strengthens the inference that they acted with scienter. After Kozlowski's criminal conduct came to the attention of the Tyco Board, it retained the law firm of Boies, Schiller & Flexner to investigate the Officer Defendants' conduct.

825.    Although Belnick pledged that he would cooperate in that investigation, in fact, he undertook significant efforts to impede its progress.  For example, although Belnick was

informed that the Boies firm would be conducting an investigation on Tyco's behalf, he retained separate counsel of his own choosing to perform the same investigation. He then insisted that the other law firm conduct interviews of Tyco personnel and collect documents before the Boies firm could do so.

826. Despite repeated promises that the Boies firm could participate in those interviews, Belnick failed to provide the Boies firm with access to the Company's personnel or with the documents necessary to conduct its investigation. Indeed, according to the Belnick Complaint, Belnick cancelled a conference call on which his chosen counsel were supposed to brief the Boies firm as to what they had discovered. Belnick also instructed his chosen counsel not to share their information with the Boies firm or permit the Boies firm to participate in interviews except as Belnick might agree on a case-by-case basis.

827. Furthermore, when the Boies firm arrived at Tyco's Boca Raton offices on June 10, 2002 to participate in scheduled interviews of Tyco personnel, they were informed that Belnick had ordered that lawyers from the Boies firm not participate in those interviews. The Boies firm attorneys were informed at that time that Belnick was not, as he had promised he would be, in Boca Raton, but that he was in Tyco's New York offices packing boxes.

828. Belnick also destroyed numerous documents, and attempted to destroy others, after learning of the criminal investigation of Kozlowski's conduct, including the compensation fraudulently secured from Tyco by Kozlowski. Early on the morning of Monday, June 10, 2002, Belnick entered Tyco's New York offices and directed Tyco personnel and others to commence packing boxes with numerous files maintained in the vicinity of his office that belonged to Tyco.

829.     Belnick also deleted folders, files and numerous documents from his computer. Those files included documents related to his compensation and his employment at Tyco, memoranda to Kozlowski and other confidential Tyco documents.

830.     Belnick was aware that the electronic files that he deleted were Tyco property. Indeed, Belnick personally approved a Tyco policy entitled "Standards of Conduct" that was disseminated to all Tyco employees that provided, in pertinent part: "E-mail and other electronic data created, sent or stored on Company property (including data accessed, copied or printed from the Internet) is Company property."

831.     Belnick's conduct in deleting electronic information on June 10, 2002 was a breach of his fiduciary duties to the Company and constituted attempted theft or destruction of Company property that breached his ethical obligations to this client.

832.     Belnick was not successful in having all of the boxes of documents that he had ordered packed removed from Tyco's offices, however.  As a result, on June 10, 2002, Belnick's personal counsel demanded that Tyco return 20 boxes of files packed by Belnick's assistant earlier that morning and that no copies be made of those files.  In response, the Boies firm advised Belnick's personal counsel that it was conducting a review of the relevant documents to determine whether they were business or personal files and that Tyco reserved the right to copy documents as appropriate.

833.     Even after that exchange of correspondence, Belnick's personal counsel continued to demand that the files be returned without copying and further demanded that Tyco's counsel "delete the Quicken program and all of Belnick's financial data on the computer in his office."  Those demands were made although Belnick and his counsel were aware at that

time that both the Manhattan D.A.'s office and the SEC were conducting inquiries regarding Defendants' fraudulent conduct and had issued subpoenas demanding documents from Tyco.

834.    On June 10, 2002, Tyco announced that it had fired Belnick because it had lost confidence in his willingness and ability to conduct a fair investigation of company executives, including Belnick himself.

835.    Kozlowski also destroyed documents concerning his tax evasion after he became aware of the Manhattan D.A.'s investigation of his conduct.  In a criminal proceeding, Kozlowski's secretary testified that he removed certain shipping documents from files that had been subpoenaed by the Manhattan D.A.  As a result, Kozlowski has been indicted for obstruction of justice.

836.    Moreover, the September 8-K states that, "after his violation of the sales tax rules led to the service of a subpoena on the Company, [Kozlowski] caused Tyco not to comply with a subpoena.  Concerned only with protecting his wrongdoing from discovery, he tampered with evidence subject to a subpoena, and risked exposing the Company to an obstruction of justice claim."

837.    Moreover, Defendants' efforts to hide the true state of Tyco's operations from investors long pre-dated the criminal investigations of the Officer Defendants.

838.    According to the September 30, 2002 edition of *The Wall Street Journal*, in 2000, Tyco paid $40 million to settle a lawsuit after the plaintiffs in that action obtained information indicating that U.S. Surgical intentionally slowed revenue growth and wrote off assets before its acquisition by Tyco was completed.

839.    As the *Wall Street Journal* article reported, an internal memoranda between "two former top financial executives of Tyco" discussed the ways that "Tyco would help U.S.

Surgical slow its growth after Tyco agreed to acquire that company, but months before the purchase was completed."  In addition, a former Tyco executive termed Tyco's plan for inflating U.S. Surgical's results "financial engineering."

840.    Defendants also attempted to destroy evidence that demonstrated that the Tyco Compensation Committee was aware of excessive and unauthorized "relocation" loans made to the Officer Defendants.  In that regard, the *Associated Press* reported, in a September 23, 2002 article, that Patricia Prue, a Tyco Human Resources executive, was asked by Tyco director Joshua Berman to improperly doctor the Compensation Committee's minutes to eliminate any discussion of the Board's approval of Belnick's compensation.

841.    Prue refused that request, and memorialized the incident in a June 7, 2002 memo to Swartz and Fort (then acting CEO).  In relevant part, that memo stated:

> As you know, I plan as always to assist you and the board with whatever request you have in conjunction with my role as head of human resources . . . However, as a result of the fact that I was recently pressured by Josh Berman to engage in conduct which I regarded as dishonest – and which refused to do – I will decline to have any personal contact with him in the future.  In addition, I ask that Josh not go to my staff with any requests for information or directions.

842.    Moreover, as is specifically alleged above, Tyco has admitted that Defendants concealed from the SEC "[a] large quantity of documents collected by Tyco and its counsel in connection with the SEC's document request."  That obstruction of the SEC's investigation of Tyco's accounting improprieties provides additional powerful support for inference that Defendants acted with scienter.

**E.    Defendants Either Knew Or Recklessly Failed To Know
        That Tyco's Financial Controls Were Grossly Inadequate**

843.    The inference that Defendants acted with scienter is also significantly strengthened by Tyco's concessions in the September 8-K, the December 8-K and the 2002 10-

K that, at all material times, the Company maintained a grossly inadequate system of internal controls. Indeed, the controls employed by Tyco were so lax that Kozlowski's personal assistant authorized $182,000 in KEL program loans and was authorized by Kozlowski and Swartz to sign any document or request charged against the executive department.

844. Defendants maintained that deficient system of internal controls although the Officer Defendants, the Audit Committee Defendants and the PWC Defendants were all specifically charged with guaranteeing that the Company maintained adequate financial controls and procedures.

845. The September 8-K, the December 8-K and the 2002 10-K repeatedly acknowledge gross deficiencies in Tyco's overall system of internal controls. For example, Tyco conceded that:

a. "current management has concluded that, in the past, the Company in general suffered from poor documentation; inadequate policies and procedures to prevent the misconduct of senior executives that occurred; inadequate procedures for proper corporate authorizations; [and] inadequate approval procedures and documentation";

b. the Company's accounting during the time period relevant to this action exhibited "both a notable lack of documentation supporting the establishment and utilization of reserves and a pattern of aggressive purchase accounting in the application of APB 16";

c. the Company's records exhibited "a notable lack of documentation explaining and justifying both a number of accounting judgments (*e.g.*, the creation of reserves, allocation of the purchase price of acquisitions) and certain corporate governance issues (*e.g.*, uses of corporate assets, approval of employee loans and compensation)";

d.　the Company needed to "adopt accounting controls and procedures which improve the clarity and consistency of its financial statements and which are intended to be neutral as to the timing of the recognition of expenses and revenues . . ."

e.　the Company had to undertake a number of internal control changes to combat its past practice of taking "aggressive approaches in its accounting, including its acquisition accounting, the classification of charges and expenses as non-recurring, amortization and depreciation decisions, recognition of revenue, and capitalization of expenses"; and

f.　the failure of the Company to maintain adequate controls repeatedly resulted in Tyco reversing restructuring and merger-related reserves following further analysis by segment management, a course of events that Tyco admits "suggest[s] that initial entries may not have been fully supported by contemporaneous documentation."

846.　Likewise, Tyco acknowledged in the 2002 10-K that the Company's new management determined that: there were instances in which documentation of important financial reporting matters was substandard; there had been limited review of bonuses and incentive compensation across Tyco; the manner in which former senior management managed Tyco reflected neither a commitment to sound corporate governance nor the processes required to ensure the highest standards of financial integrity and accounting rigor; and the Company's new senior management determined that Tyco's existing policies and standards of approval needed "substantial improvement."

847.　In addition, the December 8-K concedes that the process by which the Tyco Defendants created the Company's consolidated financial statements was marred by numerous control deficiencies.  Specifically, the December 8-K states:

[T]he documentation supporting the consolidation process is limited. Many of the General Accounting and other entries have limited contemporaneous documentary support. In certain instances the support, if any, provides little or no additional documentation than the journal entry itself. Also, much of the documentation was not centrally located. A large portion of the documentation located was maintained throughout Tyco's finance department and not included in Tyco's consolidation binders.

For certain categories, the contemporaneous documentation available often does not provide (i) an adequate description of the entry; (ii) the identification of the Tyco employee who requested or initiated the entry; (iii) the identification of the Tyco employee who prepared the adjustment; and (iv) written approval by management. Written procedures or standard forms for use in the consolidation process do not appear to exist.

848.     In the September 8-K and the December 8-K, Tyco also acknowledged the following facts that demonstrate that the Company's internal controls and procedures for awarding executive compensation, entering related-party transactions, reporting compensation and related-party issues to investors and recording the Company's financial results were grossly deficient:

a.      As is specifically alleged above, Tyco has conceded that: (1) the Officer Defendants were able to abuse the KEL program and Tyco's relocation loan program with impunity over the course of five years or more; and (2) the Officer Defendants and Walsh were able to pay themselves unapproved and grossly excessive compensation without following the procedures supposedly in place at the Company to award executive and director compensation.

b.      Tyco's business segments paid approximately $2.2 million in unauthorized bonuses. Those business segments also paid undocumented bonuses totaling about $6.7 million. In addition, the procedure for authorizing bonuses at the business segments was so flawed that one unit Vice President approved a bonus for the unit's President.

c.     Executives of Tyco's business segments were paid large bonuses totaling $51.7 million that appeared to be the product of overgenerous bonus formulas and that produced bonuses that were disproportionate to the employees' responsibilities. The December 8-K also noted at least four instances where segments changed the bonus formulas as the year progressed, sometimes in ways that appeared to provide bonuses to people who would not otherwise have received a bonus under the pre-existing formula.

d.     Tyco business segments maintained approximately 13 apartments, of which three were for TyCom employees. In at least three cases, no income was imputed to the employees for the use of the apartments.

e.     Tyco's review of Defendants' conduct also caused the Company to discontinue its maintenance of aircraft for use by the business segments. The December 8-K noted that, although logs were maintained as to who used the aircraft and when, there was inadequate documentation of the purposes for which the aircraft was used.

f.     The December 8-K also reported that employees utilized company cars in a manner that was inconsistent with Tyco policy. For example, three employees who had company cars also received car allowances.

g.     Tyco did not have "a formal approval process for making charitable contributions, approving and modifying employee compensation and the use of corporate funds and assets, making and approving employee loans, and making and approving restructuring decisions at the segment or unit level." As a result, Kozlowski was able to utilize the Company's funds to make charitable contributions in his own name and for his own benefit, Tyco's business segments made charitable contributions that were not authorized, and a Tyco

business segment made a $150,000 contribution to an organization that did not qualify as a charity.

       h.     Tyco overstated its 2001 revenue by $41 million and overstated its revenue for the first three quarters of 2002 by $101 million because the Company's EarthTech subsidiary did not have in place adequate measures to eliminate inter- and intra-company revenue during the consolidation process. Such controls are basic and are undeniably essential for a conglomerate such as Tyco that engaged in numerous inter-company transactions.

      849.    Furthermore, following the completion of Tyco's review of the Company's internal controls, Tyco adopted numerous significant changes to its pre-existing accounting controls and procedures that illustrate the gross deficiencies in those controls and procedures. For example:

       a.     Tyco decided to keep only one of the thirteen corporate apartments that the Company had maintained prior to the review.

       b.     The Company discontinued its maintenance of aircraft for use by the business segments.

       c.     The Company was forced to put "[p]rocedures . . . in place to prevent the use of company cars in ways inconsistent with Company policy in the future."

       d.     As a result of the revelation of the fraudulent conduct alleged herein, Tyco's Board was forced to "review[] all of its responsibilities to ensure that it has procedures to assure that it is receiving sufficient information to fulfill its obligations." Among the areas that the Tyco Board recognized it needed to analyze were "all equity compensation plans, compensation programs, and other similar programs with written approval or disapproval." Even prior to the completion of that review, Tyco recognized that the Company needed to

implement a number of improvements to the Company's compensation-related controls and procedures. In that regard, the December 8-K states, "For any delegated responsibilities to committees or officers, the Board will ensure that the delegation fits within certain parameters and that the Board regularly reviews the performance of the committee or officer to whom the responsibility has been delegated. At least annually, the Board and an appropriate committee will review charitable contributions, compensation to officers, loans to employees, and the use of corporate assets. The Board is preparing and will approve detailed written charters for each of the committees of the Board that clearly articulate the committee's duties and responsibilities."

e.      At the Company's ADT unit, Tyco changed the manner in which it accounted for the fees paid by dealers to ADT at the time Tyco purchased customer accounts from those dealers and adopted specific account identification in accounting for customer disconnects.

f.      The Company reduced the amount of expenses that Tyco capitalized in connection with the Company's installation of 1-800 upgrades.

g.      Defendants' abuse of the Company's bonus programs caused Tyco to create company-wide bonus programs, as adapted to the particular needs of individual subsidiaries, that were fixed and that did not authorize special bonuses that were not approved by the Tyco Board or Compensation Committee. In addition, Tyco belatedly standardized personnel policies to prevent unwarranted disparities in compensation levels, bonuses and retention and severance agreements.

h.      Only after Defendants had pillaged Tyco, the Company created a new employee code of conduct and code of conduct for all financial executives.

i.    To combat specific deficiencies in the Company's internal controls, the Company also: (1) formulated a new delegation of authority to govern, among other business processes, the expenditure or commitment of funds; (2) initiated a controllership assessment process to identify the status of key routines and controls; (3) realigned executives' reporting so that the CFOs and General Counsel of Tyco's various business units report directly to the corporate CFO and corporate General Counsel, respectively; (4) required the PWC Defendants to assign additional senior audit partners to Tyco to significantly expand the audit procedures performed by the PWC Defendants; (5) instituted a requirement that the key financial and legal corporate executives of the Company's business units execute representation letters, similar to the CEO and CFO certifications that the SEC requires for companies' financial statements; and (6) instituted detailed operating reviews with the CEO and CFO and each business unit.

j.    To prevent a re-occurrence of the Officer Defendants' fraudulent conduct, the Company centralized all corporate programs, such as relocation programs, travel and expense programs, and loan programs. Pre-existing employee loan programs were eliminated, and the Company stated that, if replaced, those programs would be carefully designed and monitored consistent with applicable law and regulations.

**F.    Defendants Either Knew Or Recklessly Failed To Know That Tyco's Management Encouraged The Manipulation Of The Company's Financial Results**

850.    Tyco has also now conceded that the Company's management created a corporate culture that encouraged the manipulation of the Company's books and records so that the Officer Defendants could announce inflated financial results to the public.

851.    In particular, the December 8-K states that the corporate culture created by the Defendants was characterized by:

a pattern of using aggressive accounting that, even when not erroneous, was undertaken with the purpose and effect of increasing reported results above what they would have been if more conservative accounting were used; pressure on, and inducements to, segment and unit managers to increase current earnings, including by decisions as to what accounting treatment to employ; and a lack of a stated and demonstrable commitment by former senior corporate management to set appropriate standards of ethics, integrity, accounting, and corporate governance.

852. The December 8-K further reported that, "during at least the five years preceding Kozlowski's resignation, Tyco pursued a pattern of aggressive accounting that was intended, within the range of accounting permitted by GAAP, to increase current earnings above what they would have been if a more conservative accounting approach had been followed." The same document acknowledged that "[t]here were also instances where senior management exerted pressure and provided incentives which had the purpose and effect of encouraging unit and segment officers to achieve higher earnings, including in some cases by their choice of accounting treatments."

853. A number of specific documents that were accessible to Defendants provide further support for the conclusion that Defendants encouraged their subordinates to manipulate Tyco's financial results. For example, the December 8-K stated:

> [I]n 1999, a controller for one of the Fire & Security business units prepared and gave a presentation to the subsidiary's operating managers relating to what was entitled "Acquisition Balance Sheet Opportunities." It urged its audience to "be aggressive in determining exposures; determine reserves with worst case scenario; have a strong story to tell regarding each reserve; book the reserves on the acquired company's financial system; use the owner for ideas; improve on your estimates." The presentation also told its audience to "be aggressive in determining the reductions of the asset," and "create stories to back the reductions." With respect to "transitioning the acquired company" by creating reserves to cover one-time costs, the document provided "being aggressive in our estimates will allow us to be aggressive in the cost we apply." It also provided, "keep the reserve descriptions within the accounting rules but stretch the expenditures that go in."

854. The executives to whom this presentation was made recognized their marching orders and the impropriety of those orders. The December 8-K reports that one version of the document contains marginal notations stating, "Be Careful!! — I wouldn't want this to get out." Likewise, following a comment in the presentation that reads, "Severance — if immaterial, our existing business — include fringe at high rate," a handwritten notation states, "I would strongly recommend Never to put this in writing!!"

## G. Additional Facts That Demonstrate That The PWC Defendants Acted With Scienter

### 1. The Facts That Demonstrate That The Tyco Defendants Acted With Scienter Also Create A Strong Inference That The PWC Defendants Did The Same

855. Many of the facts that provide a strong inference that the Tyco Defendants acted with scienter likewise provide a strong inference that the PWC Defendants, who played an integral role in the fraudulent conduct alleged herein, also acted with scienter.

856. Those facts demonstrate that the PWC Defendants ignored numerous red flags that Tyco's financial statements were not prepared in accordance with GAAP. Because those numerous red flags were of such an obvious character, the PWC Defendants either knew of their existence, but nevertheless ignored them, or were grossly reckless in failing to take note of those facts.

857. The fact that the Officer Defendants and Walsh were able to loot Tyco for an extended period of time by making unusual, high-dollar journal entries to multiple accounts in the Company's books and records during a time in which the PWC Defendants had complete access to Tyco's records and key personnel demonstrates that, at a minimum, the PWC Defendants were grossly reckless in failing to notice that misconduct.

858.     In particular, the journal entries made by the Tyco Defendants in connection with the TyCom bonuses, the ADT Automotive bonuses, Walsh's $20 million bonus, the KEL loan program and the Florida and New York Relocation Programs were large in size and obviously improper.  Such flagrant misconduct could not possibly have gone unnoticed had the PWC Defendants performed even the most rudimentary audit procedures.  Indeed, a number of experts in the field are incredulous that the PWC Defendants did not uncover Defendants' fraudulent conduct.

859.     The PWC Defendants' decision to bless the manner in which Tyco accounted for and disclosed the TyCom Bonus payments was particularly egregious.  As is specifically alleged above, the accounting treatment for that bonus that the PWC Defendants approved was patently inappropriate because Tyco hid the multi-million bonus payments in accounts wholly unrelated to officer compensation or the TyCom IPO, which purportedly justified the bonus payments.

860.     Yet, as was reported in a January 3, 2003 article in *The New York Times*, the PWC Defendants relied upon oral assurances from Tyco that a legal opinion obtained from the Company's counsel demonstrated that the $32,976,000 TyCom bonus paid to Kozlowski did not need to be disclosed in the Company's 2001 Proxy Statement.

861.     The PWC Defendants' decision to rely upon that oral representation, rather than insisting that they see a copy of it (no such opinion existed) demonstrates that the PWC Defendants did not maintain the level of professional skepticism required by AU §§ 230, 316, 333 and other GAAS provisions.

862.     Furthermore, the PWC Defendants' failure to recognize that the Company engaged in the numerous accounting manipulations designed to inflate Tyco's reported

financial results that are specifically described above significantly strengthens the inference that the PWC Defendants acted intentionally or with reckless disregard for the falsity of their representations and omissions. Again, many of the journal entries associated with that misconduct by the Tyco Defendants were obvious because of their size and clear impropriety. Thus, any adequately designed audit would have discovered those fraudulent entries.

863.    The fact that Tyco acknowledges that many of the large journal entries through which the Tyco Defendants perpetrated their fraudulent conduct were anonymous, unapproved and inadequately documented further supports the inference that the PWC Defendants acted with scienter.

864.    GAAS, particularly AU §§ 316, 329 and 334, required the PWC Defendants to review accounting records for large, unusual, or nonrecurring transactions or balances, paying particular attention to transactions recognized at or near the end of accounting reporting periods.

865.    Nevertheless, as the December 8-K acknowledges:

For certain categories, the contemporaneous documentation available often does not provide (i) an accurate description of the entry: (ii) the identification of the Tyco employee who requested or initiated the entry (iii) the identification of the Tyco employee who prepared the adjustment and (iv) written approval by management. Written procedures or standard forms for use in the consolidation process do not appear to exist.

866.    It is therefore inconceivable that the PWC Defendants could have audited the Company's financial statements in compliance with GAAS during the period in which Plaintiffs purchased Tyco securities without identifying the fact that many of Tyco's largest journal entries were anonymous, unapproved, and inadequately documented.

867.    Furthermore, the conclusion that the PWC Defendants acted with scienter is strengthened by the fact that, although the Tyco Defendants' fraud involved significant dollar amounts, it was neither sophisticated nor difficult for an auditor to uncover.  Rather, that fraud focused heavily upon large accounting entries in improper accounts that even the most rudimentary audit should have uncovered.  In light of the size and nature of those accounting entries, they should have been readily detected by the PWC Defendants.

868.    In addition, the restructuring and merger reserve entries through which the Tyco Defendants inflated the Company's financial results had long been the subject of concern by the SEC and investors.  Similarly, the SEC and investors had long expressed concerns that Tyco was causing companies that it acquired to manipulate their financial results immediately prior to acquisition in order to spring-load Tyco's post-acquisition financial results.  The PWC Defendants's failure to discover the Tyco Defendants' repeated use of such tactics to inflate the Company's reported results therefore significantly strengthens the inference that the PWC Defendants acted with scienter.

869.    The PWC Defendants' failure to discover and disclose the Tyco Defendants' fraudulent accounting in connection with acquisitions was particularly reckless because, as PWC LLP partner Rick Scalzo stated in a February 18, 2002 letter to defendant Fort that was attached as an exhibit to a Form 8-K filed by Tyco with the SEC, the PWC Defendants were intimately involved with the manner in which Tyco accounted for its acquisitions.

870.    In particular, the Scalzo letter noted that "[o]ne of the areas of [the PWC Defendants'] audit focus on Tyco relates to business combinations."  Furthermore, Scalzo emphasized that, in connection with their work on Tyco acquisitions, the PWC Defendants would: "[r]eview the associated deal costs"; "[e]valuate the Company's overall application of

purchase accounting"; "[o]btain the Company's analysis of consideration with respect to the exchange of shares and stock options/restricted stock"; "[p]erform audit procedures on opening balance sheet of significant acquisitions"; [a]ssess the fair value adjustments recorded by the Company (inventory, A/R, environmental, legal, other long-term commitments, etc.) to the opening balance sheet"; [e]valuate the Company's allocation of purchase price to assets (both tangible and intangible) and liabilities"; "[e]valuate the purchase accounting liabilities recorded by Tyco, if any, including integration plans, severance agreements, facility consolidations, and other long-term obligations (leases)"; and "[e]valuate the audit evidence related to the Company's subsequent spending for the purchase accounting liabilities on a quarterly basis."

871.    As is specifically alleged above, the fraudulent entries in Tyco's financial statements with respect to the Company's acquisitions related to all of the quoted aspects of the PWC Defendants' supposed review of those acquisitions.   The magnitude and extent of the errors the PWC Defendants ignored in performing their audits and reviews of Tyco's financial statements and disclosures to investors therefore provide additional support for the conclusion that the PWC Defendants acted with scienter.

**2.    The Access That The PWC Defendants Had To Facts That Demonstrated The Fraudulent Conduct Alleged Herein Further Strengthens The Inference Of Scienter**

872.    The PWC Defendants' failure to disclose Defendants' fraudulent conduct was particularly egregious because, by virtue of their positions as Tyco's longtime independent accountants, auditors and business consultants, the PWC Defendants had complete access to the files and key employees of the Company at all relevant times.

873.    In light of the fact that the admissions of looting set forth in the September 8-K were based entirely upon documents kept in Tyco's business records, the PWC Defendants' failure to discover and disclose that fraudulent conduct was, at an absolute minimum, grossly reckless.

874.    Moreover, prior to issuing their clean audit opinion with respect to the Company's financial statements, the PWC Defendants had complete access to Tyco's confidential financial, operating and business information.  Documents and information that did or would have revealed the Tyco Defendants' accounting fraud to the PWC Defendants were therefore readily accessible to the PWC Defendants prior to the time that they issued their materially misleading audit opinions.

875.    Furthermore, as is demonstrated by the enormous audit and consulting fees paid by Tyco to the PWC Defendants, those defendants were frequently present at Tyco's headquarters and other offices.  Indeed, the PWC Defendants were integrally involved in the process employed by Tyco to calculate its annual and quarterly financial results, to prepare the disclosures made by Tyco concerning the those results and to prepare the Company's disclosures concerning the compensation paid to the Company's executives and directors and the Company's related-party transactions.

876.    As is specifically alleged above, the Officer Defendants have stated during the course of their criminal proceedings that the PWC Defendants were responsible for preparing the Company's disclosures regarding executive compensation and related-party transactions.

877.    In particular, in a motion filed by Belnick to dismiss the criminal charges brought against him by the Manhattan D.A., Belnick states that he personally apprized the PWC

Defendants that he had received $14 million in "relocation" loans. Nevertheless, the PWC Defendants permitted the Tyco Defendants not to disclose those loans to investors.

878. Furthermore, after conducting a substantial grand jury investigation of the Officer Defendants' misconduct, the lead prosecutor in defendant Kozlowski's New York RICO prosecution has acknowledged that the PWC Defendants were aware of at least some of the improper compensation paid to the Officer Defendants. Despite that knowledge, the PWC Defendants repeatedly caused false disclosures concerning the Officer Defendants' compensation to be made to investors.

879. Moreover, it does not appear that the Officer Defendants undertook any effort to conceal their fraudulent conduct from the PWC Defendants. Tyco has acknowledged in the September 8-K that the loans taken by the Officer Defendants pursuant to the bogus New York and Florida relocation programs and to purchase Belnick's Utah ski chalet were fully disclosed in the Company's internal financial records. Those entries reached well into the tens of millions of dollars and were not disguised in any manner on the Company's financial statements. As a result, they were a glaring red flag that the PWC Defendants either knew of or recklessly disregarded.

880. Similarly, the bogus loans taken by the Officer Defendants pursuant to the Company's KEL loan program were fully disclosed in Tyco's financial records. Those loans were also large in amount, reaching into the hundreds of millions of dollars, and clearly did not conform to the requirements of the KEL program. The PWC Defendants either learned of those loans and disregarded them or designed their audits of the Company's financial statements in such a deficient manner that they did not learn of the hundreds of entries related to those massive loans.

881.    Thus, in violation of their duties under GAAS — particularly their obligations under AU § 316.05 to design their audit to provide reasonable assurance of detecting errors and intentional misstatements and under AU § 230.01 to exercise due professional care in performing their audit — the PWC Defendants either failed to determine that the Tyco Defendants were fraudulently looting Tyco or recklessly disregarded that information.

### 3.    The PWC Defendants Had Strong Motives To Turn Their Backs On The Tyco Defendants' Fraudulent Conduct

882.    The enormous fees paid by Tyco to the PWC Defendants also provided the PWC Defendants with a strong motive to turn their backs on the Tyco Defendants' fraudulent conduct and thereby avoid a confrontation with the executives who were responsible for lining the PWC Defendants' pockets with cash.

883.    Tyco has been a longstanding and significant client of the PWC Defendants and a major source of income for PWC-Bermuda and PWC LLP's Boston office.  Indeed, during Tyco's fiscal 2001, Tyco paid the PWC Defendants $50.1 million in fees, including $37.9 million for consulting, advisory, tax and accounting services and $13.2 million in auditing fees.

884.    In fact, the massive scope of the non-audit work performed by the PWC Defendants for Tyco had caused some professional investors to question the independence of the PWC Defendants from Tyco even before the announcement of Defendants' unlawful conduct.

885.    In that regard, a February 22, 2002 article in *The Boston Globe* noted that the Marco Consulting Group ("Marco"), a Chicago investment consultant holding 6.3 million Tyco shares, urged Tyco to cease hiring the PWC Defendants to perform non-audit services.

In that article, Marco consultant Greg Kincszewski was quoted as stating, "This has to raise a question, how independent is the audit?"

### 4. The PWC Defendants Had Discovered Improper Accounting By The Tyco Defendants But Permitted Them Not To Adjust The Company's Reported Financial Results

886. The inference that the PWC Defendants acted with scienter is also strengthened by Tyco's concessions that the PWC Defendants had uncovered inappropriate accounting at Tyco in the past, but had not required the Company to correct those errors. Specifically, Tyco concedes in the 2002 10-K that it has "identified several adjustments" that the PWC Defendants proposed to make during its year-end audits but which Tyco never recorded. For example, prior to fiscal 2000, the PWC Defendants identified and proposed adjustments to Tyco's financial statements for improper "adjustments" to Tyco's acquisition reserves that overstated Tyco's reported income by a net amount of $22.7 million.

887. Likewise, Tyco concedes in the 2002 10-K that it has "identified several adjustments" that the PWC Defendants proposed to make during their year-end audit of Tyco's 2001 financial statements, but which Tyco never recorded. In fiscal 2001, the PWC Defendants identified and proposed adjustments to Tyco's financial statements for improper "adjustments" to Tyco's acquisition reserves that overstated Tyco's reported income by a net amount of $26.4 million.

### 5. The PWC Defendants' Failure To Comply With Additional GAAP And GAAS Requirements Strengthens The Inference That They Acted With Scienter

888. The PWC Defendants' scienter is also demonstrated by their obvious failure to comply with additional basic GAAP and GAAS principles in constructing their audits of Tyco's financial statements and in issuing their materially false and misleading audit reports.

889.     Numerous GAAP and GAAS provisions emphasize the great significance of disclosing related-party transactions to shareholders.  For example, AU § 325 required the PWC Defendants to report to the Company's Board or Audit Committee the numerous undisclosed related-party transactions in which the Officer Defendants engaged with the Company and FASB Statement No. 57 required the disclosure of all of the Company's related-party transactions in its financial statements.

890.     In addition, AU § 334 sets forth specific steps that auditors should follow in assessing related-party transactions.  For example, AU § 334 suggests that auditors should: consider the controls a company has in place with respect to management conduct; assess the supposed business purpose served by related-party transactions; review all documentation related to those transactions; review SEC filings disclosing such transactions; consider whether transactions are occurring, but are not being reflected on the issuer's books and records; determine whether the issuer's Board has approved the transactions; and assess the reasonableness of any amounts disclosed or considered for disclosure.

891.     Had the PWC Defendants followed those required steps, they could not have remained ignorant of: Tyco's grossly deficient internal controls; the fact that the Tyco Defendants were fleecing the Company; the failure of the Board to approve the grossly excessive compensation paid to the Officer Defendants and Walsh; or the absence of any legitimate business purpose for the related-party transactions in which the Tyco Defendants engaged.

892.     Furthermore, in light of the Tyco Defendants' failure to disclose material related-party transactions in the Company's financial statements, the PWC Defendants were obligated to expand the scope of their audit of Tyco by AU § 331, which provides that "conditions that

may require extension or modification of audit tests" include "the existence of related party transactions."

## X.

### DEFENDANTS' MATERIALLY FALSE REPRESENTATIONS AND OMISSIONS AND UNLAWFUL COURSE OF CONDUCT WERE THE CAUSE OF PLAINTIFFS' DAMAGES

893.    As described herein, Defendants made or caused to be made a series of false statements and failed to disclose various material information concerning Tyco's operations, financial results and the compensation paid to the Officer Defendants and Walsh.  In addition, Defendants engaged in a unlawful course of conduct that had the effect of causing Tyco stock to trade at inflated values at all relevant times.

894.    Defendants' materially false and misleading disclosures and unlawful course of conduct were highly material to investors in Tyco securities.

895.    In particular, the disclosures concerning the compensation paid to the Officer Defendants and Walsh and the unlawful course of conduct in which Defendants engaged in connection with such matters were material because of the absolute amount of the money that the Officer Defendants and Walsh looted from the Company.

896.    More importantly, Defendants' materially misleading statements concerning their compensation and unlawful course of conduct were critical to investors because, as absentee owners of Tyco, shareholders must repose substantial trust in the integrity of Tyco's management and auditors to perform their obligations in the best interests of shareholders. Any breach of that trust – such as the payment of excessive, undisclosed compensation to corporate fiduciaries or the commission of criminal conduct by a company's officers and directors – is therefore highly material to investors.

897.    Defendants' representations concerning Tyco's financial results and accounting practices and policies and the unlawful course of conduct in which Defendants engaged in connection with such matters were also material to investors because Tyco securities traded at premium values based upon the market's perception that the Company was producing revenue and earnings growth through superior management of Tyco's businesses and acquisitions.

898.    As a result, at all material times, Defendants' materially misleading disclosures and omissions and the unlawful course of conduct in which they engaged during the time period in which Plaintiffs invested in Tyco securities had the effect of either inflating the market price of those securities or of maintaining the prices of those securities at values at which they would not have traded had the truth concerning the Company's operations been disclosed to investors.

899.    Defendants' false portrayal of Tyco's business operations and unlawful course of conduct resulted in Plaintiffs purchasing Tyco securities at prices significantly in excess of the actual value of those securities.

900.    Plaintiffs would not have purchased Tyco securities at the prices that prevailed at the time of their purchases, if at all, had they been aware of the true facts concerning the Company's business operations, excessive executive compensation payments and other unlawful conduct.

901.    When the market determined the true status of Tyco's operations and the conduct in which Defendants had engaged, the prices of the Company's securities declined substantially in value, thereby imposing many millions of dollars of losses upon Plaintiffs and the public employees, pensioners and school children who are the beneficiaries of the Plaintiff funds.

902.    Accordingly, the material misrepresentations, omissions, acts, practices and schemes alleged herein were the proximate causes of the damages sustained by Plaintiffs in connection with their purchases of Tyco's securities.

## XI.

## NO SAFE HARBOR

903.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the misrepresentations or omissions alleged herein.

904.    Defendants did not adequately identify any of the misrepresentations alleged herein as "forward-looking statements" at the time those representations were made.

905.    Furthermore, those representations were not accompanied by meaningful cautionary language identifying important factors that could cause actual results to differ materially from those in the specific statements.

906.    To the extent that the statutory safe harbor could apply to any of the misrepresentations pleaded herein, those statements are actionable because, at the time those representations were made, the speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was made by or with the approval of an executive officer of Tyco who knew that the statement was false or misleading.

## XII.

## NEW JERSEY RICO ALLEGATIONS

907.    In part, Plaintiffs are entitled to relief in this action by virtue of the violations of the New Jersey RICO statute, N.J.S.A. 2C:41-1 *et seq.*, committed by defendants Tyco, Kozlowski, Swartz, Belnick, Walsh, PWC LLP and PWC-Bermuda (the "RICO Defendants"). That misconduct was committed pursuant to a common scheme that each of the RICO

Defendants agreed to pursue through the commission of multiple predicate acts of mail fraud, wire fraud and acts of fraud in the offering, sale or purchase of securities in violation of N.J.S.A. 2C:41-1(p).

908.    The RICO Defendants operated two RICO enterprises during the time frame relevant to this action: (a) Tyco (the "Tyco Enterprise"); and (b) an association in fact among the RICO Defendants (the "Compensation Enterprise").

909.    Both the Tyco Enterprise and the Compensation Enterprise operated continuously from no later than 1997 through at least June 2002, when Kozlowski resigned in shame as Tyco's Chairman and CEO.  During their course of the operation of the Tyco Enterprise and the Compensation Enterprise, the RICO Defendants defrauded thousands of investors in Tyco securities.

910.    The Officer Defendants and Walsh (the "Individual RICO Defendants") operated the Tyco RICO Enterprise through their roles as officers, directors and controlling persons of the Company.  Through their operation of the Tyco Enterprise, the Individual RICO Defendants unlawfully enriched themselves by engaging in numerous predicate acts designed to improperly inflate their compensation.  The Individual RICO Defendants operated and exercised control over the operations of the Tyco Enterprise by, *inter alia*, causing the Company to pay them bonuses, to lend them money, to forgive their loans, to make false disclosures concerning such matters to investors and to conceal such information from the public.

911.    Kozlowski served as the leader of the Tyco Enterprise by virtue of his positions as Chairman and CEO of the Company.  Swartz played an integral role in the Tyco Enterprise as the Company's CFO and a Tyco director.  In his role as CFO, Swartz was responsible for

monitoring the payment of the unlawful compensation provided to the Individual RICO Defendants and for supervising the Company's disclosures regarding such matters. Belnick played an integral role in the operation and control of the Tyco Enterprise as a result of his position as the Company's General Counsel. In that position, Belnick was charged with guaranteeing that Tyco did not disclose that the compensation paid to the Officer Defendants and Walsh failed to comply with the policies adopted by the Tyco Board and that the Officer Defendants and Walsh had engaged in other criminal misconduct. Walsh served as Tyco's Lead Director, and in that position facilitated the Officer Defendants' efforts to enrich themselves at the expense of Tyco investors by permitting the Officer Defendants to conceal their excessive compensation, failure to comply with Tyco's compensation policies and other criminal conduct from investors. As a member of the Tyco Enterprise, Walsh also introduced Tyco to CIT as an acquisition candidate and caused Tyco to pay him an unlawful $20 million fee in connection with that transaction.

912. All of the RICO Defendants jointly participated in the operation of the Compensation Enterprise, which was an association in fact of the RICO Defendants designed to inflate the compensation of the Individual RICO Defendants and the fees earned from Tyco by the PWC Defendants. In connection with the Compensation Enterprise, the RICO Defendants made regular filings with the SEC that were materially false and misleading, arranged for the payment of the excessive compensation paid to the Officer Defendants and Walsh and arranged for the PWC Defendants to receive enormous fees for auditing Tyco and for performing consulting work for the Company.

913. The Individual RICO Defendants played the same role in the Compensation Enterprise that they played in the Tyco Enterprise. Tyco, through its agents, the Individual

RICO Defendants, was ultimately responsible for making the materially false and misleading representations and omissions that were the focus of the Compensation Enterprise. In connection with the Compensation Enterprise, the PWC Defendants played a controlling role in designing the disclosures made by all of the Defendants concerning the compensation paid to the Officer Defendants and Walsh and the additional criminal conduct committed by those Defendants. The PWC Defendants drafted many of the charts and other disclosures that informed investors of such matters, and no disclosures regarding the compensation paid to the Officer Defendants were made without the acquiescence and approval of the PWC Defendants. The PWC Defendants capitalized upon the existence of the Compensation Enterprise by obtaining tens of millions of dollars in auditing and consulting fees from Tyco each year.

914. As the RICO Defendants agreed to do, each of them committed numerous predicate acts in furtherance of their unlawful scheme to increase the compensation paid to them. Those predicate acts included numerous acts of fraud in the offering, sale or purchase of securities in violation of N.J.S.A. 2C:41-1(p). Each materially false and misleading representation and omission made by the RICO Defendants concerning the compensation paid to the Officer Defendants and Walsh, Tyco's related-party transactions and the additional criminal conduct committed by the Officer Defendants and Walsh constituted a separate act of fraud in the offering, sale or purchase of securities in violation of N.J.S.A. 2C:41-1(p).

915. In addition, the RICO Defendants committed numerous acts of mail fraud and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343, respectively. As is specifically alleged above, the RICO Defendants engaged in a scheme to defraud investors and in furtherance of this scheme the RICO Defendants caused numerous documents concerning the compensation paid to the Officer Defendants and Walsh, the additional criminal conduct in which those

Defendants engaged and Tyco's related-party transactions to be filed with the SEC and disseminated to investors with the approval and acquiescence of the PWC Defendants. The RICO Defendants knew that those documents were materially false at the time they caused them to be filed with the SEC and disclosed to investors. The RICO Defendants nevertheless caused those documents to be filed with the SEC to advance the interests of their common scheme to enrich themselves at the expense of Tyco investors. The filing of each of those materially false and misleading documents with the SEC constituted a separate act of wire fraud because those filings were made electronically by means of the SEC's EDGAR system. Prior to the filing of each of those fraudulent documents with the SEC, each of the RICO Defendants authorized the dissemination of the materially misleading information contained therein to be filed with the SEC and disclosed to investors.

916. Furthermore, the RICO Defendants committed numerous acts of mail fraud by authorizing Tyco to distribute to investors materially false and misleading disclosures. In particular, each of the Proxy Statements and Annual Reports in which Defendants made materially false and misleading representations concerning, *inter alia*, the compensation paid to the Officer Defendants and Walsh, the criminal conduct in which those Defendants engaged and Tyco's related-party transactions was mailed to all of the Company's shareholders at or about the times specified above with the knowledge, approval and acquiescence of each of the RICO Defendants. In addition, throughout the time period relevant to this action, Tyco has maintained a policy of mailing to shareholders or potential investors any SEC filing that they request. The RICO Defendants knew that those documents were false at the time they caused them to be mailed and did so to advance the interests of their common scheme to enrich themselves at the expense of Tyco investors. Thus, each time Tyco mailed to any investor an

SEC filing concerning the compensation paid to the Officer Defendants or Walsh, the criminal conduct in which those Defendants engaged or Tyco's related-party transactions constituted a separate act of mail fraud and a separate act of fraud in the offering, sale or purchase of securities in violation of N.J.S.A. 2C:41-1(p).

917.    In connection with their insider selling of Tyco stock, the Individual RICO Defendants also committed numerous predicate acts of mail fraud, wire fraud and fraud in the offering, sale or purchase of securities in violation of N.J.S.A. 2C:41-1(p). In connection with each of their insider sales detailed above, and in furtherance of their fraudulent scheme, the Individual RICO Defendants delivered electronic or telephonic instructions that those shares be sold on or about the date on which the sales were sold. At the time they delivered those instructions, the Individual RICO Defendants knew that they possessed adverse material information concerning Tyco. Nevertheless, the Individual RICO Defendants caused their shares of Tyco stock to be sold without disclosing that adverse information to advance the RICO Defendants' common scheme to enrich themselves at the expense of Tyco investors. Each of the instructions delivered by the Individual RICO Defendants to make those insider sales constituted a separate act of wire fraud and a separate act of fraud in the offering, sale or purchase of securities in violation of N.J.S.A. 2C:41-1(p).

918.    In addition, on or about the dates of their insider sales, the Individual RICO Defendants caused the proceeds of their sales to be transferred to them by wire or other electronic means. At the time they collected those proceeds, the Individual RICO Defendants knew that they had generated those proceeds by defrauding Tyco investors. Nevertheless, the Individual RICO Defendants collected the proceeds without disclosing the material adverse information known to them in order to advance their common scheme to enrich themselves at

the expense of Tyco investors.   Each of the transactions in which the Individual RICO Defendants received the proceeds of their insider selling therefore constituted a separate act of wire fraud and a separate act of fraud in the offering, sale or purchase of securities in violation of N.J.S.A. 2C:41-1(p).

919.    In reliance upon the accuracy and completeness of the disclosures made by the RICO Defendants concerning the compensation paid to the Officer Defendants and Walsh, the criminal conduct in which those Defendants engaged and Tyco's related-party transactions, Plaintiffs purchased Tyco common stock and refrained from selling that stock.  As a direct and proximate result of the RICO Defendants' pattern of mail fraud, wire fraud and acts of fraud in the offering, sale or purchase of securities in violation of N.J.S.A. 2C:41-1(p), Plaintiffs suffered substantial losses to their property, *i.e.*, they purchased shares of Tyco stock at prices that were artificially inflated a result of the RICO Defendants' fraudulent conduct.

## XIII.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### (Violations of § 10(b) of the Exchange Act Against All Defendants)

920.    Plaintiffs repeat and reallege each of the foregoing allegations as if fully set forth herein.  This cause of action is asserted against all Defendants.

921.    Defendants, individually and in concert, engaged in a plan, scheme and course of conduct, pursuant to which they knowingly and/or recklessly engaged in acts, transactions, practices, and courses of business which operated as a fraud upon Plaintiffs.

922. Defendants perpetrated this fraudulent scheme by making various representations that were false or which omitted material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading.

923. Defendants were obligated to supplement and update the disclosures that they made because: (a) they voluntarily made materially misleading statements; (b) the Tyco Defendants sold large amounts of securities to the public while they were in possession of material, adverse information concerning the Company's operations; and (c) such disclosures were mandated by SEC regulations, including Item 303 of SEC Regulation S-K.

924. Defendants had actual knowledge that the statements specifically alleged above were materially false and misleading and that additional disclosures were necessary to correct the misleading effect of their statements. In the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain that their statements were materially false and misleading and/or lacking in reasonable basis at all relevant times.

925. As a direct and proximate result of the foregoing material misrepresentations and omissions and Defendants' fraudulent course of conduct, the market prices of Tyco common stock were artificially inflated throughout the period in which Plaintiffs purchased those securities.

926. In ignorance of the materially misleading and/or incomplete nature of the representations made by Defendants, Plaintiffs relied to their detriment upon the accuracy and completeness of those statements and/or upon the integrity and efficiency of the market for Tyco common stock.

927. Plaintiffs would not have purchased Tyco securities at the market prices that prevailed during the relevant period, if at all, had they been aware of the true facts concerning

the Company's financial results, the compensation paid to the Company's executive officers and directors, the Company's related-party transactions and Defendants' other unlawful conduct.

928. The market price of Tyco's common stock declined materially as investors belatedly learned the adverse facts that had been concealed and misrepresented by Defendants during the relevant period. Plaintiffs have therefore suffered substantial damages as a direct and proximate result of Defendants' misconduct.

929. By reason of the foregoing, Defendants knowingly or recklessly violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they: (a) employed devices, schemes and artifices to defraud; (b) made material misrepresentations of fact and failed to disclose material facts necessary in order to make their statements, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs in connection with their purchases of Tyco securities during the relevant period.

930. Plaintiffs are therefore entitled to damages in an amount to be determined at trial.

## SECOND CAUSE OF ACTION

### (Against the Individual Defendants for Violations of § 20(a) of the Exchange Act)

931. Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein. This cause of action is asserted against the Individual Defendants.

932. As is particularized above, the Individual Defendants were "controlling persons" of the Company within the meaning of § 20(a) of the Exchange Act.

933. The Individual Defendants qualify as "controlling persons" because they had the power to cause Tyco to engage in the unlawful conduct complained of herein and because they

could have prevented the unlawful conduct that Plaintiffs allege. The Individual Defendants, by virtue of their positions as officers and directors of Tyco, had the power to influence and control, and did so influence and control, the acts and conduct of Tyco. In particular, the Individual Defendants had the power and influence to direct Tyco to disclose the true facts concerning Tyco's financial results, the nature and amount of executive compensation received by the Company's officers and directors and the Company's related-party transactions throughout the relevant period.

934. Because each of the Individual Defendants is a "controlling person" of Tyco and the other Individual Defendants, each of whom is a person who has committed violations of Section 10(b) of the Exchange Act, the Individual Defendants are secondarily liable for those primary violations pursuant to Section 20(a) of the Exchange Act.

935. Plaintiffs are therefore entitled to damages in an amount to be determined at trial.

### THIRD CAUSE OF ACTION

**(Violation of Section 20A of the Exchange Act Against
Defendants Kozlowski, Swartz, Walsh and Fort)**

936. Plaintiffs hereby incorporate by reference the foregoing allegations as if fully set forth herein.

937. As is set forth in the chart attached hereto as Exhibit G, Plaintiffs purchased Tyco common stock contemporaneously with sales of Tyco stock by Defendants Kozlowski, Swartz, Walsh and Fort (the "Insider Trading Defendants").

938. By virtue of their positions as senior officers and directors of Tyco, the Insider Trading Defendants were in possession of material, non-public information about the

Company at the time of their collective sales of more than $728 million of their own Tyco stock to Plaintiffs and other investors in Tyco stock.

939.    By virtue of their participation in the scheme to defraud investors described herein, and their sales of Tyco stock while in possession of adverse, material, non-public information concerning their conduct and Tyco's operations, the Insider Trading Defendants violated the Exchange Act and applicable rules and regulations thereunder.

940.    Plaintiffs have suffered substantial damages in that they paid artificially inflated prices for Tyco stock as a result of the Insider Trading Defendants' securities law violations.

941.    Plaintiffs would not have invested in Tyco common stock at the prices they paid for those securities, if at all, had it not been for the Insider Trading Defendants' violations of the federal securities laws.

942.    Thus, because the Insider Trading Defendants have violated § 20A of the Exchange Act, they are required to account for all such stock sales and to disgorge their profits or ill-gotten gains.

943.    Plaintiffs are therefore entitled to damages in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION

**(Against the Tyco Defendants For Violations of Section 14(a)
of the Exchange Act and Rule 14a-9 Promulgated Thereunder)**

944.    Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein, except those allegations that state that any of the Defendants acted in a fraudulent manner. This cause of action does not sound in fraud.

945.    The Tyco Defendants caused to be issued or permitted and acquiesced in or controlled the issuance of Tyco's 1998-2002 Proxy Statements.

946.     Those Proxy Statements contained materially false and misleading representations and failed to disclose material information concerning, among other things, the Officer Defendants' compensation, Tyco's related-party transactions and the Tyco KEL program.

947.     Utilizing those materially false and misleading disclosures, the Tyco Defendants solicited proxies from Plaintiffs and other investors in Tyco stock.  The Tyco Defendants' misrepresentations and omissions were an essential link in soliciting shareholder approval of, among other matters, the election of directors to the Tyco Board and the selection of the PWC Defendants as Tyco's auditors.

948.     By reason of the conduct alleged herein, the Tyco Defendants violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

949.     As a direct and proximate result of the Tyco Defendants' violations as described above, Plaintiffs have sustained damages in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION

### (Against All Defendants Except Belnick for Violation of § 11 Of the Securities Act of 1933)

950.     Plaintiffs repeat and reallege each of the foregoing allegations as if fully set forth herein, except any allegation that Defendants acted in a fraudulent manner or with scienter.

951.     This claim is asserted against all of the Defendants except Belnick for violations of § 11 of the Securities Act of 1933 ("Securities Act").

952.     Defendant Tyco was the issuer of the shares of Tyco common stock purchased or otherwise acquired by Plaintiffs in connection with the following Registration Statements:

the March 2001 CIT S-4; the April 2001 CIT S-4/A; the May 2001 Post-Effective Amendment; the July 2000 Mallinckrodt S-4; the August 2000 Mallinckrodt S-4/A; a June 11, 1999 S-4 filed in connection with Tyco's acquisition of Raychem Corp.; and a July 1, 1999 S-4/A filed in connection with the Raychem acquisition.

953.    All of the Defendants except Belnick issued, caused to be issued and participated in the issuance of materially false and misleading written statements to Plaintiffs that were contained in the Registration Statements, which misrepresented or failed to disclose, among other things, the facts set forth above.  By virtue of this conduct each of those Defendants violated, and/or controlled a person who violated, Section 11 of the 1933 Act.

954.    Kozlowski, Swartz, Walsh and the Audit Committee Defendants were all directors of Tyco at the time that the materially false and misleading Registration Statements identified above pursuant to which shares of Tyco were issued to the public became effective. All of those Defendants signed the Registration Statements filed with the SEC by Tyco during their tenures as directors of that entity.

955.    By virtue of their status as the issuers of shares of Tyco, or as the directors of Tyco, or as the accounting firms who certified the financial statements of Tyco included in such Registration Statements, the Defendants named in this cause of action were responsible for assuring the completeness and accuracy of the disclosures made in the Registration Statements, or in the case of the accounting firms, the completeness and accuracy of the disclosures made in the financial statements, including any notes thereto.

956.    The Registration Statements pursuant to which shares of Tyco were issued to the public (including the Prospectuses that were incorporated by reference therein) contained

untrue statements of material fact and failed to state material facts required to be stated therein or which were necessary to make the statements therein not misleading.

957.     The Defendants named in this cause of action cannot sustain the burden of demonstrating: (a) that they were without knowledge of the facts that show that the Registration Statements were materially misleading; or (b) that they had reasonable grounds to believe that the Registration Statements were accurate and complete in all material respects.

958.     At the time that they purchased shares in Tyco pursuant to the Registration Statements identified above, Plaintiffs were without knowledge of the wrongful conduct alleged herein and could not have reasonably discovered the wrongdoing that they now allege.

959.     Plaintiffs have sustained damages as a direct and proximate result of the misrepresentations and omissions made by the Defendants named in this caused of action.

960.     Less than one year elapsed from the time that Plaintiffs discovered or reasonably could have discovered the facts upon which their claims are based and the time that this action was commenced.

961.     Moreover, less than three years elapsed from the time that the securities to which this cause of action relates were <u>bona</u> <u>fide</u> offered to the public and the time that a class action asserting this claim on behalf of all of the Plaintiffs was commenced.

962.     Accordingly, Plaintiffs are entitled to damages as a result of the violations of § 11 of the Securities Act committed by the Defendants named in this cause of action.

**SIXTH CAUSE OF ACTION**

**(Against Tyco for Violation Of Section 12(a)(2) Of The Securities Act)**

963. Plaintiffs repeat and reallege each of the foregoing allegations as if fully set forth herein, except any allegation that Defendants acted in a fraudulent manner or with scienter.

964. Plaintiffs bring this cause of action against the Tyco for violations of § 12(a)(2) of the Securities Act.

965. Tyco offered or sold shares to Plaintiffs by means of the following Prospectuses: the April 2001 CIT Prospectus; August 2000 Mallinckrodt Prospectus; and the July 14, 1999 Raychem Prospectus.

966. Tyco owed Plaintiffs a duty to make a reasonable and diligent investigation of the statements contained in the Tyco Prospectuses to ensure that those statements were true and that the Prospectuses did not fail to disclose material facts required to be stated in order to make the statements contained in the Prospectuses not misleading.

967. As is alleged in detail above, the Prospectuses issued by Tyco were materially inaccurate and misleading, contained untrue statements of material fact, omitted to state other facts necessary to make the statements made in the Prospectuses not misleading, and concealed and failed adequately to disclose material facts.

968. Tyco cannot sustain the burden of proving that it was unaware of, or, in the exercise of reasonable care, could not have known of, the false and misleading statements included in the  Prospectuses.

969. Plaintiffs purchased shares of Tyco pursuant to the defective Prospectuses.

970. Plaintiffs did not know and, in the exercise of reasonable diligence, could not have known, that Tyco's Prospectuses contained materially false and misleading statements.

971.     Less than one year elapsed from the time that Plaintiffs discovered or reasonably could have discovered the facts upon which their claims are based and the time that this action was commenced.

972.     Moreover, less than three years elapsed from the time that the securities to which this cause of action relates were bona fide offered to the public and the time that a class action asserting this claim on behalf of all of the Plaintiffs was commenced.

973.     Accordingly, Plaintiffs are entitled to damages as a result of the violations of § 12(a)(2) of the Securities Act committed by Tyco.

### SEVENTH CAUSE OF ACTION

### (Against the Individual Defendants For
### Violation of Section 15 of the Securities Act)

974.     Plaintiffs repeat and reallege the foregoing allegations as if set forth in full herein, except any allegation that Defendants acted in a fraudulent manner or with scienter.

975.     This claim is asserted against the Individual Defendants for violations of § 15 of the Securities Act.

976.     As is specifically alleged above, the Tyco Defendants and others violated §§ 11 and/or 12(a)(2) of the Securities Act.

977.     The Individual Defendants were control persons (as that term is utilized in § 15 of the Securities Act) of Tyco at all material times by virtue of their positions as directors and/or senior officers of Tyco.

978.     The Individual Defendants cannot sustain the burden of proving: (a) that they had no knowledge of the facts that demonstrate that Tyco's Registration Statements and Prospectuses were materially misleading; or (b) that they had reasonable grounds to believe

that Tyco's Registration Statements and Prospectuses were accurate and complete in all material respects.

979. Each of the Individual Defendants was a culpable participant in the violations of §§ 11 and 12(a)(2) of the 1933 Act alleged in the Fifth and Sixth Causes of Action above, based on their having signed or participated in the preparation and/or dissemination of the Registration Statements and Prospectuses pursuant to which Plaintiffs purchased Tyco securities or having otherwise participated in the process that allowed those offerings to be successfully completed.

980. Thus, the Individual Defendants have violated § 15 of the Securities Act and are jointly and severally liable with the remaining Defendants for the damages suffered by Plaintiffs in connection with Defendants' violations of §§ 11 and 12 of the Securities Act.

## EIGHTH CAUSE OF ACTION

### (Against All Defendants for Common Law Fraud)

981. Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein. This cause of action is asserted against all Defendants.

982. As particularized above, Defendants knowingly or with conscious indifference to the truth and with fraudulent intent made and participated in the making of misrepresentations of material facts concerning, among other things, Tyco's financial results, the Company's related-party transactions and the nature and amounts of compensation paid to officers and directors of the Company. In addition, Defendants knowingly or with conscious indifference to the truth and with fraudulent intent failed to disclose or fraudulently concealed the true facts relating thereto. These misrepresentations and omissions were made directly and/or indirectly to Plaintiffs prior to their investments in the Company.

-267-

983.     Plaintiffs honestly believed Defendants' misrepresentations.

984.     In reasonable reliance on those representations, and as a result of Defendants' failure to disclose and fraudulent concealment of the true facts, Plaintiffs purchased and/or acquired Tyco securities.

985.     As a direct and proximate result of the fraudulent conduct of Defendants, Plaintiffs have sustained damages in an amount to be proven at trial.

## NINTH CAUSE OF ACTION

### (Against All Defendants for Aiding and Abetting Common Law Fraud)

986.     Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.  This cause of action is asserted against all Defendants.

987.     As set forth above, Defendants intentionally and knowingly defrauded Plaintiffs by misrepresenting and concealing material facts concerning, among other things, the Officer Defendants' compensation, Tyco's reported financial results and the Company's related-party transactions.  Those misrepresentations and omissions were designed to and did induce Plaintiffs to purchase and/or acquire Tyco securities.

988.     Each of the Defendants knew of the misrepresentations and omissions described above and knowingly, recklessly, and intentionally rendered substantial assistance and aided and abetted the perpetration of the fraudulent scheme alleged herein.

989.     As a direct and proximate result of the conduct of each of the Defendants, as described above, Plaintiffs were induced to purchase and/or acquire Tyco securities and have sustained damages in an amount to be determined at trial.

## TENTH CAUSE OF ACTION

### (Against All Defendants for Conspiracy to Commit Fraud)

990. Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein. This cause of action is asserted against all Defendants.

991. In committing the wrongful acts alleged herein, Defendants have pursued a common course of conduct, have acted in concert with and have conspired and agreed with one another in furtherance of their common plan, scheme and design to injure Plaintiffs.

992. Defendants initiated and/or joined in a course of conduct that was designed to and did: (i) deceive Plaintiffs regarding the nature and amount of executive compensation received by officers and directors of the Company, the Company's related-party transactions and Tyco's financial results; (ii) artificially inflate the market price of Tyco's common stock; (iii) cause Plaintiffs to purchase and/or acquire Tyco securities at artificially inflated prices; and (iv) enrich Defendants at the expense of Plaintiffs and other investors in Tyco securities. In furtherance of this plan, conspiracy and course of conduct, Defendants took the actions set forth herein, all of which constitute overt acts resulting in damage to Plaintiffs.

993. As a direct and proximate result of Defendants' acts of conspiracy, as described above, Plaintiffs have sustained damages in an amount to be determined at trial.

## ELEVENTH CAUSE OF ACTION

### (Against all Defendants for Negligent Misrepresentation)

994. Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein, except those allegations that state that any of the Defendants acted in a fraudulent manner. This cause of action does not sound in fraud.

995. In making the misrepresentations and omissions alleged herein, Defendants acted without any reasonable grounds for believing the representations they made to be true.

Had Defendants employed due care, Defendants would have discovered and known of their misstatements and omissions.

996.    The misrepresentations made by Defendants as described herein were made directly and/or indirectly to Plaintiffs prior to their investments in the Company.

997.    Defendants owed Plaintiffs a duty of reasonable care and knew, or should have known, that in purchasing and/or acquiring Tyco securities, Plaintiffs would rely upon each of the Defendants' acts, practices, misrepresentations, omissions and violations and other wrongs complained of above.

998.    Plaintiffs actually, reasonably, foreseeably and justifiably relied upon each of the acts, practices, misrepresentations, omissions, violations and other wrongs complained of above, in purchasing and/or acquiring Tyco securities.

999.    As a direct and proximate result of the conduct of each of the Defendants, as described above, Plaintiffs were induced to purchase and/or acquire Tyco securities and have sustained damages in an amount to be determined at trial.

## TWELFTH CAUSE OF ACTION

### (Against the Individual Defendants for Breaches of Fiduciary Duties)

1000.    Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.  This cause of action is asserted against the Individual Defendants.

1001.    At all relevant times, the Individual Defendants owed Plaintiffs fiduciary duties of due care, candor and good faith and were obligated to make full and complete disclosure with regard to all relevant and material information in their possession and control.   As described above, the Individual Defendants breached those fiduciary duties by misrepresenting and failing to disclose material information during the relevant period regarding, among other

things, Tyco's financial results and related-party transactions and the nature and amounts of compensation received by executive officers of the Company, including the Officer Defendants. By virtue of those misrepresentations and omissions, and in reliance thereon, Plaintiffs were induced to and did purchase, acquire and/or retain Tyco securities during the relevant period.

1002.   As a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, as described above, Plaintiffs have sustained damages in an amount to be determined at trial.

### THIRTEENTH CAUSE OF ACTION

**(Against the Individual Defendants and the PWC Defendants for Aiding and Abetting the Individual Defendants' Breaches of Their Fiduciary Obligations)**

1003.   Plaintiffs hereby incorporate by reference each of the foregoing allegations as if fully set forth herein.

1004.   As is alleged above, the Individual Defendants breached their fiduciary obligations of dues care, loyalty and candor to Plaintiffs.

1005.   The PWC Defendants and the Individual Defendants were aware that the Individual Defendants owed those fiduciary obligations to Plaintiffs.

1006.   In addition, the Individual Defendants and the PWC Defendants knowingly and substantially assisted the Individual Defendants in breaching those fiduciary obligations by making the material misrepresentations alleged herein, failing to disclose the misconduct in which the Individual Defendants engaged and by formulating the materially misleading disclosures Defendants made to Plaintiffs and other investors in Tyco securities.

1007.   As a proximate result of that misconduct by the Individual Defendants and the PWC Defendants, Plaintiffs have suffered substantial damages.  Plaintiffs would not have purchased their shares of Tyco stock at the prices at which those shares were purchased, would have sold their holdings in Tyco securities without suffering the massive losses they eventually suffered or would otherwise have avoided those losses had the Individual Defendants and the PWC Defendants not materially assisted the other Defendants in misleading Plaintiffs and other investors.

1008.   Plaintiffs are therefore entitled to damages in an amount to be determined at trial.

## FOURTEENTH CAUSE OF ACTION

### (Violation of the New Jersey RICO Statute Against the RICO Defendants)

1009.   Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.  This cause of action is alleged against all of the RICO Defendants.

1010.   Each of the RICO Defendants is a person within the meaning of N.J.S.A. 2C:41-1, *et seq*.

1011.   The RICO Defendants operated two enterprises: (a) the Tyco Enterprise; and (b) the Compensation Enterprise.

1012.   From 1997 until at least September of 2002, the RICO Defendants operated those enterprises by means of a pattern of racketeering activity, as that term is defined in N.J.S.A. 2C:41-1a.  In particular, the RICO Defendants engaged in at least two incidents of racketeering conduct in furtherance of both of the enterprises as that term is defined in N.J.S.A. 2C:41-1a.

1013. The racketeering activity perpetrated by the RICO Defendants was interrelated by distinguishing characteristics and did not consist of isolated incidents. The racketeering activity carried out by the RICO Defendants was intended to damage the same victims, namely the investing public, including Plaintiffs, and was characterized by the same purpose, result and participants.

1014. The incidents of racketeering conduct perpetrated by the RICO Defendants against the investing public, including Plaintiffs, between 1997 and September of 2002 include, among others, the repeated and systematic dissemination of false and misleading information concerning Tyco's financial condition and affairs, the compensation paid to the Officer Defendants and Defendant Walsh, the criminal conduct in which the Officer Defendants engaged and the related-party transactions conducted among Tyco, the Officer Defendants and Walsh. The RICO Defendants thereby perpetrated securities fraud on the investing public, including Plaintiffs, by means of fraudulent practices, theft, and mail and wire fraud.

1015. The conduct alleged in this cause of action and alleged in greater detail above constituted a violation of the New Jersey RICO Act, N.J.S.A. 2C:41-2(c).

1016. As a direct and proximate result of the RICO Defendants' racketeering activities, Plaintiffs have been damaged in an amount to be determined at trial.

## FIFTEENTH CAUSE OF ACTION

### (Aiding and Abetting Liability Under the New
### Jersey RICO Statute Against the RICO Defendants)

1017.   Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.  This claim is asserted against all of the RICO Defendants.

1018.   As is alleged above, each of the RICO Defendants has committed violations of the New Jersey RICO statute.

1019.   Each of those Defendants was aware of the participation of the other RICO Defendants in the Tyco Enterprise and the Compensation Enterprise.

1020.   Each of the RICO Defendants knowingly committed predicate acts in furtherance of both the Tyco Enterprise and the Compensation Enterprise.

1021.   By so doing, each of the RICO Defendants provided substantial assistance to the common course of fraudulent conduct pursued by the Tyco Enterprise and the Compensation Enterprise and thereby aided and abetted the other RICO Defendants in violating the New Jersey RICO statute.

1022.   As a direct and proximate result of the RICO Defendants' racketeering activities, Plaintiffs have been damaged in an amount to be determined at trial.

## SIXTEENTH CAUSE OF ACTION

### (Respondeat Superior Liability Under the New Jersey RICO Statute Against Tyco)

1023.   Plaintiffs repeat and reallege the foregoing allegations as if set forth at length herein.  This cause of action is alleged against Tyco.

1024.   At all relevant times, Tyco was aware of and was a participant in the RICO violations committed by the Individual RICO Defendants.  Tyco attempted to benefit from said

racketeering activity by, among other things, (i) issuing stock in connection with the numerous corporate acquisitions conducted by Tyco with the Company's artificially inflated stock, (ii) disseminating false and misleading statements regarding its financial condition to the investing public, and (iii) issuing stock options as compensation to its officers and employees that were artificially inflated as a result of the RICO Defendants' racketeering activity.

1025.   Between 1997 and August of 2002, Tyco knowingly participated in this pattern of racketeering activity, which involved the repeated and continuous issuance of false, misleading and fraudulent representations concerning Tyco's financial condition and affairs, the compensation paid to the Officer Defendants and Defendant Walsh, the criminal conduct in which the Officer Defendants engaged and the related-party transactions conducted among Tyco, the Officer Defendants and Walsh.

1026.   Tyco aided and abetted and participated in this scheme by misrepresenting and failing to disclose material facts.  Tyco had full knowledge of the losses that would eventually result from the racketeering activity.

1027.   As a direct and proximate result of Tyco's racketeering activities, Plaintiffs have been damaged in an amount to be determined at trial.

## SEVENTEENTH CAUSE OF ACTION

### (Conspiracy to Violate the New Jersey RICO Statute Against the RICO Defendants)

1028.   Plaintiffs repeat and reallege the foregoing allegations as if set forth at length herein.  This cause of action is alleged against all of the RICO Defendants.

1029.   As is specifically alleged above, each of the RICO Defendants committed violations of the New Jersey RICO statute in furtherance of both the Tyco Enterprise and the Compensation Enterprise.

1030.   In furtherance of the Tyco Enterprise and the Compensation Enterprise, the RICO Defendants combined and conspired with each other to defraud the investing public as set forth above.  The object of the RICO Defendants' conspiracy was to enrich themselves at the expense of the investing public, including Plaintiffs, as set forth above.

1031.   Thus, the RICO Defendants conspired with each other to violate the provisions of the New Jersey RICO statute and have therefore violated N.J.S.A. 2C:41-2(d).

1032.   The RICO Defendants' conspiracy began at least as early as 1997 and continued through at least August of 2002.

1033.   Each of the RICO Defendants knowingly participated in the conspiracy.  Each agreed to commit, did commit and/or aided and abetted the commission of racketeering acts in furtherance of the Tyco Enterprise and the Compensation Enterprise, including the use of the interstate mails and wires to implement, perpetuate and share in the fruits of their fraudulent scheme.

1034.   Each of the RICO Defendants knew that the scheme they were pursuing would enrich themselves and injure the investing public, including Plaintiffs.  Each of the RICO Defendants agreed to commit racketeering acts in furtherance of the conspiracy, including through the issuance of false, fraudulent and misleading statements regarding the compensation paid to the Individual RICO Defendants, the criminal conduct committed by those Defendants and the related-party transactions between Tyco and those Defendants.

1035.   As a direct and proximate result of the RICO Defendants' conspiracy to violate the New Jersey RICO statute, Plaintiffs have been damaged in an amount to be determined at trial.

**EIGHTEENTH CAUSE OF ACTION**

**(Against Defendant Tyco for Violation Of Section
24(c) of the New Jersey Uniform Securities Law)**

1036.   Plaintiffs repeat and reallege each of the foregoing allegations as if fully set forth herein, except any allegation that Defendants acted in a fraudulent manner or with scienter.

1037.   This Cause of Action does not sound in fraud.  All of the preceding allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Cause of Action.

1038.   This claim is asserted against Defendant Tyco for violations of section 24(c) of the New Jersey Uniform Securities Law ("Securities Law"),  N.J.S.A. § 49:3-71(c).

1039.   Defendant Tyco was the seller of the shares of Tyco common stock purchased or otherwise acquired by plaintiffs pursuant to the Registration Statements and Prospectuses identified below.

1040.   Tyco issued, caused to be issued and participated in the issuance of materially false and misleading written statements to Plaintiffs that were contained in the following Registration Statements and Prospectuses; those documents contained untrue statements of material fact and omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, as set forth in detail above:

| Type of Filing | Date |
| --- | --- |
| S-4 (CIT Group, Inc.) | 3/29/01 |
| S-4/A | 4/13/01 |
| Prospectus | 4/24/01 |
| Post-Effective Amendment No. 1 to Form S-4 | 5/24/01 |

| | |
|---|---|
| Prospectus | 6/05/01 |
| S-4 (Mallinckrodt, Inc.) | 07/12/00 |
| S-4/A | 08/09/00 |
| Prospectus | 08/11/00 |
| S-4 (Raychem Corp. ) | 06/11/99 |
| S-4/A | 07/01/99 |
| Prospectus | 07/14/99 |
| S-4 (Keystone International, Inc.) | 07/18/97 |
| S-4/A | 07/29/97 |

1041.  At the time that they purchased their Tyco shares, Plaintiffs did not know of the untruths or omissions in the foregoing documents.

1042.  Plaintiffs have sustained damages as a direct and proximate result of Defendants' conduct.

1043.  Less than two years have elapsed from the time that Plaintiffs discovered or reasonably could have discovered the facts upon which their claims are based and the time that this action was commenced.

1044.  By virtue of the foregoing conduct defendant Tyco violated Section 24(c) of the Securities Law and is liable to plaintiff for damages and other relief, including rescission.

### NINETEENTH CAUSE OF ACTION

**(Against the Individual Defendants for Violation Of
Section 24(d) of the New Jersey Uniform Securities Law)**

1045.  Plaintiffs repeat and reallege each of the foregoing allegations as if fully set
forth
herein, except any allegation that Defendants acted in a fraudulent manner or with scienter.

1046. This Cause of Action does not sound in fraud. All of the preceding allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Cause of Action.

1047. This claim is asserted against the Individual Defendants for violations of section 24(d) of the New Jersey Securities Law, N.J.S.A. §49:3-71(d).

1048. As alleged in the Eighteenth Cause of Action above, Tyco is liable to Plaintiffs under N.J.S.A. 49:3-71(c).

1049. Defendant Tyco was the seller of the shares of Tyco common stock purchased or otherwise acquired by Plaintiffs pursuant to the false and misleading Registration Statements and Prospectuses identified in Eighteenth Cause of Action above.

1050. At all material times, by virtue of their positions as senior officers and directors of Tyco, the Individual Defendants directly and indirectly controlled Tyco.

1051. The Individual Defendants cannot sustain the burden of demonstrating: (a) that they were without knowledge of the facts that show that the Registration Statements and Prospectuses were materially false and misleading; or (b) in the exercise of reasonable care they could not have known that the Registration Statements and Prospectuses were materially false and misleading.

1052. At the times that they purchased shares in Tyco, Plaintiffs were without knowledge of the wrongful conduct alleged herein and could not have reasonably discovered the wrongdoing that they now allege.

1053. Plaintiffs have sustained damages as a direct and proximate result of Defendants' conduct.

1054.  Less than two years have elapsed from the time that Plaintiffs discovered or reasonably could have discovered the facts upon which their claims are based and the time that this action was commenced.

1055.  Accordingly, Plaintiffs are entitled to damages and other relief, including rescission, as a result of these violations of the Securities Law committed by the Individual Defendants.

**TWENTIETH CAUSE OF ACTION**

**(Against Defendant Tyco for Violation Of RSA
§ 421-B:25(II) of the New Hampshire Uniform Securities Law)**

1056.  Plaintiffs repeat and reallege each of the foregoing allegations as if fully set forth herein, except any allegation that Defendants acted in a fraudulent manner or with scienter.

1057.  This Cause of Action does not sound in fraud.  All of the preceding allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Cause of Action.

1058.  This claim is asserted against defendant Tyco for violations of § 421-B:25(II) of the New Hampshire Uniform Securities Law.

1059.  Defendant Tyco sold and solicited the sale of securities to Plaintiffs pursuant to the Registration Statements and Prospectuses identified above.

1060.  Defendant Tyco made untrue statements of material fact and omitted material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading in connection with the sale of securities to Plaintiffs.

1061.   Less than six years have elapsed from the time that Plaintiffs first made payment of money to a broker-dealer or issuer of the transactions at issue in this Cause of Action.

1062.   By virtue of this conduct, defendant Tyco violated §§ 421-B:25(3)(II) and 421-B:25(II) of the New Hampshire Uniform Securities Law and is liable to Plaintiffs for damages, including all costs and reasonable attorneys' fees incurred in connection with this action.

## TWENTY-FIRST CAUSE OF ACTION

### (Against the Individual Defendants for Violation Of RSA § 421-B:25(III) of the New Hampshire Uniform Securities Law)

1063.   Plaintiffs repeat and reallege each of the foregoing allegations as if fully set forth herein, except any allegation that Defendants acted in a fraudulent manner or with scienter.

1064.   This Cause of Action does not sound in fraud.  All of the preceding allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Cause of Action.

1065.   This claim is asserted against the Individual Defendants for violations of § 421-B:25(III) of the New Hampshire Uniform Securities Law.

1066.   As alleged in the Twentieth Cause of Action above, Tyco is liable to Plaintiffs under § 421-B:25(II) of the New Hampshire Uniform Securities Law.

1067.   The Individual Defendants directly or indirectly controlled (as that term is utilized in § 421-B:25(III) of the New Hampshire Uniform Securities Law) Tyco at all material times by virtue of their positions as directors and/or senior officers of Tyco.

1068.   The Individual Defendants cannot sustain the burden of proving that they did not know, and in the exercise of reasonable care would not have known of the facts that demonstrate that Tyco's Registration Statements and Prospectuses identified above were materially false and misleading.  As such, they are jointly and severally liable to plaintiffs along with Tyco, the seller of above-mentioned securities.

1069.   At the time that they purchased shares in Tyco, Plaintiffs were without knowledge of the wrongful conduct alleged herein and could not have reasonably discovered the wrongdoing that they now allege.

1070.   Less than six years have elapsed from the time that Plaintiffs first made payment of money to a broker-dealer or issuer of the transactions at issue in this Cause of Action.

1071.   By virtue of this conduct the Individual Defendants violated § 421-B:25(3)(III) of the New Hampshire Uniform Securities Law and are liable to Plaintiffs for damages, including all costs and reasonable attorneys' fees incurred in connection with this action.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray for judgment as follows:

A.   Declaring the conduct of the Defendants to be in violation of law as set forth herein;

B.   Awarding Plaintiffs compensatory damages;

C.   Awarding Plaintiffs rescissionary damages;

D.   Awarding Plaintiffs punitive damages;

E.   Awarding Plaintiffs statutory damages;

F.   Awarding Plaintiffs treble damages;

F.      Awarding Plaintiffs' reasonable attorneys' fees, experts' fees, interest and cost of suit; and

G.      Such other and further relief as this Court may deem just and proper.

*JURY TRIAL DEMANDED*

Plaintiffs hereby demand a trial by jury.


Dated: March 24, 2003                    SHALOV STONE & BONNER LLP


By: _____
      Patrick L. Rocco
      James P. Bonner
485 Seventh Avenue, Suite 1000
New York, New York 10018
(212) 239-4340
Fax (212) 239-4310

RIKER, DANZIG, SCHERER, HYLAND
  & PERRETTI LLP
Gerald A. Liloia
Michael P. O'Mullan
Headquarters Plaza
One Speedwell Avenue
Morristown, New Jersey 07962-1981
(973) 538-0800
Fax: (973) 538-1984

**Attorneys for Plaintiffs**

OF COUNSEL:

RANSMEIER & SPELLMAN, PROFESSIONAL
  CORPORATION
R. Matthew Cairns
One Capitol Street
P.O. Box 600
Concord, New Hampshire 03302-0600
Tel:  603-228-0477
Fax: 603-224-2780